Kassia Siegel (AK Bar # 0106044)
Julie Teel Simmonds (*pro hac vice pending*)
Kristen Monsell (*pro hac vice pending*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7100
F: (510) 844-7150
E: ksiegel@biologicaldiversity.org
kmonsell@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

*Attorneys for Plaintiffs Cook Inletkeeper and
Center for Biological Diversity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>    Plaintiffs,<br><br>    v.<br><br>WILBUR ROSS, Secretary of Commerce; JIM BALSINGER, Regional Administrator of National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE,<br><br>    Defendants. | Civil Action No. 3:19-cv-00238-HRH<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(5 U.S.C. §§ 701-06; 16 U.S.C. §§ 1361-1421; 16 U.S.C. §§ 1531-1544; 42 U.S.C. §§ 4231-4370) |

## INTRODUCTION

1.      In this case, Plaintiffs Cook Inletkeeper and Center for Biological Diversity

("Plaintiffs") challenge a regulation that permits the oil and gas company Hilcorp Alaska

LLC ("Hilcorp") to harm and harass critically endangered Cook Inlet beluga whales and other marine mammals incidental to oil and gas exploration and development activities in Cook Inlet, including 2-dimensional (2D) and 3-dimensional (3D) seismic airgun blasting.

2.     Seismic surveys detect oil and gas reserves beneath the ocean floor by blasting the water column using dozens of airguns that generate some of the loudest sounds humans produce in the ocean. These seismic surveys can disturb, injure, and even kill animals across the marine ecosystem, from zooplankton and fish to dolphins and whales.

3.     Along with 2D and 3D seismic surveys, Hilcorp's activities will include geohazard surveys, pile driving, well drilling, vessel activity, and other sources of harmful noise pollution.

4.     Marine mammals depend on sound for all their essential life functions, and the noise generated by these activities can harm them in a variety of ways. Noise can, for example, cause auditory injury in marine mammals, avoidance or displacement from important habitats, and masking that impairs their ability to communicate, mate, find prey, and detect predators.

5.     The National Marine Fisheries Service ("Fisheries Service") finalized regulations authorizing Hilcorp to "take" (i.e., harm and harass) eleven species of marine mammals in Cook Inlet, Alaska over a five-year period: Eastern Pacific gray whales; Northeastern Pacific fin whales; Alaska minke whales; Western North Pacific humpback whales; Cook Inlet beluga whales; Alaska Resident killer whales; Alaska Transient killer whales;

Gulf of Alaska harbor porpoise; Alaska Dall's porpoise; Western Steller sea lion; and Cook Inlet/Shelikof harbor seals.

6.      In its summary of planned activities, the Fisheries Service's regulation anticipates over 3,000 days of activity, including up to 240 days of exploratory well activity per year for three years, 180 days of Iniskin Peninsula exploration and development construction per year for three years, over 100 days of geohazard surveys in three locations, 150 days of Granite Point production drilling and geohazard surveys, 30 days of 2D seismic testing, and 60 days of around-the-clock 3D seismic exploration activity, with the airguns firing every 4.5 to 6 seconds, amounting to up to 800 seismic airgun blasts per hour.

7.      In total, the Fisheries Service estimates Hilcorp's activities will harm marine mammals an estimated 12,663 times in just one year of this five-year regulation.

8.      Scientific experts, including the federal Marine Mammal Commission, have repeatedly warned that noise pollution from oil and gas activities in the Inlet is likely to push Cook Inlet beluga whales closer to extinction. The Commission has advised that such projects, including the incidental take regulations at issue in this case, should not be authorized while this highly imperiled species continues to decline.

9.      Indeed, the Fisheries Service has itself recently recognized that the Cook Inlet beluga whale is one of the most endangered marine mammals on the planet and that "immediate, targeted efforts are vital for stabilizing their populations and preventing

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH         3

Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 3 of 42

their extinction." Species in the Spotlight Priority Actions: 2016-2020 Cook Inlet Beluga Whale *Delphinapterus leucas*, at 1.

10.     Its 2016 Recovery Plan for the Cook Inlet beluga whale identified reducing the threat of anthropogenic noise and the cumulative effects of multiple stressors as the highest priority for stabilizing the population and preventing its extinction. Only a category for "catastrophic events" such as oil spills was similarly ranked. National Marine Fisheries Service, Recovery Plan for the Cook Inlet Beluga Whale (*Delphinapterus leucas*) (December 2016), at xiii.

11.     Effects on the other vulnerable marine mammal species in Hilcorp's project area, including endangered fin whales, endangered humpback whales, and endangered Steller sea lions, could also be severe.

12.     Despite this, the Fisheries Service issued regulations allowing Hilcorp to conduct its oil and gas activities in Cook Inlet. The agency did so by making arbitrary and unlawful findings under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361–1407, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231–4370, and failing to actually analyze the impacts of the authorized take as required by law.

13.     Accordingly, Plaintiffs seek an order declaring the Fisheries Service's incidental take regulations to be arbitrary, capricious, and in violation of the MMPA, ESA, and NEPA, and vacating the unlawful regulation and accompanying biological opinion, environmental assessment, and finding of no significant impact.

*Cook Inletkeeper, et al., v. Ross, et al*.
Complaint
Case No. 3:19-cv-00238-HRH                                    4
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 4 of 42

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States) and 28 U.S.C. § 1346 (actions against the United States). An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–02. Judicial review is available under the Administrative Procedure Act. 5 U.S.C. §§ 701–06.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the events and omissions giving rise to the claim occurred in this district.

## PLAINTIFFS

16.     Plaintiff COOK INLETKEEPER is a private nonprofit organization dedicated to protecting the vast Cook Inlet watershed and the life it sustains. Since its inception in 1995, Cook Inletkeeper has relied on research, education, and advocacy to become a leader in watershed-based protections in the rich but threatened streams, lakes, and estuaries of the Cook Inlet watershed. Among other things, Cook Inletkeeper was lead petitioner in the effort to list the Cook Inlet beluga whale as endangered under the ESA, and it has led and supported citizen-based science efforts to count, identify, and better understand the Cook Inlet beluga whale. Additionally, Cook Inletkeeper focuses a considerable amount of its work on protecting wild salmon habitat to ensure beluga whales and other marine mammals in the Inlet have sufficient food sources.

17.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a nonprofit corporation headquartered in Tucson, Arizona, with offices across the country

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                    5
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 5 of 42

and in Baja California Sur, Mexico. The Center has over 67,300 members throughout the United States, including Alaska. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats both in the United States and abroad. The Center has been actively involved in protecting Alaska's wildlife since the early 1990s. The Center's Oceans Program focuses specifically on conserving marine wildlife and habitat. In pursuit of this mission, the Center has been actively involved in securing protections for imperiled marine mammals, including Cook Inlet beluga whales. The Fisheries Service listed the Cook Inlet belugas as endangered in 2008 in response to a legal petition filed by the Center and Cook Inletkeeper. The Center also has engaged in longstanding efforts to protect Cook Inlet beluga whales and other Alaska-dwelling species from water and noise pollution, disturbance from vessels, the risk of offshore oil drilling activities and spills, and other threats.

18.    Plaintiffs bring this action on behalf of themselves and their members. Plaintiffs and their members live near and regularly visit Cook Inlet to observe, photograph, study, and otherwise enjoy critically endangered Cook Inlet beluga whales, gray whales, fin whales, minke whales, humpback whales, killer whales, porpoises, sea lions, harbor seals, and their habitat. Plaintiffs and their members have an interest in the survival, recovery, and health of these species and their habitat. For example, Plaintiffs' members regularly walk along, sail, and go whale watching to enjoy the marine habitat and look for and photograph Cook Inlet beluga whales and their habitat. Plaintiffs and their

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                    6
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 6 of 42

members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from the presence of Cook Inlet marine mammals and their habitat. Plaintiffs' members and staff intend to continue to frequently engage in these activities and to use and enjoy Cook Inlet marine mammal habitat in the future.

19.     The Fisheries Service's failure to comply with federal law, and the resulting harm to the marine environment, including the disturbance, injury, and death of marine mammals and other marine life, irreparably harms the interests of Plaintiffs and their members.

20.     Plaintiffs' injuries will be redressed by the relief they request. Plaintiffs have no other adequate remedy at law.

## DEFENDANTS

21.     Defendant WILBUR ROSS is named in his official capacity as the Secretary of the U.S. Department of Commerce. The Secretary is vested with authority over and the duty to conserve the marine mammals at issue in this case under the ESA and MMPA and is the official ultimately responsible under federal law for ensuring that the actions and decisions of the Department comply with all applicable laws and regulations, including the MMPA, ESA, and NEPA.

22.     Defendant JIM BALSINGER is named in his official capacity as the Regional Administrator of the Fisheries Service for the Alaska Region. Regional Administrator Balsinger has the responsibility at the regional level for implementing and fulfilling the agency's duties under the MMPA, ESA, and NEPA.

23.     Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the

U.S. Department of Commerce. The Fisheries Service is the agency to which the

Secretary of Commerce has delegated the authority to manage marine mammals under

the MMPA and ESA, including whales, dolphins, porpoises, seals, and sea lions.

## LEGAL BACKGROUND

### Marine Mammal Protection Act

24.     Recognizing that "certain species and population stocks of marine mammals are,

or may be, in danger of extinction or depletion as a result of man's activities," Congress

passed the MMPA in 1972 to ensure that marine mammals are "protected and

encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6).

25.     To promote its objectives, the MMPA establishes a general moratorium on the

"taking" of marine mammals, 16 U.S.C. § 1371(a) and expressly prohibits the

unauthorized "take" of a marine mammal by any person. *Id*. § 1372(a)(1), (2).

26.     The MMPA broadly defines "take" as "to harass, hunt, capture, or kill, or attempt

to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). And it defines

"harassment" to include any act that has the potential to (1) "injure a marine mammal"

(known as Level A harassment); or (2) "disturb a marine mammal" by disrupting

behavioral patterns such as migration, breeding, feeding, or sheltering (known as Level

B harassment). *Id.* § 1362(18)(A).

27.     The MMPA provides several narrow exceptions to the moratorium on takings. *Id*.

§1371(a)(5). As is relevant here, the MMPA authorizes the Fisheries Service to

promulgate regulations, with a maximum duration of five years, that enable U.S. citizens engaged in a specified activity other than commercial fishing to take marine mammals incidental to that activity. 16 U.S.C. §1371(a)(5)(A); 50 C.F.R. §§ 216.101–108.

28.     To meet these goals,, Congress carefully circumscribed the ability of the agencies to authorize such incidental takings. First, the Fisheries Service can authorize the take of only "small numbers of marine mammals of a species or population stock." 16 U.S.C. § 1371(a)(5)(A)(i).

29.     Second, the total of authorized take must have no more than "a negligible impact on such species or stock" and must "not have an unmitigable adverse impact on the availability of such species or stock for taking for subsistence uses." *Id*. § 1371(a)(5)(A)(i)(I), (II).

30.     Third, if the Fisheries Service authorizes a take, the agencies must also prescribe "means of effecting the least practicable impact" on the marine mammal species or stock and their habitat, "paying particular attention to rookeries, mating grounds, and areas of similar significance" and must prescribe monitoring and reporting requirements. *Id*. § 1371(a)(5)(A)(i)(II).

31.     The Fisheries Service's incidental take regulations must be "based on the best available information." 50 C.F.R. § 216.105(c).

32.     The Fisheries Service regulations implementing the MMPA define a negligible impact as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through

effects on annual rates of recruitment or survival." *Id*. § 216.103. The regulations also define "small numbers" as "a portion of a marine mammal species or stock whose taking would have a negligible impact on that species or stock." *Id*. The Ninth Circuit has struck down the regulatory definition of "small numbers" as inconsistent with the MMPA.

33.    A "Letter of Authorization" is required to conduct activities under any regulations established by the Fisheries Service under section 1371(a)(5)(A). *Id*. § 216.106(a). The Fisheries Service will issue a Letter of Authorization "based on a determination that the level of taking will be consistent with the findings made for the total taking allowable under the specific regulations." *Id.* § 216.106(b).

34.    To ensure all decisions related to marine mammals are made based on the best scientific information, Congress established the Marine Mammal Commission and directed it to make recommendations to the Fisheries Service on matters related to marine mammals. 16 U.S.C. §§ 1401–02. The MMPA requires that any deviation from the Marine Mammal Commission's recommendations must be explained in detail. *Id.* § 1402(d).

## Endangered Species Act

35.    In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction" and that these species are "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(2), (3).

*Cook Inletkeeper, et al., v. Ross, et al*.
Complaint
Case No. 3:19-cv-00238-HRH                                        10
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 10 of 42

36.     The ESA protects imperiled species by listing them as "endangered" or "threatened." A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

37.     The ESA seeks "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such . . . species." *Id*. § 1531(b).

38.     The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." *Id*. § 1532(3). Accordingly, the ultimate goal of the ESA is not only to prevent listed species from going extinct, but also to recover these species to the point where they no longer require ESA protection.

39.      To accomplish these goals, Section 4 of the ESA requires NMFS to designate "critical habitat" for listed species. *Id*. § 1533(a)(3)(A). Critical habitat includes specific areas occupied by the species with "physical or biological features . . . essential to the conservation of the species and . . . which may require special management considerations or protection," as well as specific areas unoccupied by the species that "are essential for the conservation of the species." *Id*. § 1532(5)(A).

*Cook Inletkeeper, et al., v. Ross, et al*.
Complaint
Case No. 3:19-cv-00238-HRH                                                     11
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 11 of 42

40.     Section 9 of the ESA generally makes it unlawful for "any person" to "take" an

endangered species. 16 U.S.C. § 1538(a)(1)(B), (C). A "person" includes private parties

as well as local, state, and federal agencies. *Id.* § 1532(13). "Take" is defined broadly

under the ESA to include harassing, harming, wounding, killing, or capturing a protected

species (or attempting to engage in such conduct), either directly or by degrading its

habitat enough to impair essential behavior patterns. *Id.* § 1532(19); 50 C.F.R. §

222.102. The ESA prohibits the acts of parties directly causing a take as well as the acts

of third parties, such as governmental agencies, whose acts cause such taking to occur.

16 U.S.C. § 1538(g).

41.     Additionally, Section 7(a)(2) of the ESA requires federal agencies to "insure that

any action authorized, funded, or carried out by such agency . . . is not likely to

jeopardize the continued existence of any" listed species or result in the "destruction or

adverse modification" of designated critical habitat. *Id.* § 1536(a)(2).

42.     To comply with Section 7(a)(2)'s substantive mandate, federal agencies must

consult with the Fisheries Service when their actions "may affect" a listed marine

species. *Id.* The agencies must utilize the "best scientific and commercial data available"

during the consultation process. *Id.*; 50 C.F.R. § 402.14(f), (g)(8).

43.     Where the Fisheries Service is also the acting agency, (as in this case where the

agency promulgated incidental take regulations under the MMPA), and its actions affect

species under its own jurisdiction, the Fisheries Service must undertake internal

consultation.

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                    12
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 12 of 42

44.     Where formal consultation is required, the Fisheries Service, in its capacity as the expert consulting agency, develops a biological opinion that determines if the agency action is likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(a)(2). The biological opinion must include a summary of the information upon which the opinion is based and consider whether the aggregate effects of the factors considered in the environmental baseline, effects of the action, and cumulative effects, when viewed against the status of the species, are likely to jeopardize the continued existence of the species. 50 C.F.R. §§ 402.02, 402.14(g).

45.     "Effects of the action" include both direct and indirect effects of an action "that will be added to the environmental baseline." *Id.* § 402.02. The "environmental baseline" includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* "Cumulative effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.*

46.     Thus, in issuing a biological opinion, the Fisheries Service must consider not just the isolated share of responsibility for impacts to the species traceable to the activity that is the subject of the biological opinion, but also the effects of that action when added to all other activities and influences that affect the status of that species.

47.    After the Fisheries Service has added the direct and indirect effects of the action to the environmental baseline and cumulative effects, it must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species." *Id*. § 402.14(h)(3).

48.    A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id*.

49.    If the Fisheries Service determines that the agency action is likely to jeopardize the species, the opinion may specify reasonable and prudent alternatives that will avoid jeopardy and allow the agency to proceed with the action. 16 U.S.C. § 1536(b)(3). The agencies may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13.

50.    A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in take incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4). The incidental take statement must specify the amount or extent of incidental taking on such listed species, "reasonable and prudent measures" that the Fisheries Service considers necessary or appropriate to minimize such impact, and set forth "terms and conditions"

that must be complied with by the action agency to implement the reasonable and prudent measures. *Id*.; 50 C.F.R. § 402.14(i).

51.    Additionally, when the listed species to be incidentally taken are marine mammals, the take must first be authorized by the Fisheries Service pursuant to the MMPA, and the incidental take statement must include any additional measures necessary to comply with the MMPA take authorization. 16 U.S.C. § 1536(b)(4)(C).

52.    The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under Section 9 of the ESA. 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

## National Environmental Policy Act

53.    NEPA, the nation's "basic national charter for protection of the environment," seeks to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," and to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(a)–(c).

54.    To reach these goals, federal agencies must prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

55.    The Council on Environmental Quality has promulgated regulations implementing NEPA, which are binding on all federal agencies. 40 C.F.R. § 1507.1.

56.    The regulations specify the factors an agency must consider in determining

whether an action may significantly affect the environment and warrant preparation of

an EIS. *Id*. § 1508.27. Specifically, whether an action may have "significant" impacts on

the environment is determined by considering the "context" and "intensity" of the

action. *Id*. In considering the "context" of the action, the significance of the project

"must be analyzed in several contexts such as society as a whole (human, national), the

affected region, the affected interests, and the locality." *Id*. § 1508.27(a).

57.    The "intensity" of the action is determined by considering the ten factors

enumerated in the regulations, which are: (1) impacts that may be both beneficial and

adverse; (2) the degree to which the proposed action affects public health or safety; (3)

unique characteristics of the geographic area such as proximity to historic or cultural

resources, park lands, or ecologically critical areas; (4) the degree to which the effects on

the human environment are likely to be highly controversial; (5) the degree to which the

possible effects on the human environment are highly uncertain or involve unique or

unknown risks; (6) the degree to which the action may establish a precedent for future

actions with significant effects; (7) whether the action is related to other actions with

individually insignificant but cumulatively significant impacts; (8) the degree to which

the action may cause loss or destruction of significant scientific, cultural, or historical

resources; (9) the degree to which the action may adversely affect a species listed under

the ESA or its designated critical habitat; and (10) whether the action threatens a

*Cook Inletkeeper, et al., v. Ross, et al*.
Complaint
Case No. 3:19-cv-00238-HRH                                        16
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 16 of 42

violation of federal, state, or local environmental laws. *Id*. § 1508.27(b). The presence of just one of these factors may be sufficient to require preparation of an EIS.

58.     NEPA's regulations provide that an agency may first prepare an Environmental Assessment ("EA") aimed at determining whether the environmental impact of a proposed action may be "significant," warranting preparation of an EIS. 40 C.F.R. § 1501.3. If, pursuant to the EA, an agency determines that an EIS is not required, it must issue a "Finding of No Significant Impact" ("FONSI") that presents the reasons why the proposed agency action will not have a significant impact on the human environment. *Id*. §§ 1501.4(e), 1508.13. The EA must "provide sufficient evidence and analysis for determining whether" a FONSI is sufficient to satisfy NEPA. *Id*. § 1508.9(a)(1).

59.     An agency may only issue a FONSI for actions with no significant impact on the human environment. *See id*. § 1508.13. If an action may have a significant effect on the environment, or if there are substantial questions as to whether it may, an EIS must be prepared.

60.     Both EAs and EISs must specify the underlying purpose and need to which the agency is responding in proposing the action. *Id*. §§ 1502.13, 1508.9(b).

61.     Both EAs and EISs must also "describe the environment of the areas to be affected or created by the alternatives under consideration." *Id*. § 1502.15.

62.     Additionally, EAs and EISs must discuss a proposed action's direct, indirect, and cumulative effects. 40 C.F.R. §§ 1502.16, 1508.9(b). Direct effects are "caused by the action and occur at the same time and place," whereas indirect effects are "caused by the

action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8. Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id*. § 1508.7.

63.     EAs and EISs must also include a reasonable range of alternatives, 42 U.S.C. § 4332(2)(C)(iii), (E), 40 C.F.R. § 1508.9(b), and provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

64.     "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*. § 1500.1(b).

**Administrative Procedure Act**

53.     Judicial review of federal agency action is governed by the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701–706.

54.     Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

55.     Also under the APA, courts "shall. . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." *Id*. § 706(2)(A), (D).

# FACTS

## Cook Inlet, Alaska

65.     Cook Inlet is a semi-enclosed tidal estuary in southcentral Alaska bounded to the east by the Kenai peninsula. It is fed by three rivers: the Susitna; the Matanuska; and the Kenai. Cook Inlet's watershed includes nine terrestrial ecosystems, seven national parks and wildlife refuges, and four state parks. The watershed includes the alpine tundra of the Denali Wilderness, coastal rainforests of the southern Kenai Peninsula, and wetlands of the Susitna, Matanuska, and Kenai river deltas.

66.     The Cook Inlet watershed is a sensitive and unique environment that provides habitat for magnificent wildlife, including all five species of wild Pacific salmon, herring, scallops, halibut, and several other species of bottom fish, brown and black bears, moose, caribou, migratory birds, wolves, humpback whales, beluga whales, killer whales, sea otters, and sea lions.

67.     The Cook Inlet watershed is also home to almost two-thirds of Alaska's population. The city of Anchorage is located near the head of Cook Inlet, which receives the Susitna River, and the cities of Kenai and Homer are also located along the Inlet. Native villages of the Cook Inlet region include Eklutna, Knik, Salamatof, Tyonek, Chickaloon, Ninilchik, and Seldovia.

68.     Cook Inlet oil production began in the 1950s. It peaked at around 230,000 barrels per day in 1970 and has fallen to 15,000 barrels per day in 2016. The aging oil and gas

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                    19
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 19 of 42

fields and aging industry infrastructure, much of it dating back to the 1950s and 1960s, led many to believe the industry would phase out operations in the Inlet.

69.     However, in 2017, Hilcorp bought fourteen new federal leases covering about 76,615 acres in Cook Inlet. This was the first time since 1997 that a company had invested in federal oil and gas leases in Cook Inlet. All other existing federal leases in Cook Inlet expired several years ago with no oil fields ever developed on them.

70.     Under the federal Bureau of Ocean Energy Management's 2017–2022 Outer Continental Shelf Oil and Gas Leasing Plan, another Cook Inlet lease sale is scheduled in 2021.

71.     Just before the 2017 lease sale, Hilcorp reported a natural gas leak at its operations in Cook Inlet. The source of the leak was later identified as an underwater pipeline that had been leaking gas since December. The company was unable to repair the leak for nearly four months due to broken ice, tidal flows, and limited daylight.

72.     In recent years, federal regulators have warned the company to improve maintenance of its gas pipelines, and state regulators have repeatedly cited Hilcorp for violating safety regulations for its oil and gas operations in the state. For example, in 2016, the Alaska Oil and Gas Conservation Commission documented more than two dozen violations over a 3.5-year period at Hilcorp's operations in Alaska—so many that the agency concluded that "disregard for regulatory compliance is endemic to Hilcorp's approach to its Alaska operations."  AOGCC, Decision and Order Re: Failure to Test

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                                      20
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 20 of 42

BOPE After Use, Milne Point Unit I-03, PTD 1900920, Other Order 109, Docket No. OTH-15-029 at 3 (May 3, 2016).

73.     Hilcorp is expanding its operations in other parts of Alaska as well. In August 2019, BP announced that it is selling all its Alaska operations to Hilcorp.

### Marine Mammals in the Project Area

74.     According to the Fisheries Service, the marine mammals in the vicinity of Hilcorp's oil and gas exploration and development activities are Cook Inlet beluga whales, harbor seals, killer whales, harbor porpoises, gray whales, fin whales, minke whales, Dall's porpoises, humpback whales, California sea lions, and Steller sea lions.

75.     As the agency has acknowledged, "[h]earing is the most important sensory modality for marine mammals underwater, and exposure to anthropogenic sound can have deleterious effects." Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to Oil and Gas Activities in Cook Inlet, Alaska Final Rule; issuance of Letters of Authorization (LOA) ("Final Rule"), 84 Fed. Reg. 37,422, 37,466 (July 31, 2019).

76.     High intensity noise can contribute to a range of damaging impacts on wildlife. Seismic surveys can harm marine mammals through hearing impairment; physiological changes like stress; behavioral impacts such as avoidance or displacement from important habitats; masking that impairs their ability to communicate, find prey, or detect predators; and harm to prey species like fish, invertebrates, and zooplankton.

77.     Due to the acoustics of sound in water, seismic surveys affect large areas. A single seismic survey has been shown to cause endangered fin and humpback whales to stop vocalizing—a behavior essential to breeding and foraging—and other baleen whales to abandon habitat over an area at least 100,000 square nautical miles.

78.     Other activities associated with oil and gas exploration, including pipe and pile driving and geohazard and geotechnical surveying using sub-bottom profilers, can harm and harass marine mammals by displacing them from key foraging habitat, harming their prey, impairing hearing, masking communication and echolocation vocalizations, changing swimming and surfacing behaviors, interfering with other essential behaviors, and causing physiological stress.

79.     Some odontocetes, such as beluga whales, are highly sensitive to a range of low-frequency and low-frequency-dominant anthropogenic sounds, including seismic airgun noise, which has been shown to displace belugas from near-coastal foraging areas.

80.     Each stock of beluga whales is unique and geographically isolated from the others. Cook Inlet beluga whales are particularly vulnerable. The Cook Inlet stock of beluga whale in Alaska is critically endangered with only 328 individuals remaining from its historical abundance estimate of 1,300 animals. The Fisheries Service estimates that the population is currently declining at a rate of 0.5 percent per year.

81.     Beluga whales are known as "the canaries of the sea," easily recognized by their range of vocal sounds, white color, social nature, "melon heads," and ability to move between salt and fresh water.

82.     They live year-round in Cook Inlet and can be found throughout the Inlet at any

time of year.

83.     Cook Inlet beluga whales eat a range of foods, including octopus, shellfish, snails,

and fish such as euchalon and salmon. They return to their birth area each summer to

feed, breed, and calve.



A beluga mother and calf pair near the Beluga River. *Photo: Hollis Europe/Jacob Barbaro, NOAA Fisheries*

84.     The Fisheries Service has noted that belugas make sounds across some of the

widest frequency bands and are one of just five non-human animal species where there

is convincing evidence of frequency modulated vocal learning.

85.     The Fisheries Service has recognized that "Cook Inlet beluga whales are

vulnerable to harassment and injury from human-caused sources of noise" and that

"[r]educing in-water noise is an especially important focal effort due to the importance

of hearing to the Cook Inlet belugas' survival in the extraordinarily turbid waters of Cook Inlet." Fisheries Service Cook Inlet Beluga Whale 5-Year Action Plan at 2.

86.     The Fisheries Service designated the whales as "depleted" under the MMPA in 2000 and "endangered" under the ESA in 2008. There has been no subsistence hunting of the species since 2005. However, the population has shown no signs of recovery.

87.     In 2011, the Fisheries Service designated almost 2 million acres of critical habitat for the whale. In doing so, the agency recognized that "[b]eluga whales are known to be among the most adept users of sound of all marine mammals, using sound rather than sight for many important functions, especially in the highly turbid waters of upper Cook Inlet. Beluga whales use sound to communicate, locate prey, and navigate, and may make different sounds in response to different stimuli." Endangered and Threatened Species: Designation of Critical Habitat for Cook Inlet Beluga Whale; Final Rule, 76 Fed. Reg. 20,180, 20,203 (April 11, 2011).

88.     Due to the importance of quiet areas for the whales' survival and recovery, the Fisheries Service designated "[w]aters with in-water noise below levels resulting in the abandonment of critical habitat areas by Cook Inlet beluga whales" as one of five physical or biological features essential to the conservation of this species. *Id.*

89.     In 2014, the Fisheries Service acknowledged the precarious state of Cook Inlet beluga whales when it proposed issuing a programmatic environmental impact statement that would analyze the multitude of anthropogenic activities (including the expected increase in activities) over multiple years in state and federal waters in Cook Inlet,

expressing "concern[]" about the "lack of recovery" of the whales. Notice of Intent To Prepare an Environmental Impact Statement on the Issuance of Take Authorizations in Cook Inlet, Alaska, 79 Fed. Reg. 61,616, 61617 (Oct. 14, 2014). In 2017, the Fisheries Service postponed this effort citing funding shortages and a reduced number of incidental take authorization requests.

90.    In 2015, Cook Inlet belugas became one of the Fisheries Service's eight "Species in the Spotlight," which prioritizes those species at the highest risk of extinction. The Fisheries Service considers these Species in the Spotlight a "recovery priority #1." A recovery priority #1 species is one whose extinction "is almost certain in the immediate future because of a rapid population decline or habitat destruction, whose limiting factors and threats are well understood and the needed management actions are known and have a high probability of success, and is a species that is in conflict with construction or other developmental projects or other forms of economic activity." Species *in the* Spotlight Priority Actions: 2016–2020 Cook Inlet Beluga Whale *Delphinapterus leucas*, at 1, n.1.

91.    The Fisheries Service developed five-year action plans for each of the eight species that outline short-term efforts vital for stabilizing their populations and preventing their extinction.

92.    The first of the "Key Actions Needed 2016–2020" in the Fisheries Service's Species on the Spotlight Cook Inlet Beluga Whale 5-Year Action Plan is "Reduce the Threat of Anthropogenic Noise in Cook Inlet Beluga Whale Habitat." *Id.* at 4. The plan

seeks to accomplish this, in part, through "the development, testing, and routine incorporation of sound-reducing technologies, especially for major noise-producing activities." *Id.* at 4.

93.     In December 2016, the Fisheries Service published a Recovery Plan for the Cook Inlet beluga. Of ten threats identified in the Plan, the Fisheries Service ranks just three in the category of "High Relative Concern:" (1) Catastrophic events (e.g., natural disasters; spills; mass strandings); (2) Cumulative effects of multiple stressors; and (3) Noise.

94.     The Plan notes that Cook Inlet beluga whale's "high auditory sensitivity . . . and dependence upon sound to navigate, communicate, and find prey and breathing holes in the ice make belugas vulnerable to noise pollution, which may mask beluga signals or lead to temporary or permanent hearing impairment." Recovery Plan at II-52. The Plan summarized that noise threats to the belugas can also cause habitat degradation, is localized and range-wide, is continuous, intermittent, and seasonal, is increasing overall, and is of high relative concern.

95.     The Plan identifies sources of noise in Cook Inlet from oil and gas development, including seismic activity, pile driving, vessel traffic, air traffic, drilling, discharge of wastewater and drilling muds, habitat loss from the construction of oil and gas facilities, and contaminated food sources and/or injury resulting from an oil spill or natural gas blowout. It noted that studies on beluga whales specifically have revealed that anthropogenic noise can impair beluga hearing capabilities, mask the ability of whales to

hear specific sounds, result in belugas changing their vocal behaviors, and displace

whales from their habitat.

96.    It notes that the synergistic effects of noise and contaminants can temporarily and

permanently damage hearing and is "of increasing concern," Recovery Plan at III-8, and

concludes that "[i]n the long term, anthropogenic noise may induce chronic effects

altering the health of individual CI belugas, which in turn have consequences at the

population level (i.e., decreased survival and reproduction)." Recovery Plan at III-13.

Additionally, "[a]lthough the effects on CI belugas of the diverse types of anthropogenic

noises occurring in their habitat have not been analyzed and are currently unknown,

there is enough evidence from other odontocete species (and for some effects in other

beluga populations) to conclude that the potential for a negative impact to CI beluga

recovery is of high relative concern." *Id.*.

97.    The Marine Mammal Commission has repeatedly advised that the

Fisheries Service defer issuance of incidental take authorizations and regulations until

the Fisheries Service has better information on the cause or causes of the decline of

Cook Inlet beluga whales, and, as part of the Fisheries Service's small numbers and

negligible impact determinations, has a reasonable basis for determining that

authorizing additional takes by harassment would not contribute to or exacerbate that

decline.

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                    27
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 27 of 42

## The Fisheries Service's Incidental Take Regulations

98.    On April 17, 2018, the Fisheries Service received an application from Hilcorp requesting authorization to take marine mammals incidental to noise exposure resulting from oil and gas exploration, development, production, and decommissioning activities in Cook Inlet, Alaska, from May 2019 to April 2024, including 2D and 3D seismic surveys, geohazard surveys, vertical seismic profiling, vibratory sheet pile driving, and drilling of exploratory wells.

99.    Three Fisheries Service decision documents and analyses required to authorize Hilcorp's activities are at issue in this case: (1) the final incidental take regulations issued under the MMPA; (2) the Biological Opinion for the take regulations issued under the ESA; and (3) the EA and FONSI issued for the take regulations under NEPA.

100.    On July 31, 2019, the Fisheries Service issued incidental take regulations through a Final Rule for Takes of Marine Mammals Incidental to Oil and Gas Activities in Cook Inlet, Alaska over the course of five years (July 30, 2019-July 30, 2024) and a one-year Letter of Authorization to Hilcorp.

101.    The Fisheries Service's incidental take regulations states that the use of the sound sources described in Hilcorp's application may result in the take of marine mammals through disruption of behavioral patterns and auditory injury and thus necessitated an incidental take authorization.

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                                                 28
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 28 of 42

102.    The geographic area of the activities covers approximately 2.7 million acres in Cook Inlet and includes land and adjacent waters in Cook Inlet including both State of Alaska and federal Outer Continental Shelf waters.

103.    The Fisheries Service incidental take regulations provide an estimate of the number of takes authorized to inform its "small numbers" and "negligible impact" determinations.

104.    To estimate take, the Fisheries Service considers (1) acoustic thresholds for marine mammals above which they will be behaviorally harassed or incur permanent hearing impairment; (2) the area that will be "ensonified" above these acoustic thresholds in a day; (3) the density of marine mammals within these areas; and (4) the number of days of activities.

105.    The Fisheries Service counted every take estimated to occur over the course of a single 24-hour period as one take. In other words, marine mammals could be exposed multiple times per day by one or more authorized activities, and the Fisheries Service considered this just one take.

106.    The Fisheries Service final regulations and the Letter of Authorization issued to Hilcorp include two rows for take of Cook Inlet beluga whales. One is titled "Beluga whale (NMFS)" and authorizes 35 Level B takes for a single year. The second is "Beluga whale (Goetz)," which also purports to authorize 35 Level B takes for one year. The qualifiers "NMFS" and "Goetz" are used to indicate that the Fisheries Service

applied two different models to estimate Cook Inlet beluga whale density and estimate take. This could be understood to authorize a total of 70 whales in any single year.

107. However, in its responses to public comments, the Fisheries Service stated "[f]or Cook Inlet beluga whales, the authorized take, by Level B harassment only, accounts for 11 percent of the population annually, which NMFS also considers small." 84 Fed. Reg. at 37,458. This indicates that the Service intended to cap authorized take of Cook Inlet beluga whales at 35 per year.

108. Assuming that is the Fisheries Service's intent, its table of "Estimated maximum exposures that may be authorized for each species in a single year," demonstrates it is authorizing a maximum of 12,628 takes of marine mammals from Level A and Level B harassment each year.

109. This amounts to a maximum five-year total authorization of 63,140 takes of marine mammals from Level A and Level B harassment, including 175 beluga whales or 53 percent of the population.

110. In its "Estimated number of Level A Harassment exposures per activity and location over five years" the Fisheries Service estimated a maximum of 360 Level A takes over five years, including 13 minke whales, 2 fin whales, 1 Dall's porpoise, 40 harbor porpoises, 303 harbor seals, and 1 Steller sea lion.

111. In its calculation of "Estimated number of Level B Harassment exposures per activity and location over five years," the Fisheries Service estimated a maximum of 13,847 Level B takes over five years, including 55 "Beluga whale Goetz" and 30

"Beluga whale NMFS." In this instance, the Fisheries Service indicates that these two estimates should be added by defining each figure geographically, with Beluga whale NMFS defined as "LCI-Lower Cook Inlet Wells" and Beluga whale Goetz as "NCI—North Cook Inlet well." Final Rule, 84 Fed. Reg. at 37,484. This totals 85 Cook Inlet beluga whales taken over five years, which represents 26 percent of the population.

112. The Fisheries Service also estimated a Level B harassment total over the five-year period of 96 humpback whales, 1 minke whale, 4 gray whales, 17 fin whales, 32 killer whales, 8 Dall's porpoise, 237 harbor porpoise, 12,596 harbor seals, and 411 Steller sea lions.

113. In other words, while the final incidental take regulations *authorize* a maximum of 12,628 takes from Level A and Level B harassment each year (a five-year total authorization of 63,140 takes), the agency does not *expect* the one-year maximum to be reached each year. Instead, it expects a total of 14,207 takes from Level A and Level B harassment over the five-year period.

114. The Fisheries Service noted that it was difficult to characterize each year accurately because many of the activities are progressive and thus result in uncertainty in their timing, duration, and complete scope of work.

115. Hilcorp plans to collect 3D seismic survey data for 45-60 days in either the fall of 2019 or spring of 2020 over eight of its fourteen existing federal leases in lower Cook Inlet. This survey will be active 24 hours per day. The airgun used will fire "every 4.5 to

6 seconds, depending on the exact speed of the vessel." Final Rule, 84 Fed. Reg. at 37,446.

116.    Hilcorp plans to conduct 2D surveys in the marine, intertidal, and onshore area on the eastern side of Cook Inlet from Anchor Point to Kasilof in April through October of 2020 or 2021 using similar seismic airgun array sizes used during 3D surveys. The stated purpose of collecting 2D seismic data is to determine the location of possible oil and gas prospects within potential future lease sales in state and federal waters.

117.    When it completes the 3D surveys, Hilcorp plans to conduct geohazard surveys on specific areas of interest identified by the surveys before drilling exploratory wells. The final rule describes the equipment typically used for these surveys, including single beam and multi-beam echosounders, which provide water depths and seafloor morphology, a side scan sonar that provides acoustic images of the seafloor, a sub-bottom profiler that penetrates 20-200 meters, a magnetometer to detect ferrous material, gravity/piston corers and grab samplers.

118.    Hilcorp will then proceed to drill two to four exploratory wells per year from 2020-2022 in lower Cook Inlet based on the 2D and 3D maps, with each well taking approximately 40-60 days to drill and test and will use pipe driving and vertical seismic profiling (VSP).

119.    Hilcorp also plans to conduct geohazard surveys and exploratory drilling of 1-2 wells in the Trading Bay area using similar methods.

120.     The Fisheries Service's incidental take regulations also authorize take from Iniskin Peninsula exploration activities near Chinitna Bay approximately 60 miles west of Homer. This will include construction of a dock, a long access road, bridges, an air strip, barge landing/staging areas, fuel storage facilities, an intertidal causeway, water wells and extraction sites, and a camp/staging area.

121.     The incidental take regulations contain mitigation and monitoring requirements, including as-yet undefined exclusion and safety zones, shut down procedures if belugas are observed within the area where Level B harassment is expected to occur, aerial overflights, and the use of protected species observers during specified activities.

122.     On August 16, 2019, the Fisheries Service published in the Federal Register a notice and request for comments on its proposed modification of Hilcorp's July 31, 2019 Letter of Authorization. It proposed to modify a mitigation measure pertaining to 3D seismic surveying during Year 1 of Hilcorp's activity stating that it "published a mitigation measure in error that stated before ramp up of seismic airguns during the 3D seismic survey, the entire exclusion zone (EZ) must be visually cleared by protected species observers (PSOs). This measure is correct for operations beginning in daylight hours. However, visually clearing the entirety of the EZ to ramp up airgun activity at night was not NMFS' intent." Notice; request for comments on modification of Letter of Authorization, 84 Fed. Reg. 41,957 (Aug. 16, 2019).

123.     The Regional Administrator of the Fisheries Service signed the Biological Opinion for the incidental take regulations on June 18, 2019, concluding that the action

was likely to adversely affect Cook Inlet beluga whales along with four other species listed under the ESA (fin whales, Western North Pacific distinct population segment ("DPS") of humpback whales, Mexico DPS of humpback whales, and Western DPS of Stellar sea lion).

124.    The Biological Opinion determined that a subset of Hilcorp's oil and gas activities in Cook Inlet would result in acoustic stressors that could result in Level A and B harassment of marine mammals: 2D seismic survey (assuming a 2400 cubic inch airgun); 3D seismic survey (assuming a 2400 cui airgun); geohazard surveys (only when using sub-bottom profilers); drive pipe installation; vertical seismic profiling (VSP); vibratory sheet pile driving (Iniskin Peninsula causeway); and water jets.

125.    It excluded noise from many other covered activities and sources, including drilling rigs, other geohazard survey equipment, tugs, drilling and well construction, rock laying, offshore production platforms, hydraulic grinders, underwater cutters, drones, pingers, vessels, and aircraft.

126.    The Fisheries Service notes that little information is available on beluga whales' reactions to noise pulses, which is "difficult to accurately predict," and is an area where more research and data are needed. As a result, it used "generic sound exposure thresholds" to calculate take. Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion, AKRO-2018-00381, at 135, 157. The Fisheries Service calculated Level A and Level B harassment exposures for Cook Inlet beluga whales per activity per location by multiplying the estimated density of whales per kilometer[2] by the area of ensonification,

and the duration of the activity in days per year. The Fisheries Service explained that "[i]ndividual animals may be exposed to received levels above our harassment thresholds more than once per day, but [the Fisheries Service] considers animals only 'taken' once per day." *Id.* at 146.

127.    The Biological Opinion proposed a maximum annual Level B take of beluga whales of 35 animals and no authorized Level A take in any given year. It estimates that the Fisheries Service Permits Division will authorize the take of 58 beluga whales by Level B harassment over the five-year period of activities.

128.    For purposes of its analysis, the Fisheries Service considered "any anticipated take under the MMPA to be expected take under the ESA." *Id.* at 169.

129.    The Biological Opinion concluded that the action was not likely to jeopardize the five species analyzed or adversely modify the designated critical habitat of the Cook Inlet beluga whale or Stellar sea lion.

130.    On July 17, 2019, the Fisheries Service finalized an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") for the incidental take regulations under NEPA.

131.    In the EA, the Fisheries Service purported to describe the purpose and need for the incidental take regulations and then analyze their environmental impacts on the affected physical, biological, and socioeconomic environment. It clarified that the scope of its analysis was limited to the decision for which it was responsible, "whether to issue the regulations and LOAs" or letters of authorization. Environmental Assessment for the

Issuance of Regulations and Letters of Authorization for the Take of Marine Mammals Incidental to Hilcorp Alaska LLC Oil and Gas Activities in Cook Inlet, Alaska, at 9.

132.    The agency stated its obligation to consider "a reasonable range of alternatives to a Proposed Action as well as the No Action Alternative." *Id.* at 10.

133.    The agency then only evaluated two options, the action proposed by Hilcorp, which "constitutes Alternative 1 and is the Preferred Alternative," and the No Action Alternative, which assumes Hilcorp's application is denied and the final incidental take regulations are not issued. *Id.* at 22.

134.    The Preferred Alternative consisted of the issuance of the incidental take regulations and letters of authorization subject to mitigation and monitoring measures and reporting requirements set forth in the regulation and letters of authorization.

135.    The public comments submitted to the Fisheries Service, including from the Marine Mammal Commission, contained several additional alternatives and mitigation measures that the agency dismissed.

136.    In its section on cumulative impacts, the Fisheries Service lists subsistence hunting (which is not currently permitted for Cook Inlet beluga whales), fisheries interactions, vessel traffic, oil and gas development, underwater installations (including the Alaska LNG pipeline), coastal zone development (including the Pebble Mine project and Chuitna Coal Project), marine mammal research, and climate change.

137.    However, the Fisheries Service did not provide any analysis of how these and other projects, including the incidental take regulations at issue, cumulatively impact the environment and marine mammals in Cook Inlet.

138.    Its FONSI determined that the issuance of the incidental take regulations and LOA to Hilcorp will not significantly impact the quality of the human environment and the preparation of an Environmental Impact Statement is unnecessary.

## FIRST CLAIM FOR RELIEF
### (Violations of the Marine Mammal Protection Act and Administrative Procedure Act)

139.    Plaintiffs incorporate each and every allegation set forth in the Complaint by reference.

140.    The Fisheries Service violated the MMPA and APA because it improperly determined and failed to ensure that the authorized activities will take only "small numbers" of marine mammals. The Fisheries Service underestimated take, failed to assess the total number of takes authorized for the five-year regulations, and erroneously concluded that the take constituted "small numbers."

141.    The Fisheries Service violated the MMPA and APA because it improperly determined and failed to ensure that the authorized activities will have no more than a "negligible impact" on marine mammals. For example, as the Marine Mammal Commission and its Committee of Scientific Advisors on Marine Mammals conveyed to the agency, the Fisheries Service does not currently have a reasonable basis for determining that authorizing takes by harassment would not contribute to or exacerbate

the decline of Cook Inlet beluga whales that could support a negligible impact conclusion. Additionally, the Fisheries Service underestimated the extent and degree of take and failed to assess the total number of takes authorized for the five-year regulations.

142.     The Fisheries Service violated the MMPA and APA because it improperly assessed and failed to prescribe "means of effecting the least practicable adverse impact" on marine mammals and their habitat, "paying particular attention to rookeries, mating grounds, and areas of similar significance," and on the availability of the species for subsistence uses. The agency failed to ensure that the incidental takes authorized by the regulations will have the "least practicable adverse impact" on marine mammals and failed to provide a reasoned analysis for rejecting other mitigation measures as impracticable, including additional time-area closures and restrictions on level, scope, timing, and duration of activities, among others.

143.     The Fisheries Service violated the MMPA and APA because it did not explain in detail its deviations from the Marine Mammal Commission's recommendations.

144.     The Fisheries Service's small numbers, negligible impact, and least practicable adverse impact determinations are improperly conclusory, have no factual and analytical basis, are not rationally connected to the facts found, and are not based on the best available scientific data.

145.     The Fisheries Service's Cook Inlet incidental take regulations violate the MMPA and its implementing regulations, 16 U.S.C. §§ 1371(a)(5)(A), 1402(d); 50 C.F.R. §

216.101–105, and are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and otherwise not in accordance with the law, in violation of the APA. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

### (Violations of the Endangered Species Act and Administrative Procedure Act)

146.    Plaintiffs reallege and incorporate, as if fully set forth herein, each and every allegation in this Complaint.

147.    The Fisheries Service's Biological Opinion failed to conduct the proper jeopardy analysis under the ESA. The Fisheries Service's determination in the Biological Opinion that the take authorized under the regulations will not jeopardize the continued existence of the Cook Inlet beluga and other listed species is improperly conclusory, has no factual and analytical basis in the Biological Opinion, is not rationally connected to the facts found in the Biological Opinion, and is not based on the best available scientific data. The Biological Opinion also failed to adequately analyze the effects of the action on both the survival and recovery of Cook Inlet beluga whales, fin whales, humpback whales, and Stellar sea lions.

148.    The Fisheries Service failed to properly consider the effects of the authorized take on these species when added to the direct and indirect impacts of past and present activities in the environmental baseline as well as cumulative effects on the species from vessel traffic, other oil and gas activities, construction projects, and other sources.

149.    The Fisheries Service's Biological Opinion on its issuance of the Cook Inlet incidental take regulations is a final agency action within the meaning of the APA.

*Cook Inletkeeper, et al., v. Ross, et al.*
Complaint
Case No. 3:19-cv-00238-HRH                                       39
Case 3:19-cv-00238-SLG   Document 1   Filed 09/04/19   Page 39 of 42

150.    The agency's issuance of the Cook Inlet incidental take regulations and

Biological Opinion is arbitrary, capricious, an abuse of discretion, and a violation of the

ESA and its implementing regulations, 16 U.S.C. § 1536(a)(2), 50 C.F.R. §§ 402.10–16,

and the APA, 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
#### (Violations of the National Environmental Policy Act and Administrative Procedure Act)

151.    Plaintiffs reallege and incorporate, as if fully set forth herein, each and every

allegation in the preceding paragraphs of this Complaint.

152.    The Fisheries Service's failure to prepare an EIS analyzing the impacts of the

take authorized under the incidental take regulations violated NEPA. The Fisheries

Service's issuance of the Cook Inlet incidental take regulations is a major federal action

within the meaning of NEPA. The Fisheries Service's decision implicates several NEPA

significance factors for when an EIS is required: it may have adverse impacts; it may

affect geographically unique areas; it involves highly uncertain or unique or unknown

risks; it has cumulatively significant impacts; it may cause loss or destruction of

significant scientific, cultural, or historical resources; and it may adversely affect

threatened or endangered species or their critical habitat.

153.    The Fisheries Service's failure to prepare an EIS constitutes an agency action

unlawfully withheld or unreasonably delayed, in violation of the APA. 5 U.S.C. §

706(1). Alternatively, the Fisheries Service's decision to issue the take regulations

without first preparing an EIS are arbitrary, capricious, an abuse of discretion, made

without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, in violation of the APA. *Id*. § 706(2).

154.    The Fisheries Service's EA and FONSI are inadequate under NEPA because the agency failed to take a "hard look" at the direct, indirect, and cumulative environmental impacts of its decision before acting. The agency failed to include sufficient evidence and adequate analysis of the environmental impacts of the proposal and its ultimate no significant impact conclusion.

155.    The Fisheries Service's EA violated NEPA's requirement that the Fisheries Service consider a reasonable range of alternatives to the proposed action. In this case, the agency considered just two alternatives (the proposed action and no-action alternatives) without rigorously exploring and objectively evaluating all reasonable alternatives to the proposed action in violation of NEPA.

156.    The Fisheries Service's EA and FONSI are arbitrary, capricious, an abuse of discretion, made without observance of procedure required by law, and not in accordance with NEPA or its implementing regulations, 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1508.7, 1508.8, 1508.9, in violation of the APA. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1.    Enter a declaratory judgment that the Fisheries Service's incidental take regulations violate the MMPA and APA;

2.      Enter a declaratory judgment that the Fisheries Service's biological opinion on its

incidental take regulations violate the ESA and APA;

3.      Enter a declaratory judgment that the Fisheries Service's EA and FONSI on its

incidental take regulations violate NEPA and APA;

4.      Set aside the incidental take regulations, Biological Opinion, EA and FONSI

issued by the Fisheries Service;

5.      Enter preliminary and permanent injunctive relief as needed to prevent

irreparable harm from implementation of the activities authorized unless and until the

Fisheries Service complies with the MMPA, ESA, and NEPA;

6.      Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

7.      Grant such other relief as this Court deems just and proper.

 Respectfully submitted this 4th day of September, 2019.

s/ Kassia Siegel
Kassia Siegel (AK Bar # 0106044)
CENTER FOR BIOLOGICAL DIVERSITY

s/ Kristen Monsell
Kristen Monsell (CA Bar #304793; *pro hac vice pending*)

s/ Julie Teel Simmonds
Julie Teel Simmonds (CO Bar # 32822; *pro hac vice pending*)

CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiffs Cook Inletkeeper and Center for Biological Diversity*