Kassia Siegel (AK Bar # 0106044)
Julie Teel Simmonds (*Pro Hac Vice*)
Kristen Monsell (*Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7100
F: (510) 844-7150
E: ksiegel@biologicaldiversity.org
kmonsell@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

*Attorneys for Plaintiffs Cook Inletkeeper and*
*Center for Biological Diversity*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER, et al., | |
|       *Plaintiffs*, | |
|   v. | |
| WILBUR ROSS, et al., | |
|       *Defendants*, | Civil Action No. 3:19-cv-00238-SLG |
|   and | |
| HILCORP ALASKA, LLC, et al., | |
|       *Intervenor-Defendants*. | |

### MEMORANDUM IN SUPPORT OF PLAINTIFFS'
### MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ........................................................................................................... 1

    I.    Cook Inlet Is Home to Critically Endangered Cook Inlet
        Beluga Whales .................................................................................. 2

    II.   NMFS's Regulations Authorizing Hilcorp to Take
        Marine Mammals ............................................................................ 4

STANDARD OF REVIEW ............................................................................................ 6

ARGUMENT ................................................................................................................... 7

    I.    NMFS's Take Regulations Violate the MMPA ........................................ 7

        A.    The MMPA Requires NMFS to Carefully Limit Impacts
              on Marine Mammals ............................................................... 7

        B.    NMFS Underestimated Take by Ignoring Take from
              Vessel Noise ............................................................................ 8

        C.    NMFS Arbitrarily Segmented its Small Numbers Analysis ............ 12

        D.    NMFS Failed to Require Sufficient Mitigation or
              Monitoring Measures ........................................................... 15

    II.   NMFS's BiOp and Failure to Reinitiate Consultation Violate
        the ESA .......................................................................................... 18

        A.    The ESA Requires NMFS to Carefully Analyze the
              Impacts of the Regulations on Protected Species Based
              on the Best Available Science ................................................ 18

        B.    NMFS's Biological Opinion Is Unlawful ........................................ 20

             1.    NMFS Failed to Properly Consider the Effects of
                    the Action ...................................................................... 21

        2.     NMFS Failed to Aggregate the Effects of the Action ........... 24

    C.    NMFS's Refusal to Reinitiate Consultation Violates
        the ESA ............................................................................ 27

III.    NMFS's EA Violates NEPA ....................................................... 30

    A.    NMFS Must Fully Evaluate the Environmental Impacts
        of the Regulations .......................................................... 30

    B.    NMFS Failed to Take a Hard Look at Direct Impacts .................... 32

    C.    NMFS Failed to Take a Hard Look at Cumulative Impacts ........... 33

CONCLUSION ................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Lubchenco,*
    723 F.3d 1043 (9th Cir. 2013) ...................................................................... 19

*All. for the Wild Rockies v. U.S. Forest Serv.,*
    907 F.3d 1105 (9th Cir. 2018) ........................................................................ 6

*Am. Rivers v. U.S. Army Corps of Eng'rs,*
    271 F. Supp. 2d 230 (D.D.C. 2003) ............................................................. 22

*Blue Mtns. Biodiversity Project v. Blackwood,*
    161 F.3d 1208 (9th Cir. 1998) ...................................................................... 32

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,*
    575 F.3d 999 (9th Cir. 2009) ........................................................................ 30

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988) ................................................................ 20, 23

*Conservation Council for Haw. v. NMFS,*
    97 F. Supp. 3d 1210 (D. Haw. 2015) ........................................................... 13

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012) .................................................................. 6, 27

*Ctr. for Biological Diversity v. Salazar,*
    695 F.3d 893 (9th Cir. 2012) ......................................................... 12, 14, 15

*Ctr. for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018) ........................................................................ 7

*Defs. of Wildlife v. U.S. Dep't of the Interior,*
    931 F.3d 339 (4th Cir. 2019) ........................................................................ 21

*Forest Guardians v. Johanns,*
    450 F.3d 455 (9th Cir. 2006) ........................................................................ 28

*Greenpeace v. NMFS,*
    80 F. Supp. 2d 1137 (W.D. Wash. 2000) .................................................... 23

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010)...................................................................... 6

*Kern v. Bureau of Land Mgmt.*,
    284 F.3d 1062 (9th Cir. 2002)...................................................................... 33

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004)............................................................ 33, 34, 35

*Kokechik Fishermen's Ass'n v. Sec'y of Comm.*,
    839 F.2d 795 (D.C. Cir. 1988) ...................................................................... 7

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000)...................................................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................. 7, 10

*Nat. Res. Def. Council v. Evans*,
    232 F. Supp. 2d 1003 (N.D. Cal. 2002) ................................... 12–13, 14, 18

*Nat. Res. Def. Council v. Pritzker*,
    828 F.3d 1125 (9th Cir. 2016)............................................................... 16, 18

*Nat'l Wildlife Fed'n v. NMFS*,
    524 F.3d 917 (9th Cir. 2008)........................................................... 24, 27, 30

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    361 F.3d 1108 (9th Cir. 2004)...................................................................... 33

*Or. Nat. Res. Council Fund v. Goodman*,
    505 F.3d 884 (9th Cir. 2007)....................................................................... 32

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005)..................................................................... 24

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
    265 F.3d 1028 (9th Cir. 2001)..................................................................... 25

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) .................................................................................... 30

*Sierra Club v. Lyng*,
    694 F. Supp. 1260 (E.D. Tex. 1988) ........................................................... 28

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                  iv

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
608 F.3d 592 (9th Cir. 2010)....................................................................31, 35

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978).............................................................................................19

*Turtle Island Restoration Network v. U.S. Dep't of Comm.*,
878 F.3d 725 (9th Cir. 2017)...........................................................19, 25, 28

*W. Watersheds Project v. Kraayenbrink*,
632 F.3d 472 (9th Cir. 2011).............................................................................33

**Statutes**

5 U.S.C. § 706 ..........................................................................................................6

5 U.S.C. § 706(2)(A) ...............................................................................................6

16 U.S.C. §§ 1361–1421 .........................................................................................1

16 U.S.C. §§ 1531–1544 .........................................................................................1

16 U.S.C. § 1361(1) ................................................................................................7

16 U.S.C. § 1361(6) ................................................................................................7

16 U.S.C. § 1362(8) ................................................................................................8

16 U.S.C. § 1362(13) ..............................................................................................8

16 U.S.C. § 1362(18)(A) .........................................................................................8

16 U.S.C. § 1371(a) ...........................................................................................8, 14

16 U.S.C. § 1371(a)(5)(A) ......................................................................................8

16 U.S.C. § 1371(a)(5)(A)(i) ...........................................................................13, 14

16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa) ...................................................................15

16 U.S.C. § 1371(a)(5)(A)(i)(II)(bb) ...................................................................15

16 U.S.C. § 1371(a)(5)(D)(i) ...............................................................................13

Case 3:19-cv-00238-SLG   Document 53-1   Filed 07/27/20   Page 6 of 44

16 U.S.C. § 1372(a) .................................................................................. 8

16 U.S.C. § 1401 ...................................................................................... 4

16 U.S.C. § 1532(19) ............................................................................. 19

16 U.S.C. § 1532(3) ............................................................................... 19

16 U.S.C. § 1533(f) .................................................................................. 3

16 U.S.C. § 1536(a)(2) ...................................................................... 19, 21

16 U.S.C. § 1536(b)(3) .......................................................................... 20

16 U.S.C. § 1536(b)(4) .......................................................................... 20

16 U.S.C. § 1538(a)(1) .......................................................................... 19

42 U.S.C. §§ 4321–4370 .......................................................................... 1

42 U.S.C. § 4321 ................................................................................... 30

42 U.S.C. § 4332(2)(C) ......................................................................... 31

**Regulations**

40 C.F.R. § 1500.1(a) ............................................................................ 30

40 C.F.R. § 1501.2 ................................................................................. 31

40 C.F.R. § 1501.4 ................................................................................. 31

40 C.F.R. § 1501.4(b) ............................................................................ 31

40 C.F.R. § 1501.4(e) ............................................................................ 31

40 C.F.R. § 1502.5 ................................................................................. 31

40 C.F.R. § 1508.7 ................................................................................. 31

40 C.F.R. § 1508.8 ................................................................................. 31

40 C.F.R. § 1508.9 ................................................................................. 31

40 C.F.R. § 1508.9(b) ............................................................................ 31

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    vi

40 C.F.R. § 1508.13 ................................................................................. 31

50 C.F.R. § 216.3 .................................................................................... 8

50 C.F.R. § 216.104 ................................................................................. 8

50 C.F.R. § 216.106(a) ............................................................................. 8

50 C.F.R. § 217.160 ............................................................................... 14

50 C.F.R. § 217.161 ............................................................................... 14

50 C.F.R. § 402.02 ................................................................... 20, 22, 30

50 C.F.R. § 402.14(a) ............................................................................ 19

50 C.F.R. § 402.14(g)(4) ........................................................... 20, 22, 24

50 C.F.R. § 402.14(g)(8) ................................................................. 19, 21

50 C.F.R. § 402.14(h) ....................................................................... 21, 24

50 C.F.R. § 402.14(h)(1) ....................................................................... 20

50 C.F.R. § 402.16(a)(2) ............................................................ 20, 27, 28

## Other Authorities

76 Fed. Reg. 20,180 (Apr. 11, 2011) ................................................. 2, 3

77 Fed. Reg. 73,434 (Dec. 10, 2012) ................................................... 17

83 Fed. Reg. 63,268 (Dec. 7, 2018) ..................................................... 13

84 Fed. Reg. 30,991 (June 28, 2019) ................................................... 34

85 Fed. Reg. 19,294 (Apr. 6, 2020) ..................................................... 34

**INTRODUCTION**

Cook Inlet beluga whales are struggling to survive. New information reveals that this critically endangered species is suffering a rapid population decline. With just 279 of these whales remaining on Earth, the National Marine Fisheries Service (NMFS) considers them one of nine species most at risk of extinction if existing threats are not dramatically decreased. NMFS lists reducing human-caused noise pollution in Cook Inlet as the number one priority to stabilize the population decline and promote its recovery.

Against this backdrop, NMFS issued regulations allowing Hilcorp, Alaska LLC (Hilcorp) to harm and harass (i.e., "take") these and other marine mammals during its oil and gas activities in Cook Inlet. The regulations allow Hilcorp to flood the Inlet with noise pollution from seismic airgun blasting, vessels, pile driving, and other activities at levels known to cause hearing loss and disrupt feeding and other essential behaviors.

NMFS failed to comply with the Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361–1421, Endangered Species Act (ESA), *id.* §§ 1531–1544, and National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370, in issuing the regulations. Each of NMFS's violations stems from its failure to carefully consider the impacts of Hilcorp's activities as required by law, including failing to properly examine whether such activities will have no more than a negligible impact on a species already hanging on the brink of extinction. NMFS's failures leave Cook Inlet belugas without legally required protections from one of the primary threats preventing their recovery. Accordingly, the Court should grant Plaintiffs' Motion for Summary Judgment and

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                    1

vacate the unlawful regulations and associated documents.

## FACTUAL BACKGROUND

**I.      Cook Inlet Is Home to Critically Endangered Cook Inlet Beluga Whales**

The Cook Inlet watershed is a sensitive, unique environment that provides habitat for a variety of wildlife, including salmon, cod, migratory birds, humpback whales, fin whales, and sea lions. PR1_NEPA 000051–52, 68–70. Cook Inlet is also home to critically endangered Cook Inlet beluga whales. PR1_NEPA 000068–69.

Cook Inlet belugas are a small, geographically isolated population that remains in the Inlet year-round, making them especially vulnerable to anthropogenic impacts. AKR3014188; PR1_ESA 000064. NMFS designated the whales as "depleted" under the MMPA in 2000 and "endangered" under the ESA in 2008. PR1_ESA 000063.

In 2011, NMFS designated almost two million acres of critical habitat for the whale. In doing so, the agency recognized that beluga whales are "among the most adept users of sound of all marine mammals, using sound rather than sight for many important functions, especially in the highly turbid waters of upper Cook Inlet. Beluga whales use sound to communicate, locate prey, and navigate, and may make different sounds in response to different stimuli." 76 Fed. Reg. 20,180, 20,203 (Apr. 11, 2011). "Beluga whales produce high frequency sounds which they use as a type of sonar for finding and pursuing prey, and likely for navigating through ice-laden waters." *Id.* Due to the importance of quiet areas for the whales, NMFS defined "[w]aters with in-water noise below levels resulting in the abandonment of critical habitat areas by Cook Inlet beluga

whales" as a habitat feature essential to the conservation of this species. *Id.*

Despite these protections, the population has shown no signs of recovery. *See* PR1_ESA 00063. In fact, the outlook for Cook Inlet belugas has become especially grim in the last several years. In 2015, NMFS identified Cook Inlet beluga whales as a "Species in the Spotlight," a program to prioritize actions to save species at the highest risk of extinction. NMFS considers these species a "recovery priority #1," meaning their "extinction is almost certain in the immediate future" and their "limiting factors and threats are well understood and the needed management actions are known and have a high probability of success." JOINTSUPP200880. NMFS developed five-year action plans for each "Species in the Spotlight" outlining short-term efforts vital for stabilizing the populations and preventing extinction. *See id.* The first of the "Key Actions Needed 2016–2020" in NMFS's plan for Cook Inlet belugas is to "Reduce the Threat of Anthropogenic Noise in Cook Inlet Beluga Whale Habitat." JOINTSUPP200883.

Additionally, in 2016, NMFS developed a Recovery Plan for Cook Inlet belugas that established a roadmap for how the whales can eventually be secure from the risk of extinction and removed from the endangered species list. *See* 16 U.S.C. § 1533(f). The Recovery Plan identifies anthropogenic noise and the cumulative effects of multiple stressors as two of the three most significant threats impeding the survival and recovery of the population (the other being catastrophic events such as oil spills). PR1_KeyRef 003136. The Recovery Plan notes the beluga's "high auditory sensitivity . . . and dependence upon sound to navigate, communicate, and find prey and breathing holes in

the ice make belugas vulnerable to noise pollution, which may mask beluga signals or

lead to temporary or permanent hearing impairment." PR1_KeyRef 003200. The Plan

states noise pollution can also cause habitat degradation and that, "[i]n the long term,

anthropogenic noise may induce chronic effects altering the health of individual CI

belugas, which in turn have consequences at the population level." PR1_KeyRef 003231.

While the critically endangered beluga's population estimate was already

alarmingly small at 328 whales, a new NMFS report indicates it is actually much smaller.

In January 2020, NMFS issued a new abundance estimate of 279, concluding that the

population is "smaller and declining more quickly than previously thought."

JOINTSUPP100020. Even before this report, the Marine Mammal Commission

(MMC)—an agency established to advise the federal government on protecting marine

mammals, 16 U.S.C. § 1401—urged NMFS not to authorize *any* additional take of

belugas given their critically endangered status. *See* PR1_MMPA 001786.

## II.    NMFS's Regulations Authorizing Hilcorp to Take Marine Mammals

In July 2019, NMFS issued regulations under the MMPA authorizing Hilcorp to

take marine mammals incidental to oil and gas activities in Cook Inlet from 2019 through

2024. PR1_MMPA 002252. The activities affect roughly 2.7 million acres of the Inlet

and include a variety of activities in both state and federal waters. Specifically, the

activities include a 3D seismic survey for 45-60 days in either the fall of 2019 or spring

of 2020 across eight of Hilcorp's existing federal leases in lower Cook Inlet. The survey

"will be active 24 hours per day" and fire an airgun "every 4.5 to 6 seconds, depending

on the exact speed of the vessel" to search for oil below the seafloor. PR1_MMPA
002255–56. The activities also include a 2D seismic survey in the marine, intertidal, and
onshore areas of Cook Inlet from Anchor Point to Kasilof in either 2021 or 2022. PR1_
MMPA 002253. In addition, Hilcorp's activities include geohazard surveys, pile and pipe
driving, exploratory drilling in state and federal waters, development drilling in state
waters, and numerous vessels, including tugs towing rigs. PR1_ MMPA 002253–54.

Each of these activities will generate noise that overwhelms marine animals'
ability to hear the world around them, interfering with their ability to find food, or
communicate with their young calves; causing physiological damage; and displacing
them from their prime habitat. *See, e.g.*, PR1_KeyRef 003213; JOINTSUPP200166. By
NMFS's own estimate, whales, sea lions, and seals could suffer these and other
disturbances from Hilcorp's activities over 12,600 times in a single year. *See* PR1_
MMPA 002301 (Tbl. 18, total of all harassments).

NMFS estimated the extent of take by considering: (1) the acoustic thresholds for
marine mammals above which NMFS believes they will be behaviorally harassed ("Level
B" harassment) or incur permanent hearing impairment ("Level A" harassment); (2) the
area that will be "ensonified" above these thresholds in a day; (3) the density of marine
mammals within these areas; and (4) the number of days of activities. PR1_MMPA
002287. After conducting this analysis and requiring mitigation measures, NMFS
authorized Hilcorp to take 35 belugas per year via behavioral, or "Level B," harassment.
PR1_MMPA 002301. NMFS also authorized various levels of take of other marine

mammals, including humpback and fin whales, via Level A and Level B harassment. *Id.*

Along with the regulations, NMFS issued a biological opinion (BiOp) under the ESA concluding that Hilcorp's activities will not jeopardize Cook Inlet beluga whales or any other ESA-listed species. PR1_ESA 00003. NMFS also issued an environmental assessment under NEPA and concluded that the issuance of the regulations would not have a significant impact on the environment. PR1_NEPA 000044; PR1_NEPA 000107.

Following issuance of the regulations, NMFS refused to reinitiate ESA consultation, JOINTSUPP100006–09, despite its own new report indicating that the population is smaller and declining much more rapidly than NMFS thought at the time it issued the regulations, and that the density estimates it used to calculate the extent of authorized beluga take may no longer be accurate. *See* JOINTSUPP100020.

## STANDARD OF REVIEW

Section 706 of the Administrative Procedure Act (APA), 5 U.S.C. § 706, governs judicial review of the validity of NMFS's actions and inactions under the MMPA, ESA, and NEPA. *See Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010) (APA governs MMPA and NEPA review); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1109 (9th Cir. 2012) (APA governs review of agency actions under the ESA). Under the APA, a reviewing court "shall 'hold unlawful and set aside agency action, findings, or conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018) (quoting 5 U.S.C. § 706(2)(A)).

Even where an agency with "special expertise" acts "within its area of expertise," the Court "need not defer to the agency when the agency's decision is without substantial basis in fact." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted). An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

I.      **NMFS's Take Regulations Violate the MMPA**

NMFS's regulations are arbitrary, capricious, and violate the MMPA. In evaluating whether Hilcorp's activities will take only a "small number" of Cook Inlet belugas and have no more than a "negligible impact" on this beleaguered and declining population, NMFS ignored take from vessel noise; improperly segmented its small numbers analysis; and failed to require adequate mitigation or monitoring measures.

A.      The MMPA Requires NMFS to Carefully Limit Impacts on Marine Mammals

Congress enacted the MMPA to address the concern that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," and to help "protect[] and encourage[]" marine mammals "to develop to the greatest extent feasible." 16 U.S.C. § 1361(1), (6). "The interest in maintaining healthy populations of marine mammals comes first" under the statute.

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                                    7

*Kokechik Fishermen's Ass'n v. Sec'y of Comm.*, 839 F.2d 795, 800, 802 (D.C. Cir. 1988).

To accomplish these objectives, the MMPA establishes a complete moratorium on the "taking" of marine mammals. 16 U.S.C. §§ 1371(a), 1372(a); *see also id.* § 1362(8). Prohibited takes include actions that harass, capture, or kill marine mammals; as well any act that "has the potential to injure a marine mammal" (known as "Level A" harassment) or disrupt behavioral patterns, including migration, breathing, breeding, or feeding (known as "Level B" harassment). *Id.* § 1362(13), (18)(A); 50 C.F.R. § 216.3.

The MMPA contains limited exceptions to this otherwise-broad prohibition. As relevant here, NMFS may issue regulations allowing take incidental to a "specified activity" for a five-year period, if, using the best available science, NMFS determines the proposed activity will take only "small numbers" of marine mammals and have no more than a "negligible impact" on the species; and only if it prescribes methods and means of effecting the "least practicable impact" and measures to monitor take. 16 U.S.C. § 1371(a)(5)(A); 50 C.F.R. § 216.104. A "[l]etter of [a]uthorization" from NMFS is required to conduct any activity under the regulations. 50 C.F.R. § 216.106(a).

B.    NMFS Underestimated Take by Ignoring Take from Vessel Noise

NMFS omitted key factors from consideration and failed to consider the best available science by ignoring take from vessel noise. Such failures infected both NMFS's small numbers and negligible impact determinations, rendering the regulations unlawful.

The "specified activity" NMFS must consider in conducting its small numbers and negligible impact analyses is Hilcorp's oil and gas program in the Inlet. *See* 16 U.S.C.

§ 1371(a)(5)(A). This program involves all the activities and noise sources depicted in Table 1 of the final rule: seismic surveys; geohazard surveys; pile driving; tugs towing rigs; and support vessels for numerous activities. PR1_MMPA 002253–54.

NMFS admits that Hilcorp's oil and gas activities will increase vessel noise in the Inlet. PR1_ESA 000183. The vessel traffic from these activities involves source, support, and mitigation vessels for various seismic and geohazard surveys; tugs towing rigs and support vessels for exploratory drilling in federal waters; vessels for exploration and development at Iniskin Peninsula; tugs towing rigs and support vessels for exploratory drilling at Trading Bay; tugs towing rigs and support vessels for production drilling at Granite Bay; support vessels for platform and pipeline maintenance; and support vessels for well abandonment and decommissioning activities. PR1_MMPA 002253–54.

Yet NMFS failed to consider take from noise generated by tugs towing rigs and other vessels. NMFS did so by summarily claiming that such take is not likely "because of the predictable movement of vessels and tugs," and any marine mammals present in the area "are likely habituated to the existing baseline of commercial ship traffic." PR1_MMPA 002257. NMFS further asserted that there are "no activity- location- or species-specific circumstances or other contextual factors that increase concern and the likelihood of take from towing of the drill rig." *Id.* The record belies such contentions.[1]

As an initial matter, the agency does not explain why the fact tugboats and other

---

[1] Indeed, when NMFS flagged those activities that will *not* cause take with a "*" notation (in Table 20 of the final rule), it did not flag "[t]ug towing rig." PR1_MMPA 002304.

vessels may move in "predictable" paths means they will not take Cook Inlet beluga whales via noise pollution or why it thinks there are no "location- or species-specific circumstances" that increase the risk from tugboats. The agency's own Recovery Plan for Cook Inlet beluga whales lists noise from tugboats as *the highest* noise threat to this critically endangered species, PR1_KeyRef 003211; and project maps show that tugboats will travel directly through federally designated Cook Inlet beluga whale critical habitat. *See* PR1_ESA 000206. NMFS's failure to consider the increased risk of noise from tugboats (and other vessels) to Cook Inlet belugas is the very definition of a "fail[ure] to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 43.

The best available science demonstrates that noise from tugboats and other vessels "takes" Cook Inlet belugas within the meaning of the MMPA. Under NMFS's current approach in analyzing the impacts of noise pollution on marine mammals, the agency assumes that marine mammals are likely to experience a behavioral disturbance sufficient to constitute "Level B" harassment when exposed to underwater noise at levels of 120 decibels (dB) and above for continuous (non-impulsive) noise, such as vessel noise, and above 160 dB for impulsive noise, such as seismic airguns. PR1_MMPA 002287. The best available science shows that vessels generate noise above 120 dB. In one study of vessel traffic near the Port of Alaska, scientists determined that a tugboat produced sound levels of 149 dB at a distance of approximately 100 meters (328 feet), while a docked cargo freight ship produced sound levels of 126 dB at 100 to 400 meters (328-1,312 feet). PR1_ESA 000109. A more recent study determined that "[c]ontinuous noise from ships

generally exceeds 120 dB . . . to distances between 500 and 2,000 m (1,640 and 6,562 ft)." *Id*. And yet another recent study found that "[s]ome vessels, such as tugs towing barges or oil rigs, can produce sound capable of harassing marine mammals located over 2 km from the source." *Id.*

Other science demonstrates the risk of vessel noise to beluga whales in particular. Studies show that belugas respond to vessel noise in a variety of ways. PR1_ESA 000182. Studies of belugas in Canada suggest the chronic noise associated with vessel traffic "likely masks beluga whale communication and echolocation vocalizations," and NMFS has acknowledged vessel noise could cause Cook Inlet belugas to temporarily abandon their critical habitat. PR1_ESA 000183; *see also* PR1_MMPA 002281 ("displacement. . . is one of the most obvious manifestations of disturbance"). Notably, a 2019 study of Cook Inlet belugas determined that current activities, including shipping, "exceed behavioral harassment levels on a daily basis in a significant portion of the critical habitat." AKR3014188; *see also* AKR3003469; AKR3011803.

Any notion that the whales are "habituated" to vessel noise, PR1_MMPA 002257, flies in the face of NMFS's own conclusions that reducing anthropogenic noise is the number one priority for saving the species, JOINTSUPP200883, and that noise from tugboats and cargo vessels are the number one and number two noise sources of highest concern, respectively. PR1_KeyRef 003211; *see also* AKR3020828 (2015 study noting that "[s]ome animals may have limited abilities to move elsewhere, and their decision to remain in an area may likely reflect tolerance (ie persisting in an important area despite

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    11

the cost) rather than habituation").

NMFS's refusal to consider beluga take from vessel noise means NMFS ignored such take in conducting both its small numbers and its negligible impact determinations. *See* PR1_MMPA 002287 (take estimate informed "consideration of 'small numbers' and the negligible impact determination"); PR1_MMPA 002296–301 (activities expected to cause take do not include vessels). NMFS's regulations are thus unlawful.

C. NMFS Arbitrarily Segmented its Small Numbers Analysis

NMFS failed to provide a reasoned explanation for its determination that Hilcorp will take only "small numbers" of Cook Inlet belugas. The Ninth Circuit has held that NMFS's existing regulatory definition of small numbers is unlawful. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 903 (9th Cir. 2012). As such, rather than rely on its regulatory definition, NMFS used a relative, percentage-based approach to conclude the taking of 10.67% of the estimated Cook Inlet beluga population is "small." *See* PR1_MMPA 002268, 2311. In reaching this determination, NMFS looked only at the 35 takes it authorized per year, rather than the total number of takes over the five-year life of the regulations. PR1_MMPA 002301. If Hilcorp were to actually reach the total amount of authorized take each year, this will result in 175 takes of Cook Inlet belugas over the next five years—53% of the estimated population at the time NMFS issued the regulations. More than half the population is by no means small. *See Nat. Res. Def. Council v. Evans*, 232 F. Supp. 2d 1003, 1027 (N.D. Cal. 2002) ("A definition of 'small number' that permits the potential taking of as much as 12% of the population of a

species is plainly against Congress' intent.").[2]

NMFS nowhere explained why it is appropriate to look at only the amount of take per year, rather than the total amount of take it is authorizing over the life of the regulations. While NMFS referenced harassment authorizations for seismic surveys in the Atlantic Ocean in support of its small numbers determination, *see* PR1_MMPA 002269 (citing 83 Fed. Reg. 63,268 (Dec. 7, 2018)), NMFS issued those authorizations pursuant to MMPA section 101(a)(5)(D), which, under the plain language of the statute, can only apply to a "period[] of not more than one year." 16 U.S.C. § 1371(a)(5)(D)(i). It thus cannot possibly serve as the requisite explanation for the five-year take regulations.

While no court has spoken directly to the issue in the context of small numbers, at least one court has held that in making a negligible impact determination, "the MMPA makes it clear that it is *authorized* take that must be evaluated." *Conservation Council for Haw. v. NMFS*, 97 F. Supp. 3d 1210, 1221 (D. Haw. 2015). This is because the MMPA says NMFS "shall allow . . . the incidental . . . taking . . . of . . . marine mammals of a species or population stock if [NMFS] . . . finds that the *total of such taking* . . . will have a negligible impact on such species or stock." *Id.* (citing 16 U.S.C. § 1371(a)(5)(A)(i)). Since "the total of such taking" is the incidental taking that NMFS "shall allow," the statute requires NMFS to consider the total authorized take. *Conservation Council for Haw.*, 97 F. Supp. 3d at 1221.

---

[2] While the BiOp authorizes 58 total beluga takes, PR1_ESA 000227, this is 17% of the population, significantly higher than 10.67% and the percentage courts have found to be a small number. Regardless, the BiOp cannot substitute for a proper MMPA analysis.

The same should be true of the agency's small numbers determination. In issuing incidental take regulations, NMFS allows those engaged in a "specified activity" to take "small numbers of marine mammals," while engaging in that activity "during periods of not more than five consecutive years." 16 U.S.C. § 1371(a)(5)(A)(i). Here, NMFS defined the "specified activity" as Hilcorp's oil and gas program in Cook Inlet, *e.g.*, 50 C.F.R. § 217.160; PR1_MMPA 002260, and made the regulations effective from July 30, 2019 through July 30, 2024. 50 C.F.R. § 217.161. Thus, the plain language of the MMPA required NMFS to determine that the totality of Hilcorp's oil and gas program during this time would take no more than a small number of beluga whales.

Any other interpretation would undermine the purposes of the MMPA and congressional intent in including the small numbers standard. As one court has explained, "[t]he default provision of the MMPA is that 'no permit may be issued for the taking of any marine mammal.'" *Evans*, 232 F. Supp. 2d at 1027 (citing 16 U.S.C. § 1371(a)). In other words, "[t]he intent of Congress is that the taking of even a single marine mammal is to be avoided." *Evans*, 232 F. Supp. 2d at 1027. And Congress further instructed that "[u]nless a particular activity takes only small numbers of marine mammals, *and* that taking has a negligible impact on the species, the [provisions allowing take authorizations] are not applicable to that activity." *Id.* at 1025 (citing legislative history); *see also Salazar*, 695 F.3d at 906 (small numbers requirement prevents agency from authorizing a proposed activity that harasses a large segment of a population, even if such harassment is "merely trivial and fleeting").

By segmenting its small numbers analysis into each individual year of activity, rather than the totality of the take it is authorizing, NMFS effectively deprives "small numbers" of meaning and makes "negligible impact" the only operative standard. The Ninth Circuit has already rejected an approach that would "allow [NMFS] to authorize the incidental take of large numbers of mammals, so long as that take did not have more than a negligible impact on the relevant species" in holding NMFS's regulatory definition of small numbers unlawful. *Salazar*, 695 F.3d at 903. Yet that is just what NMFS's approach does here. NMFS's regulations are therefore unlawful.

      D.     <u>NMFS Failed to Require Sufficient Mitigation or Monitoring Measures</u>

NMFS failed to require "means [to ensure] the least practicable adverse impact" on the marine mammals to be taken. *See* 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa). NMFS also failed to include sufficient monitoring requirements. *See id.* § 1371(a)(5)(A)(i)(II)(bb).

In issuing the regulations, NMFS estimated the extent of take by considering the area of water that will be ensonified at levels above which marine mammals will be harassed for various activities, including seismic surveys, pile driving, and others. PR1_ MMPA 002288–89. NMFS then established exclusion zones (EZ) and safety zones (SZ) for each activity. PR1_MMPA 002304. The EZs are either 100 or 500 meters depending on the activity; and the SZs are 1500 meters for most of the activities NMFS determined will take marine mammals. *Id.* As relevant here, the EZ is the area in which Hilcorp must shutdown activities if a marine mammal enters, or is about to enter, the area (based on Level A harassment threshold). *Id.* The SZ is the area Hilcorp must visually monitor

during operations using trained observers. *See id.* The regulations also require Hilcorp to shutdown activities if a beluga whale is seen within the SZ. *Id.* This is insufficient.

First, NMFS failed to ensure "the least practicable adverse impact" on marine mammals. Specifically, NMFS failed to require a shutdown of operations in the event a marine mammal other than a Cook Inlet beluga whale enters the SZ. The "least practicable adverse impact" standard exists to ensure NMFS includes "mitigation measures aimed at protecting marine mammals from take *to the greatest extent practicable*," even where NMFS does not anticipate such take will have population level impacts. *Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1133–34 (9th Cir. 2016) (emphasis added). If it is practicable to shutdown when a beluga enters the SZ, it is also practicable to shutdown if a humpback whale, fin whale, killer whale, or other animal subject to the regulations enters the SZ. Yet NMFS failed to require this measure.

Second, the shutdown zones fail to ensure the least practicable adverse impact even for belugas because they are substantially smaller than the Level B harassment zones. By example, the harassment zones for 2D and 3D seismic surveys have a radius of 7330 meters from the sound source; the sub-bottom profiler zone is 2929 meters; and the pile driving zone is 4642 meters. PR1_MMPA 002290. But the SZ/shutdown zones for each of these activities is only 1500 meters. PR1_MMPA 002304. By not requiring a shutdown zone coextensive with the Level B harassment zone, the regulations allow take that could have been avoided. *See Pritzker*, 828 F.3d at 1141 (shutdown zones smaller than Level B harassment zones do not protect marine mammals from harassment); PR1_

MMPA 001793 (MMC stating "it is not convinced the proposed SZs are sufficient").

Earlier versions of NMFS's mitigation measures would have required Hilcorp to shut down activities if a beluga was seen anywhere within a harassment zone, including the 7300-meter zone for seismic. *See* PR1_CORR 001888–89 (requiring Hilcorp to shut down if a beluga whale enters Level B harassment zones). But in the final rule, NMFS required only a 1500-meter shutdown zone for beluga whales because industry said the 7300-meter zone would be impracticable. *See* PR1_MMPA 002265. NMFS arbitrarily failed to explain why that is the case, especially when NMFS previously required companies to shut down seismic activities if belugas were seen within the harassment zone. *See* 77 Fed. Reg. 73,434, 73,443 (Dec. 10, 2012) (requiring Apache to shut down seismic in the Inlet if a group of belugas was seen within Level B harassment zone). Regardless, this says nothing about why NMFS did not require larger SZ/shutdown zones for other non-seismic activities. *See* PR1_CORR 001889 (draft mitigation establishing SZ/shutdown zones for belugas equal to Level B harassment zones for all activities).

Third, even if the MMPA did not require NMFS to mandate that Hilcorp shutdown activities if a beluga is seen within the Level B harassment zone, NMFS's failure to require Hilcorp to monitor the entirety of the Level B harassment zone is unlawful. *See* PR1_MMPA 001793 (MMC stating it "is not convinced that Hilcorp can adequately enumerate the numbers of beluga whales taken within the various extents of the Level B harassment zones"). Drafts of the monitoring requirements would have required Hilcorp to monitor the entirety of the harassment zone, including the 7300-meter seismic

harassment zone. *See, e.g.*, PR1_CORR 001891 (requiring Hilcorp conduct aerial surveys to ensure entire harassment zone for that day's seismic activities contains no belugas); *see also Pritzker*, 828 F.3d at 1141 n.14 (describing monitoring requirements of Navy sonar activities involving visual monitoring, passive acoustic monitoring, and active acoustic monitoring). But NMFS did not include such requirements in the final rule.

This means that monitoring will not capture the true extent of take. "The purpose of the monitoring requirement is to assure that the take allowed under the permit is, in fact, small, and also has only a negligible impact on affected species." *Evans*, 232 F. Supp. 2d at 1033 (citing legislative history). NMFS's failure to require monitoring of the entire Level B harassment zone, or other measures to monitor for beluga presence within the area, means it cannot ensure the authorized take complies with the small numbers and negligible impact standards, in violation of the MMPA.

## II.     NMFS's BiOp and Failure to Reinitiate Consultation Violate the ESA

NMFS's issuance of the regulations violates the ESA in two distinct ways. First, NMFS's BiOp fails to comply with the ESA because it employs an unlawful jeopardy analysis. Second, NMFS failed to reinitiate consultation despite new information indicating both that (1) the Cook Inlet beluga population is declining much more rapidly and is even smaller than NMFS thought at the time it issued the regulations, and (2) the density estimate relied on by NMFS in estimating the extent of take is no longer valid.

### A.     The ESA Requires NMFS to Carefully Analyze the Impacts of the Regulations on Protected Species Based on the Best Available Science

The ESA embodies Congress's "plain intent" to "halt and reverse the trend toward

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                          18

Case 3:19-cv-00238-SLG   Document 53-1   Filed 07/27/20   Page 26 of 44

species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). The goal of the statute is not to maintain a species on life support indefinitely, but to recover the species to the point where it no longer requires protection. *See* 16 U.S.C. § 1532(3); *Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013) (citation omitted).

To accomplish these goals, section 9 prohibits any person from "taking" an endangered species, 16 U.S.C. § 1538(a)(1), defined broadly to include acts that kill, harm, harass, and capture protected animals. *Id.* § 1532(19). A federal agency may authorize actions causing take, "only if the projected take 'is not likely to jeopardize the continued existence' of any listed species." *Turtle Island Restoration Network v. U.S. Dep't of Comm.*, 878 F.3d 725, 735 (9th Cir. 2017) (quoting 16 U.S.C. § 1536(a)(2)).

The ESA prescribes a consultation process by which a federal agency can meet its substantive no-jeopardy obligation. When an action agency proposes any action that "may affect" a listed species, it must consult with the expert wildlife agency delegated responsibility for that species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Where, as here, NMFS is both the action agency (for issuing the regulations at issue) and expert wildlife agency, it must undertake intra-agency consultation. At the completion of formal consultation, NMFS issues a biological opinion, providing its evaluation of whether the agency action may jeopardize a listed species' continued existence. The ESA requires the consultation process and resulting biological opinion to be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). To comply with this requirement, NMFS "cannot ignore available biological information"

and must "give the benefit of the doubt to the species." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citation omitted).

In conducting its jeopardy analysis, NMFS must determine whether the direct and indirect effects of an action—in the context of the existing status of the species, added to the environmental baseline, and taken together with cumulative effects—"is likely to jeopardize the continued existence of a species." 50 C.F.R. § 402.14(g)(4), (h)(1); *see also* 16 U.S.C. § 1536(b)(3), (4). The environmental baseline includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area" along with "the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. "Cumulative effects" are "those effects of future State or private activities, not including Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

NMFS's ESA obligations do not end with the issuance of a biological opinion. As relevant here, NMFS must reinitiate consultation "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2).

B.     NMFS's Biological Opinion Is Unlawful

NMFS's BiOp purporting to analyze the impacts of the regulations on Cook Inlet beluga whales is arbitrary and capricious. NMFS's BiOp fails to consider the full effects

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                                                 20

of the action and fails to consider the aggregate effects of the action in light of the highly imperiled status of the species, environmental baseline, and cumulative effects.

### 1. *NMFS Failed to Properly Consider the Effects of the Action*

NMFS's jeopardy analysis fails to consider the full effects of the regulations. Specifically, in its jeopardy analysis—the section of the BiOp titled "Integration and Synthesis of Effects," PR1_ESA 000213—NMFS arbitrarily considered only a limited range of noise-producing activities. NMFS only analyzed the impacts of "seismic exploration, sub-bottom profiler, vertical seismic profiling, pipe and vibratory sheet pile driving, and water jet activities" because these were the only activities NMFS determined could "take" belugas within the meaning of the ESA. *See* PR1_ESA 000218; *see also* PR1_ESA 000139 (defining take). In doing so, NMFS ignored numerous effects from the action, including noise from tugboats, vessel operations, and other sources. *See* PR1_ ESA 000172 (stating these noise sources "may cause disturbance, but were not used to estimate Level A or B acoustic harassment"). This is wrong for two separate reasons.

First, the best available science shows that tugboat noise and other vessel traffic "take" Cook Inlet beluga whales within the meaning of the ESA. *See supra* pp. 8–12 (describing science indicating that vessels expose belugas to noise at or above levels the agency deems "harassment"). Yet NMFS inexplicably failed to consider such information in its jeopardy analysis, violating the requirement that NMFS base its analysis on the best available science. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8), (h); *see also Defs. of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 346, 349 (4th Cir. 2019)

(noting an agency "must seek out and consider all existing scientific data relevant to the decision it is tasked with making" and holding biological opinion unlawful for failing to consider the best available science, including the agency's own data).

Second, even if such sources of noise do not exceed the threshold for "take" under the ESA, the ESA still requires NMFS to consider these impacts as part of its jeopardy analysis. *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003) ("The ESA requires that all impacts of agency action . . . be addressed in the consultation's jeopardy analysis."). NMFS must "[a]dd the effects of the action and cumulative effects to the environmental baseline." 50 C.F.R. § 402.14(g)(4). "Effects of the action" are "*all consequences* to listed species or critical habitat that are caused by the proposed action." *Id.* § 402.02 (emphasis added). Under this definition "[a] consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." *Id.* There is no question that noise from tugboats and other vessel traffic from Hilcorp's activities fall within this broad definition. For example, NMFS admitted that tugboat noise can cause the whales to "engage in low-level avoidance behavior, short-term vigilance behavior, or short-term masking behavior." PR1_ESA 000176. NMFS also acknowledged that vessel traffic could cause Cook Inlet belugas to temporarily abandon their critical habitat. PR1_ESA 000183.

Even these so-called "low-level" or "short-term" behavioral responses can impact Cook Inlet beluga whales. The best available science demonstrates that, in contrast to species like humpback whales whose ranges span from Alaska to Central America, Cook

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                              22

Inlet belugas are particularly sensitive to disturbance because they have nowhere else to go. *See, e.g.*, AKR3020828–29 (noting concerns from "repeat exposures of animals that display a strong fidelity to a particular habitat" and "cumulative, synergistic, and chronic effects of elevated noise"); AKR3014188 (Cook Inlet belugas' site fidelity makes them "particularly vulnerable to anthropogenic impacts"); PR1_KeyRef 003361 (chronic noise can increase stress, leading to detrimental effects on health and reproduction). Moreover, NMFS's Recovery Plan ranks tugboat noise as the noise source of highest concern to the species' recovery, and noise from cargo vessels the second highest. PR1_KeyRef 003211.

By declaring such impacts "insignificant" or "discountable" because they allegedly will not "take" Cook Inlet belugas, PR1_ESA 000176, 183, 214, NMFS impermissibly ignored these impacts in its jeopardy analysis. NMFS has no legal basis for substituting only those activities constituting "take" for the comprehensive effects analysis mandated by the ESA. Yet that is just what NMFS did, rendering its BiOp unlawful. *See Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1147–50 (W.D. Wash. 2000) (stating "a biological opinion which does not address the full scope of the agency action is arbitrary and capricious because it necessarily fails to consider important aspects of the problem" and holding biological opinion unlawful for failing to assess the full scope of individual and cumulative fishing allowed under fishery management plan); *Conner*, 848 F.2d at 1453 (an agency must "analyze the effect of the *entire* agency action").[3]

---

[3] NMFS also claims the impacts from tugs and other vessels will be insignificant because of mitigation measures. *See* PR1_ESA 000176, 183. Most of the mitigation measures

## 2. NMFS Failed to Aggregate the Effects of the Action

NMFS also failed to conduct the proper jeopardy analysis by failing to aggregate the cumulative effects, environmental baseline, and proposed action in light of the status of Cook Inlet belugas to determine whether they collectively jeopardize the species' continued existence. *See* 50 C.F.R. § 402.14(g)(4), (h). In making this determination, the proper analysis "is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed action in the present and future human and natural contexts." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Bureau of Reclamation*, 426 F.3d 1082, 1093 (9th Cir. 2005) (citations omitted). Were it otherwise, "a listed species could be gradually destroyed, so long as each step on the path to destruction is sufficiently modest." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008).

As such, the Ninth Circuit has repeatedly rejected jeopardy analyses that fail to consider the impacts of the action under review when *added to* baseline conditions that have already contributed to a species' decline. For example, in *Turtle Island Restoration Network*, the plaintiffs challenged a biological opinion concluding that a longline fishery in Hawaii that would kill one loggerhead sea turtle per year would not jeopardize the

---

address the risk of ship strikes, not ship noise. *See* PR1_ESA 000050–51. The BiOp does not explain how such measures will reduce noise impacts, particularly (1) where tugs cannot discontinue activity when towing a rig, PR1_ESA 000045, and (2) the measures ask boats to avoid coming within 100 yards of a marine mammal, yet the available science shows some vessels, such as tugboats, "can produce sound capable of harassing marine mammals located over 2 km [2,187 yards] from the source." PR1_ESA 000109.

continued existence of the species because the species would decline anyway from other threats. *See* 878 F.3d at 735–36. The court held this approach unlawful, finding NMFS arbitrarily minimized the effects of the action at issue because "where baseline conditions already jeopardize a species, an agency may not take action that deepens the jeopardy by causing additional harm." *Id.* at 737 (citation omitted); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 265 F.3d 1028, 1036–37 (9th Cir. 2001) (if "individual projects are diluted to insignificance and not aggregated," then NMFS's "assessment . . . is tantamount to assuming that no project will ever lead to jeopardy of a listed species").

NMFS took a similarly arbitrary approach in the BiOp at issue here. NMFS has found that the Cook Inlet beluga whale population has declined by 75% since 1979, JOINTSUPP200881; concluded that the whale is "a species whose extinction is almost certain in the immediate future," JOINTSUPP200880; and considers reducing anthropogenic noise pollution the number one priority action to reduce the beluga's dramatic decline. JOINTSUPP200883. Hilcorp's oil and gas activities will increase noise pollution in Cook Inlet, including through new oil and gas activity in federal waters where existing lease sales have long expired and were never developed.

Nevertheless, in its jeopardy analysis, NMFS concluded noise and other impacts from Hilcorp's oil and gas activities in the Inlet would not jeopardize the species. *See* PR1_ESA 000225. NMFS reached its determination on the basis that any harassment to Cook Inlet beluga whales is "expected to be minimal," and to the extent a whale experiences a stress response, it will "dissipate shortly after the individual leaves the

Case 3:19-cv-00238-SLG   Document 53-1   Filed 07/27/20   Page 33 of 44

area" or the activity stops. PR1_ESA 000218. NMFS then concluded Hilcorp's activities are "not expected to appreciably reduce the likelihood of recovery of Cook Inlet beluga whales." *Id.* In so concluding, NMFS nowhere considered the effects of the regulations when *combined* with the baseline, cumulative impacts, and the grim status of the species.

Such failure is especially arbitrary considering NMFS's own Recovery Plan for Cook Inlet beluga whales states that "[e]xposure to any given stressor at a sub-lethal level may predispose individual belugas to greater susceptibility to mortality or long-term effects (for example, reproductive failure) from other stressors . . . the additive effects of multiple noise sources, as well as the combination of noise and other stressors, are of particular concern." PR1_KeyRef 003230. Moreover, while "individual activities might be deemed insignificant . . . creeping normality (e.g., death by a thousand cuts) can cause substantial adverse effects to CI belugas, at both individual and population levels" and that while the agency has historically reviewed the impacts of harassment authorizations under the MMPA "in isolation . . . the high level of human activity in Cook Inlet has increased such that cumulative effects of multiple activities must be appropriately accounted for." PR1_KeyRef 003274; *see also* AKR3014188 (study finding belugas already suffer noise levels constituting harassment "in a significant portion of the critical habitat"); PR1_MMPA 001787 (MMC emphasizing that NMFS is continuing to authorize beluga take "without adequate consideration of the combined or cumulative impacts of current and planned activities"). NMFS's failure to consider the aggregate impacts fails to ensure highly imperiled Cook Inlet beluga whales do not "slow[ly] slide into oblivion,"

in violation of the ESA. *See Nat'l Wildlife Fed'n*, 524 F.3d at 930.

     C.     <u>NMFS's Refusal to Reinitiate Consultation Violates the ESA</u>

Even if NMFS's BiOp was valid at the time the agency completed it, new

information has triggered NMFS's duty to reinitiate consultation. *See* 50 C.F.R.

§ 402.16(a)(2). NMFS's refusal to do so, and its continued reliance on an outdated BiOp

to implement the regulations, violates NMFS's procedural and substantive duties under

the ESA. *See Ctr. for Biological Diversity*, 698 F.3d at 1108 ("When reinitiation of

consultation is required, the original biological opinion loses its validity").

In January 2020, NMFS issued a new report on the distribution, abundance, and

trend of Cook Inlet belugas dated December 2019. JOINTSUPP100020. According to

NMFS, the report uses a "new, more reliable methodology" that "provides more accurate

picture of the status of Cook Inlet belugas," and reveals that "[t]he population is

estimated to be smaller and declining more quickly than previously thought." *Id*. NMFS

now estimates that there are only 279 whales remaining; and that the population is

declining at a rate of roughly 2.3% per year. *Id*.; JOINTSUPP100036–37. This means the

population is declining *4.6 times faster* than NMFS estimated when it issued its BiOp.

*See, e.g.*, PR1_ESA 000217 (estimating rate of decline at 0.5% per year). Further, the

new report changes NMFS's "methodology for analyzing the results of aerial population

surveys" via "a new group size estimation method and new criteria to determine whether

certain data from aerial surveys could be used reliably." JOINTSUPP100020.

The "new information" in this report "reveals effects of the action that may affect

[Cook Inlet beluga whales] . . . in a manner or to an extent not previously considered," triggering NMFS's duty to reinitiate consultation to ensure the regulations are not likely to jeopardize this highly imperiled, and ever-dwindling, species. *See* 50 C.F.R. § 402.16(a)(2). NMFS's failure to reinitiate consultation is unlawful. *See Forest Guardians v. Johanns*, 450 F.3d 455, 463 (9th Cir. 2006) (stating that it is the agency's burden to show the circumstances for reinitiating consultation are not present).

First, the new information regarding the dramatic rate of the whale's decline changes the foundation from which NMFS must analyze the impacts of the regulations. Indeed, NMFS acknowledged that the new information paints "a substantially different" picture for the species than what existed at the time it issued the BiOp. JOINTSUPP100136; *see also* JOINTSUPP100223 (the "results indicate there is a high probability" that the Cook Inlet beluga whale has "substantial[ly] decline[d]" in abundance over the last ten-years). In other words, the rapidly declining population is an important aspect of the problem NMFS must consider in analyzing the magnitude of threats posed by Hilcorp's activities, particularly in light of the Ninth Circuit's directive that "[w]here a species is already in peril, an agency may not take an action that will cause 'an active change in status for the worse.'" *Turtle Island Restoration Network*, 878 F.3d at 735 (citation omitted); *see also Sierra Club v. Lyng*, 694 F. Supp. 1260, 1273 (E.D. Tex. 1988) (new report indicating endangered woodpecker "had substantially declined" in national forests constituted new information triggering agency's duty to reinitiate where report pointed out "deficiencies in current forest management practices").

Second, the new information indicates that Hilcorp's activities may take more whales than NMFS considered in the BiOp. According to NMFS, the new population trend and abundance estimate is based on the agency's development of a "new, more reliable methodology" for how it assesses the aerial survey results. JONITSUPP100020. In its BiOp, NMFS used aerial survey results to estimate the density of Cook Inlet beluga whales in the action area, which in turn were used to estimate the number of whales that could be taken by Hilcorp's activities. *See* PR1_ESA 000147 (density estimates for belugas "based on NMFS aerial surveys"); PR1_ESA 000148 (NMFS "calculated the estimated exposures (without any mitigation) per activity per location by multiplying the density of marine mammals (# of marine mammals/km2) by the area of ensonification (km2) and the duration (days per year)"). As such, NMFS's update to how it analyzes survey data is likely to alter the density estimates, and thereby change the estimated number of takes of belugas. Indeed, NMFS acknowledged that "the new method makes some estimates of group size smaller and some larger," JOINTSUPP100135, indicating that Hilcorp may take more whales than NMFS estimated in the BiOp.

Nevertheless, NMFS claims it need not reinitiate because the authorized takes "are all in the form of behavioral harassment and will not affect fitness, reproduction, or survival of any individual whale." JOINTSUPP100008. This explanation fails.

In analyzing the impacts of the regulations on belugas, the relevant question is not just whether the activities they allow may affect the species' survival, but also whether they will affect its *recovery*. *See* 50 C.F.R. § 402.02 (defining "jeopardize"); *Nat'l*

*Wildlife Fed'n*, 524 F.3d at 931 ("[A] species can often cling to survival even when recovery is far out of reach"). NMFS's Recovery Plan for Cook Inlet belugas states that in evaluating effects on recovery, NMFS must consider "behavioral modification," "compromised communication," "chronic stress," and other impacts in addition to fitness, reproduction, and survival. *See* PR1_ KeyRef 003203. NMFS cannot look at only a subset of impacts to brush off its obligation to reinitiate consultation. Moreover, this explanation says nothing about whether the agency's new method for analyzing aerial surveys means more belugas will be taken than anticipated in the BiOp. NMFS's failure to reinitiate consultation violates the ESA.

## III.  NMFS's EA Violates NEPA

NMFS failed to take a hard look at the impacts of the regulations on Cook Inlet belugas as required by NEPA. NMFS violated this requirement by failing to fully consider the direct impacts; and by failing to properly consider cumulative impacts.

### A.  NMFS Must Fully Evaluate the Environmental Impacts of the Regulations

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a); *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009). Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. To that end, NEPA establishes "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted). The NEPA process seeks to force federal agencies, including NMFS,

to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. *See* 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5.

To accomplish these goals, NEPA requires the preparation of an environmental impact statement (EIS) for federal actions that may significantly affect the environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. An agency may prepare an environmental assessment (EA) to determine whether an EIS is required. *See* 40 C.F.R. § 1501.4(b). An EA must "include brief discussions of the need for the proposal . . . [and] of the environmental impacts of the proposed action and alternatives." *Id*. § 1508.9(b). When an agency issues an EA and concludes an EIS is not necessary, it must issue a "finding of no significant impact" (FONSI) identifying the reasons why the proposed action will not have a significant impact. *See id*. §§ 1501.4(e), 1508.13.

Like an EIS, an EA must examine both the direct impacts of an agency action, as well as potential cumulative impacts. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9; *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602-03 (9th Cir. 2010) (citation omitted). Direct impacts are those "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8. A "cumulative impact" is the impact that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id*. § 1508.7.

"Because the very important decision whether to prepare an EIS is based solely on the EA, the EA is fundamental to the decision-making process." *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000). The agency's EA and FONSI must supply a "convincing

statement of reasons" why the effects are insignificant, and why the agency's decision not to prepare an EIS was reasonable. *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211–12 (9th Cir. 1998) (citation omitted).

B.     NMFS Failed to Take a Hard Look at Direct Impacts

Like its MMPA and ESA analyses, NMFS's EA fails to properly consider the impacts of noise from tugboats and other vessels on Cook Inlet belugas, thereby failing to take the requisite hard look at the direct impacts under NEPA. Despite recognizing vessel noise can cause "physiological stress responses" in marine mammals, PR1_NEPA 000087, the EA ignores the impacts of vessel noise on Cook Inlet beluga whales. It does so by summarily claiming that any animals present in the project area "are likely habituated to the existing baseline of commercial ship traffic" and there are no "species-specific circumstances or other contextual factors that would increase concern and the likelihood of take from towing of the drill rig." PR1_NEPA 000059–60.

These cursory statements fail to comply with NEPA's hard look requirements. *See, e.g.*, *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007) (holding a NEPA analysis unlawful for, *inter alia*, failing to take a hard look at the direct impacts of a project on the Pacific fisher). And it also ignores the "species-specific circumstances" demonstrating the significant risk that vessel noise poses to Cook Inlet belugas, described at length in the scientific literature, including the agency's own Recovery Plan. *See* PR1_KeyRef 003211; *supra* pp. 8–12. In short, NMFS's EA fails to "include a discussion of adverse impacts that does not improperly minimize negative side

effects" to Cook Inlet beluga whales as required by NEPA. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (citation omitted).

      C.      <u>NMFS Failed to Take a Hard Look at Cumulative Impacts</u>

NMFS's EA also fails to take a hard look at the cumulative impacts of the regulations. A cumulative impacts analysis is vitally important to fulfilling NEPA's goals. As the Ninth Circuit has instructed, because "so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002). "[I]n considering cumulative impact, an agency must provide some quantified or detailed information; . . . general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004) (citation omitted). NMFS failed to comply with these requirements.

NMFS's "analysis" of cumulative impacts amounts to nothing more than general descriptions of categories of activities and projects that impact Cook Inlet beluga whales. PR1_NEPA 000092–100. While naming these categories and activities is a necessary start to an adequate cumulative impacts analysis, "it is not a description of *actual* environmental effects." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004). Instead of simply listing other activities and projects, the EA must explain "how those individual impacts might combine or synergistically interact with each other to affect the . . . environment." *Id.* at 997. NMFS failed to do so.

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG             33

Nowhere does NMFS actually analyze what the impacts on Cook Inlet beluga whales will be. This failure is particularly glaring considering NMFS lists "[c]umulative effects of multiple stressors" as a threat of high concern to the species, *see* PR1_KeyRef 003136, and has authorized, or is considering authorizing, take of Cook Inlet beluga whales incidental to numerous other projects in the Inlet that will overlap with Hilcorp's activities. *See, e.g.*, 84 Fed. Reg. 30,991 (June 28, 2019) (proposed rule to allow the Alaska Gasline Development Corporation to take Cook Inlet beluga whales incidental to construction and operation of the Alaska LNG project from 2020-2025); 85 Fed. Reg. 19,294 (Apr. 6, 2020) (authorizing the Port of Alaska to take Cook Inlet beluga whales incidental to construction of the Petroleum and Cement Terminal); PR1_KeyRef 003274 (noting in 2012 over 2,700 takes of Cook Inlet beluga whales were requested for research and development projects). Nor does NMFS consider the impacts from other activities that NMFS has not authorized, but may be negatively impacting the species. *See, e.g.*, AKR3014188, 206 (2019 study finding the current level of shipping activities creates chronic noise and noting concern regarding unpermitted activities that affect belugas).

The failure to report and analyze the total estimated take of, and other impacts to, Cook Inlet beluga whales stymies an assessment of the cumulative impacts to the whales from Hilcorp's activities. *See* PR1_MMPA 001787 (MMC letter highlighting that NMFS continues to authorize take of Cook Inlet beluga whales without adequately considering cumulative impacts). While NMFS may consider the impacts from Hilcorp's activities to be minor, that does not absolve the agency of its duty under NEPA to consider the

combined impacts of the regulations on endangered beluga whales. As the Ninth Circuit has explained:

> the addition of a small amount of [pollution] to a [waterway] may have only a limited impact on [fish] survival, or perhaps no impact at all. But the addition of a small amount here, a small amount there, and still more at another point could add up to some-thing with a much greater impact, until there comes a point where even a marginal increase will mean that *no* [fish] survive.

*Klamath-Siskiyou*, 387 F.3d at 994; *see also Te-Moak Tribe*, 608 F.3d at 603–06 (rejecting EA's cumulative impact analysis because it failed to analyze impacts in light of other projects that would impact the same resources).

The same is true for impacts to Cook Inlet belugas from noise pollution—the addition of some noise here, and some noise there, could add up to cumulatively significant impacts. This is especially true considering NMFS itself recently found that "[a]nthropogenic noise, particularly the combined effect of different sound sources occurring simultaneously or consecutively, has the potential to" negatively affect the behavior of Cook Inlet beluga whales and "may induce chronic effects altering the health of individual CI belugas, which in turn have consequences at the population level (i.e., decreased survival and reproduction)" over time. PR1_KeyRef 003213. Yet NMFS failed to take a hard look at cumulative impacts, in violation of NEPA.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment and vacate the regulations and associated BiOp, EA, and FONSI.

Respectfully submitted this 27th day of July, 2020,


/s/ Kristen Monsell
Kristen Monsell
(CA Bar #304793; *Pro Hac Vice*)

/s/ Julie Teel Simmonds
Julie Teel Simmonds
(CO Bar # 32822; *Pro Hac Vice*)

/s/ Kassia Siegel
Kassia Siegel (AK Bar # 0106044)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiffs Cook Inletkeeper and*
*Center for Biological Diversity*