Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
James C. Feldman (Bar No. 1702003)
james.feldman@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

Attorneys for Hilcorp Alaska, LLC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER and CENTER FOR BIOLOGICAL DIVERSITY, | No.: 3:19-cv-00238-SLG |
| Plaintiffs, | |
| v. | |
| WILBUR ROSS, Secretary of Commerce; JIM BALSIGER, Regional Administrator of National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants, | |
| HILCORP ALASKA, LLC; and STATE OF ALASKA, | |
| Intervenor-Defendants. | |

## INTERVENOR-DEFENDANT HILCORP ALASKA'S OPPOSITION BRIEF (L.R. 16.3(c)(2))

### *ORAL ARGUMENT REQUESTED*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

I.    INTRODUCTION ........................................................................................ 1

II.   BACKGROUND .......................................................................................... 3

      A.    Oil and Gas Development in Cook Inlet ...................................... 3

      B.    Hilcorp's Cook Inlet Operations ................................................. 4

      C.    Applicable MMPA Standards ...................................................... 4

      D.    Agency Processes and Determinations Challenged in This Lawsuit .......... 5

III.  STANDARD OF REVIEW ........................................................................ 7

IV.   ARGUMENT ............................................................................................... 8

      A.    Plaintiffs Have Waived Many of Their Claims and Arguments ................. 9

            1.    Plaintiffs have waived claims not pursued in their summary
                  judgment brief ...................................................................... 9

            2.    Plaintiffs have waived arguments that were not raised during
                  the administrative process or pled in the Supplemental
                  Complaint ............................................................................ 10

      B.    NMFS's Decision Complies with the MMPA ........................... 13

            1.    NMFS's reasoned determination that vessel noise is not an
                  expected source of take is entitled to deference. ............... 13

            2.    NMFS's "small numbers" determination is well supported
                  and consistent with law and agency practice. ................... 16

            3.    NMFS reasonably mandated a suite of mitigation and
                  avoidance measures designed to ensure the least practicable
                  impact .................................................................................. 21

      C.    NMFS's Decision Complies with the ESA ................................ 27

            1.    The BiOp fully considers the effects of vessel noise ......... 27

            2.    NMFS enumerated and analyzed all effects of the action,
                  along with baseline and cumulative effects ...................... 28

            3.    NMFS rationally determined that reinitiation of consultation
                  is unwarranted .................................................................... 31

      D.    NMFS's Decision Complies with NEPA ................................... 34

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG                           i

1. NMFS took a hard look at the potential impacts of vessel noise on beluga whales................................................................. 35

2. NMFS fully analyzed cumulative impacts..................................... 36

E. Vacatur Is Not the Appropriate Remedy..................................... 37

V. CONCLUSION ............................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Wilderness League v. Jewell*,
   116 F. Supp. 3d 958 (D. Alaska 2015) ...................................................................... 20

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ...................................................................... 38

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
   273 F.3d 1229 (9th Cir. 2001) ...................................................................... 7, 8, 21

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
   688 F.3d 989 (9th Cir. 2012) ...................................................................... 38

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...................................................................... 8

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ...................................................................... 7

*City of Tacoma, Wash. v. FERC*,
   460 F.3d 53 (D.C. Cir. 2006) ...................................................................... 15

*Ctr. for Biological Diversity v. Kempthorne*,
   588 F.3d 701 (9th Cir. 2009) ...................................................................... 8, 11, 13

*Ctr. for Biological Diversity v. Salazar*,
   695 F.3d 893 (9th Cir. 2012) ...................................................................... 18, 19, 21, 36

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ...................................................................... 13

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
   451 F.3d 1005 (9th Cir. 2006) ...................................................................... 35

*Exxon Mobil Corp. v. U.S. EPA*,
   217 F.3d 1246 (9th Cir. 2000) ...................................................................... 12, 13

*Gaule v. Meade*,
   402 F. Supp. 2d 1078 (D. Alaska 2005) ...................................................................... 21

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
378 F.3d 1059 (9th Cir. 2004) ................................. 17

*Havasupai Tribe v. Robertson,*
943 F.2d 32 (9th Cir. 1991) ................................. 11

*Idaho Farm Bureau Fed'n v. Babbitt,*
58 F.3d 1392 (9th Cir. 1995) ................................. 38

*Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of
Interior,*
767 F.3d 781 (9th Cir. 2014) ................................. 8

*Kleppe v. Sierra Club,*
427 U.S. 390 (1976) ................................. 8, 21

*Kunaknana v. U.S. Army Corps of Eng'rs,*
23 F. Supp. 3d 1063 (D. Alaska 2014) ................................. 12

*Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.,*
120 F. Supp. 2d 1005 (M.D. Fla. 2000) ................................. 32, 33, 34

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989) ................................. 8, 21, 35

*Metcalf v. Daley,*
214 F.3d 1135 (9th Cir. 2000) ................................. 34, 35

*Nat. Res. Def. Council, Inc. v. Evans,*
279 F. Supp. 2d 1129 (N.D. Cal. 2003) ................................. 17

*Nat'l Wildlife Fed'n v. Espy,*
45 F.3d 1337 (9th Cir. 1995) ................................. 38

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.,*
947 F. Supp. 2d 1031 (D. Alaska 2013) ................................. passim

*Native Vill. of Nuiqsut v. Bureau of Land Mgmt.,*
432 F. Supp. 3d 1003 (D. Alaska 2020) ................................. 10, 36

*Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.,*
647 F. Supp. 2d 1221 (D. Or. 2009) ................................. 35

Case 3:19-cv-00238-SLG   Document 60   Filed 10/09/20   Page 5 of 49

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

# TABLE OF AUTHORITIES
(continued)

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
 402 F.3d 846 (9th Cir. 2005) .................................................................. 7

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez,*
 606 F. Supp. 2d 1122 (E.D. Cal. 2008) ................................................ 15

*Pac. Rivers Council v. U.S. Forest Serv.,*
 942 F. Supp. 2d 1014 (E.D. Cal. 2013) ................................................ 38

*Portland Audubon Soc'y v. Endangered Species Comm.,*
 984 F.2d 1534 (9th Cir. 1993) .............................................................. 15

*Portland Gen. Elec. Co. v. Bonneville Power Admin.,*
 501 F.3d 1009 (9th Cir. 2007) .............................................. 11, 12, 13

*Protect Our Water v. Flowers,*
 377 F. Supp. 2d 844 (E.D. Cal. 2004) .............................................. 32, 34

*Reyes v. Lynch,*
 842 F.3d 1125 (9th Cir. 2016) .............................................................. 19

*Save the Yaak Comm. v. Block,*
 840 F.2d 714 (9th Cir. 1988) ................................................................ 35

*Selkirk Conservation Alliance v. Forsgren,*
 336 F.3d 944 (9th Cir. 2003) ................................................................ 36

*Sierra Club v. Marsh,*
 816 F.2d 1376 (9th Cir. 1987) .............................................................. 32

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
 608 F.3d 592 (9th Cir. 2010) ................................................................ 36

*Tin Cup, LLC v. U.S. Army Corps of Eng'rs,*
 904 F.3d 1068 (9th Cir. 2018) .............................................................. 18

*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
 878 F.3d 725 (9th Cir. 2017) ................................................................ 30

*United States v. Turkette,*
 452 U.S. 576 (1981) ................................................................................ 20

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Wyo. Outdoor Council v. Bosworth,*
  284 F. Supp. 2d 81 (D.D.C. 2003) ......................................................................... 32, 34

**Statutes**

5 U.S.C. § 706(2)(A) .................................................................................................... 38

16 U.S.C. § 1362(13) ..................................................................................................... 4

16 U.S.C. § 1362(18)(A)(i) ........................................................................................... 5

16 U.S.C. § 1371(a) ....................................................................................................... 4

16 U.S.C. § 1371(a)(5)(A) ........................................................................................ 1, 17

16 U.S.C. § 1371(a)(5)(A)(i) ......................................................................................... 4

16 U.S.C. § 1371(a)(5)(A)(i)(I) ........................................................................... 5, 18, 20

16 U.S.C. § 1371(a)(5)(D) ........................................................................................... 20

Endangered Species Act, 16 U.S.C. §§ 1531–1544 ............................................... passim

Marine Mammal Protection Act, 16 U.S.C. §§ 1361–1421 ..................................... passim

National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 ................................. passim

**Regulations**

50 C.F.R. § 216.106 ....................................................................................................... 5

50 C.F.R. § 217.163(g)(6) ........................................................................................... 25

50 C.F.R. § 402.02 ....................................................................................................... 29

50 C.F.R. § 402.16(a)(2) .......................................................................................... 31, 34

78 Fed. Reg. 75,488 (Dec. 12, 2013) .......................................................................... 19

81 Fed. Reg. 47,240 (July 20, 2016) ........................................................................... 19

83 Fed. Reg. 63,268 (Dec. 7, 2018) ............................................................................ 24

84 Fed. Reg. 46,788 (Sept. 5, 2019) ............................................................................ 19

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

85 Fed. Reg. 55,645 (Sept. 9, 2020)..................................................................... 24

**Other Authorities**

H.R. Rep. No. 97-228, *reprinted in* 1981 U.S.C.C.A.N. .................................................. 18

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

# I. INTRODUCTION

This case involves the National Marine Fisheries Service's ("NMFS") authorization of "incidental take" under the Marine Mammal Protection Act ("MMPA")[1] for Hilcorp Alaska LLC's ("Hilcorp") exploration, production, and maintenance activities in Cook Inlet. Hilcorp requested the authorization because its lawful activities may incidentally cause non-lethal and temporary harassment (*i.e.*, "take") of small numbers of marine mammals. Rather than requesting numerous one-year "incidental harassment authorizations" ("IHAs") under the MMPA year after year, Hilcorp proactively petitioned NMFS for the issuance of "incidental take regulations" ("ITR") covering a five-year period. This allowed NMFS to comprehensively evaluate all of the potential impacts of the planned activities and establish an effective, long-term regulatory framework.

NMFS can issue an ITR under the MMPA if it determines that the requested authorization will involve "small numbers" of marine mammals, have no more than a "negligible impact" on potentially affected species, and result in the least practicable adverse impact.[2] NMFS conducted a thorough review and concluded that these requirements were met based on an extensively documented administrative record and an unprecedented suite of mitigation and monitoring measures. NMFS also concluded that the ITR was not likely to "jeopardize" any species listed under the Endangered Species

---

[1] 16 U.S.C. §§ 1361–1421.

[2] 16 U.S.C. § 1371(a)(5)(A).

Act ("ESA")[3] and would not result in a "significant impact" under the National Environmental Policy Act ("NEPA").[4]

Plaintiffs Cook Inletkeeper and Center for Biological Diversity ("CBD" and collectively "Plaintiffs") are environmental advocacy organizations that have long opposed industrial activities in Cook Inlet. Their current target is Hilcorp, and they have publicly expressed strong opposition in particular to Hilcorp's seismic survey in Cook Inlet—the activity with which the majority of estimated beluga whale incidental harassment under the ITR is associated.[5] After Plaintiffs filed this lawsuit in 2019, Hilcorp conducted the seismic survey and, as documented in its 238-page monitoring report, not a single harassment of a Cook Inlet beluga whale was recorded.[6]

With the centerpiece of their opposition completed without incident, Plaintiffs shift their summary judgment arguments to nibble around the edges of NMFS's decision, attempting unsuccessfully to manufacture a case out of nothing. In their motion for summary judgment, Plaintiffs raise issues that were never presented to NMFS during the administrative process, and have therefore waived those arguments. They assert other arguments that are almost identical to arguments that have already been heard and rejected by this Court. They misconstrue and misapply core MMPA and ESA legal

---

[3] 16 U.S.C. §§ 1531–1544.

[4] 42 U.S.C. §§ 4321–4347.

[5] *See, e.g.*, PR1_MMPA 961–75 (Plaintiffs' comment letter lamenting the alleged effects of Hilcorp's seismic survey).

[6] *See* JOINTSUPP 100237–474.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

standards. And, most fatally, Plaintiffs' arguments ignore and directly contradict the wealth of information and analyses contained in NMFS's administrative record.

Ultimately, Plaintiffs simply disagree with NMFS's reasoned conclusions. But NMFS is the expert, not Plaintiffs, and NMFS's rational and well-supported scientific determinations are entitled to the highest level of deference. Hilcorp therefore respectfully requests that this Court deny Plaintiffs' motion for summary judgment and grant the cross-motions for summary judgment of Defendants and Intervenor-Defendants.

## II. BACKGROUND

### A. Oil and Gas Development in Cook Inlet.

Alaska's Cook Inlet basin contains large oil and gas deposits that have been actively developed for over 60 years. Cook Inlet reached peak oil production in the 1970s and peak natural gas production in the mid-1990s.[7] Numerous oil and gas fields on the Kenai Peninsula and offshore Cook Inlet have produced over 1.3 billion barrels of oil and 7.75 trillion cubic feet of natural gas.[8] Cook Inlet's natural gas reserves are essential to meeting the energy needs of Alaska, generating 70 percent of the electricity that powers homes and businesses in communities along the Railbelt.[9]

---

[7] Dkt. 17 ¶ 4.

[8] *Id.*

[9] *See* Michael Redlinger et al., Alaska Dep't of Nat. Res., "Cook Inlet Natural Gas Availability," at 9 (Mar. 2018), https://dog.dnr.alaska.gov/Documents/ResourceEvaluation/CI_Natural_Gas_Availability _Study_2018.pdf (last visited Sept. 21, 2020).

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG                    5

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

**B.** **Hilcorp's Cook Inlet Operations.**

Hilcorp has been operating in Alaska since 2011 and owns or operates numerous oil and gas units and facilities located in both Cook Inlet and on the North Slope.[10] Additionally, Hilcorp's subsidiaries own and operate four major pipeline systems in Cook Inlet.[11] Although Hilcorp expends considerable effort to avoid interactions with marine mammals, the proximity of certain marine mammal habitat to Hilcorp's Cook Inlet infrastructure as well as suitable oil and gas development locations make it nearly impossible to completely eliminate the potential for some unintentional, minor marine mammal interactions.

**C.** **Applicable MMPA Standards.**

With certain exceptions, the MMPA generally prohibits the "taking" of marine mammals.[12] The MMPA defines "take" to mean "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal."[13] The MMPA gives NMFS the authority to allow, by regulation, the incidental, but not intentional, taking of small numbers of marine mammals in response to requests by citizens.[14] This authorization may be issued if the total takings within a five-year period will have a negligible impact on the affected marine mammal stocks.[15] In so doing, NMFS must also identify

---

[10] Dkt. 17 ¶ 3.

[11] *Id.*

[12] *See* 16 U.S.C. § 1371(a).

[13] 16 U.S.C. § 1362(13).

[14] *See* 16 U.S.C. § 1371(a)(5)(A)(i).

[15] *Id.* § 1371(a)(5)(A)(i)(I).

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG                                                   4

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

"permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on the species … and its habitat…."[16] To authorize specific instances of take, NMFS issues Letters of Authorization ("LOA") to requesting parties that meet the terms and conditions of the regulations.[17]

The MMPA specifies two levels of harassment. Level A harassment is defined as "any act of pursuit, torment, or annoyance which … has the *potential to injure* a marine mammal or marine mammal stock in the wild."[18] Level B harassment means "any act of pursuit, torment, or annoyance which … has the *potential to disturb* a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering."[19]

## D. Agency Processes and Determinations Challenged in This Lawsuit.

In April 2018, with the goal of exploring for and developing oil and gas resources on recently purchased lease tracts as well as maintaining existing infrastructure and decommissioning certain facilities, Hilcorp petitioned NMFS for an ITR under which NMFS would authorize the unintentional, non-lethal take of marine mammals incidental to sound exposure associated with Hilcorp's activities in Cook Inlet from May 2019 to

---

[16] *Id*. § 1371(a)(5)(A)(i)(II)(aa).

[17] 50 C.F.R. § 216.106.

[18] 16 U.S.C. § 1362(18)(A)(i) (emphasis added).

[19] *Id*. § 1362(18)(A)(ii) (emphasis added). NMFS has developed acoustic thresholds that identify the received level of underwater sounds above which exposed marine mammals will be reasonably expected to experience behavioral disturbance (Level B harassment) or incur permanent threshold shift (Level A harassment). *See* PR1_MMPA 2287.

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG                    5

April 2024.[20] After 15 months of evaluation under the MMPA, the ESA, and NEPA, NMFS granted Hilcorp's petition and issued the ITR for 2019–2024, as well as a one-year LOA authorizing Hilcorp to take, by incidental harassment, certain species of marine mammals while conducting 3D seismic surveys, geohazard surveys, and platform and pipeline maintenance.[21] The ITR and LOA prescribe a suite of mitigation and monitoring measures designed to minimize and avoid any potential impacts to marine mammals from Hilcorp's activities.[22] With respect to Cook Inlet beluga whales, the ITR and LOA authorize only Level B harassment.[23]

In corresponding decisions, NMFS issued an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") under NEPA, as well as a "no-jeopardy" Biological Opinion ("BiOp") pursuant to Section 7 of the ESA. Shortly thereafter, in early September 2019, Plaintiffs filed this lawsuit challenging the ITR and NMFS's associated determinations.[24]

With all necessary permits and authorizations secured, Hilcorp collected 3D seismic data in Lower Cook Inlet over 38 days in the fall of 2019, completing the survey

---

[20] *See* PR1_MMPA 2253.

[21] PR1_MMPA 2252. NMFS issued the Year 2 LOA to Hilcorp on April 22, 2020.

[22] PR1_MMPA 2303–08.

[23] *See* PR1_MMPA 2268 ("For Cook Inlet beluga whales, the authorized take, by Level B harassment only….").

[24] *See* Dkt. 1 (Plaintiffs' Complaint).

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

in mid-October.[25] Hilcorp's final report from this survey documents zero instances of Cook Inlet beluga whale takes.[26]

In January 2020, NMFS released its biennial abundance estimate for Cook Inlet beluga whales.[27] NMFS estimated that the present population size is between 250 and 317 animals and that the rate of decline is approximately 2 percent per year (compared to the previous estimate of 0.5 percent per year).[28] Based on this information, NMFS revised its abundance estimate down to 293 whales (from 328 whales). CBD subsequently sent a notice of intent to sue to NMFS for failing to reinitiate Section 7 consultation under the ESA based on the revised abundance estimate, and amended Plaintiffs' Complaint to assert that claim.[29]

### III. STANDARD OF REVIEW

NMFS's actions at issue here are reviewed under the Administrative Procedure Act ("APA").[30] Under the APA, courts "will reverse agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[31] Although

---

[25] JOINTSUPP 100269–71.

[26] JOINTSUPP 100297–99.

[27] JOINTSUPP 100129.

[28] JOINTSUPP 100000.

[29] JOINTSUPP 100012; Dkt. 47.

[30] *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2005); *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1235 (9th Cir. 2001).

[31] *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (citation omitted).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

this review is "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."[32] "For issues requiring agency expertise, [courts] must defer to the informed discretion of the responsible federal agencies,"[33] and courts exercise their "greatest deference" involving "scientific predictions within the scope of [an agency's] expertise."[34] "Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science."[35]

## IV. ARGUMENT

Plaintiffs assert that NMFS violated the MMPA, the ESA, and NEPA in authorizing marine mammal takes incidental to Hilcorp's Cook Inlet oil and gas activities.[36] As explained below, these claims lack merit on both procedural and substantive grounds.

---

[32] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

[33] *Cal. ex rel. Imperial Cty. Air Pollution Control Dist. v. U.S. Dep't of Interior*, 767 F.3d 781, 792 (9th Cir. 2014) (internal quotation marks and citation omitted); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))).

[34] *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 711 (9th Cir. 2009).

[35] *Ariz. Cattle Growers'*, 273 F.3d at 1236 (internal quotation marks and citation omitted).

[36] *See* Dkt. 47 (Plaintiffs' Supplemental Complaint).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

## A. Plaintiffs Have Waived Many of Their Claims and Arguments.

As a threshold matter, Plaintiffs have waived many of their claims and arguments. Plaintiffs' waiver applies to both claims or allegations pled in the Supplemental Complaint but not pursued in the motion for summary judgment as well as to numerous arguments raised for the first time in their motion for summary judgment.

### 1. Plaintiffs have waived claims not pursued in their summary judgment brief.

Plaintiffs' motion for summary judgment abandons several of the claims and arguments alleged in the Supplemental Complaint. Specifically, Plaintiffs fail to pursue the following:

- Plaintiffs' Second Claim for Relief, which alleges that the modified LOA issued to Hilcorp violates the MMPA and the APA.[37]

- Plaintiffs' allegation from the First Claim for Relief that NMFS failed to ensure that the authorized take will have no more than a "negligible impact" on marine mammals.[38]

---

[37] *Id.* ¶¶ 168–70. Additionally, Plaintiffs' Supplemental Complaint makes numerous allegations about the impact of seismic surveys on the beluga whale, but those are not included in Plaintiffs' Opening Brief. Any challenge to the propriety of the seismic surveys is also waived, and with respect to the now-completed 3D seismic survey, is moot as no effective relief can be granted.

[38] *Id.* ¶ 163.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

- Plaintiffs' allegation from the First Claim for Relief that NMFS violated the MMPA and APA by failing to explain alleged deviations from the Marine Mammal Commission's recommendations.[39]

- Plaintiffs' allegation from the Fifth Claim for Relief that NMFS was required to prepare an environmental impact statement.[40]

- Plaintiffs' allegation from the Fifth Claim for Relief that NMFS failed to consider a reasonable range of alternatives.[41]

Plaintiffs' failure to pursue these claims and arguments at summary judgment results in waiver.[42] Accordingly, the Court should grant summary judgment in favor of Defendants and Intervenor-Defendants on all of these claims and arguments.

### 2. Plaintiffs have waived arguments that were not raised during the administrative process or pled in the Supplemental Complaint.

Plaintiffs' motion for summary judgment presents several new arguments that were never raised in comments to NMFS during the administrative rulemaking process below. Additionally, Plaintiffs neglected to plead these previously unraised allegations in their Complaint, their First Amended Complaint, or their Supplemental Complaint.[43] Arguments raised for the first time in Plaintiffs' motion for summary judgment include:

---

[39] *Id.* ¶ 165.

[40] *Id.* ¶¶ 182–83.

[41] *Id.* ¶ 185.

[42] *See Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 432 F. Supp. 3d 1003, 1036 n.229 (D. Alaska 2020) ("Plaintiffs do not raise, or even mention, this claim in their briefing. The Court therefore considers this claim waived.").

[43] *See* Dkts. 1, 28, 47.

- Plaintiffs' allegation that NMFS underestimated Cook Inlet beluga takes attributable to vessel noise.[44]

- Plaintiffs' allegation that NMFS "segmented" its "small numbers" analysis.[45]

- Plaintiffs' allegation that NMFS failed to take a "hard look" at vessel noise under NEPA.[46]

"A participant in an administrative process must alert the agency to their position and contentions. Failure to raise such particular objections may result in forfeiture of any objection to the resulting regulation."[47] "Absent exceptional circumstances, such belatedly raised issues may not form a basis for reversal of an agency decision."[48] As articulated by the Ninth Circuit, the purpose of this rule is to "protect[] the agency's prerogative to apply its expertise, to correct its own errors, and to create a record for our review."[49] Despite submitting multiple comment letters during the administrative rulemaking process,[50] Plaintiffs failed to include all of the arguments listed above in their

---

[44] Dkt. 53-1 at 8–12.

[45] *Id.* at 12–15.

[46] *Id.* at 32–33.

[47] *Kempthorne*, 588 F.3d at 710 (brackets, internal quotation marks, and citations omitted).

[48] *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991).

[49] *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007).

[50] *See* PR1_MMPA 2559 (Cook Inletkeeper Comments on Notice of Receipt of Petition for ITR); PR1_MMPA 2543 (CBD Comments on Notice of Receipt of Petition for ITR); PR1_MMPA 961 (CBD and Cook Inletkeeper Comments on Proposed Rule); JOINTSUPP 200000 (CBD and Cook Inletkeeper Comments on Modified LOA).

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG

comments and no other commenter raised these issues. Moreover, because these arguments are either very narrow and specific (*i.e.*, vessel noise allegedly causes Level B harassment) or novel and unprecedented (*i.e.*, NMFS "segmented" its small numbers analysis), NMFS could not reasonably have been expected to respond to the specific issues that Plaintiffs have raised for the first time in their Opening Brief.[51] Plaintiffs have therefore waived those arguments.[52]

Indeed, this case perfectly illustrates why stakeholders must notify the agency of concerns during the rulemaking process. For example, Plaintiffs specifically allege in their motion for summary judgment that NMFS failed to explain why tugboats and other support vessels operate in ways that are unlikely to take Cook Inlet beluga whales and then use this supposed shortcoming to argue that "NMFS's refusal to consider beluga take from vessel noise means NMFS ignored such take in conducting both its small numbers and its negligible impact determinations."[53] But Plaintiffs communicated none of this criticism to NMFS in their comment letters and, as such, NMFS had no opportunity to respond to Plaintiffs' specific complaints.[54] In fact, the only apparent

---

[51] *Kunaknana v. U.S. Army Corps of Eng'rs*, 23 F. Supp. 3d 1063, 1088 (D. Alaska 2014); *see infra* Section IV.B.

[52] *See Portland Gen. Elec.*, 501 F.3d at 1023 ("Petitioners have waived their right to judicial review of these final two arguments as they were not made before the administrative agency, in the comment to the proposed rule, and there are no exceptional circumstances warranting review." (quoting *Exxon Mobil Corp. v. U.S. EPA*, 217 F.3d 1246, 1249 (9th Cir. 2000))).

[53] Dkt. 53-1 at 12.

[54] *See supra* n.50.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

reference from *any commenter* on the ITR remotely alluding to incidental take associated with vessel noise is the Marine Mammal Commission's comment *agreeing with* NMFS's conclusion that take of marine mammals associated with tugs and other transiting vessels is unlikely to occur.[55] This "gotcha" scenario is precisely what the waiver rule is intended to prevent.

The waiver rule makes it incumbent upon Plaintiffs to raise issues during the rulemaking process to allow the agency to meaningfully address their criticisms. Plaintiffs failed to do so on the issues identified above and no other commenter addressed those issues. Accordingly, Plaintiffs have waived those arguments.[56] In addition, as set forth below, even if Plaintiffs had not waived those arguments, they still fail on the merits.

**B.      NMFS's Decision Complies with the MMPA.**

  **1.      NMFS's reasoned determination that vessel noise is not an expected source of take is entitled to deference.**[57]

Although the Supplemental Complaint primarily addresses underwater noise from Hilcorp's now-completed 3D seismic survey, Plaintiffs' summary judgment motion shifts

---

[55] PR1_MMPA 1787 ("The preamble to the proposed rule indicated that incidental taking is unlikely to occur during tug-towing activities based on the predictable movement of the tug, similar to other transiting vessels. *The Commission agrees* but questions why NMFS included the extents of both Level A and B harassment zones in Tables 5 and 6 in the Federal Register notice, respectively." (emphasis added)).

[56] *See Kempthorne*, 588 F.3d at 710 ("Failure to raise such 'particular objections' may result in 'forfeit[ure of] any objection' to the resulting regulation." (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765–66 (2004)); *Portland Gen. Elec.*, 501 F.3d at 1023; *Exxon Mobil Corp.*, 217 F.3d at 1249.

[57] As explained in *supra* Section IV.A, Plaintiffs have waived this argument.

---

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

13

gears to focus on the alleged impacts of vessel noise on beluga whales from tugboats and other vessels that will be used to support Hilcorp's authorized activities.[58] Specifically, Plaintiffs assert that "NMFS failed to consider take from noise generated by tugs towing rigs and other vessels."[59] They also repackage this argument into ESA and NEPA claims (addressed in the following sections). All of these claims are meritless.

Despite the fact that Plaintiffs raised no vessel noise concerns during the administrative process, the administrative record shows that NMFS extensively considered the effects of vessel noise on marine mammals, including beluga whales.[60] This is particularly evident in the BiOp's detailed discussion of noise associated with vessel traffic and with tugboats in particular.[61] The BiOp explains the various sources of sound associated with tugboats and other vessels and notes that "observations of beluga whales in Cook Inlet have reported very little response to industrial activities."[62] The BiOp concludes:

> Whale reactions to slow-moving vessels are less dramatic than their reactions to faster and/or erratic vessel movements. Some species have been noted to tolerate slow-moving vessels within several hundred meters, especially when the vessel is not directed toward the animal and when there are no sudden changes in direction or engine speed. Considering that tugs towing the drill

---

[58] *Compare* Dkt. 47 *with* Dkt. 53-1 at 8–12.

[59] Dkt. 53-1 at 9.

[60] *See* PR1_MMPA 257 (explaining that take from tugboats towing the drill rig is unlikely to occur because of the low marine mammal population density in the project area combined with the predictable movement of the vessels and tugs).

[61] *See* PR1_ESA 181–83 (BiOp's discussion of vessel noise); PR1_ESA 172–74 (BiOp's discussion of tugboat noise).

[62] PR1_ESA 175.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

rig are only anticipated to travel at ~5 knots, we do not anticipate consequential reactions to towing noise.[63]

In issuing the ITR, NMFS can rely upon the analysis of issues thoroughly addressed by the agency in the BiOp.[64] The agency's rational determination with respect to the insignificant potential for harassment from vessel noise is entitled to deference.[65]

Plaintiffs also contend that "[t]he best available science demonstrates that noise from tugboats and other vessels 'takes' Cook Inlet belugas within the meaning of the MMPA."[66] But, aside from second-guessing NMFS's scientific determination, Plaintiffs' argument incorrectly presumes that Cook Inlet beluga whales will be encountered just hundreds of feet from Hilcorp's tugs.[67] The ITR establishes safety zones and exclusion zones that must be carefully monitored and requires "Hilcorp to shut down activities when any beluga is sighted within the relevant Level B harassment isopleth."[68] Accordingly, NMFS concluded that "with the implementation of these [and other]

---

[63] *Id.* (citations omitted).

[64] *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1122, 1188 (E.D. Cal. 2008) ("[T]he action agency need not undertake a separate, independent analysis of the issues addressed in the BiOp." (quoting *City of Tacoma, Wash. v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006))); *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993) (APA provides that judicial review of agency action shall be based on "the whole record" including "everything that was before the agency pertaining to the merits of its decision").

[65] Vessel noise is not addressed in the responses to comments in the final ITR because Plaintiffs failed to raise the issue in their comments. It is, however, addressed in the BiOp, which is referenced in the ITR, because the ESA requires analysis of the indirect effects of the action.

[66] Dkt. 53-1 at 10.

[67] *See id.*

[68] PR1_MMPA 2267, 2304 (Table 20); PR1_ESA 44–45 (Table 6).

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG    15

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

mitigation and monitoring measures, the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small."[69] This determination is also entitled to deference.

Finally, the untenability of Plaintiffs' position is also apparent when considering that Hilcorp's activities represent a tiny fraction of the anthropogenic noise in Cook Inlet.[70] If Plaintiffs' vessel noise argument is taken to its logical extreme, any cargo vessel, cruise ship, dredge, tug operator, military ship, or pleasure craft would need to apply for and secure authorization under the MMPA to incidentally take marine mammals just by virtue of operating in or transiting through Cook Inlet. Neither the MMPA nor common sense justifies such an outcome, and NMFS rationally concluded that "the probability of vessel noise rising above the threshold for Level B harassment is very small, and thus adverse effects to Cook Inlet belugas are extremely unlikely to occur."[71]

---

[69] PR1_ESA 183.

[70] *See Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1037 (D. Alaska 2013) ("Cook Inlet is one of the most industrialized and urbanized regions of Alaska. High artificial noise levels in the inlet are caused by vessels; air traffic; construction equipment; and activities such as pile driving, oil and gas development, coastal development, dredging and filling.").

[71] PR1_ESA 183.

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

## 2. NMFS's "small numbers" determination is well supported and consistent with law and agency practice.[72]

Plaintiffs next argue that NMFS must change the way it tabulates takes—by calculating take as a percentage of the population over the entire five-year ITR instead of annually—in an effort to inflate the percentage of Cook Inlet belugas that may be taken into something larger than a "small number."[73] As set forth below, this novel argument has no support in the express language of the MMPA, caselaw, or agency practice.[74]

Initially, it bears emphasis that Plaintiffs have challenged NMFS's *method* for determining "small numbers," *not* NMFS's substantive conclusion that the predicted number of annual beluga Level B takes in the ITR is a "small number." "An agency's scientific methodology is owed substantial deference."[75] In fact, this Court previously upheld NMFS's substantive "small numbers" conclusion for a similar number of annual beluga Level B takes for a Cook Inlet project.[76] Consequently, if the Court determines that NMFS's method of assessing takes annually is entitled to deference, it should also uphold NMFS's substantive "small numbers" finding.

---

[72] As explained in *supra* Section IV.A, Plaintiffs have waived this argument.

[73] Dkt. 53-1 at 12–13.

[74] NMFS had no opportunity to respond to Plaintiffs' position in the record because it was not raised in public comments.

[75] *See Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1066 (9th Cir. 2004), *superseded on other grounds by regulation as stated in Defenders of Wildlife v. Zinke*, 856 F.3d 1248, 1260 (9th Cir. 2017).

[76] *See Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1053 ("Here, where the agency has quantified the number of authorized takes, its 'small numbers' determination that 30 authorized takes by incidental harassment constitute small numbers relative to the population as a whole is not arbitrary and capricious.").

600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500
STOEL RIVES LLP

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG    17

With respect to NMFS's method, the MMPA does not define the term "small numbers" or prescribe how it must be assessed.[77] As explained by the Ninth Circuit, "Congress recognized 'the imprecision of the term "small numbers," but was unable to offer a more precise formulation because the concept *is not capable of being expressed in absolute numerical limits*.'"[78] Indeed, NMFS was not even required to quantify the number of expected takes.[79] Accordingly, the Ninth Circuit extends *Chevron* deference to agencies' reasonable interpretations of "small numbers."[80] Here, NMFS's method is entirely reasonable.

*First*, NMFS's method is consistent with the MMPA's plain language. As stated above, the MMPA is silent about how "small numbers" must be assessed. In contrast, for the "negligible impact" analysis, the MMPA expressly instructs NMFS to consider the "*total* of such taking during each five-year (or less) period concerned."[81] If Congress had intended for NMFS to also consider the "total" take over the five-year period when evaluating "small numbers," it would have said so, just as it did for "negligible impact."[82]

[77] *Nat. Res. Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1147 (N.D. Cal. 2003); 16 U.S.C. § 1371(a)(5)(A).

[78] *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 906 (9th Cir. 2012) (emphasis in original) (quoting H.R. Rep. No. 97-228, *reprinted in* 1981 U.S.C.C.A.N. at 1469).

[79] *Id*. ("Nor is there anything in Section 101(a)(5)(A) that requires the Service, when promulgating incidental take regulations, to quantify or estimate the number of mammals that would be taken.").

[80] *Id.* at 907.

[81] 16 U.S.C. § 1371(a)(5)(A)(i)(I) (emphasis added).

[82] *See Tin Cup, LLC v. U.S. Army Corps of Eng'rs*, 904 F.3d 1068, 1073 (9th Cir. 2018) ("When Congress uses particular language in one part of a statute and omits it

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Cook Inletkeeper, et al. v. Ross, et al.*

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Moreover, Plaintiffs' argument that NMFS must apply the "total take" requirement to "small numbers"[83] is not only contrary to the statutory language but it also contradicts the Ninth Circuit's instruction that "[t]he key interpretative requirement of the Section 101(a)(5)(A) language is that 'small numbers' and 'negligible impact' remain *distinct* standards."[84] NMFS's use of the annual take metric for assessing "small numbers" is fully consistent with the MMPA.

*Second*, in practice, NMFS and the U.S. Fish and Wildlife Service routinely calculate take as a percentage of population annually as the basis for their small numbers analyses.[85] To the best of Hilcorp's knowledge, Plaintiffs have never challenged this methodology for assessing small numbers in prior lawsuits, and, indeed, Plaintiffs

---

elsewhere, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks and citation omitted)).

[83] Dkt. 53-1 at 13–14.

[84] *Salazar*, 695 F.3d at 906 (emphasis added). Plaintiffs' position here is ironic in light of their claims in other lawsuits that agencies improperly *conflated* the "negligible impact" and "small numbers" standards. *See Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1050 ("Plaintiffs assert that 'NMFS failed to differentiate its cursory "small numbers" analysis from its "negligible impact" analysis and in so doing failed to explain how it reached its conclusion regarding small numbers.'" (citation omitted)); *see also Salazar*, 695 F.3d at 902 ("[Plaintiffs] argue that the Service relied on an impermissible regulatory definition that conflates the question whether an authorized take is for 'small numbers' of mammals with the separate question whether the take will result in a 'negligible impact' on the species or stock.").

[85] *See, e.g.*, 84 Fed. Reg. 46,788, 46,817 (Sept. 5, 2019) (ITR for Alaska Fisheries Science Center calculating take as a percentage of population annually); 81 Fed. Reg. 47,240, 47,269 (July 20, 2016) (ITR for Apache Alaska Corporation's oil and gas exploration program in Cook Inlet calculating take as percentage of population annually); 78 Fed. Reg. 75,488, 75,503 (Dec. 12, 2013) (ITR for Beaufort Sea offshore oil and gas facilities calculating take as a percentage of population annually).

concede that no legal authority supports their argument.[86] This established agency practice supports NMFS's approach here.[87]

*Third*, Plaintiffs' argument makes no sense from a policy perspective. In addition to its ITR provisions, the MMPA allows for one-year IHAs.[88] The MMPA states the "small numbers" requirement identically for ITRs and IHAs, but Congress eliminated the "total taking" language for negligible impact determinations in IHAs because they are limited to a single year.[89] If NMFS were required to determine "small numbers" by summing all five years in an ITR, applicants could simply bypass that requirement by seeking five consecutive one-year IHAs. Accepting Plaintiffs' interpretation would mean that Congress (for no apparent reason) placed more stringent requirements on "small numbers" for ITRs than on IHAs, but then created an obvious loophole to avoid that more stringent requirement. Courts eschew statutory interpretations that lead to such absurd results.[90]

In sum, in the absence of statutory direction, NMFS, as the expert agency, may determine whether it will evaluate "small numbers" on an annual basis or by some other

---

[86] *See* Dkt. 53-1 at 13 ("no court has spoken directly to the issue in the context of small numbers….").

[87] *See Reyes v. Lynch*, 842 F.3d 1125, 1135–36 (9th Cir. 2016) (extending *Chevron* deference to agency's construction of ambiguous statutory term where the agency's application is both "reasonable and consistent with the [agency's] own precedent").

[88] *See* 16 U.S.C. § 1371(a)(5)(D).

[89] *Compare id.* § 1371(a)(5)(A)(i)(I) *with id.* § 1371(a)(5)(D)(i)(I).

[90] *See United States v. Turkette*, 452 U.S. 576, 580 (1981) ("In determining the scope of a statute … absurd results are to be avoided….").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG

20

method. NMFS's application here is consistent with the MMPA, caselaw, and past

agency practice, and is entitled to deference.[91]

### 3. NMFS reasonably mandated a suite of mitigation and avoidance measures designed to ensure the least practicable impact.

In a reprise of arguments considered and rejected in other lawsuits, Plaintiffs claim

that the mitigation and monitoring measures imposed by NMFS are insufficient to protect

beluga whales and other marine mammals. Plaintiffs' claim is undermined by adverse

precedent and flatly contradicted by the administrative record.

Courts exercise deference on matters involving an agency's area of expertise.[92]

This "[d]eference is particularly important when the agency is making predictions, within

its area of special expertise, at the frontiers of science."[93] Courts applying this precedent

have recognized that determinations on the appropriateness of mitigation measures fall

into the category of decisions that are within an agency's area of expertise.[94]

---

[91] *Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1052; *Alaska Wilderness League v. Jewell*, 116 F. Supp. 3d 958, 970 (D. Alaska 2015) (finding the Service "presented a reasoned analysis for its small numbers determination based on the record before it"), *vacated as moot by* 637 Fed. App'x 976 (9th Cir. 2015).

[92] *See Or. Nat. Res. Council*, 490 U.S. at 377 ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (quoting *Kleppe*, 427 U.S. at 412)).

[93] *Ariz. Cattle Growers'*, 273 F.3d at 1236 (citation omitted).

[94] *See Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1060 ("[T]he record reflects that the agency did consider additional time-area restrictions and exercised its expertise to determine that they were not necessary."); *Salazar*, 695 F.3d at 908, 916 (rejecting arguments that mitigation measures were ineffective or that agency should have considered other measures); *Gaule v. Meade*, 402 F. Supp. 2d 1078, 1087 (D. Alaska 2005) (determining with respect to the effectiveness of mitigation measures, "[t]he Court is not here to substitute its judgment for that of the agency").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Here, "NMFS identified and required an expanded suite of mitigation and monitoring requirements" that were "more protective than those proposed by the applicant and ensure the least practicable adverse impact to marine mammals or stocks" and "more restrictive" than NMFS's standard measures.[95] These measures include monitoring for marine mammals by multiple independent Protected Species Observers ("PSO") stationed on vessels, monitoring for beluga whale presence with daily aerial flights before seismic survey activities begin, monitoring by a separate mitigation vessel positioned 3,000 meters beyond a seismic survey vessel, exclusion zones,[96] safety zones,[97] enhanced shutdown requirements if belugas are observed anywhere within the Level B harassment isopleth, seasonal exclusion areas to protect beluga foraging and calving areas, use of "ramp up" or "soft start" techniques for seismic surveys or impact pile driving, sound source verification to characterize sound levels and verify the distances of the exclusion and safety zones, and immediate, monthly, and annual reporting requirements.[98]

These requirements are the gold-standard for agency-required marine mammal mitigation and reporting, and NMFS concluded that they would reduce potential stressors

---

[95] PR1_NEPA 111; PR1_MMPA 2260.

[96] An exclusion zone is the area in which all operations are shut down in the event a marine mammal enters or is about to enter the zone based on distances to the Level A harassment threshold. PR1_MMPA 2304.

[97] A safety zone is a larger area beyond the standard exclusion zone that is the focal area to be monitored for the presence of protected species. *Id*. The distances for the safety and exclusion zones vary by activity. *See id.* at Table 20.

[98] *See* PR1_MMPA 2303–09.

to the Cook Inlet beluga whale such that they "are highly unlikely to occur or will be immeasurably small in impact."[99] Indeed, the final report for Hilcorp's 2019 activities did not record a *single instance* of a beluga whale being taken by any level of harassment, despite NMFS's authorization of 35 Level B takes for the year.[100] This is particularly significant because this report accounts for Hilcorp's completed 3D seismic survey, which was the single activity permitted under the ITR with the greatest potential to cause Level B harassment.

Plaintiffs raise three specific criticisms of the mitigation measures, none of which have merit.

*First*, Plaintiffs argue that NMFS failed to ensure that Hilcorp's permitted activities will have the least practicable impact on marine mammals because the ITR should have required shutdowns for all marine mammals (not just beluga whales) observed within a safety zone. Plaintiffs reason that if it is practicable to require a shutdown when a beluga whale enters the safety zone, it is also practicable to shut down if any other marine mammal enters the safety zone.[101] However, this argument erroneously assumes that all marine mammals are affected by sound in the same way and presumes to second-guess NMFS's conclusion on this scientific issue.

---

[99] JOINTSUPP 100007; PR1_MMPA 2260 ("Moreover, Hilcorp proposed and NMFS has required in the rule a rigorous mitigation plan to reduce impacts to Cook Inlet beluga whales and other marine mammals to the lowest level practicable.").

[100] JOINTSUPP 100297–99.

[101] Dkt. 53-1 at 16.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

As NMFS correctly points out, the degree to which marine mammal behavior is affected by sound is highly species- and context-specific.[102] For example, the highly abundant harbor seal does not typically exhibit the same behavioral disturbances in response to underwater noise as do whales.[103] In practice, NMFS very rarely requires shutdowns for marine mammal observations in a *safety zone*—shutdown requirements in NMFS authorizations typically apply only to *exclusion zones*.[104] Here, NMFS created a special requirement for beluga whales "in light of concerns surrounding the status of Cook Inlet beluga whales," which do not exist for the other species.[105]

Plaintiffs also overlook that the purpose of an ITR is to *authorize* incidental take, not eliminate it completely. NMFS must require reasonable measures to mitigate and minimize the authorized take, but only to the extent "practicable."[106] For example, it is not practicable (or good for marine mammals) for a seismic survey to shut down and re-

---

[102] PR1_MMPA 2280 ("Behavioral responses to sound are highly variable and context-specific and any reactions depend on numerous intrinsic and extrinsic factors (e.g., species…)."); *see also Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1058 (same).

[103] PR1_MMPA 2282 ("Marine mammals are likely to avoid the activities … while the harbor seals might be attracted to them out of curiosity.").

[104] *See, e.g.*, 85 Fed. Reg. 55,645, 55,658 (Sept. 9, 2020) (IHA for seismic survey in the Aleutian Islands provides that crews should be *prepared* to shut down if marine mammals are detected within the buffer zone but outside the exclusion zone); 83 Fed. Reg. 63,268, 63,311 (Dec. 7, 2018) (NMFS required a 500-meter safety zone where crews should be *ready* to shut down if a marine mammal enters the exclusion zone).

[105] PR1_MMPA 2265; *see also* PR1_MMPA 2260 ("These shutdown measures are more restrictive than the standard shutdown measures typically applied."); PR1_MMPA 2310 ("Mitigation for beluga whales is extensive, including shutdowns at any distance and exclusion zones and avoiding exposure during critical foraging periods around the Susitna Delta.").

[106] 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa).

---

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG                                    24

start many times because animals are observed in the expansive safety zone. Here, NMFS, as the expert agency, determined that it would require a special, extra-protective measure for beluga whales. That decision did not require NMFS to impractically apply that special measure to all marine mammals.[107]

*Second*, Plaintiffs assert that the shutdown zone for beluga whales should not be limited to 1,500 meters.[108] Plaintiffs are wrong—the beluga shutdown zone is not limited to 1,500 meters. The ITR clearly states that "[o]perations must shut down completely if a beluga whale is sighted *within the relevant Level B harassment isopleth.*"[109] The Level B "isopleth" is the largest ensonified area within which animals would be expected to encounter sounds at a decibel level constituting Level B harassment (*i.e.*, just over 7,000 meters for seismic activity). Although NMFS required a 1,500-meter safety zone for other marine mammals, "in light of concerns surrounding the status of Cook Inlet beluga whales, NMFS implemented a shutdown measure that requires Hilcorp to shutdown active sound sources from which take could occur if a Cook Inlet beluga whale is sighted *at any distance within the relevant Level B harassment isopleths.*"[110] Plaintiffs' mistaken argument should be rejected.

---

[107] *See Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1060 ("[T]the record reflects that the agency did consider additional time-area restrictions and exercised its expertise to determine that they were not necessary.").

[108] Dkt. 53-1 at 16.

[109] PR1_MMPA 2314 (50 C.F.R. § 217.163(g)(6)) (emphasis added); *see also* PR1_MMPA 2265, 2267.

[110] PR1_MMPA 2265.

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG          25

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Third*, in a variation of the previous argument, Plaintiffs allege that NMFS's decision not to require visual *monitoring* of the entire Level B harassment zone is unlawful.[111] Again, Plaintiffs' argument lacks merit. The ITR requires shutdowns for beluga whale observations *anywhere* within the Level B harassment zone. It requires PSOs to actively monitor out to at least 1,500 meters, it requires monitoring from a separate mitigation vessel for seismic surveys, and it requires monitoring by aircraft in advance of surveys.[112]

Moreover, Plaintiffs' complaint that visual on-vessel monitors should actively monitor beyond established zones is disingenuous given that Plaintiffs already panned "visual monitoring (or 'lookouts')" as allegedly "ineffective and inadequate to protect the species."[113] And their suggestion that NMFS should have required passive acoustic monitoring[114] ignores the fact that acoustic monitoring has long been demonstrated to be ineffective in Cook Inlet's noisy waters.[115] Finally, Plaintiffs' assertion that visual observation will underestimate the total amount of takes overlooks the fact that NMFS

---

[111] Dkt. 53-1 at 17–18.

[112] PR1_MMPA 2314; PR1_ESA 44–45.

[113] PR1_MMPA 966.

[114] Dkt. 53-1 at 18.

[115] PR1_MMPA 2266 (previous "efforts have not resulted in successful deployment of [passive acoustic monitoring] or useful detections of marine mammals to inform mitigation and monitoring during the activities"); PR1_MMPA 2307 ("Passive acoustic monitoring has also been used in Cook Inlet and is typically required for seismic surveys but has not shown to be an effective solution in Cook Inlet's specific environmental conditions.").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

uses a proven formula to extrapolate PSO observations into actual take estimates.[116] Plaintiffs' complaints about the visual monitoring zone are baseless.

In sum, Plaintiffs' nitpicking of the mitigation and monitoring measures required by NMFS reflects a classic disagreement with a decision falling squarely within the agency's technical expertise. NMFS fully explained the required measures and its determinations are entitled to deference.

## C.    NMFS's Decision Complies with the ESA.

### 1.    The BiOp fully considers the effects of vessel noise.

Plaintiffs repackage their vessel noise argument, incorrectly asserting that NMFS did not consider "effects from the action, including noise from tugboats, vessel operations, and other sources."[117] As explained in *supra* Section IV.B.1, the BiOp discusses in comprehensive detail why noise from tugboats and other vessels are expected to be "very minor" and will have "insignificant and discountable" effects on beluga whales.[118] Plaintiffs seem to mistakenly believe that if NMFS did not specifically address a topic in detail in the "Integration and Synthesis" section of the BiOp, then NMFS failed to consider it in the "jeopardy" analysis. This myopic, section-specific view of the BiOp is impractical and, in any event, the "Integration and Synthesis" section

---

[116] PR1_MMPA 2264–65 (describing the process used to calculate take when PSOs are only able to monitor a portion of the Level B harassment zone); JOINTSUPP 100266 (explaining the density-based Level B exposure estimation methodology for areas beyond the visual observation range of PSOs).

[117] Dkt. 53-1 at 21–22.

[118] *See* PR1_ESA 181–83.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG    27

plainly states that it considers "the effects of the action (Section 6)" and "the environmental baseline (Section 5)."[119] In short, NMFS clearly documented and explained its vessel noise analysis, and its conclusion is entitled to deference.

> **2.   NMFS enumerated and analyzed all effects of the action, along with baseline and cumulative effects.**

Plaintiffs next argue that NMFS failed "to aggregate the cumulative effects, environmental baseline, and proposed action in light of the status of Cook Inlet belugas to determine whether they collectively jeopardize the species' continued existence."[120] Again, the administrative record directly contradicts this claim, and Plaintiffs misconstrue the law.

In the BiOp, NMFS first provides a helpful general description of its approach to the analysis.[121] As to the Cook Inlet beluga whale, NMFS then spends 10 pages describing the status of the species in comprehensive detail.[122] After describing the status of the species, NMFS catalogues all of the "baseline" effects, including coastal development, road construction, port activity, oil and gas development, underwater installations, natural and anthropogenic noise, water quality and pollution, fisheries, tourism, direct mortality, climate and environmental change, and natural catastrophic

---

[119] PR1_ESA 213. Also, all sources of vessel noise were expressly considered as "project stressors." PR1_ESA 131.

[120] Dkt. 53-1 at 24.

[121] PR1_ESA 60–61.

[122] PR1_ESA 63–73.

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA  98101
*Main (206) 624-0900 Fax (206) 386-7500*

changes.[123] Next, NMFS analyzes the cumulative effects of all non-federal actions that will continue into the future.[124] NMFS brings all of these analyses together in the "Integration and Synthesis" section of the BiOp:[125]

> In this section, we add the effects of the action (Section 6) to the environmental baseline (Section 5) and the cumulative effects (Section 7) to formulate the agency's biological opinion as to whether the proposed action is likely to: (1) result in appreciable reductions in the likelihood of the survival or recovery of the species in the wild by reducing its numbers, reproduction, or distribution; or (2) result in the adverse modification or destruction of critical habitat as measured through potential reductions in the value of designated critical habitat for the conservation of the species. These assessments are made in full consideration of the status of the species (Section 4).[126]

Finally, based upon all of these analyses, NMFS concludes that "based on the best information currently available, the proposed action is not expected to appreciably reduce the likelihood of recovery of [the] Cook Inlet beluga…."[127]

Accordingly, Plaintiffs' claim that NMFS "nowhere considered the effects of the regulations when *combined* with the baseline, cumulative impacts, and the grim status of

---

[123] PR1_ESA 93–130. The "environmental" baseline consists of all "past and present impacts." 50 C.F.R. § 402.02.

[124] PR1_ESA 211–13. Cumulative effects must be "reasonably certain to occur" and do not include future federal actions, which will be subject to their own ESA Section 7 consultations. 50 C.F.R. § 402.02.

[125] PR1_ESA 213–18.

[126] PR1_ESA 212; *see also* PR1_ESA 216–17 (detailing aggregated effects on beluga whales).

[127] PR1_ESA 218.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

the species"[128] is false. As summarized above, and set forth comprehensively in the

BiOp, NMFS did precisely that.

Plaintiffs also suggest that NMFS had no choice but to conclude that the ITR

jeopardizes the species because the status of the Cook Inlet beluga whale is already in a

state of jeopardy.[129] Plaintiffs misconstrue the ESA. In fact, this Court rejected this same

argument in *Native Village of Chickaloon*:

> In *National Wildlife Federation v. National Marine Fisheries Service,* the
> Ninth Circuit emphasized that NMFS may not "conduct the bulk of its
> jeopardy analysis in a vacuum[,]" but rather must "consider the proposed ...
> operations in their actual context[.]" However, the Ninth Circuit also held
> this consideration of context does not require the agency to consider the
> proposed action as if that action included "all independent or baseline harms
> to listed species." Because the verb "to jeopardize ... implies causation, and
> thus some new risk of harm[,]" the agency need only assess the risk of new
> jeopardy posed by the proposed action. Thus, while NMFS was required in
> the BiOp in this case to consider the effects of Apache's surveying "within
> the context of other existing human activities that impact" the beluga
> whale, it was not required to specifically determine whether the beluga
> whale, at that baseline, was already in jeopardy.[130]

In a similar vein, Plaintiffs' reliance on *Turtle Island Restoration Network v.*

*United States Department of Commerce* is misplaced. In that case, the Ninth Circuit

remanded the biological opinion because the court found that NMFS's "no-jeopardy"

analysis failed to adequately address NMFS's model showing that projected turtle

mortalities from the action would cause up to an 11% decline in an already-declining

---

[128] Dkt. 53-1 at 26.

[129] *Id.* at 25.

[130] 947 F. Supp. 2d at 1065–66 (brackets in original; citations omitted).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

population.[131] NMFS made no such finding here and, in fact, found that the action would cause only minor, short-term, behavioral Level B harassment of small numbers of beluga whales, resulting in a negligible impact.

In sum, NMFS carefully considered all effects of the action, along with all baseline and cumulative effects, and concluded that its issuance of the ITR will not jeopardize the Cook Inlet beluga whale because it "is not expected to appreciably reduce the likelihood of recovery of [the species]."[132] This determination is consistent with the ESA, supported by the administrative record, and entitled to deference.

### 3.    NMFS rationally determined that reinitiation of consultation is unwarranted.

Plaintiffs contend that the January 2020 publication of a biennial abundance estimate for Cook Inlet beluga whales ("Biennial Estimate") required NMFS to reinitiate Section 7 consultation.[133] However, NMFS fully explained why the regulatory standard for reinitiation is not satisfied and that rational determination is entitled to deference.[134]

NMFS must reinitiate Section 7 consultation when, *inter alia*, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."[135] The Ninth Circuit has cautioned that not

---

[131] 878 F.3d 725, 737–39 (9th Cir. 2017).

[132] PR1_ESA 218.

[133] Dkt. 53-1 at 27.

[134] *See* JOINTSUPP 100006 (NMFS Alaska Region Memo to NMFS Office of Protected Resources).

[135] 50 C.F.R. § 402.16(a)(2).

*STOEL RIVES* LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG    31
Case 3:19-cv-00238-SLG   Document 60   Filed 10/09/20   Page 39 of 49

"every modification of or uncertainty in a complex and lengthy project requires the agency to stop and reinitiate consultation."[136] Courts have similarly recognized that "[p]ublication of a later report on the relevant listed species does not automatically constitute revelation of new information."[137] In short, there must be an affirmative, compelling demonstration that the new information reveals *new effects of the action* that were not already considered.[138]

As applied here, at the request of NMFS's Office of Protected Resources, NMFS's Alaska Regional Office carefully evaluated whether the Biennial Estimate required the reinitiation of consultation and concluded that the BiOp's analysis and conclusions "remain[] valid in light of the new information."[139] It explained that "in no instance are [the] disruptions [from Hilcorp's activities] expected to result in a reduction in fitness or survival of any whales" and the "new information does not suggest there will be any new stressors or effects causing take of any whales, nor does it suggest that take would be of a different type or greater severity than those considered in our analysis."[140] Accordingly,

---

[136] *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987), *abrogated on other grounds by Nat'l Family Farm Coal. v. U.S. EPA*, 966 F.3d 893 (9th Cir. 2020).

[137] *Protect Our Water v. Flowers*, 377 F. Supp. 2d 844, 874 (E.D. Cal. 2004).

[138] *See Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 94 (D.D.C. 2003) (rejecting environmental group's challenge to U.S. Fish and Wildlife Service decision not to reinitiate consultation where the new information just confirmed earlier findings); *Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 120 F. Supp. 2d 1005, 1025 (M.D. Fla. 2000) (new scientific study and data did not satisfy plaintiff's burden to show different or more extensive effects).

[139] JOINTSUPP 100005–08.

[140] JOINTSUPP 100008.

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

the Regional Office concluded that, "with no anticipated effects on fitness or survival of individual whales, and thus no adverse consequences for the population, we find no basis to reinitiate consultation."[141] NMFS's Office of Protected Resources concurred with this assessment, concluding:

> [w]e have carefully considered the change in Cook Inlet beluga abundance and growth trend, but neither changes our assessment that the exposure of Cook Inlet beluga whales to sounds produced by Hilcorp's oil and gas activities is not anticipated to impact the fitness of any individual beluga whales, much less adversely affect the stock through effects on annual rates of recruitment or survival.[142]

NMFS therefore responded to Plaintiffs' notice of intent to sue explaining why reinitiation was unwarranted[143] and reaffirmed its FONSI.[144]

Plaintiffs also argue that NMFS failed to consider how the revised abundance estimate affects the calculation of takes.[145] Again, the administrative record shows otherwise.[146] NMFS explained that it is "very difficult to modify our take estimates with reliable precision to account for this small change in abundance" and that "[a] corresponding 4.7% reduction in our take estimate is not justifiable because we do not expect that belugas occur throughout the action area (nor throughout their range) at a

---

[141] *Id.*

[142] JOINTSUPP 100001.

[143] JOINTSUPP 100011.

[144] JOINTSUPP 100003.

[145] *See* Dkt. 53-1 at 29.

[146] *See* JOINTSUPP 100008 ("We also considered how the new population estimate and trend information could affect our estimate of takes.").

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG    33

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

uniform density."[147] Additionally, the small change in population size would not cause the agency to revise its mitigation measures.[148]

Plaintiffs therefore fail to meet their burden of showing that the Biennial Estimate demonstrates new significant effects that were not considered.[149] NMFS's decision not to reinitiate consultation rested on precisely the type of technical analyses and conclusions that are within NMFS's special expertise and are entitled to deference.[150]

## D.    NMFS's Decision Complies with NEPA.

Finally, Plaintiffs assert that NMFS violated NEPA by failing to take a hard look at the direct and cumulative impacts of the ITR on beluga whales.[151] Both of these claims lack merit.

"NEPA does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."[152] Courts reviewing NEPA analyses "must defer to an agency's decision that is 'fully informed and well-considered' but we need not forgive a

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

---

[147] *Id.*

[148] *Id.*

[149] *See Protect Our Water*, 377 F. Supp. 2d at 874 (reinitiation of consultation unwarranted where new information revealed no effects that were different or more extensive than those previously considered).

[150] 50 C.F.R. § 402.16(a)(2); *Protect Our Water*, 377 F. Supp. 2d at 874; *Wyo. Outdoor Council*, 284 F. Supp. 2d at 94.

[151] Dkt. 53-1 at 30.

[152] *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (citation omitted).

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG    34

clear error of judgment."[153] Here, the administrative record shows that NMFS took the requisite hard look at the impacts of its authorization.

### 1. NMFS took a hard look at the potential impacts of vessel noise on beluga whales.[154]

Plaintiffs again repackage their vessel noise argument, this time claiming that NMFS "fails to properly consider the impacts of noise from tugboats and other vessels on Cook Inlet belugas, thereby failing to take the requisite hard look at the direct impacts under NEPA."[155] But the EA does address vessel noise.[156] And, both the EA and the FONSI specifically reference the agency's BiOp, which provides NMFS's comprehensive analysis of vessel noise and concludes that "the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small."[157] Accordingly, NMFS took the requisite hard look at the potential impacts of vessel noise on Cook Inlet beluga whales.

---

[153] *Id.* (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988); *Or. Nat. Res. Council*, 490 U.S. at 378)).

[154] As explained in *supra* Section IV.A, Plaintiffs have waived this argument.

[155] Dkt. 53-1 at 32.

[156] *See* PR1_NEPA 55 (EA's listing of tugs towing rig and vessels as anticipated noise sources); PR1_NEPA 59 (EA's explanation of why low marine mammal population density and predictable movement of vessels is unlikely to result in take).

[157] PR1_ESA 183; *see Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) ("Clearly, NEPA and the ESA involve different standards, but this does not require USFS to disregard the findings made by FWS in connection with formal consultation mandated by the ESA."); *see also Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp. 2d 1221, 1247 (D. Or. 2009) (determining agency's Environmental Assessment properly relied on BiOp prepared by NMFS).

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG                                                        35

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

## 2.    NMFS fully analyzed cumulative impacts.

Plaintiffs next claim that NMFS failed to take a hard look at cumulative impacts, arguing that the EA does not assess the impact of Hilcorp's activities on beluga whales within the context of noise from other activities.[158] They contend that "NMFS's 'analysis' of cumulative impacts amounts to nothing more than general descriptions of categories of activities and projects that impact Cook Inlet beluga whales."[159] This argument is a retread of the same argument this Court rejected seven years ago when CBD challenged the IHA issued to Apache for its seismic survey activities in Cook Inlet, and it should similarly be rejected.[160]

"An EA's analysis of cumulative impacts 'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment."[161] Although "[a]n EA must fully assess the cumulative impacts of a project … under NEPA [courts] defer to an agency's determination of the scope of its cumulative effects review."[162]

---

[158] Dkt. 53-1 at 33–35.

[159] *Id.* at 33.

[160] *Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1073 ("Plaintiffs assert that 'the EA summarized—but did not actually analyze—cumulative impacts' and its failure to do so is arbitrary and capricious and unsupported by the record evidence.").

[161] *Native Vill. of Nuiqsut*, 432 F. Supp. 3d at 1036 (quoting *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010)).

[162] *Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1073–74 (internal quotation marks omitted; second brackets in original) (quoting *Salazar*, 695 F.3d at 917; *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 959 (9th Cir. 2003)).

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

The cumulative impacts section of the EA specifically considers Hilcorp's activities in the context of vessel traffic and "account[s] for the impact of these vessels through the final rule and in this document as acoustic sources operating from vessels are the primary form of harassment for marine mammals considered."[163] In addition to vessel noise, NMFS thoroughly considered the cumulative effects of the project in conjunction with subsistence hunting, pollution, fisheries interaction, oil and gas development, coastal zone development (including the Chuitna Coal Project, ORPC Tidal Energy Projects, and Pebble Mine), underwater installations, marine mammal research, and climate change.[164] Indeed, the cumulative effects analysis in the current EA is remarkably similar to the cumulative effects analysis that this Court approved in *Native Village of Chickaloon*.[165]

The administrative record shows that NMFS fully addressed the past, present, and future projects while taking the requisite hard look at the cumulative impacts on the Cook Inlet beluga whale. NMFS's analysis is entitled to deference.

**E.    Vacatur Is Not the Appropriate Remedy.**

Plaintiffs request—without any supporting argument—that the Court vacate the ITR, BiOp, EA, and FONSI.[166] As an initial matter, if this Court finds any merit in

---

[163] PR1_NEPA 94–95.

[164] PR1_NEPA 92–100.

[165] *Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1074 (finding EA's cumulative effects analysis sufficient where "the EA addressed the effects of pollution; fisheries interaction; coastal zone development including the Port of Anchorage and Port Mackenzie expansions, the Chuitna Coal Project, and the ORPC Alaska Tidal Energy projects; marine mammal research; and climate change").

[166] Dkt. 53-1 at 35.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Plaintiffs' claims, Hilcorp respectfully requests the opportunity to more fully address the appropriate remedy through supplemental briefing and argument.

Although an agency action that is held to be unlawful can be set aside under the APA,[167] vacatur is "a species of equitable relief," and "courts are not mechanically obligated to vacate agency decisions that they find invalid."[168] "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[169] The Ninth Circuit has made clear that in considering whether vacatur is appropriate, courts should consider economic and other practical concerns.[170]

As a general matter, vacatur is not warranted here because the violations alleged by Plaintiffs are relatively minor and curable on remand. Vacatur would have highly disruptive consequences to, at a minimum, Hilcorp's ability to develop the leases in which it has made a significant investment and its ongoing maintenance activities in

---

[167] 5 U.S.C. § 706(2)(A).

[168] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, *it is not required to set aside every unlawful agency action*." (emphasis added)); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

[169] *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 993 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

[170] *Id.* at 994 ("[I]f saving a snail warrants judicial restraint, so does saving the power supply." (citation omitted)).

Cook Inlet that are critical to maintaining the network of underwater pipelines that supply the Municipality of Anchorage and Railbelt communities with natural gas.[171]

## V. CONCLUSION

Hilcorp's exploration, maintenance, and decommissioning activities have undergone rigorous permitting review and are subject to an extensive suite of mitigation and monitoring measures designed to minimize or avoid impacts to marine mammals, particularly the Cook Inlet beluga whale. As set forth above, Plaintiffs' attempts to poke holes in NMFS's careful and comprehensive analyses are both procedurally and substantively meritless. Hilcorp respectfully requests that the Court deny Plaintiffs' motion for summary judgment, grant Defendants' and Intervenor-Defendants' cross-motions for summary judgment, and affirm NMFS's reasoned decisions.

DATED:   October 9, 2020.

STOEL RIVES LLP

By:  _/s/ Ryan P. Steen_____
      RYAN P. STEEN (Bar No. 0912084)
      JASON T. MORGAN (Bar No. 1602010)
      JAMES C. FELDMAN (Bar No. 1702003)

      *Attorneys for Hilcorp Alaska, LLC*

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

---

[171] *See* PR1_MMPA 2253–54.

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,997 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 9th day of October, 2020.

*/s/ Ryan P. Steen*
Ryan P. Steen

# CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2020, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:19-cv-00238-SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Ryan P. Steen
Ryan P. Steen

107454243.10 0066502-00011

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA  98101
*Main (206) 624-0900 Fax (206) 386-7500*

*Cook Inletkeeper, et al. v. Ross, et al.*
Case No. 3:19-cv-00238-SLG
Case 3:19-cv-00238-SLG   Document 60   Filed 10/09/20   Page 49 of 49