EDWARD C. THOMAS
Trial Attorney, Natural Resources Section
United States Department of Justice
Post Office Box 7611
Washington, D.C. 20044-7611
Edward.C.Thomas@usdoj.gov
Tel: (202) 305-0239

JOHN H. MARTIN
Trial Attorney, Wildlife & Marine Resources Section
999 18th St., South Terrace Suite 370
Denver, CO 80202
john.h.martin@usdoj.gov
Tel: (303) 844-1383

*Of counsel:*
JOHN FONSTAD, Assistant U.S. Attorney
District of Alaska

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER et al., | ) Case No. 3:19-cv-00238-SLG |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| WILBUR ROSS, Secretary of | ) |
| Commerce, et al. | ) |
| Defendants, | ) |
| and | ) |
| | ) |
| HILCORP ALASKA, LLC, and | ) |
| STATE OF ALASKA | ) |
| Intervenor-Defendants | ) |

## FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

(oral argument requested)

## TABLE OF CONTENTS

PAGE

INTRODUCTION..................................................................................................... 1

BACKGROUND...................................................................................................... 1

   I. FACTUAL BACKGROUND ............................................................................ 1

   II. STATUTORY AND REGULATORY BACKGROUND ........................................... 4

      A. The Marine Mammal Protection Act ......................................................... 4

      B. Endangered Species Act Section 7.............................................................. 6

      C. The National Environmental Policy Act ...................................................... 6

STANDARD OF REVIEW ........................................................................................ 8

ARGUMENT ......................................................................................................... 9

   I. THE INCIDENTAL TAKE REGULATIONS COMPORT WITH THE
      MMPA AND APA.................................................................................... 9

      A. NMFS Reasonably Concluded that Vessel Noise Would Not Take Beluga
        Whales. ................................................................................................ 9

      B. NMFS' Small Numbers Determination Comports with the MMPA...............12

      C. The ITR Set Forth Appropriate Means to Effect the Least Practicable Adverse
        Impact.................................................................................................18

   II. NMFS' BIOLOGICAL OPINION COMPLIED WITH THE ESA..........................22

      A. The Biological Opinion Reasonably Considered Noise Effects, Including
        Those Sources It Found Not Likely to Adversely Affect Cook Inlet Beluga
        Whales. ...............................................................................................22

      B. NMFS' Jeopardy Analysis Is Reasonable....................................................24

      C. NMFS Is Not Required to Reinitiate ESA Consultation................................28

   III. NMFS COMPLIED WITH NEPA...............................................................30

A. NMFS Considered the Direct Impacts of Noise on Belugas...........................31

B. NMFS Properly Considered the Cumulative Impacts ....................................32

IV. THE COURT SHOULD ALLOW SUPPLEMENTAL REMEDY BRIEFING IF IT FINDS ANY ERROR..........................................................................................35

CONCLUSION...................................................................................................................36

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE

*Alaska Wilderness League v. Jewell,*
    788 F.3d 1212 (9th Cir. 2015)...................................................................9

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs,*
    524 F.3d 935 (9th Cir. 2008).............................................................8, 31

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012)...................................................................36

*Center for Biological Diversity v. Salazar,*
    695 F.3d 893 (9th Cir. 2012)............................................................passim

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837 (1984) ...................................................................9

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004)...................................................................8

*Connor v. Burford,*
    848 F.2d 1441 (9th Cir. 1988)...................................................................24

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
    789 F.3d 1075 (9th Cir. 2015)...................................................................29

*Ctr. Biological Diversity v. FWS,*
    807 F.3d 1031 (9th Cir. 2015)...................................................................26

*Ctr. For Biological Diversity v. Kempthorne,*
    588 F.3d 701 (9th Cir. 2009)...................................................................12

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004) ...................................................................7, 8

*Envtl. Prot. Info. Ctr. v. U.S. Forest Service,*
    451 F.3d 1005, 1012 (9th Cir. 2006) ...................................................................8

*Glacier Fish Co. LLC v. Pritzker,*
    832 F.3d 1113 (9th Cir. 2016)...................................................................17, 18

*Greenpeace Action v. Franklin,*
  14 F.3d 1324 (9th Cir. 1992) ...................................................................... 31

*King v. Burwell,*
  576 U.S. 473 (2015) ............................................................................................. 9

*Klamath-Siskiyou Wildlands Center v. BLM,*
  387 F.3d 989 (9th Cir. 2004) ........................................................... 34, 35

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ...................................................... 9, 12, 28

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir. 2005) .................................................. 32, 33, 34

*Marsh v. Or. Natural Res. Council,*
  490 U.S. 360 (1989) ............................................................................................. 8

*Metcalf v. Daley,*
  214 F.3d 1135 (9th Cir. 2000) ...................................................................... 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ............................................................................................... 9

*Native Ecosystems Council v. U.S. Forest Service*
  428 F.3d 1233 (9th Cir. 2005) ........................................................................ 8

*Native Ecosystems Council v. Weldon,*
  697 F.3d 1043 (9th Cir. 2012) ........................................................................ 7

*Native Village of Chickaloon v. NMFS,*
  947 F. Supp. 2d 1031 (D. Ak. 2013) ........................................ 16, 21, 25

*Nat'l Family Farm Coal. v. U.S. Envtl. Prot. Agency,*
  966 F.3d 893 (9th Cir. 2020) ........................................................................ 36

*National Wildlife Federation v. NMFS,*
  524 F.3d 917, 930 (9th Cir. 2008) ............................................................. 26

*Natural Resources Defense Council v. Evans,*
  279 F. Supp.2d 1129 (2003) ........................................................................ 13

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  361 F.3d 1108, 1128 (9th Cir. 2004) ....................................................... 35

*Oceana v Pritzker*,
   125 F.Supp.3d 232 (D.D.C. 2015) ..................................................... 26

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ........................................................................... 7

*Russello v. United States*,
   464 U.S. 16 (1983) ............................................................................ 15

*San Luis & Delta-Mendota Water Authority v. Jewell*,
   747 F.3d 581 (9th Cir. 2014) ............................................................. 28

*Save the Yaak Comm. v. Block*,
   840 F.2d 714 (9th Cir. 1988) ............................................................. 31

*Sierra Club v. Marsh*,
   816 F.2d 1376 (9th Cir. 1987) ........................................................... 29

*Strycker's Bay Neighborhood Council v. Karlen*,
   444 U.S. 223 (1980) ........................................................................... 7

*Turtle Island Restoration Network v. Dept. of Commerce*
   878 F.3d 725 (9th Cir. 2017) ....................................................... 27, 28

*United States v. Wing*,
   682 F.3d 861 (9th Cir. 2012) ............................................................. 16

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*,
   435 U.S. 519 (1978) ....................................................................... 6, 17

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ............................................................................... 9

*Wyoming Outdoor Council v. Bosworth*,
   284 F. Supp. 2d 81 (D.D.C. 2003) .................................................... 31

<u>STATUTES</u>

4 U.S.C. § 4332(2)(C) ............................................................................ 7

5 U.S.C. § 706 ........................................................................................ 8

16 U.S.C. § 1362(13) ............................................................................. 4

16 U.S.C. § 1362(18)(A)(i) ........................................................................... 5

16 U.S.C. § 1362(18)(A)(ii) .......................................................................... 6

16 U.S.C. § 1362(26) ................................................................................... 16

16 U.S.C. § 1371(a) ....................................................................................... 4

16 U.S.C. § 1371(a)(5)(A) ............................................................................ 5

16 U.S.C. § 1371(a)(5)(A)(i) ............................................................... 5, 13, 16

16 U.S.C. § 1371(a)(5)(A)(i)(I) ............................................................... 5, 18

16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa) .......................................... 5, 19, 20, 22

16 U.S.C. § 1371(a)(5)(A)(i)(II)(bb) ............................................................ 5

16 U.S.C. § 1371(a)(5)(D)(i) ...................................................................... 16

16 U.S.C. § 1383a(l)(1)(C) ......................................................................... 16

16 U.S.C. § 1386(a) .................................................................................... 16

16 U.S.C. § 1386(c) .................................................................................... 16

16 U.S.C. § 1533 .......................................................................................... 6

16 U.S.C. § 1536(a)(2) .................................................................................. 6

42 U.S.C. 4332(2)(C) .................................................................................... 8

42 U.S.C. §§ 4321–4370 ............................................................................... 6


REGULATIONS

40 C.F.R. Part 1500 (2018) ........................................................................... 7

40 C.F.R. § 1501.3 ........................................................................................ 8

40 C.F.R. § 1501.4 ........................................................................................ 8

40 C.F.R. § 1508.27 ...................................................................................... 8

40 C.F.R. § 1508.9(a) .................................................................................... 7

40 C.F.R. § 1508.9(a)(1) ............................................................................... 7

40 C.F.R. §1508.9(b) ..................................................................................... 8

40 C.F.R. §1508.13 ....................................................................................... 8

40 C.F.R. § 1509.7 ............................................................................... 32, 34

40 C.F.R. §§ 1500–1508 ............................................................................... 7

50 C.F.R. Part 402 ...................................................................................... 26

50 C.F.R. § 216.3 ............................................................................................... 5, 6

50 C.F.R. § 216.103 ........................................................................................... 5, 6

50 C.F.R. § 216.105 ............................................................................................... 5

50 C.F.R. § 216.106 ............................................................................................... 5

50 C.F.R. § 217.164 ............................................................................................... 3

50 C.F.R. § 217.164(g)(6) ............................................................................... 20, 21

50 C.F.R. § 217.164 (g)(1)-(5) ............................................................................ 19

50 C.F.R. § 217.164(f) ......................................................................................... 22

50 C.F.R. § 217.164(j) ......................................................................................... 22

50 C.F.R. § 217.165 ........................................................................................ 19, 22

50 C.F.R. § 217.166 ............................................................................................... 5

50 C.F.R. §§ 217.160 – 217.167 ............................................................................ 2

50 C.F.R. § 402.02 ............................................................................................... 27

50 C.F.R. § 402.13 ................................................................................................. 6

50 C.F.R. § 402.14 ................................................................................................. 6

50 C.F.R. § 402.14(g) ........................................................................................... 25

50 C.F.R. § 402.14(g)(4) ....................................................................................... 25

50 C.F.R. § 402.14(h) ............................................................................................. 6

50 C.F.R. § 402.16 ............................................................................................... 29

50 C.F.R. § 402.16(a)(2) .................................................................................. 6, 29

OTHER AUTHORITIES

43 Fed. Reg. 55,978 (Nov. 29, 1978) ..................................................................... 7

51 Fed. Reg. 15,618 (Apr. 25, 1986) ...................................................................... 7

73 Fed. Reg. 33,212 (June 11, 2008) ................................................................ 14, 15

76 Fed. Reg. 34,157 (June 13, 2011) ..................................................................... 14

81 Fed. Reg. 47,240 (July 20, 2016) ...................................................................... 14

83 Fed. Reg. 35,178 (July 25, 2018) ...................................................................... 27

83 Fed. Reg. 63,268 (Dec. 7, 2018) ............................................................ 17

84 Fed. Reg. 37,442 (July 31, 2019) ....................................................... 3, 18

84 Fed. Reg. 44,976 (Aug. 27, 2019) ...................................................... 26

85 Fed. Reg. 19,294 (April 6, 2020) ....................................................... 34

85 Fed. Reg. 50,720 (Aug. 17, 2020) ...................................................... 33

85 Fed. Reg. 59,291 (Sept. 21, 2020) ..................................................... 33

*Cook Inletkeeper v. Ross*
No. 3:19-cv-00238-SLG                iii
Case 3:19-cv-00238-SLG   Document 61   Filed 10/09/20   Page 9 of 48

# INTRODUCTION

The claims in this case allege that the National Marine Fisheries Service's ("NMFS") issuance of Incidental Take Regulations ("ITR" or "ITRs") governing incidental take of eleven different species of marine mammals from oil and gas activities by Hilcorp Alaska LLC ("Hilcorp") in Cook Inlet violated the Marine Mammal Protection Act ("MMPA"), the Endangered Species Act ("ESA"), and the National Environmental Policy Act ("NEPA"). These claims lack merit for the reasons provided below.[1]

# BACKGROUND

## I. FACTUAL BACKGROUND

On April 17, 2018, NMFS received a letter and application from Hilcorp requesting the authorization to incidentally take small numbers of eleven species of marine mammal incidental to active acoustic sources associated with oil and gas development and exploration in Cook Inlet, Alaska. Hilcorp's project includes 2D and 3D seismic airgun operations, geohazard surveys, vibratory sheet pile driving, and drilling of exploratory wells. NMFS found some of these activities may result in the take, by Level A and Level B harassment only, of marine mammals over the course of five years. NMFS determined that circumstances warranted issuance of ITRs and

---

[1] Federal Defendants join in Intervenor-Defendant Hilcorp's argument in its opposition brief, filed concurrently on this date, that Plaintiffs have waived at least three of their claims by failing to present and exhaust the issues during NMFS' administrative proceedings, by failing to allege such claims in their Complaint, and/or failing to present the claim in their opening summary judgment brief. Federal Defendants do not separately argue those points here to avoid duplication. Among the issues Plaintiffs have waived by failing to properly raise and preserve their contentions during NMFS' rulemaking process are their arguments (in Section I.B of their opening brief) that NMFS ignored Cook Inlet beluga takes attributable to vessel noise, their argument (in Section I.C of their opening brief) that NMFS "segmented" its "small numbers" analysis, and the argument (in Section III.B) that NMFS failed to take a "hard look" at vessel noise under NEPA. *See* Dkt. 53-1 ("Pl. Br.") at 8-15, 21-23, 32.

subsequent annual Letters of Authorization ("LOA") under section 10l(a)(5)(A) of the MMPA and NMFS' implementing regulations.

The purpose of Hilcorp's project is to conduct exploration, development, production, and decommissioning activities in areas of Cook Inlet for oil and gas development. Activities are confined to the lower and middle Inlet, except for geohazard surveys and well abandonment activities in northern Cook Inlet. The project is expected to continue for five years, with various phases of the project lasting one or two years each. On July 31, 2019, NMFS promulgated the ITR authorizing take incidental to five years of work for this project from April 1, 2019 to March 31, 2024. *See* 84 Fed. Reg. 37,442 (July 31, 2019) (at PR1-MMPA-002252-2316). The ITRs are set forth at 50 C.F.R. §§ 217.160 – 217.167 (at PR1-MMPA-002312).

In the Federal Register Notice for the ITR, NMFS found that no serious injury or mortality to any marine mammal was anticipated to result from this activity. The ITR requires Hilcorp to implement rigorous mitigation measures and a monitoring program designed to reduce and avoid the likelihood of injurious interactions. The number and/or intensity of incidents of take will be minimized through mitigation measures that include (but are not limited to): (1) monitoring of the ensonified areas to detect the presence of marine mammals before beginning activities; (2) aerial surveys to search for Cook Inlet beluga whales before beginning seismic surveys; (3) shutdown of activities under certain circumstances to minimize injury of marine mammals; (4) ramp up at the beginning of seismic surveying to allow marine mammals the opportunity to leave the area prior to beginning the survey at full power; (5) ceasing noise producing activities within 10 miles of the Susitna Delta at specified times, as well as ceasing seismic activity within certain distances of the Kasilof River; and (6) clearing of the safety zone ("SZ") prior to the commencing of in-water activities that have the potential to rise to the level of take. *See* PR1-MMPA-002252. The full suite of mitigation requirements for Hilcorps' activities

are detailed in the Preamble to the ITR, the ITR, and Biological Opinion ("BiOp"). PR1-MMPA-002303-306; 50 C.F.R. § 217.164 (at PR1-MMPA-2313); AKR1004690-4706.

The ITR also contains monitoring and reporting requirements, including: (a) requiring NMFS-approved protected species observers ("PSOs") to document the number and species of marine mammals exposed to sounds from oil and gas activities, as well as the behavior and responses of marine mammals to project-related activities and (b) conducting a sound source verification for the 3D seismic survey and sub-bottom profiler use in lower Cook Inlet to characterize the sound levels and propagation and to verify the monitoring zones (the Exclusion Zone and Safety Zone). *See* PR1-MMPA-002307.

NMFS determined that the effects of Hilcorp's activities will be limited to Level B harassment, consisting of temporary modification in the behavior of individual marine mammals moving away from the sound source[2] and a very limited amount of Level A harassment in the form of Permanent Threshold Shift ("PTS"), i.e., diminished hearing capacity. Any PTS incurred in marine mammals is expected to be limited and result in a low degree of hearing sensitivity loss that would not be likely to affect the fitness of any individuals. NMFS expects no Level A harassment of Cook Inlet beluga whales, and none will be authorized. Level B behavioral harassment may cause startling or avoidance reactions, increased swimming speed, increased surfacing time, or decreased foraging but is unlikely to result in a reduction in survival, reproduction, or fitness for any individual whale. *See* 84 Fed. Reg. at 37,491 (at PR1-MMPA-002301).

In the Federal Register Notice for the ITR, NMFS determined that the mitigation measures it prescribed are sufficient to achieve the least practicable adverse impact on the affected species or stocks and their habitat, as required by the MMPA. PR1-MMPA-

---

[2] NMFS estimates Level B take by harassment for the following species: humpback whale, minke whale, gray whale, fin whale, killer whale, beluga whale, Dall's porpoise, harbor porpoise, harbor seal, Steller sea lion, and California sea lion. PR1-MMPA-002294.

002252-2316. NMFS also found that the authorized takes will have a negligible impact on the affected marine mammal species and, separately, that the estimated takes (comprising no more than 25% of the population for any stock annually) represent small numbers relative to the affected stock abundances. In its BiOp under the ESA, NMFS also concluded that the ITR was not likely to "jeopardize" the ESA-listed western distinct population segment of Steller sea lions, the Cook Inlet beluga whale, or any other ESA-listed whale species, or destroy or adversely modify beluga critical habitat. AKR-1004652-4912. In compliance with NEPA, NMFS also found that issuance of the ITR would not have a "significant impact." PR1-NEPA-000044-000106; PR1-NEPA-000107-000117.

NMFS has issued LOAs to Hilcorp authorizing incidental take by specified activities occurring in 2019, 2020, and through April 22, 2021. PR1-MMPA-2456-2466; PR1-MMPA-2467-2470; PR1-MMPA-001867-1877. Hilcorp's report to NMFS documents that observed impacts to marine mammals have not exceeded those analyzed in the rulemaking and authorized in the LOAs. JOINTSUPP100237-100474.

## II. STATUTORY AND REGULATORY BACKGROUND

### A. The Marine Mammal Protection Act

The MMPA imposes a general moratorium on the "taking"[3] of marine mammals. 16 U.S.C. § 1371(a). However, the MMPA provides a number of exceptions to the moratorium, including the provision at issue in this case. MMPA section 101(a)(5)(A)(i) allows citizens of the United States who engage in a non-military readiness "specified activity" within a "specified geographical region" to request authorization for the "incidental, but not intentional" taking of "small numbers of marine mammals of a species or population stock" pursuant to that activity for a period of no more than five

---

[3] The term "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13).

consecutive years. 16 U.S.C. § 1371(a)(5)(A)(i). The Secretary – acting here through NMFS - "shall allow" the requested taking if, after notice and opportunity for public comment, the Secretary determines, *inter alia*, that the total taking during the five-year period will have a "negligible impact"[4] on affected marine mammal species or stocks. *Id*. § 1371(a)(5)(A)(i)(I). The Secretary must issue regulations identifying (1) the permissible methods of taking pursuant to the activity and "other means of effecting the least practicable adverse impact" on the affected species or stock and its habitat, and (2) requirements pertaining to the monitoring and reporting of such taking. *Id*. § 1371(a)(5)(A)(i)(II)(aa)-(bb).

There is a two-step process for obtaining incidental take authorization under MMPA Section 101(A)(5)(a). 16 U.S.C. § 1371(a)(5)(A); 50 C.F.R. §§ 216.105, 216.106. NMFS first must issue incidental take regulations for the specified activity. 16 U.S.C. § 1371(a)(5)(A); 50 C.F.R. § 216.105. Next, an applicant such as Hilcorp must apply for and obtain a LOA authorizing the incidental taking of marine mammals for a specific period of time. 50 C.F.R. §§ 216.106, 217.166.

Level A harassment as it applies to this activity is "any act of pursuit, torment or annoyance which has the potential to injure a marine mammal or marine mammal stock in the wild." 16 U.S.C. § 1362(18)(A)(i); 50 C.F.R. § 216.3. Level B harassment as it applies to this activity is "any act of pursuit, torment, or annoyance which . . . has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." 16 U.S.C. § 1362(18)(A)(ii); 50 C.F.R. §§ 216.3, 216.103.

---

[4] NMFS regulations define "negligible impact" as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103.

**B. Endangered Species Act Section 7**

The ESA provides for the listing of species as threatened or endangered, 16 U.S.C. § 1533, and it protects listed species in several ways. As pertinent here, ESA Section 7(a)(2) directs each federal agency to ensure, in consultation with NMFS or the U.S. Fish and Wildlife Service (the "consulting agency"), that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. *Id*. § 1536(a)(2). If the agency proposing the action ("action agency," or here NMFS engaged in an intra-agency consultation) determines that the action "may affect" listed species or critical habitat, the action agency must pursue either informal or (relevant here) formal consultation with the consulting agency. 50 C.F.R. §§ 402.13-402.14. At the end of the formal consultation process, the consulting agency must prepare a biological opinion stating its expert opinion on whether the proposed action is likely to "jeopardize the continued existence of" any listed species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h); *see also id*. § 402.02 (defining "jeopardize the continued existence of"). An agency shall reinitiate Section 7 consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law" and one of four conditions is met, including: "If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2).

**C. The National Environmental Policy Act**

Congress enacted NEPA, 42 U.S.C. §§ 4321–4370, to establish a process for federal agencies to consider the environmental impacts of federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). NEPA imposes procedural rather than substantive requirements, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Native Ecosystems Council v. Weldon*, 697

F.3d 1043, 1051 (9th Cir. 2012), and a court may not require agencies to "elevate environmental concerns over other appropriate considerations." *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 227 (1980). An agency's compliance with NEPA is bounded by a "rule of reason." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). That rule "ensures that agencies determine whether and to what extent to prepare an Environmental Impact Statement ("EIS") based on the usefulness of any new potential information to the decisionmaking process." *Id.* The Council on Environmental Quality ("CEQ") has issued regulations at 40 C.F.R. §§ 1500–1508 that govern implementation of the statute by all federal agencies.[5]

NEPA requires that federal agencies prepare an EIS for "major Federal actions significantly affecting the quality of the human environment[.]" 4 U.S.C. § 4332(C). Not all federal actions require an EIS, however, and the responsible agency may elect to prepare an Environmental Assessment ("EA") to "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). The regulations describe an EA as a "concise public document," *id.* § 1508.9(a), that "[s]hall include brief discussions of the need for the proposal, of alternatives . . . , of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted," *id.* §1508.9(b). If, after preparing an EA, the agency finds that the proposed action would have no significant impact, the agency issues a Finding of No Significant Impact ("FONSI"). *Id.* § 1508.13; *Dep't of Transp.*, 541 U.S. at 757–58. When the agency

---

[5] CEQ promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, the Council published a new rule, effective September 14, 2020, further revising the 1978 regulations. The claims in this case arise under the 1978 regulations, as amended in 1986. All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Part 1500 (2018).

issues a FONSI, NEPA does not require the preparation of an EIS. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1501.3, 1501.4.

The NEPA regulations list factors that are relevant in determining whether a proposed action may have a "significant" impact that may require preparation of an EIS rather than an EA. 40 C.F.R. § 1508.27. The mere presence of a listed factor does not demonstrate "significance" under NEPA. In *Native Ecosystems Council v. U.S. Forest Service*, the court held that "[t]he presence of negative effects regarding the impact of the . . . Project . . . or even information favorable to [the Plaintiff's] position" does not mean that the project may have a "significant" effect. 428 F.3d 1233, 1240 (9th Cir. 2005); *see also Envtl. Prot. Info. Ctr. v. U.S. Forest Service*, 451 F.3d 1005, 1012 (9th Cir. 2006) (the court looks at the *degree to which* an action may have an impact). As long as the agency took a reasonable approach in addressing the relevant NEPA significance factors, its determination should be upheld. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 956–57 (9th Cir. 2008).

## STANDARD OF REVIEW

Judicial review of administrative actions taken under the MMPA, ESA and NEPA is governed by Administrative Procedure Act ("APA") section 706, 5 U.S.C. § 706. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir. 2004). Under the APA, a reviewing court must satisfy itself that agency decisions are not "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. at 1206 (citations omitted). Review under this standard is to be "searching and careful" but "narrow," and a court is not to substitute its judgment for that of the agency. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Under this deferential standard, a court may reverse a decision as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*), *overruled on other grounds*, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) (citations and internal quotation marks omitted); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

A two-step inquiry applies to NMFS' interpretation and application of statutes for which it is responsible, including as relevant here, the MMPA, ESA, and NEPA. *Chevron U.S.A. v. Nat. Res. Def. Council,* 467 U.S. 837, 843–44 (1984). First, the Court asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. Second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute," i.e. "whether the agency's interpretation is reasonable." *Id.* at 843; *King v. Burwell,* 576 U.S. 473, 485 (2015); *Alaska Wilderness League v. Jewell,* 788 F.3d 1212, 1220–21 (9th Cir. 2015).

## ARGUMENT

## I. THE INCIDENTAL TAKE REGULATIONS COMPORT WITH THE MMPA AND APA.

### A. NMFS Reasonably Concluded that Vessel Noise Would Not Take Beluga Whales.

In its analysis under both the MMPA and ESA, NMFS evaluated whether the vessel noise associated with Hilcorp's various activities would adversely affect Cook Inlet beluga whales or any other marine mammal species. NMFS reasonably concluded that these sources of vessel noise, including noise from tugboats towing drilling rigs, would not take beluga whales under the MMPA and ESA or even adversely affect beluga

whales. NMFS' consideration of this issue refutes Plaintiffs' argument (Pl. Br. 8-12) that NMFS failed to consider or adequately address this issue.

NMFS concluded that vessel operations by Hilcorp would be unlikely to cause take under the MMPA for four inter-related reasons: (1) "the predictable movement of vessels and tugs," i.e., that marine mammals can detect approaching vessels before noise rises above the threshold for Level B acoustic harassment; (2) the low population density of marine mammals, especially beluga whales, in the project area; (3) any marine mammals that might come into contact with project-related vessel noise are likely habituated to vessel noise, especially the "existing baseline of commercial ship traffic;" and (4) the absence of any "activity-, location-, or species-specific circumstances or other contextual factors that increase concern and the likelihood of take from towing of the drill rig." PR1-MMPA-002257. NMFS applied its expertise to conclude that exposure of belugas to vessel noise in excess of the acoustic threshold of 120 dB that may indicate Level B harassment due to continuous noise from vessel engines would be minimal. The four contextual considerations noted above support the conclusion that take of marine mammals would be unlikely to result from exposure to vessel noise.

NMFS explained that marine mammal responses to anthropogenic sound, including vessel noise, vary widely due to numerous factors, including distance from a source, background noise levels, and the context of the exposure, all of which influence whether a sound is processed as "a negligible addition to the local environment" or "a distinctive signal that may affect marine mammals." PR1-MMPA-002278; PR1-MMPA-002286. Thus NMFS reasonably considered the relevant factors in concluding that take was unlikely to occur due to vessel noise from Hilcorp's activities. *See also* AKR1004830-32 (reviewing literature proposing that disturbance by vessels depends on number of vessels, distance between animal and vessel, vessel speed and vector, and behavioral state). Moreover, during the ice-free months when Hilcorp will be operating,

beluga whales are generally found in the upper Cook Inlet, not the central or southern portions of Cook Inlet where Hilcorp will primarily be working. PR1-MMPA-002273. Most areas outside of upper Cook Inlet are "not known to be of particular significance to Cook Inlet beluga whales," and any exposures to noise from Hilcorp's vessels in these areas will be brief and infrequent and allow belugas (and other species) to return to any areas that Hilcorp's vessels might transit. PR1-MMPA-002266-002267. NMFS explained that such "brief, transient behavioral response alone should not necessarily be considered as having the potential to disturb by disrupting behavioral patterns" sufficient to equate to Level B harassment. PR1-MMPA-002263.

The BiOp also specifically evaluated the effects of noise from general vessel operations and tugboats towing drilling rigs. NMFS concluded that these noise sources were not likely to adversely affect the Cook Inlet beluga whale or its critical habitat (or any other ESA-listed species). AKR1004821, AKR1004823-1004825, AKR1004830-1004832. With the implementation of mitigation measures, the impact of vessel noise is "very minor" and "immeasurably small," and the probability for vessel noise to rise above the threshold for Level B harassment is "very small." AKR 1004832. This conclusion is especially valid for tug noise because of their slow speed while towing a drill rig, limiting the potential to startle a marine mammal in the area and resulting in avoidance behaviors. AKR1004824-825.

These analyses are not undercut by Plaintiffs' selective and inaccurate references to NMFS' Recovery Plan for Cook Inlet beluga whales or various studies that NMFS also considered. Pl. Br. 10-11. While NMFS' Recovery Plan has identified tugboat noise and anthropogenic noise as a threat to Cook Inlet beluga whales' communication and echolocation at large distances, that general finding does not undercut NMFS' activity-specific analysis here that also considers the fact that beluga whale exposure to Hilcorp's activities will occur in areas and times of low beluga occurrence, that Hilcorp will adhere

to rigorous mitigation measures designed to avoid any harmful exposures to belugas (including requiring vessels to maintain distance from belugas), and other relevant considerations, such as tugboats operating at slower speeds with lower noise levels.

Plaintiffs mischaracterize other studies on belugas, citing a study NMFS reviewed for the proposition that current anthropogenic activities in Cook Inlet "exceed behavioral harassment levels." Pl. Br. 11, citing AKR3014188. To be sure, that study asserts that commercial shipping is the most prominent source of noise in Cook Inlet. But Plaintiffs omit the study's conclusion that the highest concentrations of noise occur in the Upper Cook Inlet, such as Knik Arm. AKR3014193. And they ignore the significant fact that Hilcorp's activities are not located in that area of Cook Inlet. They also cite other studies (Pl. Br. 11) that support NMFS' analysis, such as that belugas are highly mobile and always moving, except when stopped at certain areas in the upper Cook Inlet to socialize and feed. AKR3011803.

NMFS based its analysis and conclusions in the ITR on scientific predictions within its areas of expertise. These expert judgments deserve a great deal of deference. *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 711 (9th Cir. 2009) (citing *Lands Council*, 537 F.3d at 993). NMFS' administrative record shows that the agency evaluated the available evidence on the potential impact of vessel noise on the marine mammal species at issue here, especially Cook Inlet beluga whale, and concluded that the vessel noise associated with Hilcorp's activities is unlikely to cause incidental take or adversely affect the belugas. The Court should reject Plaintiffs' arguments to the contrary.

## B. NMFS' Small Numbers Determination Comports with the MMPA.

NMFS may authorize the incidental take of only "small numbers" of marine mammals under section 101(a)(5)(A) of the MMPA. 16 U.S.C. § 1371(a)(5)(A)(i). This statutory standard provides that "the Secretary shall allow, during periods of not more

than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of *small numbers of marine mammals of a species or population stock* if the Secretary" provides notice and opportunity for public comment, makes the required findings, and issues regulations prescribing mitigation, monitoring, and reporting requirements. *Id.* (Emphasis added.)

The MMPA does not define "small numbers." In enacting this standard, Congress explained that small numbers is not a concept that can be expressed in absolute terms. H.R. Rep. No. 97–228 (1981), *reprinted in* 1981 U.S.C.C.A.N. 1458 The definition of small numbers in NMFS' and the U.S. Fish and Wildlife Service's 1989 implementing regulations was invalidated in *Natural Resources Defense Council v. Evans*, 279 F. Supp.2d 1129 (N.D. Cal. 2003), based on the finding that the regulatory definition of small numbers was improperly conflated with the regulatory definition of "negligible impact." As that court observed, "the plain language indicates that 'small numbers' is a separate requirement from 'negligible impact.'" *Evans*, 279 F. Supp.2d at 1150. Since that time, NMFS has not applied the definition found in its regulations.

"[I]n practice, NMFS compares the number of individuals taken within a year to the most appropriate estimation of abundance of the relevant species or stock in [its] determination of whether an authorization is limited to small numbers of marine mammals. Additionally, other qualitative factors may be considered in the analysis, such as the temporal or spatial scale of the activities." PR1-MMPA-002310-2311. The Ninth Circuit upheld a similar proportional approach to applying the small numbers standard in *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 905-907 (9th Cir. 2012). In *Salazar,* the court upheld the ITR issued by the Fish and Wildlife Service for a five-year term based on that agency's analysis of the walrus and polar bears affected in relation to the size of their larger populations.

For this ITR, NMFS took a similar proportional approach for Cook Inlet beluga

whales (and all other protected species), finding that the authorized take of no more than 35 individual belugas annually represents "10.67 percent of the stock." PR1-MMPA-002311. NMFS' approach to the small numbers analysis is not a new practice. *See, e.g.*, 81 Fed. Reg. 47,240 (July 20, 2016) (small numbers determinations in ITR for seismic surveys in Cook Inlet based on annual take estimates, not total take over the five-year period of the regulations); *see also* 76 Fed. Reg. 34,157 (June 13, 2011) (small numbers determination for ITR for liquefied natural gas facility based on annual take estimates even though NMFS issued a 5-year LOA that overlapped entirely with the effective period of the ITR).

Even though NMFS is able in this ITR to quantify its estimate of the numbers of individual belugas and other marine mammals subject to incidental take, nothing in the statute requires that compliance with the small numbers limitation be demonstrated in numerical terms. *Salazar*, 695 F.3d at 906 ("Nor is there anything in Section 101(a)(5)(A) that requires the Service, when promulgating incidental take regulations, to quantify or estimate the number of mammals that would be taken."). In *Salazar*, FWS did a qualitative assessment of small numbers based on known distribution patterns and habitat use of the species at issue there, and the Ninth Circuit upheld it. 695 F.3d at 907 (citing 73 Fed. Reg. 33,212, 33,233 – 33,235 (June 11, 2008)). FWS' small numbers analysis at issue in *Salazar* did not compile the total impacts over the five-year term of the ITR, as Plaintiffs now maintain is a statutory requirement.[6] Plaintiffs nonetheless demand that the plain language of the MMPA requires NMFS to aggregate the total number of individuals of a species or stock to be taken over the five-year duration of the ITR in its

---

[6] This point is demonstrated by FWS's explanation for its analysis, such as that: "it is impossible to predict with certainty the number of walruses or polar bears that might be present in the offshore environment of the lease sale area in a given year, or in a specific project area during the open water season," and "the actual number of animals exhibiting some form of behavioral response will vary from year to year related to the exact amount of industrial activity." *See* 73 Fed. Reg. at 33,234.

small numbers analysis. Pl. Br. 12-15.

This argument fails. First, Plaintiffs' reading is not compelled by any statutory language in section 101(a)(5)(A). Rather, as the Ninth Circuit said in *Salazar*, given the ambiguity in this provision of the MMPA, "*Chevron* commands that [the Court] accept the agency's interpretation [of the small numbers language] so long as it is reasonable." 695 F.3d at 906 (citation omitted). This acknowledged ambiguity defeats Plaintiffs' argument that the plain language of the statute requires NMFS to assess small numbers on a multi-year basis.

The structure of MMPA section 101(a)(5)(A)(i) supports NMFS' construction. While MMPA section 101(a)(5)(A)(i)(I) explicitly states that the negligible impact determination for a specified activity must take into account the total taking over the five-year period, the small numbers standard in the preceding clause lacks similar language requiring consideration of the "total of such taking." This difference is meaningful because "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" of statutory language. *Russello v. United States*, 464 U.S. 16, 23 (1983). Unlike the negligible impact language in MMPA section 101(a)(5)(A)(i)(I), Congress did not include a "total of such taking" provision in the small numbers language. Plaintiffs' effort to import language from the negligible impact standard into the small numbers standard (Pl. Br. 13) is not compelled by the statute or any canon of statutory construction.

NMFS' annualized approach to its small numbers analysis importantly harmonizes the identical small numbers language that appears both in Sections 101(a)(5)(A) and 101(a)(5)(D) of the MMPA. Section 101(a)(5)(D) also allows NMFS to authorize incidental take by harassment (i.e. non-lethal take) for up to one year at a time, subject to a small numbers requirement that is identical in pertinent part to the language in Section 101(a)(5)(A). *Compare* 16 U.S.C. §§ 1371(a)(5)(D)(i), (a)(5)(A)(i); *Native Village of*

*Chickaloon v. NMFS*, 947 F. Supp. 2d 1031, 1049 n.123 (D. Alaska 2013) (observing that "the same statutory standards apply" to incidental take authorization under both provisions). NMFS' consistent use of annual assessments for small numbers under both MMPA sections 101(a)(5)(A) and (D) avoids a bias in favor of a series of short-term authorizations under 101(a)(5)(D) over a more holistic five-year regulatory framework in 101(a)(5)(A) where there is no indication Congress preferred 101(a)(5)(D) over 101(a)(5)(A). NMFS' reading thus furthers the goal of understanding this aspect of the MMPA "as a symmetrical and coherent regulatory scheme" and fits "if possible, all parts into a ... harmonious whole." *United States v. Wing*, 682 F.3d 861, 867 (9th Cir. 2012).

NMFS' approach is also consistent with other MMPA provisions that reflect a focus on annual cycles in population biology.[7] Given NMFS' discretion in light of the statutory ambiguity in the small numbers standard, NMFS' use of annual take estimates for the small numbers assessment (rather than the total taking from all activities occurring under the period of the ITR) is a reasonable and permissible interpretation of the statute. It is reasonable and wholly consistent with the structure and text of MMPA Section 101(a)(5)(A)(i) for NMFS to satisfy the small numbers mandate based on consideration of annual estimates rather than on a cumulative five-year basis. Plaintiffs have not carried their burden to demonstrate why NMFS' annualized assessment approach is unreasonable and undeserving of deference under *Chevron* step two.

---

[7] *See, e.g.,* 16 U.S.C. § 1386(a), (c) (requiring stock assessment reports to estimate the annual human-caused mortality and serious injury of the stock, and annual review of stock assessments when significant new information is available that may indicate the stock assessment should be revised); 16 U.S.C. § 1362(26) (defining "net productivity rate" as the annual per capita rate of increase in a stock resulting from additions due to reproduction, less losses due to mortality); 16 U.S.C. § 1383a(l)(1)(C) (requiring Marine Mammal Commission's recommended guidelines to govern the incidental taking of marine mammals in the course of commercial fishing operations to include as a factor to be considered and utilized in determining permissible levels of taking "the abundance and annual net recruitment of such stocks").

*Cook Inletkeeper v. Ross*
No. 3:19-cv-00238-SLG

Plaintiffs argue that NMFS did not give a detailed explanation of this methodological point. Pl. Br. 13. Plaintiffs were obligated to bring this narrow legal issue to NMFS' attention with sufficient clarity to allow NMFS "to understand and rule on the issue raised." *Glacier Fish Co. LLC v. Pritzker*, 832 F.3d 1113, 1128 (9th Cir. 2016)(citation omitted); s*ee also Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553. They did not raise this issue in comments on the proposed rule. *See* PR1-MMPA-002268 (responding to different CBD comment about small numbers); *compare* 83 Fed. Reg. 63,268, 63,301 (Dec. 7, 2018) (rejecting a more specific comment on a different ITR advocating "additive" approach to small numbers considering "all 'taking' to which a given stock may be subject" as not founded in statute, legislative history, or case law).

Plaintiffs urge nonetheless that NMFS' approach is precluded by dicta in *Salazar* where "a proposed activity might harass a large portion of the relevant mammal population, but have only a negligible impact on the species or stock because the harassment is merely trivial and fleeting." Pl. Br. 14-15, citing *Salazar*, 695 F.3d at 903, 906. But this argument rests on the false premise that NMFS must take an "additive" approach to the small numbers analysis. NMFS's small numbers analysis is consistent with *Salazar* because it takes a proportional approach to the small numbers standard and is conceptually distinct from the negligible impact analysis. *Salazar*, 695 F.3d at 907 (requiring distinct analyses).

The small numbers standard in MMPA Section 101(a)(5)(A) is an ambiguous one. At *Chevron* step two, the Court is to respect the agency's interpretation so long as it "reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent." *Glacier Fish Co.,* 832 F.3d at 1121 (citation omitted). NMFS' "small numbers" analysis is a reasonable application of the statute and Plaintiffs' arguments do not demonstrate otherwise. The Court should uphold NMFS' application of the small numbers standard here.

## C. The ITR Set Forth Appropriate Means to Effect the Least Practicable Adverse Impact.

In order to issue an LOA under section 101(a)(5)(A) of the MMPA, NMFS must set forth the permissible methods of taking pursuant to such activity, and other means of effecting the least practicable adverse impact on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for taking for certain subsistence uses. *See* 84 Fed. Reg. at 37,493 (at PR1-MMPA-002303); 16 U.S.C. § 1371(a)(5)(A)(i)(I). In applying this standard, NMFS considers two primary factors – the likely efficacy of a mitigation measure in reducing a potential adverse effect and the practicability of the measure for the applicant to implement. PR1-MMPA-002303-002304(identifying factors NMFS considered in assessing practicability). The ITR thus requires five major measures to protect all marine mammals: (1) Vessel-based and shore-based visual mitigation monitoring; (2) Establishment of a marine mammal exclusion zone and safety zone; (3) Shutdown procedures; (4) Ramp-up procedures; and (5) Vessel strike avoidance measures. PR1-MMPA-002304. These measures are derived from the best available science, established best practices, and prior NMFS authorizations and support NMFS' conclusion that these measures are both effective in minimizing impacts and practicable to implement here. PR1-MMPA-002303-002310; PR1-MMPA-002268 (further discussion of literature on effectiveness of mitigation measures).

NMFS also mandated additional mitigation measures for belugas and their habitat because of further concern about the species: (1) Aerial overflights before seismic surveys; (2) Shutdowns if belugas are sighted; and (3) Time-area closures for the biologically important areas around the Susitna Delta and Kasilof River. PR1-MMPA-002304-002306. Standard shutdown zones and ramp-up procedures minimize the likelihood of injury and more severe behavioral responses for all marine mammals. The

larger shutdown zones for belugas further reduce the likelihood or severity of any such impacts, and no Level A harassment is anticipated or authorized. The restriction on activities for belugas in the Susitna Delta and Kasilof Rivers also reduce the likelihood of lost feeding opportunities that would have detrimental impacts more likely to result in impacts on reproduction or survival. NMFS is owed substantial deference in establishing these measures given its expertise and discretion on quintessential scientific and technical issues.

Plaintiffs criticize the mitigation and monitoring measures included in the ITR at 50 C.F.R. §§ 217.164 and 217.165. Pl. Br. 15-18. Plaintiffs demand (Pl. Br. 16) that mitigation measures must be the same for every species regardless of their different circumstances or practicability. Pursuant to section 101(a)(5)(A)'s least practicable adverse impact mitigation standard, NMFS minimizes impacts to individual marine mammals with the knowledge that minimizing impacts to individuals will then minimize effects at the population/stock level. Plaintiffs argue that the MMPA obligated NMFS to require a shutdown of operations when any marine mammal, not just a beluga, enters the relevant Level B harassment zone for the activity at issue. This approach is unreasonable where the MMPA is explicit. NMFS must consider practicability when prescribing the means of effecting the "least *practicable* adverse impact on such species or stock." 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa) (emphasis added). This language supports considering potential measures under the least practicable adverse impact standard in view of particular species' needs. Thus NMFS required activity shutdown every time a beluga is observed approaching the Level B harassment zone in specific recognition of concern about Cook Inlet beluga whales.[8] 50 C.F.R. § 216.164(g)(6) (at PR1-MMPA-002324);

---

[8] NMFS estimated that a maximum of 35 belugas per year may be exposed to the Level B harassment zone. PR1-MMPA-002301. Hilcorp's final 2019 report activities documented that its activities, including completion of all planned 3D seismic surveys, did not take any Cook Inlet beluga. JOINTSUPP-100297-99.

PR1-MMPA-002265, *see also id.* at 2260. In consideration of the conservation status of Cook Inlet beluga whales, as well as the practicability of requiring an expanded shutdown for belugas, NMFS imposed this more stringent shutdown requirement (among others) in an effort to avoid any significant energetic impacts to Cook Inlet belugas. It is also relevant (both in the impact assessment and the practicability assessment) that belugas are only infrequently observed in the lower and mid-Cook Inlet area of operations during the ice-free months when Hilcorp is operating. PR1-MMPA-002273; AKR1004713, AKR1004718.

NMFS carefully considered both practicability and a range of protective measures for marine mammals in setting the ITR's mitigation requirements. Plaintiffs point to no evidence that NMFS' analysis of the required mitigation regime, which considers both the reduction of impacts effected by the required measures in combination with their practicability for Hilcorp's operations, is lacking or in error. Other protected mammal species are much more abundant. *See, e.g.*, PR1-MMPA-002301. NMFS' judgment to require an expanded shutdown zone only for Cook Inlet belugas due to their conservation status and consideration as a Species in the Spotlight, but not for other species, is based on the agency's technical and scientific expertise and is owed deference. *Cf. Native Vill. of Chickaloon*, 947 F. Supp. 2d at 1060 (deferring to NMFS expertise on need for specific time-area restrictions as mitigation).

Plaintiffs also claim that the shutdown zone for belugas is "only 1500 meters" for certain types of activities, demanding that this distance be enlarged. Pl. Br. at 16. Plaintiffs misstate NMFS' mitigation requirements for belugas. "Any time a beluga is sighted during the use of the equipment outlined in Table 20 below, activities will shut down." PR1-MMPA-002304. Thus Hilcorp must "shut down active noise sources from which take could occur if a Cook Inlet beluga whale is *spotted at any distance* within the relevant Level B harassment [zone]." PR1-MMPA-002265 (emphasis added); PR1-

MMPA-002260. This requirement is mandated by regulation. 50 C.F.R. § 217.164(g)(6) expressly requires that "[o]perations must shut down completely if a beluga whale is sighted within the relevant Level B harassment [Zone]." Plaintiffs' argument simply misconstrues the ITR.

Plaintiffs also seem to complain that the Safety Zones ("SZ") and Exclusion Zones ("EZ") established for species other than belugas, and set forth in Table 20 of the ITR (PR1-MMPA-002304), are smaller than the Level B harassment zone, and hence unacceptable. Pl. Br. 16. They also argue, relatedly, that NMFS erred in not requiring Hilcorp to monitor the entirety of the Level B Harassment zone regardless of size. Pl. Br. 17. However, NMFS set the distances specified in Table 20 of its Federal Register Notice based on the distances it found practicable for PSOs to monitor.[9] PR1-MMPA-002265; PR1-MMPA-2304. NMFS reasonably focused on pragmatic measures to ensure that PSOs are as effective as possible, such as the requirement that Hilcorp locate PSOs in different locations depending on the activity in order to visually observe the greatest possible area. PR1-MMPA-002304; PR1-MMPA-002307; 50 C.F.R. §§ 217.164(f), (g)(1)-(5) (discussing, *inter alia*, PSO placement at "best vantage point practicable"). This decision is a reasonable exercise of technical judgment by NMFS based on a permissible consideration in establishing mitigation appropriate to yield the "least practicable adverse impact." 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa).

Based on observer and equipment capabilities, it is not feasible for PSOs monitoring from vessels to identify marine mammals 7,000 meters in each direction of a vessel. PR1-MMPA-002265. However, in recognition that seismic surveys have the

---

[9] The exclusion zone is the area where all operations must cease if a marine mammal enters and is "based on distance to the Level A harassment threshold or what can be effectively monitored for the species." PR1-MMPA-002304. The safety zone is the larger radius from a vessel that Hilcorp must monitor for the presence of protected species. The safety zones are admittedly "generally smaller than the Level B harassment zones from various sources." PR1-MMPA-002304.

greatest acoustic footprint, and in an effort to ensure areas of seismic surveying are free of beluga whales, the species of greatest concern, NMFS requires Hilcorp to fly an aerial survey searching for beluga whales and prohibits Hilcorp from starting seismic surveys if belugas are sighted in the survey area. PR1-MMPA-00269; 50 C.F.R. § 217.164(j).

NMFS also set monitoring and reporting requirements designed to record all incidental take. Thus, Hilcorp must record any marine mammal observations within the Level B harassment zone and estimate takes in any portions of the Level B zone that are not visible. PR1-MMPA-002304-002308; PR1-MMPA-002264-65 (Response to Comment 16); JOINTSUPP100266 (method for estimating Level B takes of ESA-listed animals not observed by PSOs); 50 C.F.R § 217.165. Plaintiffs do not directly address NMFS' full suite of monitoring and reporting measures, or present any support for their claim that the monitoring and reporting requirements will not accurately document the true extent of incidental take. Thus, the Court should reject Plaintiffs' arguments and defer to NMFS' reasonable exercise of its scientific judgment.

## II. NMFS' BIOLOGICAL OPINION COMPLIED WITH THE ESA.

Plaintiffs three arguments challenging NMFS' "no-jeopardy" BiOp for Cook Inlet beluga whales, Pl. Br. 21-30, misread the BiOp and should also be rejected.

### A. The Biological Opinion Reasonably Considered Noise Effects, Including Those Sources It Found Not Likely to Adversely Affect Cook Inlet Beluga Whales.

In a reprise of their MMPA argument that NMFS did not evaluate the effects of noise on Cook Inlet beluga whales, Plaintiffs claim that NMFS also omitted this analysis from its BiOp. Pl. Br. 21-23. But NMFS' BiOp (AKR1004652-4912) expressly considered the potential effects of anthropogenic noise on Cook Inlet beluga whales, including vessel noise from Hilcorp's proposed activities. And NMFS concluded that vessel noise was not likely to adversely affect the Cook Inlet beluga whale or its critical habitat, or any other ESA-listed species. AKR1004821, AKR1004823-1004825,

AKR1004830-1004834; AKR1004757-58. NMFS concluded that, with the implementation of mitigation measures, the impact of vessel noise is "very minor" and "immeasurably small," and "the probability of vessel noise rising above the threshold for Level B harassment is very small." AKR1004832, AKR1004833, AKR1004834.

NMFS considered all of the effects of the action together with the environmental baseline and cumulative effects, in accordance with ESA Section 7 and the applicable regulations and case law. NMFS explained its approach in the section titled "Approach to the Assessment" and at the start of the section titled "Effects of the Action." AKR1004708-4710, AKR1004779-80. NMFS listed all stressors of the action including "sound fields produced by non-impulsive noise sources such as . . . tugs towing, [and] other support vessels." AKR1004780. NMFS' analysis included both noise it deemed likely to rise to the level of take as well as all other noise sources NMFS specifically found "not likely to adversely affect listed species or critical habitat," including "general vessel operations." *See, e.g.,* Table 35 at AKR1004821; *see also* AKR1004785-4839. The BiOp concluded that the mitigation measures required for the project, including a range of measures to avoid or minimize harassment of beluga whales, would also be sufficient to protect the other threatened and endangered species under NMFS' jurisdiction. AKR1004824-25 (tugs) (noting that 120 db Level B harassment zone would extend to 2,154 meters away from an active tug and result in "slight deflection" and other minor responses without "adverse consequences'); AKR1004832 (impact of other vessel noise is "very minor"); AKR1004859 (same for potential impact of noise on beluga critical habitat). NMFS also considered the additional effects of noise on prey species, and other potential effects of vessel operation such as vessel strikes, seafloor disturbance and habitat alteration, pollutants into waters, entanglement, and trash and debris. AKR1004837-1004851.

The "Integration and Synthesis" section of the BiOp shows NMFS'

comprehensive analysis, for example, in discussing all stressors, including the vessel noise it found would have an insignificant effect. AKR1004864, AKR1004862-1004867. In addition to considering the potential noise effects due to Hilcorp's activities, NMFS also included past and present anthropogenic noise sources in the environmental baseline. *See* AKR1004778-79. Earlier in the BiOp, NMFS discussed the effects from Hilcorp's project activities in the "Effects of the Action" section (AKR1004779-4860), and then evaluated these effects when added to the environmental baseline and the cumulative effects in the "Integration and Synthesis" section (AKR1004862-4874).

Plaintiffs' reliance on *Connor v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) to claim NMFS failed to "analyze the effect of the entire agency action," Pl. Br. at 23, does not aid their argument. NMFS did not ignore any effects. Rather, NMFS analyzed all effects based on the available science and found some to be insignificant. *Conner* is also factually distinguishable as addressing a BiOp for a lease sale that segmented pieces of the project from year-to-year in incremental steps. Here, NMFS did not segment its analysis under the ESA, but rather analyzed the entire action as a whole, including effects from all stages of Hilcorp's later production and maintenance activities occurring potentially 30 years into the future. *See, e.g.*, AKR1004662 (noting that ITR in effect from 2019 to 2024, but that Hilcorp will continue some activities for 30 years); AKR1004863 (same); AKR1004873 (same). The analysis in NMFS' BiOp considers the entire breadth and duration of the effects of Hilcorp's action, and addresses both present and future effects on the species considering the entire agency action.

## B. NMFS' Jeopardy Analysis Is Reasonable.

Plaintiffs' citation to 50 C.F.R. § 402.14(g)(4)[10] does not support their argument that NMFS's no-jeopardy finding for Cook Inlet beluga whales is allegedly contrary to

---

[10] This provision provides that NMFS is to: "Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the

law obligating NMFS to "aggregate the cumulative effects, environmental baseline, and proposed action in light of the status of the species to determine whether they collectively jeopardize the species' continued existence." Pl. Br. 24-26. The Court has already rejected what appears to be a functionally identical construction of ESA Section 7(a)(2) in *Native Village of Chickaloon*, 947 F. Supp. 2d at 1065.

As in that case, here Plaintiffs also misconstrue the jeopardy analysis under ESA Section 7(a)(2) to argue that NMFS made a methodological error in finding that the small amount of Level B harassment to belugas that may result from the ITR is not likely to jeopardize the species' continued existence. Pl. Br at 26. Plaintiffs' "collective jeopardy" approach would mean that the ITR necessarily jeopardizes the Cook Inlet beluga because the species is allegedly in a state of jeopardy due to its current status and the environmental baseline. This is not what the ESA requires. NMFS' BiOp contains the required analysis. It considered the cumulative effects, environmental baseline, the proposed ITR, and Hilcorp's proposed future oil and gas activities in light of the status of the species all together in its "Integration and Synthesis" section. AKR1004862-74. The conclusions in that section build on the BiOp's prior detailed description of the multiple stressors impacting listed species, including the beluga whale, and the cumulative effects that will continue into the future. AKR1004712-22; AKR1004742-779; AKR1004860-62.

The ESA does not recognize a "baseline jeopardy" status of a species such that additional take is impermissible.[11]  *See, e.g., Oceana v Pritzker*, 125 F.Supp.3d 232, 246

---

continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

[11] Shortly after issuing the BiOp in this case, NMFS (along with FWS) revised the ESA consultation regulations at 50 C.F.R. Part 402, effective September 26, 2019. In issuing those revisions NMFS explained that the concept of "baseline jeopardy" is inconsistent with the ESA. Rather, jeopardy analyses are "determinations that are made about the effects of Federal actions. They are not determinations made about the environmental

(D.D.C. 2015) (indicating "the impact on a species caused by a given number of takes depends on the context in which those takes occur"). The focus is whether the action *itself* is the cause of the appreciable reduction of a species' likelihood of survival and recovery. *See Nat. Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008) ("[T]he suffix '-ize' in 'jeopardize' indicates some active change of status . . . Agency action can only 'jeopardize' a species' existence if that agency action causes some deterioration in the species' pre-action condition."); *See also Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1052 (9th Cir. 2015) ("[J]eopardy caused by cumulative effects [does not] obviate the requirement that the federal action itself must cause some incremental deterioration in the species' pre-action condition.").

NMFS found that the Level B harassment due to Hilcorp's activities might cause behavioral responses in some individual beluga whales, but that such responses were not likely to reduce their fitness, especially for foraging. AKR1004865. Such a behavioral response would also not likely reduce the abundance, reproduction rates, and growth rates of the Cook Inlet beluga whale population. *Id*. NMFS made this finding while recognizing the impacts of other anthropogenic activities in Cook Inlet and the small and declining size of the current beluga whale population. AKR1004865-66. NMFS also found it important that the mitigation measures it required would keep harassment of whales from project noise sources to a minimum, e.g. by requiring shutdown "whenever a beluga whale is observed at any distance within the Level B zone." AKR1004692-93. Moreover, the loudest noise sources from seismic surveys would occur in locations of low densities of belugas. AKR1004867.

Accordingly, NMFS reasoned that:

[A]n action that is not likely to reduce the fitness of individual whales would not be likely to reduce the viability of the populations those individual whales

baseline for the proposed action or about the pre-action condition of the species." 84 Fed. Reg. 44,976, 44,987 (Aug. 27, 2019).

represent (that is, we would not expect reductions in the reproduction, numbers, or distribution of such populations). For the same reasons, an action that is not likely to reduce the viability of those populations is not likely to increase the extinction probability of the species those populations comprise; in this case, the Cook Inlet beluga.

AKR1004866; *see also* AKR1004709-10 (approach to assessment). This analysis is a reasonable application of NMFS's regulatory definition of "Jeopardize the continued existence of" at 50 C.F.R. § 402.02; *see also* 83 Fed. Reg. 35,178, 35,182 (July 25, 2018) ("Reductions in the reproduction, numbers, or distribution of a species that are inconsequential at the species level … would not be considered to rise to the level of 'reduce appreciably'… within the meaning of the regulations.").

Plaintiffs' reliance (Pl. Br. 24) on *Turtle Island Restoration Network v. Department of Commerce* is misplaced because NMFS' analysis here is not based on an impermissible comparison of the effects on belugas attributable to Hilcorp's proposed activities against threats from factors beyond those proposed activities and current baseline conditions. 878 F.3d 725, 738 (9th Cir. 2017). In other words, unlike *Turtle Island*, NMFS here did not improperly minimize the risks to beluga whale survival by only comparing the effects of the action against the baseline conditions that have already contributed to this species' decline; nor is NMFS' no-jeopardy opinion premised on the proportionality of Hilcorp's action relative to other threats.

The facts in *Turtle Island* were also different. Unlike the longline fishery in *Turtle Island*, NMFS has not authorized or predicted *any* lethal take of Cook Inlet beluga whale from Hilcorp's activity. And it certainly does not have evidence projecting a population reduction of up to 11 percent due to the action, as were the facts in *Turtle Island*. 878 F.3d at 737. NMFS made its expert judgment here that any Level B harassment of belugas is unlikely to reduce the fitness, reproduction, or survival of individual whales and thus unlikely to have material consequences at the population level, even in the context of an endangered population and cumulative effects. AKR1004862-78.

Again repeating prior arguments, Plaintiffs maintain that NMFS' no-jeopardy conclusion is refuted by other analyses, including NMFS' Recovery Plan. Pl. Br. 26. Plaintiffs have overstated the significance of the generalized discussion in the Recovery Plan because NMFS applied the same underlying science and understanding of the threats posed by anthropogenic noise to the specific circumstances here, especially in considering the time, place, and conditions under which Hilcorp would operate. Further, "experts in every scientific field routinely disagree," and resolving scientific uncertainty is the agency's task. *Lands Council*, 537 F.3d at 1001; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("The determination of what constitutes the '*best* scientific data available' belongs to the agency's 'special expertise.'").

Plaintiffs' arguments largely misconstrue the ESA and NMFS' BiOp. NMFS provided the appropriate analysis to support its conclusion that Hilcorp's oil and gas activities in Cook Inlet, including authorization of Level B harassment, are not likely to jeopardize the continued existence of the Cook Inlet beluga whale.

### C. NMFS Is Not Required to Reinitiate ESA Consultation.

During its administrative proceedings NMFS specifically addressed Plaintiffs' claim that it must reinitiate formal consultation in order to address its most recent biennial abundance estimate for Cook Inlet beluga whales. JOINTSUPP100006-09. That report provided new abundance and trend estimates and data from a 2018 aerial survey that observed fewer belugas than in prior surveys. JOINTSUPP100129. After issuing that report, and receiving notice of Plaintiffs' intention to add a new claim to this suit, the two branches of NMFS involved in the ESA Section 7(a)(2) consultation considered whether to reinitiate the ESA consultation to consider the new information or to revisit other determinations made to support the ITR. JOINTSUPP100000, JOINTSUPP100005. The NMFS Alaska Region office, in its role as consulting agency

in this intra-agency consultation and as author of the BiOp, reviewed the data and analyses in the new report to decide whether to recommend to the NMFS Office of Protected Resources that reinitiation of consultation was appropriate under 50 C.F.R. § 402.16.

This regulation requires reinitiation of consultation in several specific circumstances, but only one is at issue in this case: "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. 402.16(a)(2). This provision does not mean that "every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation." *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987), *abrogated on other grounds as recognized in Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088–89 (9th Cir. 2015). Rather, deference is owed to NMFS' application and understanding of the regulatory criteria. *Marsh*, 816 F.2d at 1388.

After review of the information cited by Plaintiffs, NMFS determined that its new study on beluga abundance did not trigger reinitiation. JOINTSUPP100129 (2020 study); JOINTSUPP100006-09 (Alaska Region memo). NMFS reasoned that, notwithstanding its general concern over a reduced and declining population and population trend for Cook Inlet beluga whales, the BiOp remained valid. JOINTSUPP100006-09. NMFS reviewed the BiOp's finding that the acoustic Level B harassment of belugas due to the project's noise sources was unlikely to cause a reduction in survival or fitness for any harassed whales. JOINTSUPP100008. Hence, "absent such effects on individual whales, there cannot be population-level effects." *Id.* In considering this new population study, NMFS reasoned that the incidental takes it had authorized "will not affect the species at the (lower) population level to a greater extent because all takes are in the form of behavioral harassment and will not affect fitness, reproduction, or survival of any

individual whale." *Id*. The new information also "does not suggest there will be any new stressors or effects causing take of any whales, nor does it suggest that take would be of a different type or greater severity than those considered in our analysis." *Id*.

NMFS also reviewed whether the new population estimate and trend information would affect the agency's estimate of take, and concluded that its calculation of 58 instances of non-lethal take over a five-year period remained valid. *Id*. Plaintiffs' argument (Pl. Br. 29) that more whales may be taken than anticipated in the BiOp has no obvious basis in the new study. Their assertion is based on an out-of-context quote from the new study that "the new method makes some estimates of group size smaller and some larger." JOINTSUPP100135. But Plaintiffs ignore that this quote relates to NMFS' method for estimating group sizes of observed belugas, i.e. how many belugas to record when a group of belugas is observed during surveying under new data correction rules for missed belugas. JOINTSUPP100134-35. This statement has no relevance to NMFS' calculation of take from 2019 to 2024 using final data on the overall beluga population. There is nothing in the study to indicate that the distribution of belugas in Cook Inlet on a seasonal basis has changed compared to NMFS' understanding prior to the new estimates.

NMFS' rational explanation for its conclusion is supported by its factual and scientific determinations about the basis for the original no-jeopardy opinion and the relevance of the new information, namely that the new information did not reveal effects to listed species or critical habitat in a manner or to an extent not previously considered in the BiOp. This decision is not arbitrary or capricious and should be upheld. *See, e.g. Wyo. Outdoor Council v. Bosworth*, 284 F. Supp. 2d 81, 94 (D.D.C. 2003) (affirming decision to not reinitiate on rational basis review).

## III. NMFS COMPLIED WITH NEPA.

Plaintiffs' argument that NMFS violated NEPA fails because NMFS properly

considered the direct and cumulative impacts on the Cook Inlet belugas when it decided to approve Hilcorp's application requesting the non-lethal, incidental take of marine mammals pursuant to Section 101(a)(5)(A) of the MMPA. Pls.' Br. at 30. As the Ninth Circuit has held, as long as a federal agency takes a reasonable approach to addressing the relevant NEPA significance factors, its determination should be upheld. *Bering Strait Citizens for Responsible Res. Dev.*, 524 F.3d at 956–57; *see also Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992). Plaintiffs' arguments would strip NMFS of its discretion to make "fully informed and well-considered" decisions and substitute Plaintiffs' view for those of a federal agency. *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (citing *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988).

## A. NMFS Considered the Direct Impacts of Noise on Belugas

Plaintiffs first argue that NMFS failed to consider direct impacts to belugas by failing to "properly consider the noise from tugboats and other vessels." Pls.' Br. at 32. This argument is meritless. NMFS specifically addressed the impact of vessel traffic, including tugboats and other vessels, on noise levels leaving from the Port of Anchorage, Port MacKenzie, and several other smaller ports including Nikiski, Kenai, Kasilof, Ninilchik, Anchor River, Tyonek and Drive River. *See* PR1_NEPA 000094. Indeed, NMFS plainly states "we have accounted for the impact of these vessels through the final rule and in this document as acoustic sources from vessels are the primary form of harassment for marine mammals." PR1_NEPA 000095. NMFS also concluded that "take is unlikely to occur" from tugboats and similarly situated vessels because of the predictable movement of those vessels, the low population density in the project area of marine mammals, and because the marine mammals present are "likely habituated to the existing baseline of commercial ship traffic." PR1_NEPA 000059-60.[12] Those are not

---

[12] NMFS also references its BiOp in the EA and the FONSI, which also discusses vessel noise and concludes "the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small." PR1_ESA 000183.

mere summary statements, they are conclusions made on the science and studies before NMFS. *See* PR1_NEPA 000053-74; *see also* PR1_ESA 000182-183.

## B. NMFS Properly Considered the Cumulative Impacts

NMFS's cumulative impacts analysis is adequate because NEPA simply requires that an EA's cumulative impacts analysis contain "a sufficiently detailed catalogue of past, present, and future projects, and provide[s] adequate analysis about how [those] projects[] and differences between" them might impact the environment. *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005); *see also* 40 C.F.R. § 1508.7 (defining cumulative effects as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."). The subject EA has a robust cumulative effects section, which states that the "past, present, and reasonably foreseeable activities that result in cumulative impacts to marine mammal populations" include the following: "subsistence hunting, marine pollution, fisheries interactions, vessel traffic; oil and gas development; coastal zone development, marine mammal research, and climate change." PR1_NEPA 000092-100.

Contrary to plaintiffs' assertions, NMFS took into account the cumulative environmental impacts on Cook Inlet belugas. Pls.' Br. 34. For instance, NMFS specifically considered the subsistence hunting of beluga by Alaska Native communities and the current long-term harvest limits based on population density. PR1_NEPA 000093.[13] NMFS considered the Cook Inlet beluga Recovery Plan, which identified "potential impacts from oil and gas development including increased noise from seismic activity, vessel traffic, air traffic, and drilling" on the belugas. PR1_NEPA 000097. That plan also included an analysis of habitat loss, discharge of wastewater, potentially

---

[13] Currently, subsistence harvest of Cook Inlet belugas is not permitted because the "average stock abundance" of belugas "is below 350 whales." PR1_NEPA 000093.

contaminated food sources and more. *Id.* NMFS also considered Hilcorp's 2018 pipeline installation project and its authorization for incidental Level B harassment of 40 Cook Inlet beluga whales. *Id.* NMFS identified beluga whales as an ESA-listed species for which permits will be issued to study in the future because "many important aspects of marine mammal biology remain unknown, or are incompletely studied." PR1_NEPA 000099. NMFS specifically considered the impact climate change may have on belugas propensity to travel "along the ice pack and feed on prey beneath it" and how any loss of ice due to climate change "could result in prey distribution change or loss." PR1_NEPA 000100. And, beyond those specific references, NMFS considered several other impacts on marine mammals generally, like the impact of acoustic sources from vessel traffic throughout Cook Inlet. PR1_NEPA 000094-95; *see also* PR1_ESA 000182-183.

Even against that backdrop, Plaintiffs argue that NMFS' cumulative impact analysis is faulty because NMFS purportedly failed to account for the Incidental Take Authorization (ITA) for Hilcorp's Alaska LNG project and the ITA for the Port of Alaska. Pls.' Br. 34. This is inaccurate. The EA states that the Federal Energy Regulatory Commission was in the process of drafting an Environmental Impact Assessment for the Alaska LNG project, including MMPA permits and an ESA consultation, which by necessity included the belugas as an ESA-listed-species. PR1_NEPA 000097-98. NMFS included this even though the final rule and authorization for incidental take in Cook Inlet for the Alaska LNG project was still more than a year after the EA and FONSI in this case. *See* 85 Fed. Reg. 50,720-01; 85 Fed. Reg. 59,291-02. And NMFS had not even received an application for the incidental harassment authorization for the Port of Alaska at the time Hilcorp's rule was finalized.[14] *See* 84 Fed. Reg. 72,154 (Dec. 30, 2019).

---

[14] The incidental harassment authorization application was dated October 15, 2019 and NMFS published notice of issuance of those incidental harassment authorizations on April 6, 2020. *See* 85 Fed. Reg. 19,294 (April 6, 2020).

Plaintiffs also incorrectly assert that NMFS failed to consider activities that "NMFS has not authorized, but may be negatively impacting the species." Pls.' Br. 34. With the exception of the "Fisheries Interaction" and the "Marine Mammal Research" categories, all of the categories of activities in the cumulative effects section of the EA are activities for which take authorization has typically not been requested. *See* PR1_NEPA 000092-100.

Without any supporting rule or regulation, Plaintiffs argue that the "failure to report and analyze the total estimated take, and other impacts" to the belugas undermines the wealth of cumulative impacts already considered by NMFS. Pls.' Br. 34. There is no separate requirement to identify in the EA an exact number of take, just that NMFS consider the overall impact on belugas. More specifically, NEPA requires that NMFS consider the cumulative effects of Hilcorp's activities in combination with the past, present and reasonably foreseeable actions in the area, which NMFS did in the cumulative effects section of the EA. *Lands Council*, 395 F.3d at 1028; *see also* 40 C.F.R. § 1508.7.

Plaintiffs citation to *Klamath-Siskiyou Wildlands Center v. BLM*, 387 F.3d 989, 994 (9th Cir. 2004), does not undermine NMFS' cumulative impact analysis here, but rather supports a finding that NMFS complied with NEPA by conducting a "useful analysis of the cumulative impacts of past, present, and future projects," *id.* (quoting *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 361 F.3d 1108, 1128 (9th Cir. 2004)). Unlike the situation in that case—where BLM failed to state "what data the conclusion was based on, or why objective data [could not] be provided"—here NMFS provided a detailed analysis with citations to studies and information it relied on when considering the many cumulative impacts on belugas and marine mammals in general. *Id.*

Lastly, the mitigation and monitoring requirements implemented by NFMS, which were considered in the EA and FONSI, further support a finding that NMFS complied

with NEPA. NMFS concluded that the mitigation measures would lessen the potential noise harassment of belugas by including: (1) exclusion and safety zones, (2) a requirement that Hilcorp "shut down if a beluga is observed within a Level B zone during in-water-noise-producing activity," (3) "required aerial overflights to clear the intended area of seismic survey activity of beluga whales on a daily basis", (4) a required "on-duty protected species observer . . . from an additional mitigation vessel during seismic activity," and (5) prohibition of noise-producing activities likely to exceed 120 sB threshold within 10 miles . . . of the Susitna Delta[15] between April 15 and October, and more. *See* PR1_NEPA 000065-66; *see also* PR1_ESA 000183 (the BiOp concludes that with the mitigation and monitoring measures "the adverse effects from vessel noise on Cook Inlet belugas are insignificant and discountable"). This directly contradicts plaintiffs' argument that NMFS ignored the direct and cumulative impacts to belugas or failed to take the requisite "hard look." Pls.' Br. 32-33.

## IV. THE COURT SHOULD ALLOW SUPPLEMENTAL REMEDY BRIEFING IF IT FINDS ANY ERROR.

Plaintiffs' brief contains no argument on a remedy in the event they prevail on any claim save for the unsupported request that the Court vacate the regulations, and associated BiOp, EA and FONSI. Pl. Br. 35. Should there be a need to address remedy, NMFS requests that the Court provide each party an opportunity to brief the appropriate remedy. Further briefing is appropriate because vacatur is not a presumptive or mandatory remedy here. *Nat'l Family Farm Coal. v. U.S. Envtl. Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020) (articulating factors to be considered and finding remand

---

[15] As considered by NMFS, "[d]uring the summer and fall, beluga whales are concentrated near the Susitna River mouth, Knik Arm, Turnagain Arm, and Chickaloon Bay . . . . Beluga whales are extremely social and often interact in close, dense groups." PR1_NEPA 000071-72.

without vacatur warranted); *see also Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (same).

## CONCLUSION

For all the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment and grant summary judgment in favor of Federal Defendants.

Respectfully submitted this 9th day of October, 2020.

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ John H. Martin*
JOHN H. MARTIN (Colo. Bar 32667)
Trial Attorney, Wildlife & Marine Resources Section
999 18th St., South Terrace Suite 370
Denver, CO 80202
john.h.martin@usdoj.gov
Tel: (303) 844-1383
Fax: (303) 844-1350

*/s/ Edward C. Thomas*
EDWARD C. THOMAS
Trial Attorney, Natural Resources Section
United States Department of Justice
Post Office Box 7611
Washington, D.C. 20044-7611
Edward.C.Thomas@usdoj.gov
Tel: (202) 305-0239
Fax: (202) 305-0506

*Of Counsel:*
JOHN FONSTAD
Assistant U.S. Attorney
United States Attorney's Office – District of Alaska
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567

Phone: (907) 271-5071
Fax: (907) 271-2344
Email: John.Fonstad@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing filing to be served upon counsel of record through the Court's electronic service system.

Dated: October 9, 2020                    _/s/ John H. Martin_