CLYDE "ED" SNIFFEN, JR.
ACTING ATTORNEY GENERAL

Aaron C. Peterson (Alaska Bar No. 1011087)
Jeff Pickett (Alaska Bar No. 9906022)
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov
        jeff.pickett@alaska.gov

*Attorneys for Intervenor-Defendant State of Alaska*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| COOK INLETKEEPER , *et al.,* )<br><br>Plaintiffs, )<br><br>v. )<br><br>WILBUR ROSS, Secretary of Commerce, *et al.* , )<br><br>Defendants. )<br><br>and )<br><br>HILCORP ALASKA, LLC, *et al.*, )<br><br>Intervenor-Defendants. ) | Case No.: 3:19-cv-00238-SLG<br><br>**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................... i

TABLE OF AUTHORITIES ................................................................................ iii

I.    INTRODUCTION ..................................................................................... 1

II.   STATUTORY BACKGROUND................................................................ 2

      A.    MMPA and "Take". ....................................................................... 2

      B.    ESA and "Jeopardy". ..................................................................... 3

      C.    NEPA. ............................................................................................ 5

III.  STANDARD OF REVIEW ........................................................................ 5

IV.   FACTUAL BACKGROUND....................................................................... 7

      A.    Cook Inlet Beluga Whale........................................................... 7

      B.    Oil and Gas Development in Alaska....................................... 10

      C.    Agency Review of Hilcorp's Project Activities ....................... 11

      D.    NMFS' Section 7 Consultation ................................................ 13

V.    ARGUMENT................................................................................................14

      A.    Alaska depends on vessel traffic in Cook Inlet........................ 14

      B.    NMFS' Take Regulations Do Not Violate the MMPA. ........................... 15

            1.    The record supports NMFS' determination that vessel noise
                 is not expected to take Cook Inlet belugas........................... 15

            2.    NMFS' articulated a rational basis for its small numbers
                 analysis............................................................................ 17

            3.    NMFS mitigation measures ensure the least practicable
                 adverse impact on marine animals....................................... 18

      C.    NMFS complied with the ESA. ................................................ 21

            1.    NMFS properly considered the effects of Hilcorp's project. .............. 23

                 i.    NMFS performed a comprehensive jeopardy
                     analysis................................................................... 24

ii. NMFS properly considered aggregate effects......................... 27

2. NMFS was not required to reinitiate consultation. ............................ 31

D.   NMFS complied with the NEPA. ................................................ 33

1. NMFS took a hard look at direct impacts. ........................................ 33

2. NMFS took a hard look at cumulative impacts. ................................ 35

E.   Vacatur is not appropriate in this case. .................................................... 36

VI. CONCLUSION ........................................................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Lubchenco*, 723 F.3d 1043 (9th Cir. 2013) ..................................................... 6

*Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105 (9th Cir. 2018) ..................... 36

*Alliance for Wild Rockies v. Probert*, 412 F.Supp.3d 1188 (D. Mont. 2019) .............................. 33

*Apache Corp. v. Fed. Energy Regulatory Comm'n*, 627 F.3d 1220 (D.C. Cir. 2010) ................. 37

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
273 F.3d 1229 (9th Cir. 2001) .............................................................................. 6, 21, 23

*Bark v. U.S. Bureau of Land Mgmt.*, 643 F.Supp.2d 1214 (D. Or. 2009) ................................... 36

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
524 F.3d 938 (9th Cir. 2008) ...................................................................................... 34, 35

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*,
688 F.3d 989 (9th Cir. 2012) .............................................................................................. 37

*Churchill Cnty. v. Norton*, 276 F.3d 1060 (9th Cir. 2001) ........................................................ 34

*City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142 (9th Cir. 1997) ................. 35

*Conservation Cong. v. Finley*, 774 F.3d 611 (9th Cir. 2014) .................................................... 30

*Conservation Cong. v. U.S. Forest Serv.*, 805 Fed. App'x 520 (9th Cir. 2020) ......................... 30

*Ctr. for Biological Diversity v. Envt'l Prot. Agency*,
65 F. Supp. 3d 742 (N.D. Cal. 2014) .................................................................................. 32

*Ctr. for Biological Diversity v. Envt'l Prot. Agency*, 847 F.3d 1075 (9th Cir. 2017) .............. 32

*Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945 (N.D. Cal. 2010) ............. 24, 27

*Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893 (9th Cir. 2012) .................................... 3, 17

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 110 (9th Cir. 2012) ............................................................................................... 32

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633 (9th Cir. 2010) .................. 6

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) .............................................................................................. 6

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) ...................................................... 5, 34

*Ecology Ctr. v. Castaneda*, 574 F.3d 652 (9th Cir. 2009) ........................................................ 6

*Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006) ................................................... 32

*Friends of the River v. Nat'l Marine Fisheries Serv.*,
293 F. Supp. 3d 1151 (E.D. Cal. 2018) ............................................................................. 33

*Friends of the River v. Nat'l Marine Fisheries Serv.*,
786 Fed. App'x 666 (9th Cir. 2019) .................................................................................... 33

*Fund for Animals, Inc. v. Rice*, 85 F.3d 535 (11th Cir. 1996) .................................................. 30

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992) ............................................ 25, 27

*Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170 (9th Cir. 2000) ............................... 7

*Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392 (9th Cir. 1995) ......................................... 6

*Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072 (9th Cir. 2006) ....................................... 24, 27

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ............................................................................................... 35

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv.*,
109 F.Supp.3d 1238 (N.D. Cal. 2015) ............................................................................... 37

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ..................................................... 6, 21

*Marsh v. Or. Nat. Res. Council*, 490 U.S. 360 (1989) .......................................................... 6, 7

*Nat. Res. Def. Council v. Pritzker,* 828 F.3d 1125 (9th Cir. 2016).........................................19, 20

*Nat'l Wildlife Fed'n v. Babbitt,*
   128 F.Supp.2d 1274 (E.D. Cal. 2000) ...................................................................... 27

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.,*
   947 F. Supp. 2d 1031 (D. Alaska 2013) ............................................................ 18, 30

*Ocean Advocates v. U.S. Army Corps of Eng'rs,* 402 F.3d 846 (9th Cir. 2005) ........................... 5

*Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation,*
   426 F.3d 1082 (9th Cir. 2005) ............................................................................. 4, 23

*Robertson v. Methow Valley Citizens Council,* 490 U S. 332 (1989)............................................ 5

*Tri-Valley CAREs v. U.S. Dep't of Energy,* 671 F.3d 1113 (9th Cir. 2012) ........................... 5, 34

*Trout Unlimited v. Lohn,* 559 F.3d 946 (9th Cir. 2009)…………………… .......................... 27

*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
   878 F.3d 725 (9th Cir. 2017) ............................................................................. 30, 31

*Westlands Water Dist. v. U.S. Dep't of Interior,* 376 F.3d 853 (9th Cir. 2004) ........................... 6

*Wild Fish Conservancy v. Salazar,* 628 F.3d 513 (9th Cir. 2010) ...................................... 4, 6, 23

## Statutes

5 U.S.C. § 553(c) ............................................................................................................. 21

5 U.S.C. § 706(2)(A)……………………………………………………………………5

16 U.S.C. § 1361 ............................................................................................................... 1

16 U.S.C. § 1362(13) ................................................................................................. 2, 3, 4

16 U.S.C. § 1371(a)(5)(D)(i) ........................................................................................... 3

16 U.S.C. § 1372(a)(1)...................................................................................................... 2

16 U.S.C. § 1531, ............................................................................................................. 1

16 U.S.C. § 1532(19) .................................................................................................. 3, 22

16 U.S.C. § 1538 .......................................................................................................... 3, 22

42 U.S.C. § 4321 ............................................................................................................... 1

42 U.S.C. § 4332(C) ......................................................................................................... 5

Alaska Stat. § 16.05.020 .................................................................................................. 1

## Other Authorities

http://dog.dnr.alaska.gov/Documents/Leasing/BIF/Cook_Inlet/20181102_Final_CI_BIF.pdf, p 9-
   1 – 9-8. .................................................................................................................. 13

https://www.adfg.alaska.gov/index.cfm?adfg=habitatregulations.special.................................... 9

## Regulations

40 C.F.R. § 1501.6 ............................................................................................................ 5

40 C.F.R. § 1508.1 ............................................................................................................ 5

40 C.F.R. § 1508.7 .......................................................................................................... 35

40 C.F.R. § 1501.3 ............................................................................................................ 5

50 C.F.R. § 17.3 ................................................................................................................ 3

50 C.F.R. § 216.103 .......................................................................................................... 3

50 C.F.R. § 402.02 .......................................................................................................... 28

50 C.F.R. § 402.16 ............................................................................................... 23, 31, 33

iv

**Constitutional Provisions**

Alaska Const. art. VIII, §§ 1, 4 ....................................................................................................... 1

## I.    INTRODUCTION

Cook Inletkeeper and Center for Biological Diversity ("Plaintiffs") ask the court to rule, as a matter of law, that regulations promulgated by the National Marine Fisheries Service ("NMFS" or "Service") permitting Hilcorp Alaska, LLC ("Hilcorp") to pursue oil and gas exploration and production activities in Cook Inlet are unlawful. Dkt. 53-1. Because NMFS complied with the requirements of the Marine Mammal Protection Act, 16 U.S.C. § 1361, *et seq.* ("MMPA"), the Endangered Species Act, 16 U.S.C. § 1531, *et seq.* ("ESA"), the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* ("NEPA"), and associated regulations and interpreting case law, the State of Alaska ("State" or "Alaska") opposes Plaintiffs' motion and asks the court to deny it. On the basis of the arguments set forth in this brief and pursuant to LR 16.3(c)(2), the State respectfully cross-moves for summary judgment that NMFS's regulations are lawful.[1]

This dispute involves issuance of incidental take regulations ("ITR") and a Letter of Agreement ("LOA")[2] under the MMPA related to Hilcorp's activities in the Cook Inlet. On December 9, 2019, the Court granted the State's motion to intervene. Dkt. 37. Alaska, as a sovereign state and pursuant to its public trust responsibilities, has an interest in managing and conserving all wildlife and other natural resources within its jurisdiction, including Cook Inlet beluga whales, their habitat, and their food sources. Alaska Const. art. VIII, §§ 1, 4; Alaska Stat. § 16.05.020; *see also* Dkt. 32 at 5-6, ¶¶10, 11. Alaska also has an interest in developing state land, resources, property, and other interests, including oil and gas development, on behalf of its citizens. Dkt. 33 at 3, ¶3.

---

[1] Alaska joins in the arguments of Defendant-Intervenor Hilcorp with respect to waiver.

[2] Unless otherwise noted, for ease of reference the State refers to the ITR and LOA collectively as the "ITR."

As the record demonstrates, NMFS engaged in reasoned decision making and its determinations are entitled to deference. Plaintiffs' challenge to the issuance of the ITR is entirely without merit and should be summarily denied.

## II.     STATUTORY BACKGROUND

### A.     MMPA and "Take".

Congress enacted the MMPA to prevent the extinction or depletion of marine mammal stocks caused by human activities. 16 U.S.C. § 1361(1). The MMPA prohibits any taking of marine mammals except when specifically permitted or when NMFS has authorized a limited, incidental taking. *Id.* at § 1372(a)(1).

The MMPA defines "take" to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* at § 1362(13) "Harassment" means any act of pursuit, torment, or annoyance which:

(i)     has the potential to injure a marine mammal or marine mammal stock in the wild [Level A harassment]; or

(ii)    has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering [Level B harassment].

*Id.* at § 1362(18)(A), (C) and (D).

The MMPA allows several exceptions to the general take prohibition, including the incidental, but not intentional, take of "small numbers" of marine mammals from "a specified activity (other than commercial fishing) within a specified geographical region" if it determines the total take would have a "negligible impact" on the relevant species or stock and would not have an "unmitigable adverse impact" on availability for specified subsistence uses. *Id.* at § 1371(a)(5)(D)(i) The implementing regulations to the MMPA define "negligible impact" as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not

2

reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103.

**B.     ESA and "Jeopardy".**

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . ." 16 U.S.C. § 1531.

The ESA contains both substantive and procedural requirements to carry out these goals. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012). Substantively, 16 U.S.C. § 1538 ("Section 9") prohibits the "take" of endangered species. Under the ESA, "take" means to "*harass*, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (emphasis added). Harassment under the ESA requires a "*likelihood* of injury to [a listed species] by annoying it to such an extent as to significantly disrupt normal behavioral patterns . . . ." 50 C.F.R. § 17.3 (emphasis added). In contrast, the MMPA "take" is triggered by potential injury, rather than likely injury. 16 U.S.C. § 1362(18)(A) "Take" under the MMPA encompasses "harassment," including any act of "torment" or "annoyance" that "has the *potential* to injure . . . or . . . disturb a marine mammal or marine mammal stock in the wild by causing *disruption* of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering." *Id.* §§ 1362(13), (18)(A)(i)–(ii) (emphasis added).

Section 7 of the ESA ("Section 7") requires each federal agency to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification" of the species' designated critical habitat. 16 U.S.C. § 1536(a)(2).

3

Section 7(a)(2)'s consultation requirement applies to "any endangered species or threatened species." *Id.*

Section 7 consultation requires the Service to prepare a biological opinion ("BiOp") to determine whether the proposed action will result in jeopardy to the species or result in the destruction or adverse modification of the species' critical habitat. *Id.*; *see also* 50 C.F.R. § 402.14. If the Service determines the action will not cause jeopardy or adverse modification, or offers reasonable and prudent alternatives that avoid jeopardy or adverse modification, it may issue an incidental take statement ("ITS"). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

A finding of jeopardy requires population level impacts that threaten the continued survival and recovery of the species. *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093-94 (9th Cir. 2005) (jeopardy determination requires consideration of the impacts to the species *population*); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 518-19 (9th Cir. 2010) (jeopardy analysis conducted at the *population* level).

C.    NEPA.

NEPA declares a broad national commitment to protecting and promoting environmental quality and establishes important "action-forcing procedures" to meet this goal. *Robertson v. Methow Valley Citizens Council*, 490 U S. 332, 348 (1989).

However, NEPA "does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) (internal quotations and citations omitted); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).

4

To further its goals, NEPA requires the preparation of an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). However, pursuant to NEPA's implementing regulations, federal agencies may first prepare an environmental assessment ("EA") that provides sufficient evidence and analysis to determine whether to prepare an EIS or make a finding of no significant impact ("FONSI"). 40 C.F.R. § 1508.1(h), (l). If the action will significantly affect the environment, an EIS must be prepared, while if the project will have only an insignificant effect, the agency issues a FONSI. 40 C.F.R. §§ 1501.3, 1501.6; *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005).

## III.   STANDARD OF REVIEW

Courts review agency compliance with NEPA and the ESA under § 706 of the Administrative Procedure Act. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 641 (9th Cir. 2010); *Wild Fish Conservancy*, 628 F.3d at 521. Under the APA, the court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). Under both of these statutes, the traditional deference is "at its highest where a court is reviewing an agency action that required a high level of technical expertise." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 807 F.3d 1031, 1043 (9th Cir. 2015) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)).

The Court's "review of agency actions, including the promulgation of a BiOp, is narrow." *Alaska v. Lubchenco*, 723 F.3d 1043, 1052 (9th Cir. 2013). As the Ninth Circuit explained, courts should be at their most deferential "when reviewing scientific judgments and technical

analyses within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). It is not the court's function to "instruct[] the agency, choos[e] among scientific studies, and order[] the agency to explain every possible scientific uncertainty." *Id.* (internal quotations and citation omitted). "Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1234 (9th Cir. 2001) (internal quotations omitted).

In assessing whether an agency took a sufficiently "hard look" in an EIS, courts apply a "rule of reason" test to "determine whether the EIS contains a reasonably thorough discussion of the significant aspects of probable environmental consequences." *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (internal quotations omitted). This standard is "essentially the same" as the abuse of discretion standard. *Id.* at 1177 n. 8 (citing *Marsh*, 490 U.S. at 377).

## IV.    FACTUAL BACKGROUND

### A.    Cook Inlet Beluga Whale.

Beluga whales (*Delphinapterus leucas*) are cetaceans of the "toothed whales" group. PR1_ESA 000070. They are also known as "white whales" because adults are often white. *Id.*; AKR3000000. The worldwide distribution of beluga whales includes the Arctic and sub-Arctic waters of North America, Greenland, Europe, and Asia. 72 Fed. Reg. 19,854, 19,855 (Apr. 20, 2007). NMFS has recognized for management purposes five "stocks" of beluga whales in Alaska: Beaufort Sea, eastern Chukchi Sea, eastern Bering Sea, Bristol Bay, and Cook Inlet. PR1_ESA 000070. Of these, only the Cook Inlet stock has been designated a distinct population segment ("DPS") under the ESA. *Id.*

The beluga whale DPS found in Cook Inlet ("CI belugas") was listed as endangered under the ESA on October 22, 2008. *Id.*; PR1_ESA 000063. This is the only population listed under the ESA.

Cook Inlet is a large, semi-enclosed tidal estuary on the south-central coast of Alaska. PR1_KeyRef 003149. The inlet measures approximately 230 miles long, with 839 miles of coastline and covering 12,427 square miles. *Id.* Over 65% of Alaska's human population resides within southcentral Alaska or the Cook Inlet region. PR1_ESA 000093.

Cook Inlet is characterized by its shallow depth, sandy and muddy bottom composition and high background noise from tides and currents. *Id.*; PR1_ESA 000103; PR1_MMPA 000786. These characteristics are important because any impact on CI beluga whales from anthropogenic noise will have a narrower impact in Cook Inlet than in more conducive acoustic environments. This is so because the effects of anthropogenic noise on marine mammals depend on multiple factors, including intensity, frequency, and duration of the noise, as well as the location and behavior of individual animals while the noise is being generated, and the nature of the acoustic environment. PR1_KeyRef 003211; PR1_ESA 000103. Noise also dissipates more rapidly in shallow water and over soft bottoms composed of sand and mud, such as that found in Cook Inlet. AKR3008218. Consequently, Cook Inlet's physical characteristics create a poor environment for propagating acoustics. *Id.*; PR1_ESA 000103.

CI beluga whales remain in Cook Inlet year-round, although they engage in seasonal movement within the inlet. PR1_ESA 000064. In summer and fall, they tend to concentrate in the shallow coastal waters of upper Cook Inlet, but disperse to mid-inlet waters in winter. *Id.* Certain portions of upper Cook Inlet are consistently used by the CI beluga whale, including Knik Arm, Turnagain Arm, Chickaloon Bay and the Susitna Delta. *Id.* These areas are important

for breeding and calving activities. PR1_ESA 000069.

Based on these seasonal distributions, NMFS designated two areas of critical habitat within Cook Inlet for the CI beluga whale on April 11, 2011. PR1_ESA 000071. "Area 1" consists of shallow tidal mudflats and river mouths that provide important habitat for foraging, calving, molting, and escape from predators and is used primarily from spring through fall. *Id*. In contrast, "Area 2" consists of known fall and winter foraging and transit habitat for belugas and some small spring and summer concentrations of belugas. *Id.* Most of Hilcorp's proposed activities will occur in habitat that is not known to be of particular significance to CI belugas. 84 Fed. Reg. 37,442, 37,457 (July 31, 2019).[3]

As set forth in the state constitution and statutes, and as evidenced in corresponding management practices, Alaska is dedicated to the conservation of all fish and wildlife, including CI belugas, within its borders. While CI belugas are subject to the MMPA, Alaska retains management authority that is not displaced by the MMPA or ESA. Dkt. 32 at 6, ¶11. That authority includes managing CI beluga habitats,[4] researching, compiling, and disseminating baseline information, researching and managing CI beluga whale prey species, entering into management agreements with other governmental agencies, and recommending and imposing mitigation measures on state-regulated activities for the protection and conservation of CI belugas. *Id*. Indeed, the State has imposed mitigation requirements for exploration and development in Cook Inlet to ensure the continued protection of *all* fish and wildlife populations

---

[3] For activities conducted near habitat important to whale behavior, such as mud flats in the Susitna River Delta, a time-area closure will be in effect during the period when whales frequent the area. *Id*.

[4] Among other conservation actions, the State has designated twelve areas as refuges, sanctuaries, and critical habitat that overlap with CI beluga whale critical habitat. *See* https://www.adfg.alaska.gov/index.cfm?adfg=habitatregulations.special.

and habitats. Dkt. 33 at 5, ¶9.

**B. Oil and Gas Development in Alaska.**

The oil and gas industry is Alaska's largest non-governmental industry, accounting for 5.2 percent of private sector jobs and 16.1 percent of private sector payroll. Dkt. 33 at 3, ¶4. The State receives a direct monetary benefit from Cook Inlet Areawide leases acquired by the oil and gas industry, such as Hilcorp's leases, in the form of bonuses, taxes, rents, royalties and other income streams arising from the lease interest. Dkt 33 at 6-8, ¶¶13-19. Revenue derived from the oil and gas industry provided Alaska with an estimated 80 percent of the State's general fund unrestricted revenues for FY 2018. Dkt 33 at 7, ¶18.

Lease sales for oil and gas development in Cook Inlet began in 1959. PR1_ESA 000098. By the late 1960s, fourteen offshore oil production facilities were installed in upper Cook Inlet. *Id*. Today, there are seventeen offshore oil and gas production platforms in the upper Cook Inlet. *Id*. NMFS has acknowledged that these activities are not the primary factor contributing to the CI beluga whales' current population level. As noted in the final listing rule, unsustainable subsistence harvest was likely the primary factor involved in the population decline:

> Alaska Natives have legally harvested Cook Inlet beluga whales prior to and after passage of the MMPA in 1972. The effect of past harvest practices on the Cook Inlet beluga whale is significant. While subsistence harvest occurred at unknown levels for decades, the observed decline from 1994 through 1998 and the reported harvest (including estimates of whales which were struck but lost, and assumed to have perished) indicated these harvest levels were unsustainable. Annual subsistence take by Alaska Natives during 1995-1998 averaged 77 whales (Angliss and Lodge, 2002). The harvest was as high as 20 percent of the population in 1996. Subsistence removals reported during the 1990s are sufficient to account for the declines observed in this population and must be considered as a factor in the proposed classification of the Cook Inlet beluga whale DPS as endangered.

73 Fed. Reg. 62,919, 62,927 (Oct. 22, 2008). The Recovery Plan stresses that "little is known about the effects of potential threats to recovery of this population" and in particular the factors

limiting growth of the population after subsistence harvests ceased. AKR3008919. This factual background rebuts Plaintiffs' portrayal of the "dire" impact of Hilcorp's activities on the viability of CI beluga whales.

### C. Agency Review of Hilcorp's Project Activities.

Hilcorp owns fifteen production platforms in central Cook Inlet, and its existing activities include routine construction on all of its platforms, development drilling, and routine maintenance, as well as in-water vessel trips five days a week, up to two trips per day, bringing supplies. 84 Fed. Reg. 37,442, 37,448 (July 31, 2019). Barges towed by tugboats and helicopters are also used for crew and supply changes. *Id.*

Hilcorp proposes to undertake four new stages of activity: exploration, development, production, and decommissioning activities in and adjacent to Cook Inlet. PR1_MMPA 002253. For the proposal, "[r]outine supply-related transits from vessels and helicopters are not substantially different form routine vessels and air traffic already occurring in Cook Inlet, and take is not expected from these activities." 84 Fed. Reg. 37,448. In contrast to its existing on-going operations, Hilcorp's activities for this project will vary from year to year, and will be temporally and spatially limited. 84 Fed. Reg. 37,459.

In April 2018, Hilcorp petitioned NMFS for Incidental Take Regulations ("ITR") under the MMPA authorizing non-lethal, incidental take of marine mammals by Level A and Level B harassment, incidental to noise exposure. In July 2019, NMFS issued the final Cook Inlet ITR for 2019-2024. PR1_MMPA 002252. Notably, the ITR authorizes only Level B take—that is take that has the potential to disturb, but not injure, marine mammals—of beluga whales. PR1_MMPA 002268. Accordingly, NMFS issued a one-year Letter of Authorization ("LOA") permitting Hilcorp to take, by incidental harassment, other species of marine mammals while

conducting 3D seismic surveys, geohazard surveys, and platform and pipeline maintenance. PR1_MMPA 2252. Hilcorp must apply for a new LOA for each of the five years of the project, meaning that the potential impacts of each annual work plan will be reviewed by the agency pursuant to the ITR.

The ITR and LOA require Hilcorp to implement a comprehensive mitigation program for the duration of the project, which includes the following:

- Protected species observers: employ personnel with the authority to require actions to minimize takes, including ordering airgun shutdowns, reducing tug power while moving equipment, delaying aircraft or watercraft arrival or departure, and altering the speed or course of tugs and other support vessels. PR1_ESA 000042.

- Exclusion zones and safety zones: establish "Exclusion Zone (EZ)" and "Safety Zone (SZ)"areas. In EZ's, operations shut down in event a marine mammal (except for belugas) enters or is about to enter this zone. For belugas, shutdown occurs whenever a whale is observed at any distance within the Level B harassment zone. SZ areas are larger than EZ's and impose strict limits on noise-producing activities in order to protect beluga whales in designated critical habitat during sensitive periods of time, including feeding and calving. PR1_ESA at 000044-45.

- Visual monitoring: monitor for marine mammals via vessel surveys, aerial surveys and shore-based surveys. PR1_ESA 000046; PR1_MMPA 002304.

11

- Ramp-up Procedure: ramp-up, or gradually increase, airgun volume so marine mammals have opportunity to leave area. PR1_ESA 000046-47; PR1_MMPA 002252.

- Vessel Speed/Course Alterations: alter vessel speed and/or course if a marine mammal is detected and likely to enter the EZ. PR1_ESA 000047; PR1_MMPA 002305.

Additionally, state issued leases contain separate mitigation measures.[5]

**D. NMFS' Section 7 Consultation.**

Pursuant to ESA Section 7, NMFS prepared a BiOp and concluded that Hilcorp's activities, in light of the mitigation measures, would not result in jeopardy to *any* listed species. NMFS stated that the expected effects from Hilcorp's activities are "considered insignificant and/or discountable." PR1_ESA 000215. NMFS also determined that the quantity and availability of essential features of critical habitat are not likely to decline as a result of being exposed to oil and gas activities from the project. PR1_ESA 000225. The BiOp includes "Reasonable and Prudent Measures" ("RPMs"), amplified by extensive "Terms and Conditions", which must be carried out by Hilcorp. PR1_ESA 00228-230. The RPMs state that Hilcorp "must implement and monitor the effectiveness of mitigation measures" incorporated into the ITR. *Id.* Moreover, the BiOp's incidental take statement ("ITS") is conditioned upon Hilcorp's MMPA authorization "and become[s] effective only upon the issuance of the MMPA authorization to take the marine mammals identified . . . ." Therefore, as a practical matter, all of the MMPA mitigation measures are incorporated into the BiOp's ESA "safe harbor" authorization.

---

[5] http://dog.dnr.alaska.gov/Documents/Leasing/BIF/Cook_Inlet/20181102_Final_CI_BIF.pdf, p 9-1 – 9-8.

## V. ARGUMENT

### A. Alaska depends on vessel traffic in Cook Inlet.

Regulation of marine activities in Cook Inlet is of critical importance to the State. Cook Inlet is a regional hub of marine transportation throughout the year, and is used by various classes of vessels, including containerships, bulk cargo freighters, tankers, commercial and sportfishing vessels, and recreational vessels. PR1_ESA 000108. A significant amount of that vessel traffic is transiting to and from the Port of Alaska ("POA"), located adjacent to Anchorage in upper Cook Inlet. PR1_NEPA 000094, PR1_ESA 000094. The POA provides 90 percent of the consumer goods for 85 percent of the State. It handles the majority of Alaska's refined petroleum products and the bulk of jet fuel for Joint Base Elmendorf-Richardson and the Ted Stevens Anchorage International Airport. PR1_NEPA 000094. Based on recent data, an average of approximately 450 vessels call to the POA annually. *Id*. Cook Inlet is also home to several minor ports, including Port MacKenzie and facilities at Nikiski, Kenai, Kasilof, Ninilchik, Anchor River, Tyonek, and Drift River. *Id*.

The administrative record demonstrates that NMFS was well aware of existing activities in Cook Inlet and thoroughly examined the additional noise from Hilcorp's activities. Plaintiff's single-minded focus on vessel noise from Hilcorp's activities ignores this context. But NMFS did not ignore it, and reasonably concluded that the additional noise from Hilcorp's project would not have significant impacts on more than a small number of belugas, and that the project would not jeopardize listed species or their critical habitat.[6]

---

[6] Alaska joins in the arguments of Defendant-Intervenor Hilcorp with respect to waiver.

### B. NMFS' Take Regulations Do Not Violate the MMPA.

#### 1. The record supports NMFS' determination that vessel noise is not expected to take Cook Inlet belugas.

Plaintiffs inaccurately assert that NMFS is "ignoring take from vessel noise." Dkt. 53-1 at

9. The ITR demonstrates that NMFS considered the noise impacts for each type of activity

proposed by Hilcorp and imposed activity-specific mitigation measures tailored to each activity.

*See, e.g.*, PR1_MMPA 002303-06.  In its MMPA analysis, NMFS addressed potential MMPA

takes resulting from noise due to vessel operations:

> The addition of multiple source and supply vessels, and noise due to vessel
> operations associated with the activities, will not be outside the present
> experience of marine mammals in Cook Inlet, although levels may increase
> locally. Given the large number of vessels in Cook Inlet and the apparent
> habituation to vessels by Cook Inlet beluga whales and the other marine
> mammals that may occur in the area, the aggregate vessel activity and its
> associated noise is not expected to have effects that could cause significant or
> long-term consequences for individual marine mammals or their populations.

PR1_MMPA 002310. NMFS further observed that "operations will not occur in the primary

beluga feeding and calving habitat during times of high use by those animals." *Id*.

NMFS also thoroughly considered all types of noise, including the effects of vessel noise,

in the BiOp, determining that the effect on belugas will be "immeasurably small". PR1_ESA

000183. While finding that "[o]verall, project vessel activity will increase vessel noise in Cook

Inlet for the duration of the proposed action" NMFS also found that the required mitigation

measures "will reduce the likelihood of adverse effects on listed marine mammals." *Id.* This

reasoning applied to belugas as well:

> With the implementation of these mitigation and monitoring measures, the
> impact of vessel noise is very minor, and thus adverse effects to Cook Inlet
> belugas will be immeasurably small. Furthermore, the probability of vessel
> noise rising above the threshold for Level B harassment is very small, and
> thus adverse effects to Cook Inlet belugas are extremely unlikely to occur.

Therefore we conclude that adverse effects from vessel noise on Cook Inlet belugas are insignificant and discountable.

PR1_ESA 000183.

In the BiOp's "Cetacean Risk Analysis", NMFS did not discount any of the types of noise that the project might create:

With the implementation of mitigation measures, exposure to vessel noise, drilling noise, well construction activity noise, aircraft noise, dynamic positioning noise, echosounders and sonar noise, hydraulic grinder noise, pinger noise, fill and rock placement noise, jack-up rig placement, sea floor disturbance, and small oil spills may occur, but the expected effects are considered insignificant and/or discountable, and are not expected to result in take. The probability of impacts on marine mammal prey occurring from the proposed project is very small, and thus adverse effects are extremely unlikely to occur. Therefore, the expected effects are considered insignificant and/or discountable.

PR1_ESA 000214.

There is no evidence that NMFS ignored the potential effects of vessel noise, as illustrated by the unequivocal finding that vessel noise would increase as a result of the project. The plaintiffs are unhappy with NMFS' conclusions, but they have made no showing that NMFS acted arbitrarily by "ignoring" one potential method of non-lethal take.

**2. NMFS' articulated a rational basis for its small numbers analysis.**

Plaintiffs argue that NMFS' "small numbers" analysis is flawed because it utilized a percentage-based approach. Dkt. 53-1 at 20. NMFS conducted its small numbers analysis in terms relative to the stock or population size of the CI beluga whales. PR1_MMPA 002269. This approach was explicitly approved in *Ctr. for Biological Diversity v. Salazar,* 695 F.3d 893, 907 (9th Cir. 2012) ("*CBD*") ("The Service can analyze 'small numbers' in relation to the size of the larger population…."). Less than a decade ago, this Court approved the application of this approach to CI belugas:

Mathematically speaking, 10% represents a relatively limited or small portion of 100%. And the agency presented a rational, albeit sparse, basis for its

> determination that 10% of the Cook Inlet beluga whale population constitutes "small numbers" of that total whale population. It looked at the nature of the activity in determining that 10% of the beluga whale population constituted small numbers, indicating that it had considered that the takes "were expected to be limited to short-term Level B harassment." In *CBD*, the Ninth Circuit upheld the agency's "small numbers" determination even though the agency had not quantified the number of anticipated takes. Here, where the agency has quantified the number of authorized takes, its "small numbers" determination that 30 authorized takes by incidental harassment constitute small numbers relative to the population as a whole is not arbitrary and capricious.

*Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1053 (D. Alaska 2013) (internal citations omitted). Knowing that this Court has already upheld NMFS' small numbers analysis, Plaintiffs attempt to recast the timeframe that NMFS must use to calculate total number of takes. Dkt. 53-1 at 12-13. While arguing for a new requirement that would artificially inflate take calculations across the board, Plaintiffs admit that "no court has spoken directly to the issue in the context of small numbers." *Id*. at 13. Plaintiffs have shown no reason why the Court should depart from its prior analysis of the "small numbers" issue.

### 3. NMFS mitigation measures ensure the least practicable adverse impact on marine mammals.

As discussed in Section IV.C, *supra*, NMFS is requiring extensive mitigation tailored to each activity, including visual monitoring, exclusion zones, marine mammal monitors with the power to shut down work, and vessel strike avoidance measures. Plaintiffs do not dispute that this program is comprehensive and enforceable; instead, they ask the Court to nit-pick the details. The Court should decline to do so for the following reasons.

Plaintiffs' contention that NMFS failed to ensure "the least practicable adverse impact" on marine mammals is not supported by the law or the administrative record. Dkt. 53-1 at 16-17. Plaintiffs take issue with the size and operation of the shutdown zones with respect to marine mammals other than belugas. *Id.* Plaintiffs' characterization of the mitigation measures is

factually incorrect in two key respects. First, the shutdown zone is not smaller than the Level B harassment zone. Section 217.163(g)(6) of the ITR requires operations to be "shut down completely if a beluga whale is sighted within the relevant Level B harassment isopleth." PR1_MMPA 002314.[7] Second, contrary to Plaintiffs' assertions, Hilcorp must continually monitor harassment zones at all times in order to be able to shut down operations. Additionally, the zone is monitored by mitigation vessels for seismic surveys and by aircraft in advance of surveys. PR1_MMPA 002314. These measures meet the requirements of the MMPA.

The Ninth Circuit has instructed that the MMPA requires two things from NMFS with respect to "the least practicable impact" standard: NMFS must first consider whether mitigation measures reduce the impact of a specified activity to the "least practicable adverse" level, and it must then explain its conclusions. *Nat. Res. Def. Council v. Pritzker,* 828 F.3d 1125, 1139 (9th Cir. 2016) (considering adequacy of MMPA mitigation measures for impacts from the Navy's sonar system for training, testing, and operations). NMFS did both here.

In *Pritzker,* the court explained that "practicable" means "something . . . capable of being done, or practical and effective." *Id.* at 1134. The court reasoned that in the context of the MMPA, the term means that "a mitigation measure that is practicable in reducing the impact of military readiness activities on marine mammals must be both effective in reducing impact, but also not so restrictive of military activity as to unduly interfere with the government's legitimate needs for military readiness activities." *Id.* at 1134-35. Here, NMFS specifically considered what measures were practicable while allowing Hilcorp's activities to proceed, and adequately explained its reasoning as to its conclusions.

---

[7] NMFS also explained this in a response to Comment 34 from Center for Biological Diversity ("CBD"): "NMFS is requiring Hilcorp to shut down activities when any beluga is sighted within the relevant Level B harassment isopleth." PR1_MMPA 002267.

17

First, far from ignoring the impacts of sound on species other than beluga whales, NMFS considered well-developed science indicating that not all marine mammals react to sound in the same way. NMFS explained that behavioral responses are dependent on both species and context. PR1_MMPA 2280 ("Behavioral responses to sound are highly variable and context-specific and any reactions depend on numerous intrinsic and extrinsic factors (e.g., species . . .)"). NMFS created special requirements for beluga whales "in light of concerns surrounding the status of Cook Inlet beluga whales," which do not exist for the other species. PR1_MMPA 2265; *see also id.* at 2260 ("These shutdown measures are more restrictive than the standard shutdown measures typically applied."); *id.* at 2310 ("Mitigation for beluga whales is extensive, including shutdowns at any distance and exclusion zones and avoiding exposure during critical foraging periods around the Susitna Delta.").

Second, rather than stubbornly sticking to the internal agency drafts preferred by Plaintiffs, NMFS reconsidered its initial proposed measures in response to public comments, as it was required to do by the Administrative Procedure Act. 5 U.S.C. § 553(c). The practicality of the mitigation measures proposed for the project was challenged in public comments by the International Society of Geophysical Contractors as infeasible, and by Plaintiff CBD as failing to ensure the least practicable adverse impact. 84 Fed. Reg. 37,442, 37,455 37,459 (July 31, 2019). NMFS explained that it "revised the mitigation and monitoring scheme, taking into consideration comments received during the public comment period." *Id*. at 37,455. The record shows that NMFS provided an extensive discussion in the Final Rule as to varying effects of noise on different species of cetaceans and pinnipeds in terrestrial and water environments, and adequately explained the bases for its mitigation measures. *Id*. at 37,455; 37,468-74. NMFS'

careful consideration of the potential impacts on all marine mammals meets the standards of the MMPA.

Given these mitigation measures, NMFS' determination that the activity would have a negligible impact on CI belugas is clearly supported by the record and is owed deference. *Arizona Cattle Growers' Ass'n,* 273 F.3d at 1234; *Lands Council*, 629 F.3d at 1074.

## C. NMFS complied with the ESA.

Plaintiffs contend NMFS violated the ESA in two respects: (1) by performing an "unlawful jeopardy analysis" that ignored the best available science with respect to vessel noise; and (2) by declining to reinitiate consultation based on an updated beluga population estimate. Dkt. 53-1 at 18. Both arguments fail.

Plaintiffs correctly note that Section 9 of the ESA prohibits the "taking" of an endangered species. 16 U.S.C. § 1538(a)(1). However, Plaintiffs' real theory, not supported by the law or the record, is that any additional "take" of belugas, whether legally authorized or not, whether temporary or not, necessarily results in population-level threats to the survival and recovery of belugas. This theory is not supported by the law or the facts.

NMFS' only task in a formal consultation is to prepare a biological opinion that discusses whether the proposed action is likely to cause jeopardy and the effects of the proposed action on listed species or on the species' critical habitat. 50 C.F.R. § 402.14(h) . In preparing its opinion, NMFS must use "the best scientific and commercial data available." *Id.* § 402.14(g)(8). If NMFS concludes that a proposed action will result in the incidental taking of an endangered or threatened species but will not cause jeopardy, it must include in its biological opinion an "incidental take statement" ("ITS") specifying, among other things, "the impact of such incidental taking on the species" affected. *See* 16 U.S.C. § 1536(b)(4) ; 50 C.F.R. § 402.14(i).

If an endangered or threatened species of marine mammal is involved, the take must be authorized under the MMPA. *See* 16 U.S.C. § 1536(b)(4)(C) . Under the ESA, a taking that complies with an ITS "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

Plaintiffs consistently conflate the MMPA's individual-specific definition of "take" with the ESA's population-level jeopardy analysis. This slight-of-hand is intentional because it allows them to imply that a finding under the MMPA of a Level B behavioral-impact "take"—a certain number of which are permissible if they have a "negligible impact" on the species—necessarily constitutes an ESA "take," none of which are permissible absent a finding that the "take" will not jeopardize the species. *See Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093-94 (9th Cir. 2005) (jeopardy determination requires consideration of the impacts to the species *population*); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 518-519 (9th Cir. 2010) (jeopardy analysis conducted at the *population* level).[8]

NMFS' conclusion that Hilcorp's activities would not jeopardize any of the listed marine mammals in the project area is supported by the best available science and is adequately explained in the record. In fact, NMFS took an extremely conservative and precautionary approach in the BiOp because it "consider[ed] any anticipated take under the MMPA to be expected take under the ESA." PRI1_ESA 000171.

---

[8] Moreover, if an approved action ultimately results in take above the level permitted in an ITS, there is no legal presumption that the species is automatically placed in jeopardy. An ITS is a procedural trigger that results in a new consultation under Section 7, not an automatic jeopardy determination. *See* 50 C.F.R. § 402.16 (providing that if the amount or extent of taking specified in an ITS is exceeded, reinitiation of formal consultation is required). The Ninth Circuit has held that "[i]n general, Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." *Arizona Cattle Growers' Ass'n,* 273 F.3d at 1249.

1.      **NMFS properly considered the effects of Hilcorp's project.**

Plaintiffs argue that NMFS failed to produce an ESA-compliant BiOp by: (1) failing "to consider the full effects of the action;" and (2) failing "to consider the aggregate effects of the action in light of the highly imperiled status of the species, environmental baseline, and cumulative effects." Dkt. 53-1 at 20-21. The record shows that they are wrong.

i.   **NMFS performed a comprehensive jeopardy analysis.**

Plaintiffs claim that NMFS, in undertaking its jeopardy analysis, "arbitrarily considered only a limited range of noise-producing activities" and therefore failed to use the "best available science" in the BiOp. Dkt. 53-1 at 29. But the only "science" Plaintiffs highlight is a supposed failure by NMFS to consider noise from tugboats and other vessels on CI belugas. *Id.* This contention, which utterly disregards the BiOp's extensive consideration of a range of noise impacts on each listed species, is demonstrably false.

Plaintiffs are correct that the ESA requires that an agency's actions be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). But the best available data requirement does not mean that an agency must exhaustively parse every conceivable impact in an endless data-gathering hunt. Instead, the standard "'merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on.'" *Ctr. for Biological Diversity v. Lubchenco*, 758 F. Supp. 2d 945, 971 (N.D. Cal. 2010) (internal citations omitted); *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006). Plaintiffs do not point to any better evidence that NMFS ignored, but instead rely on selective studies that verify the behavioral reactions to noise that NMFS did find would occur. What Plaintiffs disagree with is NMFS' ultimate conclusion that these possible behavioral impacts would not jeopardize the continued survival and recovery of the species.

21

*See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992) (upholding BiOp despite uncertainty regarding management measures because decision was based on a reasonable evaluation of all available data.)

There is no question that NMFS engaged in an exhaustive acoustic analysis in the BiOp. *See, e.g.,* PR1_ESA 000172-74, 000181-83; *see also id.* at 000214 ("Cetacean Risk Analysis"). Plaintiffs are not satisfied, however, because they believe NMFS failed to consider "tugboat noise and other vessel traffic." Dkt. 53-1 at 21. But NMFS *did* consider noise from those sources. PR1_ESA 000181–83 (vessels); PR1_ESA 000172–74 (tugboats); *see also* PR1_MMPA 000257 (considering noise caused by tugboats pulling drilling rigs). In addition to including this analysis in the BiOp, NMFS undertook an exhaustive acoustic analysis in the course of considering and promulgating the ITR pursuant to the requirements of MMPA. PR1_MMPA 002287-302.[9] NMFS considered, among other things:

- The level of vessel noise from tugs, tankers, cargo ships, fishing vessels, small recreational vessels, dredging, pile-driving, military detonations, and seismic surveys. PR1_ESA 000111.

- The biological processes associated with this noise. *Id.* at 000132-34.

- The intermittent length of time anthropogenic noise would impact the species. *Id.* at 000134.

NMFS explicitly considered the specific nature of tugboat noise and its potential impacts on whales and pinnipeds as illustrated by noise impacts from tugboats towing drilling rigs. *Id.* at

---

[9] To the extent Plaintiffs' complaint is that the BiOp did not expressly incorporate by reference the analysis NMFS performed under the MMPA, it is (a) wrong; and in any event (b) arguing for form over substance. NMFS' "Integration and Synthesis" expressly stated that it had taken into account "the effects of the action (Section 6)" and "the environmental baseline (Section 5)." PR1_ESA 213.

000175. NMFS reasoned that these noise impacts would dissipate to acceptable levels within 2,154 meters (or less) of an active tug:

> At these distances, a whale or pinniped that perceived the vessel noise is likely to ignore such a signal and devote its attentional resources to stimuli in its local environment. If animals do respond, they may exhibit slight deflection from the noise source, engage in low-level avoidance behavior, short-term vigilance behavior, or short-term masking behavior, but these behaviors are not likely to result in adverse consequences for the animals." *Id*. For this reason, combined with the imposition of mitigation measures, NMFS concluded that 'the adverse effects from tugs towing the drilling rig on Cook Inlet beluga . . . are insignificant.'

*Id*.

After undertaking a comprehensive analysis of vessels in Cook Inlet, NMFS concluded that the Hilcorp project would not result in population level threats to marine mammals:

> With the implementation of these mitigation and monitoring measures, the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small. Furthermore, the probability of vessel noise rising above the threshold for Level B harassment is very small, and thus adverse effects to Cook Inlet belugas are extremely unlikely to occur. Therefore we conclude that adverse effects from vessel noise on Cook Inlet belugas are insignificant and discountable.

PR1_ESA 000183.

In reaching this conclusion, NMFS did not "disregard[ ] available scientific evidence that is in some way better than the evidence [it] relie[d] on." *Ctr. for Biological Diversity*, 758 F. Supp. 2d at 971; *Kern Cnty. Farm Bureau*, 450 F.3d at 1080. And while Plaintiffs point to scientific data regarding sound levels from tugboats and other ships, Dkt. 53-1 at 10, NMFS' selection of the best available science is itself a decision entitled to deference, as are its scientific judgments on the nature of the noise likely to be produced as the result of the ITR (PR1_ESA 000014-41); the impact on CI belugas as a result of that noise (PR1_000130-190); required mitigation measures (PR1_000041-57); and the effectiveness of those measures (PR1_000218).

*Greenpeace Action*, 14 F.3d at 1337; *Nat'l Wildlife Fed'n*, 128 F. Supp. 2d at 1300; *Trout Unlimited*, 559 F.3d at 956.

There simply is no question that NMFS considered the "full effects" of Hilcorp's activities in reaching its no-jeopardy conclusion. Plaintiffs' argument "goes to the weight of the evidence, not whether NMFS failed to consider evidence." *Ctr. for Biological Diversity,* 758 F. Supp. 2d at 974 (rejecting similar best-science challenges). NMFS considered the best available science and data in reaching its no-jeopardy determination and adequately explained its decision.

### ii. NMFS properly considered aggregate effects.

Plaintiffs assert that NMFS "fail[ed] to aggregate the cumulative effects, environmental baseline, and proposed action in light of the status of Cook Inlet belugas to determine whether they collectively jeopardize the species' continued existence." Dkt. 53-1 at 24. Plaintiffs are wrong.

Plaintiffs' suggestion that NMFS ignored the species baseline[10] is puzzling. NMFS provided an in-depth description of the CI beluga population, its status, its environment, and various impacts on its status and its environment. PR1_ESA 00063–73. NMFS's description of those various impacts encompass a broad range of activities outside of those contemplated in the ITR. PR1_ESA 000093–130 (identifying at least fourteen different influences on the species and its environment).

Plaintiffs' suggestion that NMFS failed to account for this broad range of non-project-related impacts in its jeopardy analysis is even more puzzling. Plaintiffs correctly note that NMFS is required to consider the "cumulative effects"[11] of all sources identified in the baseline.

---

[10] The "baseline" is comprised of all "past and present impacts . . . ." 50 C.F.R. § 402.02.

[11] Cumulative effects do not include impacts flowing from the ITR and must be "reasonably certain to occur." 50 C.F.R. § 402.02.

It did that in the BiOp's aptly-named "Integration and Synthesis" section. PR1_ESA 000213–18. The purpose of that section could not be clearer: it aggregates "the effects of the [ITR] (Section 6) to the *environmental baseline* (Section 5) and the *cumulative effects* (Section 7) to formulate" the BiOp. PR1_ESA 200012 (emphasis added). NMFS then explains that its jeopardy assessments "are made in full consideration of the status of the species (Section 4)." *Id*. Plaintiffs point to nothing to suggest that the process NMFS described in the Integration and Synthesis section of the BiOp did not actually occur.

There is simply no question that the BiOp discusses and considers vessel noise in depth. *See, e.g.,* PR1_ESA 000111 ("Many sources of anthropogenic noise are seasonal and occur during the ice-free months, although anthropogenic noise is present year-round. Sources include vessel noise from tugs, tankers, cargo ships, fishing vessels, small recreational vessels, dredging, pile-driving, military detonations, and seismic surveys (NMFS 2016a)."); PR1_ESA 000181 ("Vessel noise and presence can impact whales by causing behavioral disturbances, auditory interference, or non-auditory physical and physiological effects");(PR1_ESA 000183 ("Overall, project vessel activity will increase vessel noise in Cook Inlet for the duration of the proposed action."); PR1_ESA 000183 ("With the implementation of these mitigation and monitoring measures, the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small. Furthermore, the probability of vessel noise rising above the threshold for Level B harassment is very small, and thus adverse effects to Cook Inlet belugas are extremely unlikely to occur."). On the basis of these assessments, NFMS concluded "that adverse effects from vessel noise on [CI] belugas are insignificant and discountable." PR1_ESA 000183.

Plaintiffs' complaint, at its core, is not really with the process NFMS followed. It is with NMFS' no jeopardy conclusion. PR1_ESA 000218. Plaintiffs do not like that conclusion, but because they cannot point to persuasive countervailing evidence, they do the only thing left for them to do: attack the process. That attack fails because NMFS *did* consider the CI beluga baseline, and *did* account for cumulative effects, and *did* aggregate those two considerations with the predicted impact of the proposed action.

Finally, Plaintiffs argue that NMFS was obligated to find that Hilcorp's activities would jeopardize CI belugas because the population is already jeopardized. Dkt. 53-1 at 25. In doing so, Plaintiffs ask the Court to engage in the familiar logical fallacy of begging the question: using the conclusion of their argument in support of itself in their premise. The Court rejected that type of reasoning once before:

> Because the verb "to jeopardize ... implies causation, and thus some new risk of harm[,]" the agency need only assess the risk of new jeopardy posed by the proposed action. Thus, while NMFS was required in the BiOp in this case to consider the effects of Apache's surveying "within the context of other existing human activities that impact" the beluga whale, it was not required to specifically determine whether the beluga whale, at that baseline, was already in jeopardy.

*Native Village. of Chickaloon,* 947 F.Supp.2d at 1065 (citations omitted; alteration in original).

Compounding the problem, Plaintiffs incorrectly insist that NMFS' failure to find jeopardy is arbitrary because the Recovery Plan for belugas describes multiple stressors that may or may not be impeding beluga recovery. But the Recovery Plan does not supplant NMFS' project-specific consultation in the BiOp. ESA recovery plans are not binding. *Conservation Cong. v. Finley*, 774 F.3d 611, 615, 620 (9th Cir. 2014) ("[D]eclining to adopt particular recommendations in a recovery plan or a study—neither of which is binding on an agency—does not constitute failing to consider them"); *see also Fund for Animals, Inc. v. Rice,* 85 F.3d 535,

548 (11th Cir. 1996); *Conservation Cong. v. U.S. Forest Serv.*, 805 Fed. App'x 520, 522

(9th Cir. 2020).

Despite their best efforts, Plaintiffs find no more traction from *Turtle Island Restoration*

*Network v. U.S. Dep't of Commerce*, 878 F.3d 725 (9th Cir. 2017). There, unlike here, the Ninth

Circuit found that NMFS did not account for a predicted mortality rate of over ten percent due to

the proposed action in its jeopardy analysis. 878 F.3d at 737. Here, NMFS determined that

Hilcorp's activities would have a fleeting impact on CI beluga whales' behavior, and would not

begin to approach similar levels of mortality. PR1_ESA 000226-27.

NMFS properly aggregated the cumulative effects, environmental baseline, and proposed

action in reaching its conclusion that "the proposed action is not expected to appreciably reduce

the likelihood of recovery of Cook Inlet beluga . . . whales." PR1_ESA 000218.

### 2.     NMFS was not required to reinitiate consultation.

Plaintiffs allege that new information triggered a duty for NMFS to reinitiate formal

consultation. Dkt. 53-1 at 27. They point to a report published in January 2020 that contained a

revised "abundance estimate" for CI belugas. *Id*. NMFS considered this revised estimate, as well

as new information on stranding events. JOINTSUPP10006-09. It reasonably declined to

reinitiate consultation because, although "the new information suggests a concerning trend in the

species' status, we conclude that the new information does not reveal effects of the action that

may affect Cook Inlet beluga whales in a manner or to an extent not previously considered."

JOINTSUPP10006-07.

The ESA only requires reinitiation of consultation under a limited set of circumstances.

As relevant here, NMFS is required to reinitiate consultation when "new information reveals

effects of the action that may affect listed species or critical habitat in a manner or to an extent

not previously considered." 50 C.F.R. § 402.16(a)(2). Plaintiffs' sole basis for challenging NMFS' decision not to reinitiate consultation is their contention that the new population estimate determined that there are fewer CI belugas than originally thought when the action was authorized in 2019. Plaintiffs ignore the fact that the action's effects, which are temporary and episodic, remain the same regardless of the beluga's population size. Those effects do not include any "anticipated effects on fitness or survival of individual whales, and thus no adverse consequences for the population." JOINTSUPP10008. "Absent such effects on individual whales, there cannot be population-level effects." *Id.*

The cases cited by Plaintiffs stand for the unremarkable proposition that where reinitiation is required, the original biological opinion is no longer valid, and reinitiation may be (but is not uniformly) required where the federal agency fails to monitor a significant basis for its original take authorization. *Forest Guardians v. Johanns*, 450 F.3d 455, 464-65 (9th Cir. 2006) (failure to monitor significant aspects of the take authorization that were ultimately exceeded triggered reinitiation); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012) (where take limitations exceeded, original BiOp no longer valid). However, those cases are not analogous. Both the ITR and the ITS require monitoring of Hilcorp's activities by NMFS and extensive reporting by Hilcorp of any takes. Indeed, the January 2020 abundance estimate shows that as a general matter, NMFS is continually monitoring the status of Cook Inlet belugas.

In the Ninth Circuit, "[t]he retention of discretionary control is necessary but insufficient to trigger an agency's duty to . . . initiate consultation." *Ctr. for Biological Diversity v. Envt'l Prot. Agency*, 847 F.3d 1075, 1091 (9th Cir. 2017) (quoting *Ctr. for Biological Diversity v. Envt'l Prot. Agency*, 65 F.Supp.3d 742, 758 (N.D. Cal. 2014)). Taken alone, the fact that NMFS

retained discretion over the ITS is insufficient to trigger reinitiation. Reinitiation pursuant to 50 C.F.R. § 402.16(a)(2) is only required where the original consultation or the BiOp materially failed to consider a key issue or relied on materially false information. *See Alliance for Wild Rockies v. Probert*, 412 F.Supp.3d 1188, 1200-06 (D. Mont. 2019) (requiring reinitiation where BiOp assumed no use of motorized vehicles – which was materially false).

Additionally, a new study only triggers the duty to reinitiate consultation where the original BiOp did not consider the issue – not merely where a new study is relevant or is funded and published. *Friends of the River v. Nat'l Marine Fisheries Serv.*, 293 F.Supp.3d 1151, 1174-77 (E.D. Cal. 2018) (reinitiation not triggered by new study), *rev'd in part on other grounds* 786 Fed. App'x 666 (9th Cir. 2019) (affirming District Court holding on reinitiation). While the January 2020 study certainly underscores the endangered nature of CI belugas, it does not render NMFS' baseline assumption for the BiOp inaccurate or materially deficient. The BiOp assumed that CI beluga whales are endangered and their populations are imperiled, and that Hilcorp's activities would adversely impact, but not jeopardize, the whales. All of this remains unchanged by the 2020 study. Thus, reinitiation is neither warranted nor required.

### D. NMFS complied with NEPA.

Plaintiffs argue that NMFS failed to take a "hard look" at the direct and cumulative impacts of the ITR. The record unequivocally demonstrates the opposite.

#### 1. NMFS took a hard look at direct impacts.

Plaintiffs argue that "NMFS's EA fails to properly consider the impacts of noise from tugboats and other vessels on Cook Inlet belugas" and thus failed to take a hard look at the direct impacts under NEPA. Dkt. 53-1 at 32. This allegation, and the Plaintiffs single-minded focus on vessel noise, is unfounded.

NEPA "does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Tri-Valley CAREs*, 671 F.3d at 1124 (internal citations omitted); *Dep't of Transp.*, 541 U.S. at 756-57. "Judicial review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir.2008) (citing *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1072 (9th Cir.2001)).

The EA addresses in multiple locations the effect vessel noise has on belugas, including in the sections titled "Impacts to Marine Mammal Habitat," "Impacts to Marine Mammals," and "Estimated Take of Marine Mammals by Level A and Level B Incidental Harassment." PR1_NEPA 000083-90. These sections include exhaustive analyses of the impact vessel noise has on marine mammals. The EA clearly supports NMFS' conclusion "that any effects from Hilcorp's proposed activities on marine mammals, would be short-term, site specific, and limited to inconsequential changes in behavior." *Id.* at 000092.

These analyses are more than sufficient to meet the "rule of reason" standard against which NEPA's "hard look" requirement is assessed. *Churchill Cnty*, 276 .F.3d at 1071-72. NEPA requires a "reasonably thorough" discussion of environmental impacts, "not unanimity of opinion, expert or otherwise." *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,* 123 F.3d 1142, 1151 (9th Cir. 1997). Plaintiffs may disagree with NMFS' ultimate conclusions, but that does not make its analysis deficient under NEPA.

### 2. NMFS took a hard look at cumulative impacts.

Plaintiffs also argue that the EA failed to take a "hard look" at the environmental

consequences of the ITR by failing to analyze cumulative impacts. Dkt. 48 at 42.

"Cumulative impact" is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (1978). The Ninth Circuit has held that consideration of the cumulative impacts of a project requires some quantified or detailed information. The analysis must be "'more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects.'" *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004) (citation omitted); *Bering Strait Citizens for Responsible Res. Dev.*, 524 F.3d at 954.

Here, NMFS' cumulative impacts analysis contains sufficiently detailed information to satisfy NEPA. It identifies the human-related activities affecting marine mammal species in the action area, including: subsistence hunting, marine pollution, fisheries interactions, vessel traffic, oil and gas development, coastal zone development, marine mammal research, and climate change. PR1_NEPA 000093. Further, it provided detailed information regarding future projects that may impact the action area: Pebble Mine Project, the Chuitna Coal Project, and the ORPC Alaska Tidal Energy projects. *Id.* at 000098-99.

Plaintiffs fault the EA for containing an insufficient analysis of the effects on belugas. Dkt. 53-1 at 34. While the Ninth Circuit does require some quantified or detailed information in the cumulative impacts analysis, this does not "automatically translate into a requirement to catalogue actions that are irrelevant, useless, or already incorporated into the analysis." *Bark v. U.S. Bureau of Land Mgmt.*, 643 F.Supp.2d 1214, 1224 (D. Or. 2009). The EA satisfied this standard by considering the impacts of gas and oil development, noting the following potential

effects: noise from seismic activity, vessel traffic, air traffic, and drilling; discharge of

wastewater and drilling muds; habitat loss from the construction of oil and gas facilities; and

contaminated food sources and/or injury resulting from an oil spill or natural gas blowout.

PR1_NEPA 000097. This analysis is all that is required under NEPA. The EA clearly addressed

all relevant projects and took the requisite hard look at their impacts on marine mammals in

Cook Inlet.

### E.  Vacatur is not appropriate in this case.

Plaintiffs ask the Court to vacate the Final Rule as well as the BiOp, EA, and FONSI.

Dkt. 53-1 at p. 35. Plaintiffs provide no support for why this equitable and discretionary remedy

is appropriate in this case. Their request should be denied.

The APA directs that a court "shall . . . set aside" any agency action found to be

"arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Supreme Court has identified vacatur as the presumptive remedy for an APA violation.

*Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

However, vacatur is not the only or automatic remedy in the ESA or NEPA context— "when

equity demands, the regulation can be left in place while the agency follows the necessary

procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *see also*

*Cal. Cmtys. Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992-94 (9th Cir. 2012).

"Whether agency action should be vacated depends on [1] how serious the agency's errors are

and [2] the disruptive consequences of an interim change that may itself be changed."

*Cal. Cmtys.*, 688 F.3d at 992 (internal quotations omitted). Courts may decline to vacate agency

decisions when vacatur would cause serious and irremediable harms that significantly outweigh

the magnitude of the agency's error. *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv.*, 109 F.Supp.3d 1238, 1242 (N.D. Cal. 2015).

For example, in *California Communities Against Toxics*, the Ninth Circuit declined to vacate an invalidated rule because "significant public harms" would result from stopping power plant construction, including power shortages, the loss of 350 jobs, and duplicative legislative efforts. 688 F.3d at 994 ("[I]f saving a snail warrants judicial restraint, [] so does saving the power supply.") (citation omitted). Likewise, vacatur may not be an appropriate remedy where there is a likelihood that the agency can cure any defects and justify the defective ruling on remand. *See Apache Corp. v. Fed. Energy Regulatory Comm'n*, 627 F.3d 1220, 1223 (D.C. Cir. 2010).

In this case, vacating the ITR, BiOp, EA and FONSI would result in significant harms to Alaska, including the loss of employment and future job opportunities, loss of tax revenue and royalties, and the creation of an uncertain regulatory environment that will damage Alaska's ability to develop its resources. These issues deserve the full attention of the Court before a remedy is fashioned. Moreover, it is impossible for the parties to address these issues without first having the Court's guidance as to the nature of any error. Should error be found, the State respectfully requests additional briefing to address the appropriate remedy.

## VI.    CONCLUSION

For the foregoing reasons, the State respectfully asks the Court to deny Plaintiffs' motion and grant its cross-motion for summary judgment.

Dated: October 9, 2020.

CLYDE "ED" SNIFFEN, JR.
ACTING ATTORNEY GENERAL


By:     /s/Aaron C. Peterson
           Aaron C. Peterson
           Assistant Attorney General
           Alaska Bar No. 1011087

By:     /s/Jeffrey G. Pickett
           Jeffrey G. Pickett
           Assistant Attorney General
           Alaska Bar No. 9906022
           Department of Law
           1031 W. 4th Ave., Suite 200
           Anchorage, AK 99501
           Tel: (907) 269-5275
           Fax: (907) 279-3697
           *Attorneys for Intervenor-Defendant*
            *State of Alaska*


## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2020 a true and correct copy of the **Opposition to Motion for Summary Judgment and Cross Motion for Summary Judgment** was filed with the Clerk of the Court for the United States District Court – District of Alaska by using the CM/ECF system. Participants in Case No.:3:19-cv-00238-SLG who are registered CM/ECF users will be served by the CM/ECF system.


/s/ Leilani J. Tufaga
Leilani J. Tufaga
Law Office Assistant II

34

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,612 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 9th day of October, 2020.

*/s/      Jeff Pickett*_____
Jeff Pickett
