Kassia Siegel (AK Bar # 0106044)
Julie Teel Simmonds (*Pro Hac Vice*)
Kristen Monsell (*Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7100
F: (510) 844-7150
E: ksiegel@biologicaldiversity.org
kmonsell@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

*Attorneys for Plaintiffs Cook Inletkeeper and*
*Center for Biological Diversity*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER, et al., | |
| *Plaintiffs*, | |
| v. | |
| WILBUR ROSS, et al., | Civil Action No. 3:19-cv-00238-SLG |
| *Defendants*, | |
| and | |
| HILCORP ALASKA, LLC, et al., | |
| *Intervenor-Defendants*. | |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT............................................................................................................... 2

    I.    NMFS's Regulations Violate the MMPA ....................................................... 2

        A.    NMFS Ignored the Best Available Science in Dismissing
            Vessel Noise ....................................................................................... 2

            1.    NMFS Disregarded the Threat that Vessel Noise
                  Poses to Belugas........................................................... 3

            2.    Plaintiffs Did Not Waive Their Claim Regarding
                  Vessel Noise.................................................................. 8

        B.    The Agency's Small Numbers Determination Is Unlawful ............. 10

        C.    NMFS Failed to Ensure the Least Practicable
            Adverse Impact ................................................................................ 15

    II.    NMFS's BiOp and Failure to Reinitiate Consultation Violate
        the ESA.......................................................................................................... 17

        A.    NMFS Failed to Conduct the Proper Jeopardy Analysis ................ 18

            1.    NMFS Failed to Properly Analyze the Risk of
                  Vessel Noise................................................................ 18

            2.    NMFS's Jeopardy Analysis Fails to Aggregate Impacts ...... 19

        B.    NMFS's Refusal to Reinitiate Consultation Violates
            the ESA ............................................................................................ 21

    III.    NMFS's EA Violates NEPA ........................................................................ 24

        A.    NMFS Failed to Take a Hard Look at Direct Impacts..................... 24

        B.    NMFS Failed to Take a Hard Look at Cumulative Impacts ............ 26

CONCLUSION ......................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Anacostia Riverkeeper v. Jackson,*
  798 F. Supp. 2d 210 (D.D.C. 2011) ................................................................. 14

*Bark v. U.S. Forest Serv.,*
  958 F.3d 865 (9th Cir. 2020) ................................................................. 25, 26

*Blue Mts. Biodiversity Proj. v. Blackwood,*
  161 F.3d 1208 (9th Cir. 1998) ................................................................. 25

*Cent. Laborers' Pension Fund v. Heinz,*
  541 U.S. 739 (2004) ................................................................. 14

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ................................................................. 27

*Ctr. for Biological Diversity v. Salazar,*
  695 F.3d 893 (9th Cir. 2012) ................................................................. 5, 11, 12

*Ctr. for Biological Diversity v. Zinke,*
  900 F.3d 1053 (9th Cir. 2018) ................................................................. 24

*Defs. of Wildlife v. Babbitt,*
  130 F. Supp. 2d 121 (D.D.C. 2001) ................................................................. 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ................................................................. 28

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.,*
  378 F.3d 1059 (9th Cir. 2004) ................................................................. 24

*Gov't of the Province of Manitoba v. Norton,*
  398 F. Supp. 2d 41 (D.D.C. 2005) ................................................................. 28

*Great Basin Mine Watch v. Hankins,*
  456 F.3d 955 (9th Cir. 2006) ................................................................. 27

*Idaho Sporting Cong. v. Rittenhouse,*
  305 F.3d 957 (9th Cir. 2002) ................................................................. 14

'Ilio'ulaokalani Coal. v. Rumsfeld,
    464 F.3d 1083 (9th Cir. 2006) ................................................................... 10

Kasten v. Saint-Gobain Performance Plastics,
    563 U.S. 1 (2011) ....................................................................................... 12

Malama Makua v. Rumsfeld,
    163 F. Supp. 2d 1202 (D. Haw. 2001) ....................................................... 26

Maracich v. Spears,
    570 U.S. 48 (2013) ..................................................................................... 11

Mont. Wilderness Ass'n v. Fry,
    310 F. Supp. 2d 1127 (D. Mont. 2004) ..................................................... 27

Nat. Res. Def. Council v. Evans,
    364 F. Supp. 2d 1083 (N.D. Cal. 2003) ................................................. 4, 5

Nat. Res. Def. Council v. Pritzker,
    828 F.3d 1125 (9th Cir. 2016) ............................................................. 15, 16

Nat'l Parks & Conservation Ass'n v. U.S. Bureau of Land Mgmt.,
    606 F.3d 1058 (9th Cir. 2010) ..................................................................... 9

Nat'l Wildlife Fed'n v. NMFS,
    524 F.3d 917 (9th Cir. 2008) ............................................................... 17, 20

Native Village of Chickaloon v. NMFS,
    947 F. Supp. 2d 1031 (D. Alaska 2013) .............................................. 20, 27

Ocean Advocates v. U.S. Army Corps of Engr's,
    402 F.3d 846 (9th Cir. 2005) ....................................................................... 1

Pac. Rivers Council v. U.S. Forest Service,
    668 F.3d 609 (9th Cir. 2012) ..................................................................... 26

Portland Audubon Soc. v. Lujan,
    795 F. Supp. 1489 (D. Or. 1992) ............................................................... 24

Portland Gen. Elec. Co. v. Bonneville Power Admin.,
    501 F.3d 1009 (9th Cir. 2007) ............................................................... 9, 15

*Turtle Island Restoration Network v. U.S. Dep't of Commerce*,
  878 F.3d 725 (9th Cir. 2017)............................................................................20

*Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*,
  387 F.3d 989 (9th Cir. 2004)...........................................................................28

**Statutes**

5 U.S.C. § 706(2)...............................................................................................28

16 U.S.C. § 1361(6)....................................................................................10, 13

16 U.S.C. § 1362(13)...........................................................................................4

16 U.S.C. § 1362(18)(A)...................................................................................10

16 U.S.C. § 1362(18)(A)(ii)................................................................................4

16 U.S.C. § 1371(a)(5)(A)(i)..................................................................10, 12, 13

16 U.S.C. § 1371(a)(5)(A)(i)(I)........................................................................12

16 U.S.C. § 1371(a)(5)(A)(i)(II).......................................................................15

16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa)................................................................17

16 U.S.C. § 1371(a)(5)(D)................................................................................13

16 U.S.C. § 1371(a)(5)(D)(i)............................................................................13

16 U.S.C. § 1372(a)...........................................................................................13

16 U.S.C. § 1532(19)........................................................................................25

**Regulations**

40 C.F.R. § 1508.8.............................................................................................25

50 C.F.R. § 217.162..........................................................................................14

50 C.F.R. § 402.02............................................................................................20

50 C.F.R. § 402.16(a)(2)..................................................................................21

**Legislative Material**

H.R. Rep. No. 103-439 (1994) ........................................................................ 13

H.R. Rep. No. 92-707 (1972) .......................................................................... 2

**Other Authorities**

73 Fed. Reg. 33,212 (June 11, 2008)........................................................ 4, 11

76 Fed. Reg. 20,180 (Apr. 11, 2011) ............................................................ 7

76 Fed. Reg. 34,157 (June 13, 2011) .......................................................... 14

84 Fed. Reg. 37,716 (Aug. 1, 2019) (printed version) ................................. 6

85 Fed. Reg. 50,720 (Aug. 17, 2020) ......................................................... 24

# INTRODUCTION

The National Marine Fisheries Service's (NMFS) take regulations allow Hilcorp to subject critically endangered Cook Inlet beluga whales and other marine mammals to seismic airgun blasts, vessel noise, pile driving, and other activities that can harm these animals and disrupt behaviors essential to their survival. Despite acknowledging Hilcorp's activities will increase noise in the Inlet—thereby exacerbating one of the primary threats to the continued existence of Cook Inlet belugas—NMFS failed to conduct a meaningful analysis to determine whether its regulations satisfy the strict standards of the Marine Mammal Protection Act (MMPA) and Endangered Species Act (ESA). NMFS also shirked its duty to closely examine the impacts under the National Environmental Policy Act (NEPA).[1]

Defendants want this Court to overlook the agency's significant legal errors because NMFS's decision involved science. But deference is inappropriate where, as here, the agency failed to use its expertise and instead reached conclusions contrary to the evidence, undermining Congress' intent to prioritize the protection of marine mammals and endangered species. *See Ocean Advocates v. U.S. Army Corps of Engr's*, 402 F.3d 846, 859 (9th Cir. 2005). NMFS's regulations and accompanying documents are arbitrary and capricious and should be set aside.

---

[1] Hilcorp's suggestion that most of the harmful activity is over, ECF No. 60 at 10, 31, overlooks the fact that of all the activities for which NMFS authorized take, the one expected to harass the most beluga whales is yet to come. *See* PR1_MMPA 002295.

**ARGUMENT**

## I.    NMFS's Regulations Violate the MMPA

Plaintiffs showed that NMFS arbitrarily discounted the impacts of vessel noise when determining Hilcorp's activities will take only small numbers of and have a negligible impact on Cook Inlet belugas. ECF No. 53-1 at 16–20. Plaintiffs have also demonstrated that NMFS arbitrarily segmented its small numbers determination, *id.* at 20–23, and failed to ensure the least practicable adverse impact on the affected species. *Id.* at 23–26. Defendants' arguments to the contrary are unavailing.

### A.    NMFS Ignored the Best Available Science in Dismissing Vessel Noise

That vessel noise is a threat to Cook Inlet beluga whales is no news to NMFS. Indeed, Congress enacted the MMPA in part because of the "hazards" vessels pose to marine mammals, specifically stating that the definition of take "includes the concept of harassment," H.R. Rep. No. 92-707, at 17–18 (1972), and that "the operation of motor boats in waters in which these animals are found can clearly constitute harassment." *Id.* at 23. Moreover, NMFS's Recovery Plan for Cook Inlet belugas categorizes noise from tugboats and cargo vessels as a significant threat. PR1_KeyRef 003211.

Rather than showing where in the record NMFS carefully considered whether vessel noise from Hilcorp's activities will take Cook Inlet beluga whales, Defendants point to the conclusory declarations in the final rule claiming it will not. *E.g.*, ECF No. 61 at 19. But these statements only reinforce that NMFS arbitrarily ignored the best available science demonstrating that vessel noise, and from tugboats in particular, poses a

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    2

unique threat to belugas and harasses the whales within the meaning of the MMPA.

       1.    *NMFS Disregarded the Threat that Vessel Noise Poses to Belugas*

NMFS concedes that tugs towing rigs could "take" beluga whales when it states the Level B harassment zone for such activity is larger than 1500 meters, PR1_ESA 000044–45, and could be as far as 2150 meters. PR1_ESA 000175.[2] Yet NMFS arbitrarily excluded takes from tugboat noise and other vessels in reaching its small numbers and negligible impact determinations for Cook Inlet belugas.

The agency's failure to account for noise from tugs towing rigs as take is especially glaring. As Hilcorp itself acknowledged in its permit application, while "NMFS does not generally regulate incidental harassment for vessels, . . . the activity of towing the rig onsite is not considered 'typical' vessel activity." PR1_MMPA 001443. Hilcorp determined it would take belugas via Level B harassment by towing rigs with tugs. PR1_MMPA 001462, 1464. But NMFS did not consider such take in its decision. NMFS's attempts to justify its failure are not supported by the record or the law.

First, NMFS claims "the predictable movement of vessels and tugs" means "marine mammals can detect approaching vessels before noise rises above the threshold for Level B acoustic harassment." ECF No. 61 at 19 (citing PR1_MMPA 002257). While unclear, it appears the agency is saying the animals will swim away from vessels before the noise reaches a certain level. But this is of no help to NMFS as such a response

---

[2] Hilcorp's suggestion that a beluga would have to be "encountered just hundreds of feet" from its tugs in order to be taken, ECF No. 60 at 23, is wrong: NMFS determined the Level B harassment zone for tugs extends 4,920–7,052 feet from the sound source.

constitutes a "take" under the MMPA's plain language. *See* 16 U.S.C. § 1362(13),

(18)(A)(ii) (defining take to include harassment, which is "any act . . . which . . . has the

potential to disturb a marine mammal . . . by causing disruption of behavioral patterns.").

Indeed, the agency acknowledges as much elsewhere in the final rule, stating,

"[a]voidance is the displacement of an individual from an area or migration path as a

result of the presence of a sound or other stressors, and is one of the most obvious

manifestations of disturbance in marine mammals." PR1_MMPA 002281.[3] Moreover,

"by focusing on <u>potential</u> harassment, the statute appears to consider all of the animals in

a population to be harassed if there is the potential for the act to disrupt the behavioral

patterns of the most sensitive individual in the group." *Nat. Res. Def. Council v. Evans*,

364 F. Supp. 2d 1083, 1109 (N.D. Cal. 2003); PR1_ESA 000175 (vessel noise causes

changes in behavior of belugas, including "diving . . . and reversing course").

That such disturbance may be "brief" or have "minimal" impacts on the

population, ECF No. 61 at 19, 20, is irrelevant, and conflates the separate issues of the

amount of "take" with whether those takes will have a negligible impact. *Cf.*, 73 Fed.

Reg. 33,212, 33,234–35 (June 11, 2008) (recognizing "nonlethal, minor, short-term

behavioral changes" caused by noise from oil and gas activities constitute "takes of

animals" under the MMPA, but concluding such takes would have negligible impacts on

---

[3] If the assumption belugas will swim away from approaching vessels is true, ship strikes
would not be a threat. But NMFS considers them a threat, and documented "[s]carring
consistent with propeller injuries" on Cook Inlet belugas. PR1_KeyRef 003220.

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                   4

the affected population). In other words, "[i]f NMFS defines disruptions to behavioral patterns as harassment only if they affect an entire stock of marine mammals, then that violates the MMPA." *Evans*, 364 F. Supp. 2d at 1108–09.

Second, the agency asserts the project area has low densities of belugas and any exposure to noise from vessels will be "infrequent" as a result. ECF No. 61 at 19–20. The agency again confuses the issue of whether belugas will be taken by vessel noise with the impact of that take. Infrequent harassment is still harassment. *See* PR1_ESA 000184 (marine mammals disrupted by "vessel approaches are commonly reported to shift from resting behavioral states to active behavioral states, which would imply that they incur an energy cost"); s*ee also Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 906 (9th Cir. 2012) (the MMPA prohibits even "merely trivial and fleeting" harassment).

Moreover, record evidence demonstrates that belugas may overlap in time and space with Hilcorp's activities—sometimes in significant numbers. *See, e.g.*, PR1_ESA 000015 (Figure 1, map of Hilcorp's assets in Cook Inlet); PR1_ESA 000016 (Table 1, summary of Hilcorp's planned activities, including towing rigs with tugs from April– October); PR1_ESA 000066 (around 30 belugas observed in the Kasilof River in April 2019); PR1_ESA 000067 (over 140 whales observed from May–August 2018 near some of Hilcorp's potential well sites). Indeed, Hilcorp itself estimated it would take 15 belugas by towing a rig to Trading Bay based on the same density models NMFS used to calculate take from other activities. *See* PR1_MMPA 001462.

Third, the agency claims that marine mammals are likely habituated to vessel

noise, particularly the "existing baseline of commercial ship traffic." ECF No. 61 at 19 (citing PR1_MMPA 002257). But vessel noise under Hilcorp's activities will not remain at baseline levels. To the contrary, the agency concluded: "project vessel activity will increase vessel noise in Cook Inlet for the duration of the proposed action." PR1_ESA 000185. And, as the Fish and Wildlife Service recognized in its MMPA authorization to Hilcorp for its take of sea otters, "[t]ugs will be towing rigs to areas in Cook Inlet where these activities are unusual," meaning animals "may show a greater level of . . . avoidance of these activities than for most vessel traffic due to the novelty of the activity in that area." 84 Fed. Reg. 37,716, 37,739 (Aug. 1, 2019) (printed version).

Further, the record belies the notion that Cook Inlet belugas are "habituated" to vessel noise. For example, a recent study confirms they are suffering from impacts of vessel noise despite its prevalence in their environment, including through "potentially mask[ing] beluga hearing and interfer[ing] with their communication[s]." AKR3014195; *see also* AKR3020828 (discussing tolerance versus habituation).[4] NMFS itself has elsewhere cited studies with similar results to acknowledge that Cook Inlet beluga whales *are not* habituated to vessel noise, and analyzed whether tugboats and other vessels related to another drilling project would take belugas based on the specific location, timing, and horsepower of the boats to be used. *See* AKR1001395–98, 1435, 1469–70.

---

[4] NMFS's wrongly claims Plaintiffs mischaracterized this study. Plaintiffs cited it for the fact vessel noise harms Cook Inlet belugas, including in areas of heavy ship traffic. And the study area includes areas that overlap with Hilcorp's activities, such as Trading Bay.

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                          6

Finally, the agency claims there are no "species-specific circumstances or other contextual factors that increase concern and the likelihood of take from towing of the drill rig." ECF No. 61 at 19 (quoting PR1_MMPA 002257). This statement ignores the unique threat that tugboat noise poses to Cook Inlet belugas. For example, NMFS considers tugboat noise (caused by propeller cavitation and engines) as the most important noise stressor affecting the species' recovery. PR1_KeyRef 003211. NMFS reached this conclusion based on various characteristics of tugs' acoustic footprint, including loudness and duration of sound. *Id*. Additionally, NMFS's critical habitat designation for the species "consider[s] 'quiet' areas in which noise levels do not interfere with . . . behavior of these whales to be a necessity" to the species, 76 Fed. Reg. 20,180, 20,203 (Apr. 11, 2011), yet the planned path of tugs towing rigs will pass through the belugas' critical habitat. *See* PR1_ESA 000068 (tug path); PR1_ESA 000073 (critical habitat).

And it also ignores the fact that the tugs will tow rigs in areas and times of year when belugas are likely engaging in essential behaviors such as mating and feeding—when echolocation is especially important. *See, e.g.*, PR1_MMPA 002253–54 (Table 1, depicting when and where Hilcorp's activities will occur); PR1_ESA 000069 (probable mating behavior observed in Trading Bay area in April and May); PR1_KeyRef 003365–66, PR1_KeyRef 003377 (belugas regularly seen in Tyonek area from June–September, likely feeding); 76 Fed. Reg. at 20,203 ("Beluga whales use sound to communicate, locate prey, and navigate"); PR1_KeyRef 003174 ("evidence of a decrease or even a cessation in acoustic activity of belugas in the presence of . . . engine noise").

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                    7

NMFS inexplicably overlooked these "species-specific circumstances." ECF No. 61 at 19 (quoting PR1_MMPA 002257). NMFS now claims various mitigation measures allow it to ignore its own Recovery Plan and other science indicating that tugboat and vessel noise could take Cook Inlet belugas. ECF No. 61 at 20. But none of these measures will be effective at preventing take from the noise generated by tugs towing rigs or other vessels. The final rule establishes a 1500-meter "safety" or monitoring zone for tugs towing rigs, within which the presence of protected species is considered Level B harassment. PR1_MMPA 002304. But NMFS acknowledged (1) the Level B harassment area for tugs towing rigs is larger than the 1500-meter safety zone and (2) tugs cannot shut down when towing a rig. PR1_ESA 000044–45 (Table 6, n. 3, 7). If an animal is observed within the safety zone, NMFS requires only the reporting of the observation and specifically states it would *not* be considered a take. *Id.* at n.3.

While other measures require vessels to avoid approaching within 100 yards and slow to five knots within 300 yards of marine mammals, PR1_ESA 000050, the Level B harassment zone for tugs towing rigs is much greater than these distances. Moreover, these measures only apply in the event an observer *sees* a beluga, PR1_ESA 000050, and NMFS itself admits that the turbid waters of the Inlet make it difficult to see the animals. JOINTSUPP200882.

## 2. *Plaintiffs Did Not Waive Their Claim Regarding Vessel Noise*

Hilcorp erroneously argues Plaintiffs waived their claim regarding NMFS's failure to adequately consider take from vessel noise. ECF No. 60 at 18–19; ECF No. 61 at 10,

n.1 (joining); ECF No. 62 at 7, n.1 (joining). Plaintiffs repeatedly raised the issue in comments to the agency. For example, Plaintiffs stated NMFS should consider that "ship noise can cover important frequencies these animals use for more complex communications," PR1_MMPA 002553, and that noise from vessels can also "displace marine mammals" or disrupt their normal behaviors. PR1_MMPA 002547, 2551. Plaintiffs also commented that the agency's proposed rule "may . . . underestimate take of beluga whales, which are highly sensitive to noise," PR1_MMPA 000963; that the agency's negligible impact determination failed to consider the impacts of all the vessel traffic from Hilcorp's activities, PR1_MMPA 000964; and that its draft environmental assessment failed to consider vessel traffic impacts. PR1_MMPA 000971–72. Nothing more was required. *See Nat'l Parks & Conservation Ass'n v. U.S. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010) (the Ninth Circuit interprets issue exhaustion "broadly;" an agency need only be provided with sufficient notice to consider the issue).

Moreover, the Ninth Circuit does not invoke the waiver doctrine where, as here, an agency had a chance to consider an issue. *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007). The agency is well aware of the risks that vessel noise poses to Cook Inlet belugas. *See, e.g.*, ECF No. 53-1 at 18–19; *see also* PR1_CORR 000722–23 (agency meeting notes stating "vessel operations" were not "carried forward in Level A/B analysis" but it should discuss how to determine beluga exposure to "tugs towing rig," particularly in light of tugs "transiting through different 'densities'" of belugas). In other words, because NMFS "had independent knowledge of

the very issue that concern[ed] Plaintiffs," waiver does not apply. *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006).[5]

> ### B.      The Agency's Small Numbers Determination Is Unlawful

NMFS's regulations are also unlawful for failing to consider small numbers in the aggregate. In enacting the five-year take regulations, the MMPA requires NMFS to make several distinct findings, including that Hilcorp's proposed set of activities will take only "small numbers" of individual marine mammals. 16 U.S.C. § 1371(a)(5)(A)(i).

Defendants argue that NMFS met this requirement despite looking only at the number of takes from each year of activity rather than from the full scope of activities across all five years. *See* ECF No. 61 at 21–26; ECF No. 60 at 25–29.[6] Defendants' position is inconsistent with congressional intent that marine mammals be "protected . . . to the greatest extent feasible," 16 U.S.C. § 1361(6), and a fundamental canon of statutory construction that any exception to the MMPA's broad prohibition on take of individual marine mammals be read narrowly. *See, e.g.*, 16 U.S.C. § 1362(18)(A) (prohibiting actions that harass "*a marine mammal*" (emphasis added)); *Maracich v.*

---

[5] Hilcorp's suggestion that Plaintiffs failed to sufficiently plead this argument is incorrect. Plaintiffs' Complaint clearly alleges (1) Hilcorp's activities include "vessel activity;" (2) NMFS's Recovery Plan lists noise from oil and gas-related "vessel traffic" as a threat to the species; (3) NMFS did not consider noise from tugs or vessels in its evaluation; and (4) the agency's small numbers and negligible impact determinations arbitrarily discount the true extent of take. ECF No. 47 at ¶¶ 3, 98, 141, 162–63.

[6] Plaintiffs are not arguing NMFS's proportional approach was arbitrary. *Cf.*, ECF No. 62 at 21–22. Rather, Plaintiffs' argument is that if NMFS authorizes take for a five-year period, it must determine that take across that period will be "small."

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                    10

*Spears*, 570 U.S. 48, 60 (2013) ("An exception to a 'general statement of policy' is 'usually read . . . narrowly in order to preserve the primary operation of the provision'" (citation omitted)). NMFS appears to concede as much in the final rule when stating the MMPA mandates NMFS to "make its required determinations at the specified activities level (*i.e.*, the entire project described in the application)." PR1_MMPA 002261.

In originally enacting the provision now at section 101(a)(5)(A), Congress stated, "unless a particular activity takes only small numbers of marine mammals, and that taking has a negligible impact on the species, the new provisions . . . are not applicable to that activity." *Salazar*, 695 F.3d at 904 (citations omitted). In other words, Congress intended that NMFS only authorize take from a particular activity—here, Hilcorp's oil and gas program in the Inlet from 2019 to 2024—if the total take from that activity will be small. In arguing otherwise, NMFS relies on the Ninth Circuit's decision in *Salazar* to claim that the MMPA does not require it to express its small numbers determination as a specific number. ECF No. 61 at 23–24. This is irrelevant. NMFS must still consider whether the total authorized take constitutes a small number. Indeed, in the regulations at issue in *Salazar*, the Fish and Wildlife Service did just that, determining "*the total expected takings of Pacific walruses . . . and polar bears during Industry exploration activities will impact small numbers of animals.*" 73 Fed. Reg. 33,212 (June 11, 2008) (emphasis added); *see also id.* at 33,236 ("any incidental take reasonably likely to result from the effects of the proposed activities . . . will be limited to small numbers"). The Ninth Circuit cited to the agency's determination that take from all authorized activities

would comprise only a small number of animals in upholding its small numbers determination. *Salazar*, 695 F.3d at 901.[7]

That Congress did not include the words "total taking" before "small numbers" as it did before "negligible impact" is not determinative. *Cf.*, ECF No. 60 at 26; ECF No. 61 at 24. The inclusion of "the total taking" is unnecessary to define the "small numbers" requirement as a holistic one here, as Congress already specified that take of "small numbers" can only occur if several other antecedents are satisfied, including that take occur incident to "a specified activity" "within a specified geographic region . . . while engaging in that activity" during the period for which take is authorized. *See* 16 U.S.C. § 1371(a)(5)(A)(i); *Kasten v. Saint-Gobain Performance Plastics*, 563 U.S. 1, 7 (2011) ("interpretation of the phrase 'depends upon reading the whole statutory text, considering the purpose and context of the statute . . . .'" (citation omitted)). Only then can an agency arrive at its negligible impact determination (16 U.S.C. § 1371(a)(5)(A)(i)(I)), which is nested under the overarching provision of section 101(a)(5)(A)(i).

NMFS further argues that Plaintiffs' position would render section 101(a)(5)(A) and 101(a)(5)(D) unharmonious. ECF No. 61 at 24–25. But the opposite is true. Both provisions only allow NMFS to authorize take if the specified activity will take "small numbers of marine mammals" whether "during periods of not more than five consecutive

---

[7] Requiring NMFS to conduct a comprehensive analysis of the overall number of animals to be taken and the impact of that take on the affected population does not conflate negligible impact and small numbers as Hilcorp claims. *See* ECF No. 60 at 27; *Salazar*, 695 F.3d at 906–07 (recognizing overlap and providing examples of differences).

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                         12

years" or "for periods of not more than 1 year," respectively. 16 U.S.C.

§ 1371(a)(5)(A)(i), (D). For these two provisions to be harmonious, NMFS must analyze

both the small numbers and negligible impact determinations across the totality of the

period for which NMFS is authorizing take—not using different timeframes for each

determination under 101(a)(5)(A), but the same timeframes for both determinations under

101(a)(5)(D). Moreover, this is the only reading consistent with congressional intent to

protect marine mammals to the greatest extent possible, *id.* § 1361(6), and the starting

point of the MMPA—that all take is prohibited. *Id.* § 1372(a).

Additionally, NMFS wrongly claims that its interpretation must be correct because

the alternative would be for companies such as Hilcorp to apply for "a series of short-

term authorizations under 101(a)(5)(D)" rather than the "more holistic five-year

regulatory framework in 101(a)(5)(A)." ECF No. 61 at 25. This position contradicts

Congress's statement when it added section 101(a)(5)(D) that it "was not the

Committee's intent to weaken any of the existing standards which protect marine

mammals and their habitats from incidental take." H.R. Rep. No. 103-439, sec. 4 (1994).

Moreover, it ignores the plain language of the MMPA, which prohibits authorizations

under section 101(a)(5)(D) for activities other than harassment, such as those that could

seriously injure or kill marine mammals. *See* 16 U.S.C. § 1371(a)(5)(D)(i) (applying to

"incidental . . . taking by harassment").[8]

---

[8] NMFS also points to the MMPA's requirement that NMFS issue stock assessment
reports each year and other provisions requiring it to analyze impacts to marine

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                    13

NMFS also states that its approach of looking only at annual take in its small numbers determination "is not a new practice." ECF No. 61 at 23. That an agency's practice already existed does not make it lawful. *See, e.g.*, *Anacostia Riverkeeper v. Jackson*, 798 F. Supp. 2d 210, 234 (D.D.C. 2011) ("'neither an unreasoned statement in the manual nor allegedly longstanding agency practice can trump' clear statutory commands" (quoting *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004)). Moreover, in the decisions NMFS references, ECF No. 61 at 23, it capped the total number of takes allowed over the five-year period at issue. *See* 81 Fed. Reg. 47,240, 47,275 (July 20, 2016) (seismic activity in Cook Inlet); 76 Fed. Reg. 34,157, 34,172 (June 13, 2011) (operation of LNG facility off Massachusetts). Here, NMFS included no cap on the overall level of take in the regulations, further compounding its error. *See* 50 C.F.R. § 217.162. Indeed, the regulations do not specify *any* number or limit, instead deferring to whatever limits are included in the annual letters of authorization. *See id.*

Finally, NMFS and Hilcorp are wrong in arguing that this Court cannot consider Plaintiffs' small numbers argument. *See* ECF No. 60 at 19; ECF No. 61 at 26. A member of the public may preserve an issue during the administrative process by raising the issue in general terms, rather than "precise legal formulations," *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 965–66 (9th Cir. 2002), as Plaintiffs did here. PR1_MMPA

---

mammals annually. ECF 61 at 25, n.7. But this only reinforces Plaintiffs' position: Congress would have specified that NMFS consider small numbers at the annual level had it intended NMFS to do so. Moreover, the agency's stock assessments look at takes across five-year periods. *See, e.g.*, JOINTSUPP200292, 390.

000965–66. Moreover, the Marine Mammal Commission raised the issue. PR1_MMPA 001792–93, n. 30 (noting inconsistency in how NMFS calculated small numbers across five years for some stocks and one year for others); *Portland*, 501 F.3d at 1024 (issue not waived if raised by someone).

C.     NMFS Failed to Ensure the Least Practicable Adverse Impact

NMFS also violated the requirement that the take regulations ensure "the least practicable adverse impact." *See* 16 U.S.C. § 1371(a)(5)(A)(i)(II). Defendants' contrary arguments ignore fundamental principles of statutory construction and the record.

First, NMFS claims larger shutdown zones for marine mammals other than Cook Inlet beluga whales were unnecessary because they are not as endangered as Cook Inlet belugas. ECF No. 61 at 28–29. But this conflates the question of whether the authorized take will have a "negligible impact" on the populations to be taken with the separate determination of whether the regulations ensure "the least practicable adverse impact." *See Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1133–35 (9th Cir. 2016). The least practicable adverse impact is a separate statutory standard "central to whether NMFS can authorize incidental take in the first place." *Id.* at 1133.

While the other species are not as critically imperiled as Cook Inlet belugas, some are also listed as threatened or endangered, including fin whales, humpback whales, and Steller sea lions. PR1_MMPA 002312. Rather than analyzing whether NMFS should require larger shutdown zones for other species, NMFS instead declared that its regulations meet the least practicable adverse impact standard. This is insufficient. *See*

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    15

*Pritzker*, 828 F.3d at 1135 ("An agency acts contrary to the law when it gives mere lip service or verbal commendation of a standard but then fails to abide the standard."). That is particularly true here, where Hilcorp itself proposed to shut down seismic operations if a humpback, fin, gray, or minke whale is seen within 1200 meters of the sound source, *see* PR1_CORR 004351, yet NMFS only required Hilcorp to cease seismic activity if these whales are seen within 500 meters. PR1_MMPA 002304.[9]

Second, Defendants claim that Plaintiffs' argument regarding the regulations' failure to also ensure the least practicable adverse impact to Cook Inlet belugas is in error because the regulations require Hilcorp to cease seismic, pile driving, and some other activities if a Cook Inlet beluga whale is seen within the Level B harassment zone for those activities. *See, e.g.*, ECF No. 61 at 29–30. While true on its face, the final rule establishes safety zones that are much smaller than the Level B harassment zones, rendering this requirement essentially meaningless.[10] NMFS established the safety zones based on the area in which NMFS determined observers could practicably monitor. ECF No. 61 at 30; *see also* PR1_MMPA 002265 (Level B harassment zone for 3D and 2D

---

[9] Hilcorp and the State claim that Plaintiffs' argument for larger shutdown zones for other species, fails because different marine mammals react to sound differently. ECF No. 60 at 31; ECF No. 62 at 24. But NMFS established the *same* Level B harassment thresholds for all marine mammals and the *same* sized exclusion and safety zones for all affected species. *See* PR1_MMPA 002304; PR1_ESA 000137.

[10] Plaintiffs' opening brief misstated that the shutdown zone for Cook Inlet belugas is 1500 m. *See* ECF No. 53-1 at 24–25. The safety/monitoring zone is 1500 m, but the regulations require a shutdown if a beluga is seen within the larger Level B harassment zone. But the larger shutdown zone is toothless for the reasons described herein.

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    16

seismic is 7300 meters, but NMFS set safety zone at 1500 meters because an industry trade group claimed it was impracticable to monitor the larger zone).

Defendants cannot have it both ways. They cannot conclude it is impracticable for Hilcorp to monitor a larger area than what the regulations require but then rely on the fact that Hilcorp might spot a beluga in the larger area to support its least practicable adverse impact finding. Without *mandating* monitoring beyond the 1500-meter zone, NMFS cannot be sure chance observations—and resulting shutdown—will occur. Just as NMFS cannot rely on non-binding or uncertain mitigation measures to conclude an action will not jeopardize a species under the ESA, *see Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 935–36 (9th Cir. 2008), NMFS cannot rely on non-binding, uncertain monitoring to determine its regulations ensure the least practicable adverse impact under the MMPA.

Defendants also erroneously suggest that NMFS must have satisfied the least practicable adverse impact standard for belugas because the regulations mandate several mitigation measures. *See* ECF No. 60 at 9, 32; ECF No. 61 at 27. But Congress does not require that adverse impacts merely be "reduce[d]," *see* ECF No. 60 at 31, n. 99 (quoting PR1_MMPA 2260); it requires that mitigation reduce adverse impacts to the lowest level practicable. 16 U.S.C. § 1371(a)(5)(A)(i)(II)(aa). NMFS failed to do so.

## II. NMFS's BiOp and Failure to Reinitiate Consultation Violate the ESA

Plaintiffs have shown that NMFS's BiOp fails to comply with the ESA because of its unlawful jeopardy analysis and NMFS unlawfully declined to reinitiate consultation. *See* ECF No. 53-1 at 26–37. Defendants' attempts to rebut these claims are unpersuasive.

A. NMFS Failed to Conduct the Proper Jeopardy Analysis

NMFS's jeopardy analysis is unlawful in two respects. First, it fails to properly consider the impacts of vessel noise on Cook Inlet belugas; second, it fails to consider the effects of Hilcorp's activities combined with the numerous other stressors facing the species. ECF No. 53-1 at 28–35. Defendants offer no compelling response, and instead reiterate conclusory statements, respond to arguments Plaintiffs have not made, and disregard the science on the threats of vessel noise and cumulative effects.

1. *NMFS Failed to Properly Analyze the Risk of Vessel Noise*

NMFS failed to properly analyze noise impacts from tugboats and other vessels as part of its jeopardy analysis, found in the section titled "Integration and Synthesis." *See* PR1_ESA 000213–25. In arguing otherwise, Defendants point to various places where NMFS references and then dismisses vessel noise. *See* ECF No. 60 at 35–36; ECF No. 61 at 32–37. This misses the point: Plaintiffs do not deny that the BiOp *mentions* vessel noise. Instead, Plaintiffs challenge NMFS's conclusory determination (that vessel noise would not take beluga whales and would have "insignificant" or "discountable" impacts, *see* PR1_ESA 000183), because the agency did not include vessel noise when adding the effects of Hilcorp's activities to the environmental baseline and cumulative effects.

NMFS's conclusory dismissal does not equate to the careful analysis the ESA mandates. This is particularly true considering NMFS identified tugboats and cargo vessels as the noise sources of highest concern for the species' recovery, PR1_KeyRef 003211, and a NMFS scientist completed a study in 2018 identifying ship noise as the

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    18

noise source needing the most attention from the agency. AKR3014211; ECF No. 53-1 at 18–19.

NMFS also takes issue with Plaintiffs' reliance on the agency's own Recovery Plan by claiming that scientists can disagree, and the Court should defer to the agency's resolution of scientific uncertainty. ECF No. 61 at 37–39. It is not clear what scientific uncertainty the agency claims it was resolving in the BiOp, as it simply ignored both the Recovery Plan's finding that tugboat noise poses a significant threat to Cook Inlet belugas and findings in a recent study analyzing the impacts of vessel noise on Cook Inlet belugas. *Cf.*, AKR1001435; AKR1001466–79; AKR1001486–88 (analyzing impacts of tug and vessel noise from another project considering new science).

NMFS's suggestion in its briefing that its Recovery Plan is irrelevant because of various conditions placed on Hilcorp's operations, ECF No. 61 at 37, ignores that such conditions will not reduce take from tugboat noise, *see supra* at 8, and that the tugs will pass through or near areas where large groups of belugas have been observed engaging in essential behaviors. *Supra* 7. The slow speed of the tugs when towing rigs, ECF No. 61 at 20, is immaterial: NMFS determined the Level B harassment zone is 2154 meters at roughly five knots. *See* PR1_ESA 000175.

### 2. *NMFS's Jeopardy Analysis Fails to Aggregate Impacts*

NMFS failed to determine whether Hilcorp's activities, when added to the environmental baseline and cumulative effects, will jeopardize the continued existence of critically endangered Cook Inlet beluga whales. *See Nat'l Wildlife Fed'n*, 524 F.3d at

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                    19

924; *see also Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001)

(biological opinion must "include an analysis of the effects of the action on the species

when 'added to' the environmental baseline—in other words, an analysis of the *total*

impact on the species." (citing 50 C.F.R. § 402.02)).

Defendants incorrectly claim that Plaintiffs' argument must fail under *Native*

*Village of Chickaloon v. NMFS*, 947 F. Supp. 2d 1031 (D. Alaska 2013). *See* ECF No. 60

at 38; ECF No. 61 at 34; ECF No. 62 at 32. But Plaintiffs are not arguing that NMFS was

required to determine that the baseline constitutes jeopardy as argued in that case. *See*

*Chickaloon*, 947 F. Supp. 2d at 1065. Rather Plaintiffs maintain that NMFS failed to

consider the total impacts from Hilcorp's activities in light of the baseline, cumulative

effects, and status of the species. In other words, the agency failed to "rigorously ensure

[its] action[] will not 'tip [belugas] from a state of precarious survival into a state of

likely extinction.'" *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878

F.3d 725, 738 (9th Cir. 2017) (citation omitted).

Defendants argue that *Turtle Island* is distinguishable because NMFS determined

the action at issue there would kill endangered species, whereas here it will not. ECF No.

60 at 38–39; ECF No. 61 at 36. In so arguing, NMFS essentially admits that it looked at

impacts from Hilcorp's activities in a vacuum. NMFS admits that some whales would

suffer behavioral changes from Hilcorp's activities, ECF No. 61 at 35. These changes

include, among others, fleeing the area. *See, e.g.*, PR1_ESA 000164 (avoidance is likely

the most common behavioral response to seismic); PR1_ESA 000168–69 (noise from

pile driving could cause whales to swim away and encounter another activity in the project area). Yet NMFS never considered the larger or compounded impacts, such as how this behavioral response could push belugas into other areas—where they would also be subject to noise disturbance.

In other words, NMFS nowhere considered how Hilcorp's activities could increase the overall noise footprint in Cook Inlet, thereby increasing the belugas' cumulative exposure to harmful noise. This failure is glaring considering NMFS believes the species is failing to recover due to the combined effects of noise from multiple sources and has identified the reduction of anthropogenic noise pollution as the top priority for saving the species, *see* PR1_KeyRef 003211, 3230; ECF No. 53-1 at 34; JOINTSUPP200883.

B.      NMFS's Refusal to Reinitiate Consultation Violates the ESA

The new "extremely concerning" population information released by NMFS in January 2020, JOINTSUPP100008, triggers the ESA's reinitiation requirement because it "reveals effects of the action that *may* affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a)(2) (emphasis added). The report includes (1) a downward revision of the 2016 beluga population numbers (from 328 to 279 individuals), (2) acknowledgement of a significantly steeper rate of annual population decline (from 0.5% per year to 2.8% per year), and (3) a "new and more reliable methodology," JOINTSUPP100006, for estimating beluga density and take. Defendants' attempts to cast the manner and extent of the take regulations' impacts as

totally unchanged and not warranting reinitiation despite this new information is arbitrary in several respects. *See* ECF No. 60 at 40–42; ECF No. 61 at 38; ECF No. 62 at 34.

First, NMFS's decision is predicated in part on fuzzy math. Instead of reinitiating consultation, NMFS engaged in a back of the envelope exercise to demonstrate how the "new information . . . could affect [its] estimate of takes," but does not. JOINTSUPP100008. In doing so, NMFS mashed the new information with the outdated 2016 information to conclude the new estimate is a "small change in abundance" that would arguably amount to only a "4.7% reduction in [its] take estimate." *See* ECF No. 60 at 41 (citing JOINTSUPP100008). The new 2018 population estimate of 279 belugas is 4.7% less than the new 2016 estimate of 293, but neither number formed the basis for NMFS's decision. The BiOp is based on the existence of 328 belugas in 2016—a figure *10.7% higher* than the revised 2016 estimate of 293 animals.

Second, NMFS's assumption that the amount of take would drop proportionally to the decline in population is a gross simplification. Taken to its logical conclusion, the more endangered a species becomes, the less likely NMFS will need to re-evaluate permitted levels of take. This argument also assumes without scientific basis that the impacts of NMFS's take regulations are static no matter what the size or health of the affected endangered species population. For example, NMFS overlooks the fact that larger populations inherently offer resilience against harmful exposures. *See, e.g.*, PR1_KeyRef 003201 ("[s]mall populations may be more susceptible to disease, inbreeding, predator pits, or catastrophic events than large populations.").

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                        22

Similarly, NMFS does not account for the fact that the BiOp's authorization of 58 takes will be inflicted upon a smaller number of beluga whales. In other words, a higher percentage—a full 20%—of this critically imperiled population is now authorized to be acoustically harassed. This means a higher percentage of individual beluga whales will be harassed, making them more "susceptib[le] to mortality or long-term effects (for example, reproductive failure)." PR1_KeyRef 003230; *see also* PR1_KeyRef 003274.

Finally, NMFS contends that its "new, more reliable methodology" for analyzing aerial population surveys, JOINTSUPP100020, has "no relevance to NMFS's calculation of take." ECF No. 61 at 39. Yet its take calculations were expressly based on Cook Inlet beluga aerial surveys. *See* PR1_ESA 000147–148; PR1_ESA 000064 ("Goetz et al. (2012) modeled beluga use in Cook Inlet based on the NMFS aerial surveys conducted between 1994 and 2008"); PR1_KeyRef 000344 (Goetz et al. 2012) ("To document the distribution and group size of beluga whales, we flew aerial surveys in Cook Inlet in each June/July from 1993 to 2008."). Because NMFS changed how it interprets aerial surveys, its previous calculations of take must also be revisited. *See* PR1_ESA 000148 (take estimates based on density estimates). In fact, in contrast to its position in this case, NMFS recently re-evaluated take of Cook Inlet beluga whales based on this new information and "refined density grid" in its *Final Rule for Taking Marine Mammals Incidental to Alaska Liquefied Natural Gas*:

> Cook Inlet beluga whale density was further updated based on the latest population estimated that became available in January 2020 (NMFS, 2020), and the take estimate for this species was reanalyzed using a more refined density grid than what was used for the proposed rule.

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG 23

85 Fed. Reg. 50,720, 50,733 (Aug. 17, 2020).

NMFS should have done the same here. Instead, it failed to assess the impacts of Hilcorp's oil and gas activities on this smaller, more rapidly declining population using its new and more accurate methodology—thereby failing to ensure its actions do not jeopardize the survival *and recovery* of an endangered species as required by the ESA. *Cf.*, *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004) ("the ESA was enacted . . . to allow a species to recover to the point where it may be delisted."). Its refusal to do so was "without substantial basis in fact." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citation omitted).

## III. NMFS's EA Violates NEPA

Plaintiffs have shown that NMFS failed to take the requisite hard look at the direct and cumulative impacts of Hilcorp's activities on Cook Inlet belugas.[11] ECF No. 53-1 at 38–43. Defendants fail to show otherwise.

### A. NMFS Failed to Take a Hard Look at Direct Impacts

NMFS failed to comply with the independent and distinct requirements of NEPA in evaluating the direct impacts of its regulations. *See Portland Audubon Soc. v. Lujan*, 795 F. Supp. 1489, 1509 (D. Or. 1992) ("The purpose of the [ESA] and the purpose of NEPA are not the same."). They do not merely "repackage" their vessel noise argument. *Cf.*, ECF No. 60 at 43.

---

[11] The citations to the NEPA regulations here and in Plaintiffs' opening brief are to those in effect when NMFS issued its decision, not as amended in September 2020.

NMFS's claim that its EA "*plainly states* '[it] . . . accounted for the impacts of these vessels'" and "*concluded* that 'take is unlikely to occur,'" ECF No. 61 at 40 (citing PR1_NEPA 000095 (emphasis added)), does not supplant the *analysis* of impacts required by NEPA. *See, e.g.*, *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020) (rejecting an EA that drew on "general conclusions"). Table 2 of NMFS's EA lists the planned activities covered by its regulations. Every one of the twelve activities listed includes tugs or vessels in its "Antiicpated [sic] noise sources." PR1_NEPA 000055. Yet, nowhere does NMFS then describe or *analyze* the direct impacts of those vessels.

The only defense NMFS offers to rebut Plaintiffs' claim consists of two cites to the Cumulative Effects section, ECF No. 61 at 40 (citing PR1_NEPA 000094, 095), and one paragraph of the EA's "Alternatives" section, which states "*take* is unlikely to occur, primarily because of the predictable movement of vessels and tugs" and because marine mammals are "likely habituated to the existing baseline of commercial ship traffic." PR1_NEPA 000059–60 (emphasis added).

As an initial matter, NEPA defines direct impacts are those that are "caused by the action and occur at the same time and place," not as those that cause take. *Compare* 40 C.F.R. § 1508.8 *with* 16 U.S.C. § 1532(19). Further, the EA itself "contains virtually no references to any material in support of or in opposition to its conclusions. That is where [the agency's] defense of its position must be found." *Blue Mts. Biodiversity Proj. v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998). Record evidence illustrates why NMFS's reliance on habituation is misplaced. By example, "the inappropriate application

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                      25

of the term 'habituation' can mislead wildlife managers to conclude that particular human activities have neutral, or even benign, consequences for wildlife when, in fact, the effects of these activities are detrimental." PR1_KeyRef 000014; *see also supra* at 6.

NMFS's final reach is a footnote contending the EA is sufficient because it references the existence of the BiOp and its conclusions. *See* ECF No. 61 at 40, n.12. A "no jeopardy" BiOp does not equate to a review under NEPA. "Clearly, there can be a significant impact on a species even if its existence is not jeopardized." *Malama Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001); *Pac. Rivers Council v. U.S. Forest Service*, 668 F.3d 609, 628 (9th Cir. 2012) (if the agency intended biological assessments "to serve as the analysis of the environmental consequences of [its action]" under NEPA, the agency "needed to do more than incorporate them by reference."). Furthermore, as described above, the BiOp does not adequately address vessel impacts even in the ESA context.

### B.  NMFS Failed to Take a Hard Look at Cumulative Impacts

NMFS's assertion that its EA contains "a robust cumulative effects section" that considers a "wealth of cumulative impacts," ECF No. 61 at 41, 43, is impossible to reconcile with the contents of its EA. As with direct impacts, NMFS at best made "general statements" that failed to provide the "quantified or detailed information" NEPA mandates. *See Bark*, 958 F.3d at 872–73 (alteration and citation omitted).

As an initial matter, Hilcorp urges this Court to approve NMFS's cumulative effects analysis stating it once approved a "remarkably similar" analysis in *Native Village*

*of Chickaloon*. ECF No. 60 at 45. Yet, the action at issue in *Chickaloon* was a one-year incidental harassment authorization for a 3D seismic survey that did not include the much larger suite of actions at issue here. 947 F. Supp. 2d at 1031. And NMFS approved the action challenged in that case over eight years ago, without the benefit of additional scientific research and understanding of the main threats to Cook Inlet belugas, including the devastating impact of cumulative stressors. PR1_KeyRef 003230. The Court should decline Hilcorp's invitation to rubber stamp NMFS's Cumulative Effects section and instead give this EA the "thorough, probing, in-depth" review it demands. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1144 (D. Mont. 2004) (courts "need not rubber stamp a 'clear error of judgment.'" (citations omitted)).

Moreover, while NMFS contends it provided "a detailed analysis with citations to studies . . . it relied on when considering the many cumulative impacts on belugas," ECF No. 61 at 43, a close look at the Cumulative Effects section reveals otherwise. PR1_ NEPA 000092–100. The EA's Cumulative Effects section lists types of impacts and minimally describes some projects in the area. What it does not contain is any *analysis* related to cumulative impacts, in particular on Cook Inlet belugas. Instead, it is precisely the type of perfunctory catalogue lacking any detailed analysis the Ninth Circuit has repeatedly rejected. *See, e.g.*, *Great Basin Mine Watch v. Hankins,* 456 F.3d 955, 971–72 (9th Cir. 2006) (citations omitted). For example, NMFS contends it *analyzed* the "Alaska LNG" project in its cumulative effects section. ECF No. 61 at 42. That section merely

states facts about the project, PR1_NEPA 000097–98; there is *nothing* in that section about its environmental impacts. The same can be said for the entire Cumulative Effects section. Even assuming the EA included the direct impacts of each of these activities, which it did not, the EA fatally failed to explain "how those individual impacts might combine or synergistically interact with each other to affect the . . . environment." *Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 387 F.3d 989, 997 (9th Cir. 2004); *see id.* at 994 (a "close read" revealed no assessment of "combined environmental impacts.").

A cumulative effects analysis is essential to evaluating the impacts of Hilcorp's activities on Cook Inlet belugas, where such effects were recognized in 2016 by NMFS as a "threat of high relative concern." PR1_KeyRef 003136. While "individual activities might be deemed insignificant" by themselves, Cook Inlet is a highly industrialized landscape and "creeping normality (e.g., death by a thousand cuts) can cause substantial adverse effects to CI belugas, *at both individual and population levels*." PR1_KeyRef 003274 (emphasis added); *see also Gov't of the Province of Manitoba v. Norton*, 398 F. Supp. 2d 41, 65, n.24 (D.D.C. 2005) (adoption of mitigation measures does not absolve the agency of its duty to account for possible adverse impacts in the EA).

## CONCLUSION

The Court should grant summary judgment for Plaintiffs and vacate NMFS's regulations, BiOp, EA, and FONSI because vacatur is the presumptive and appropriate remedy. *See* 5 U.S.C. § 706(2); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020) (agency decision violated the APA and "must be vacated").

Respectfully submitted this 30th day of October, 2020,

/s/ *Kristen Monsell*
Kristen Monsell
(CA Bar #304793; *Pro Hac Vice*)

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds
(CO Bar # 32822; *Pro Hac Vice*)

/s/ *Kassia Siegel*
Kassia Siegel (AK Bar # 0106044)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiffs Cook Inletkeeper and Center for Biological Diversity*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 30, 2020, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Kristen Monsell*
Kristen Monsell