# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

COOK INLETKEEPER and
CENTER FOR BIOLOGICAL
DIVERSITY,

         Plaintiffs,

    v.

GINA RAIMONDO, Secretary of
Commerce, *et al.*,

         Defendants,

   and

HILCORP ALASKA, LLC, *et al.*,

         Intervenor-Defendants.

Case No. 3:19-cv-00238-SLG

## ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT

Before the Court at Docket 53 is Plaintiffs Cook Inletkeeper and Center for Biological Diversity's Motion for Summary Judgment. Plaintiffs challenge the incidental take regulations ("ITR") promulgated by the National Marine Fisheries Service ("NMFS") that authorize Hilcorp Alaska, LLC ("Hilcorp") to conduct certain oil and gas exploration and production activities in Cook Inlet from 2019 to 2024.[1] Hilcorp responded at Docket 60. Federal Defendants responded at Docket 61.[2]

---

[1] 84 Fed. Reg. 37442 (July 31, 2019), codified at 50 C.F.R. §§ 217.160–217.167.

[2] Federal Defendants are Gina Raimondo, in her official capacity as Secretary of Commerce; James Balsiger, in his official capacity as Regional Administration of the National Marine Fisheries Service; and the National Marine Fisheries Service.

The State of Alaska responded at Docket 62 and filed a Cross Motion for Summary Judgment at Docket 63. Plaintiffs replied at Docket 64 and responded to the State of Alaska's motion at Docket 65. Oral argument was held on December 14, 2020.[3]

## BACKGROUND

Cook Inlet is a large, semi-enclosed estuary in southcentral Alaska.[4] Cook Inlet is inhabited by various marine mammals, including beluga whales, harbor porpoise, harbor seals, killer whales, humpback whales, fin whales, minke whales, Dall's porpoise, gray whales, and Steller sea lions.[5] The inlet is of shallow depth and has high background noise from tidal currents.[6]

Beluga whales are small whales that inhabit "fjords, estuaries, and shallow waters of the Arctic and subarctic oceans."[7] Cook Inlet beluga whales are one of five stocks of beluga whales found in Alaska and remain in Cook Inlet year-round.[8] Beluga whales use "sound rather than sight for many important functions," such as to "communicate, locate prey, and navigate"; they produce "high frequency sounds which they use as a type of sonar for finding and pursuing prey, and likely for

---

[3] Docket 71.

[4] PR1_NEPA 000068 (Environmental Assessment ("EA")).

[5] PR1_NEPA 000068 (EA).

[6] PR1_ESA 000103 (Biological Opinion ("BiOp")); MMPA 786. The administrative record filed at Docket 68 contains two copies of the BiOp—one at AKR1004652 and the other at PR1_ESA 000003. For clarity, the Court cites only to the copy beginning at PR1_ESA 000003.

[7] 76 Fed. Reg. 20180, 20181 (Apr. 11, 2011).

[8] PR1_ESA 000063–64 (BiOp).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 2 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 2 of 52

navigating through ice-laden waters."[9] As such, they "are vulnerable to harassment and injury from human-caused sources of noise,"[10] which in Cook Inlet includes noise from vessels, aircraft, military detonations, seismic surveys, and industrial activities. The number of Cook Inlet beluga whales has steadily declined from an estimated 1,300 in 1979 to an estimated 279 in June 2018.[11] Due to this population decline, Cook Inlet beluga whales were listed as endangered pursuant to the Endangered Species Act ("ESA") in 2008,[12] and portions of Cook Inlet were designated as their "critical habitat" in 2011.[13] Despite these measures, their population has continued to decline; the NMFS has identified Cook Inlet beluga whales as one of the eight species in the nation "most at-risk of extinction."[14]

The Marine Mammal Protection Act[15] ("MMPA") places a moratorium on the "take" of marine mammals, including by harassment[16]; however, it also directs the Secretary of Commerce to authorize takes of "small numbers" of marine mammals

---

[9] 76 Fed. Reg. 20180, 20203 (Apr. 11, 2011).

[10] JOINTSUPP200883 (Species in the Spotlight).

[11] PR1_KeyRef 003211, 003182 (Recovery Plan); JOINTSUPP100028–29 (beluga whale abundance report).

[12] PR1_ESA 000063 (BiOp); 73 Fed. Reg. 62919 (Oct. 22, 2008); 16 U.S.C. §§ 1531–1544.

[13] PR1_NEPA 000068 (EA); 76 Fed. Reg. 20180 (Apr. 11, 2011).

[14] JOINTSUPP200881 (Species in the Spotlight).

[15] 16 U.S.C. §§ 1361–1432.

[16] 16 U.S.C. §§ 1371, 1362(13), (18). The MMPA defines "take" as meaning "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 3 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 3 of 52

incidental to specified activities for up to five-year periods, provided that the Secretary finds that the takes will have a "negligible impact" on the species and prescribes regulations "effecting the least practicable adverse impact" on the species, along with monitoring and reporting requirements.[17]

Hilcorp owns 15 offshore production platforms in central Cook Inlet.[18] Some of these platforms have permanent drill rigs installed; others require the use of a mobile drill rig.[19] On April 17, 2018, NMFS received an application from Hilcorp requesting authorization pursuant to the MMPA for Hilcorp to take by harassment marine mammals in Cook Inlet incidental to noise exposure generated by its oil and gas activities.[20] Relevant here, Hilcorp sought to conduct 2D seismic exploration throughout Cook Inlet and drill exploratory and development wells using a drill rig that would be transported by tugboats; each of these activities would produce significant levels of underwater noise.[21] Hilcorp would drill two to four exploratory wells in lower Cook Inlet and one to two exploratory wells in the Trading Bay area[22]; the drill rig would be "towed on site using up to three ocean-

---

[17] 16 U.S.C. § 1371(a)(5)(A)(i).

[18] PR1_MMPA 002258 (ITR); 84 Fed. Reg. 37442, 37448 (July 31, 2019).

[19] PR1_MMPA 002258 (ITR); 84 Fed. Reg. 37442, 37448 (July 31, 2019).

[20] PR1_MMPA 002253 (ITR); 84 Fed. Reg. 37442, 37443 (July 31, 2019).

[21] PR1_MMPA 002256–57 (ITR); 84 Fed. Reg. 37442, 37446–47 (July 31, 2019). Hilcorp's proposal also included 3D seismic exploration, which has already been conducted and is not part of Plaintiffs' challenges here.

[22] PR1_MMPA 001394–95, 001409 (Petition for ITR).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 4 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 4 of 52

going tugs . . . ."[23]  Additionally, Hilcorp would conduct plugging and abandonment activities at a discovery well in the North Cook Inlet Unit, which would require the use of up to three ocean-going tugs towing a jack-up rig.[24]  Hilcorp predicted that without mitigation measures, the noise from its tug operations in the Trading Bay area would take 15 beluga whales by harassment, and an additional four beluga whales would be taken by noise harassment in the Northern Cook Inlet Unit.[25]

In July 2019, NMFS granted Hilcorp's request, authorizing the incidental taking of various marine mammal species including Cook Inlet beluga whales for

---

[23] PR1_MMPA 000787 (Petition for ITR); *see also* PR1_MMPA 001387, 001400 (Figures 3 & 8) (tug path).

[24] PR1_001408 (Petition for ITR); *see also* PR1_MMPA 001400 (Figure 8) (tug path).  The Court takes judicial notice of a Letter of Authorization (LOA) issue to Hilcorp approving of well abandonment activity in the North Cook Inlet Area, valid for one year beginning on April 22, 2020.  86 Fed. Reg. 6878-01 (Jan. 25, 2021) (Notice of LOA); Year 2 LOA (available at www.fisheries.noaa.gov/action/incidental-take-authorization-hilcorp-alaska-llc-oil-and-gas-activities-cook-inlet-alaska) (last accessed Mar. 26, 2021). Judicial notice is the "court's acceptance, for purposes of convenience and without requiring a party's proof, of a well-known and indisputable fact; the court's power to accept such a fact." *Black's Law Dictionary* (11th ed. 2019); see also *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051 n.3 (9th Cir. 2005) ("Materials from a proceeding in another tribunal are appropriate for judicial notice.") (internal quotation marks and citation omitted); see also Fed. R. Evid. 201.  However, it is not clear whether Hilcorp has already completed these abandonment activities.  Additionally, the ITR includes tug operations in Granite Point that were not considered in the proposed rule.  PR1_MMPA 002254 (Petition for ITR).  The ITR states that the Granite Point activities were planned for 2019; however, it does not appear that either of the Letters of Authorization granted so far have authorized the Granite Point tug operations.  *See* PR1_MMPA 002254 (Petition for ITR), 002456 (Year 1 LOA) (amended as noticed by 84 Fed. Reg. 53119); Year 2 LOA (available at www.fisheries.noaa.gov/action/incidental-take-authorization-hilcorp-alaska-llc-oil-and-gas-activities-cook-inlet-alaska).

[25] PR1_MMPA 001462, 001464 (Table 18).  In its Year 1 Letter of Authorization Request, Hilcorp stated that "[p]er NMFS recommendation in the ITR process, tugs towing the rig were not considered further to evaluate Level A or Level B acoustic harassment in this LOA."  PR1_MMPA 002375.  The total beluga whale take that Hilcorp estimated for all its activities was approximately 36 using NMFS aerial survey data and more than 200 using the Goetz density model.  PR1_MMPA 001464 (Petition for ITR) (Table 18).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 5 of 52

a five-year period from 2019 through 2024.[26] NMFS issued incidental take regulations ("ITR") that included various mitigation and monitoring measures, including the use of aerial surveys to search for Cook Inlet beluga whales before beginning seismic surveys.[27] NMFS estimated that with these measures, Hilcorp's activities would harass approximately 31 beluga whales each year.[28] The ITR authorizes Hilcorp to take by harassment up to 35 Cook Inlet beluga whales per year.[29] NMFS's take estimate did not include any take resulting from tug operations.

NMFS also prepared a biological opinion (BiOp) pursuant to the ESA and determined that Hilcorp's activities would not jeopardize the existence of any endangered marine mammals, including Cook Inlet beluga whales, nor destroy or adversely modify any critical habitat.[30] Additionally, NMFS prepared an Environmental Assessment ("EA") pursuant to the National Environmental Policy Act, and determined that authorizing Hilcorp's oil and gas activities in Cook Inlet would "not significantly impact the quality of the human environment."[31]

---

[26] PR1_MMPA 002252–316 (ITR); 84 Fed. Reg. 37442 (July 31, 2019).

[27] PR1_MMPA 002304, 002252 (ITR); 84 Fed. Reg. 37442, 37494, 37442 (July 31, 2019).

[28] PR1_MMPA 002293, 002301 (ITR); 84 Fed. Reg. 37442, 37483, 37491 (July 31, 2019).

[29] PR1_MMPA 002301 (ITR); 84 Fed. Reg. 37442, 37491 (July 31, 2019).

[30] PR1_ESA 000003 (BiOp). *See generally* 16 U.S.C. §§ 1536(a)(2), 1536(b)(3)(A).

[31] PR1_NEPA 000044–106 (EA); PR1_NEPA 000107 (FONSI); 42 U.S.C. § 4332(C) (requiring environmental impact statement for federal actions that may significantly affect quality of human environment); 40 C.F.R. § 1501.4(b) (providing that agencies may prepare environmental

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 6 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 6 of 52

On September 4, 2019, Plaintiffs initiated this action against Federal Defendants, alleging violations of the MMPA, ESA, National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").[32] On September 18, 2019, Hilcorp moved to intervene.[33] On October 10, 2019, Plaintiffs filed an Amended Complaint.[34] On November 13, 2019, the State of Alaska (the "State") moved to intervene.[35] On June 15, 2020, Plaintiffs filed a Supplemental Complaint adding an allegation that NMFS had violated the ESA in failing to reinitiate intra-agency consultation after a new population survey for the beluga whales had been released.[36]

## LEGAL STANDARD

Plaintiffs bring their claims pursuant to the Administrative Procedure Act.[37] Under that statute, a reviewing court shall not set aside an agency's decision unless

---

assessments to determine whether environmental impact statement is required). "The Council on Environmental Quality has adopted new regulations that became effective on September 14, 2020." *Bair v. California Dep't of Transp.*, 982 F.3d 569, 577 n.20 (9th Cir. 2020) (citing Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304, 43,304 (July 16, 2020) and 40 C.F.R. § 1506.13 (2020)). Federal Defendants applied the previous regulations to the ITR, and so the Court does as well. Docket 61 at 16 n.5. Thus, all citations to the CEQ's regulations in this order refer to 40 C.F.R. Part 1500 (2018).

[32] Docket 1 at 37–41 (Complaint).

[33] Docket 15.

[34] Docket 28.

[35] Docket 31.

[36] Docket 47, ¶¶ 176–80.

[37] Docket 47 at 6, ¶ 15 (Supplemental Complaint).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 7 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 7 of 52

it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[38]   Agency action is arbitrary and capricious if it

> relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it c[an]not be ascribed to a difference in view or the product of agency expertise.[39]

A court's review of whether an agency action is arbitrary and capricious should be "searching and careful," but "narrow," as a court may not substitute its judgment for that of the administrative agency.[40]   Courts will generally "uphold agency decisions so long as the agencies have 'considered the relevant factors and articulated a rational connection between the factors found and the choices made.'"[41]   "Agency action is 'not in accordance with the law' when it is in conflict with the language of the statute . . . ."[42]   "Whether agency action is 'not in accordance with law' is a question of statutory interpretation, rather than an

---

[38] 5 U.S.C. § 706(2)(A).

[39] *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1034 (9th Cir. 2019) (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

[40] *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

[41] *Protect Our Cmtys. Found.*, 939 F.3d at 1034 (quoting *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004)).

[42] *Nw. Envtl. Advocates v. EPA*, 537 F.3d 1006, 1014 (9th Cir. 2008) (quoting *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 8 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 8 of 52

assessment of reasonableness in the instant case."[43]

# DISCUSSION

## I. Waiver

As a threshold issue, Hilcorp maintains that Plaintiffs have waived several allegations in their motion by failing to raise them during the administrative process. These allegations include: Plaintiffs' arguments that NMFS improperly ignored take of Cook Inlet beluga whales caused by vessel noise; that NMFS improperly segmented its "small numbers" MMPA analysis; and that NMFS failed to take the requisite "hard look" at vessel noise under NEPA.[44] Hilcorp also maintains that these arguments were waived because they were not pleaded in either the Amended Complaint or in the Supplemental Complaint.[45] Federal Defendants add that Plaintiffs waived the "narrow legal issue" that "NMFS did not give a detailed explanation of" its small numbers methodology because they failed to bring that issue to NMFS's attention during the administrative process.[46]

---

[43] *Singh v. Clinton*, 618 F.3d 1085, 1088 (9th Cir. 2010) (citing *Nw. Envtl. Advocates*, 537 F.3d at 1014).

[44] Docket 60 at 18–21 (citing *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 710 (9th Cir. 2009); *Havasupai Tribe v. Robertson*, 943 F.2d 32, 34 (9th Cir. 1991); *Kunaknana v. U.S. Army Corps of Eng'rs*, 23 F. Supp. 3d 1063, 1088 (D. Alaska 2014); *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007); and *Exxon Mobil Corp. v. U.S. EPA*, 217 F.3d 1246, 1249 (9th Cir. 2000)).

[45] Docket 60 at 18–19.

[46] Docket 61 at 26 (citing *Glacier Fish Co. LLC v. Pritzker*, 882 F.3d 1113, 1128 (9th Cir. 2016); *Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 9 of 52

Plaintiffs respond that they raised the issue of vessel noise and small numbers segmentation in their comments to the agency, and that even had they not raised the issues, waiver does not apply where the agency "'had independent knowledge of the very issue that concern[ed] Plaintiffs.'"[47] Plaintiffs also contend that the "small numbers" challenge was raised in comments to the agency by a non-party to this litigation, and that Plaintiffs also raised it, even if only in general terms.[48]

"A participant in an administrative process must 'alert[] the agency to [their] position and contentions.' Failure to raise such 'particular objections' may result in "forfeit[ure of] any objection' to the resulting regulation."[49] However, the Ninth Circuit has "held that the exhaustion requirement should be interpreted broadly," explaining that "[p]laintiffs fulfill the requirement if [they] 'provided sufficient notice to the [agency] to afford it the opportunity to rectify the violations that the plaintiffs alleged.'"[50] As such, "[p]laintiffs need not state their claims in precise legal terms,

---

[47] Docket 64 at 14–16, 20–21 (quoting *Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1093 (9th Cir. 2006)).

[48] Docket 64 at 21 (citing *Portland Gen. Elec. Co.*, 501 F.3d at 1024); Docket 64 at 20 (citing *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 965–66 (9th Cir. 2002) and PR1_MMPA 000964–66, 001792 n.30. At oral argument, Plaintiffs acknowledged that claims pleaded in their complaint but not briefed in their motion for summary judgment have been waived.

[49] *Ctr. for Biological Diversity*, 588 F.3d at 710 (alterations in original) (quoting *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 533 and *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765–66 (2004)) (holding plaintiffs did not forfeit MMPA objection to agency regulation because objection was raised in letter to agency).

[50] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2010) (citing *Native Ecosystems v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002)) (holding

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 10 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 10 of 52

and need only raise an issue 'with sufficient clarity to allow the decision maker to understand and rule on the issue raised, but there is no bright-line standard as to when this requirement has been met.'"[51]  Moreover, with respect to NEPA, the Supreme Court has held that "the agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action."[52]  A flaw is "so obvious" that it does not result in waiver "where the agency had independent knowledge of the issues that concerned Plaintiffs."[53]  "This is true even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party."[54]

---

agency received sufficient notice of plaintiffs' Federal Land and Policy Management Act objection because although plaintiffs did not identify the statutory provision under which their objection arose, they adequately explained basis for their objection such that agency had sufficient notice).

[51] *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1065 (quoting *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 968 (9th Cir. 2006)).

[52] *Pub. Citizen*, 541 U.S. at 765.

[53] *'Ilio'ulaokalani Coal.*, 464 F.3d at 1092 (citing *Friends of Clearwater v. Dombeck*, 222 F.3d 552, 558–59 (9th Cir. 2000)) (holding plaintiffs did not waive objection by failing to raise it to agency where "the record [was] replete with evidence that the Army recognized the specific shortfall of the []EIS raised by Plaintiffs").

[54] *Portland Gen. Elec. Co.*, 501 F.3d at 1024 (citing *Portland Gen. Elec. Co. v. Johnson*, 754 F.2d 1475, 1481 (9th Cir. 1985), *abrogated on other grounds as recognized by Clatskanie Peoples Utility Dist. v. Bonneville Power Admin.*, 330 Fed. App'x 637, 638 (9th Cir. 2009)) (holding agency was "fully appraised" of plaintiffs' objections arising under the Northwest Power Act because other parties raised same objections during comment period and thus objections were not waived).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 11 of 52

Plaintiffs cite numerous portions of the record that they maintain demonstrate that the issue of vessel noise was raised before the agency.[55] While there is "no bright-line rule" for determining when an issue has been sufficiently raised, the references to the effects of vessel noise on beluga whales cited by Plaintiffs are particularly oblique.[56] Nonetheless, the record indicates that NMFS was independently aware that noise from vessel traffic poses a threat to beluga whales as evidenced by Federal Defendants' own assertion that NMFS sufficiently addressed the issue[57]; thus, the issue was "so obvious" as to not be waived even if Plaintiffs did not clearly raise it before the agency.[58]

As to Plaintiffs' claim that NMFS failed to take a "hard look" at the effects of Hilcorp's activities as required by NEPA, Plaintiff Center for Biological Diversity ("CBD") submitted a letter to the agency objecting to the sufficiency of the environmental assessment ("EA") as well as to NMFS's decision not to prepare an EIS.[59] This letter states that "[n]one of the impacts of . . . vessel traffic . . . is ever

---

[55] Docket 64 at 15 (citing PR1_MMPA 002553; PR1_MMPA 002547, 51; PR1_MMPA 000963; PR1_MMPA 000964; PR1_MMPA 000971–72).

[56] *Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1065 (quoting *Great Basin Mine Watch*, 456 F.3d at 968). *See* Docket 64 at 15 (citing PR1_MMPA 002553, 002547, 002551, 000963, 000964, and 000971–72).

[57] *See, e.g.*, PRA1_ESA 000182 (BiOp) ("Beluga whale responses to vessels noise varies greatly from tolerance to extreme sensitivity depending on the activity of the whale and previous experience with vessels."); Docket 61 at 18–21, 40–41.

[58] *See 'Ilio'ulaokalani Coal.*, 464 F.3d at 1092 (citing *Friends of Clearwater*, 222 F.3d at 558–59).

[59] PR1_MMPA 000967, 000969 (CBD Letter).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 12 of 52

described in the draft EA."[60]  CBD's letter also states that "the impacts on an endangered species like the environmentally and culturally significant Cook Inlet beluga and its designated critical habitat alone is enough to trigger a full environmental impact statement."[61]  Together, these statements were sufficient to place NMFS on notice that Plaintiffs objected to the EA on the grounds that it failed to adequately consider the effects of vessel noise on beluga whales, even if Plaintiffs' arguments are now more thoroughly developed.[62]

Regarding NMFS's "small numbers" analysis, the portion of CBD's letter to NMFS that is cited by Plaintiffs centers around the argument that NMFS conflated the "small numbers" and "negligible impact" standards by using a relative approach to the small numbers analysis. [63]  In another letter, CBD asserted that "take of 35 belugas every year over five years may result in a greater than negligible impact" and stated that Hilcorp's proposed activities "will also take more than small numbers of marine mammals, specifically for Cook Inlet beluga whales."[64]

---

[60] PR1_MMPA 000971 (CBD Letter).

[61] PR1_MMPA 000968–69 (CBD Letter).

[62] See Lands Council v. McNair, 629 F.3d 1070, 1076 (9th Cir. 2010) (holding challenge to 10%-old-growth standard in forest plan not waived even though plaintiff's "arguments are now more fully developed than they were in prior proceedings" because plaintiff's comments to agency put agency "on notice that it challenged the 10%-old-growth standard . . . .").

[63] PR1_MMPA 000965–66 ("Although the Service uses different headings for its small numbers and negligible impact findings, by defining small numbers to be relative to the overall population the criterion ends up being similar to the negligible impact finding.").

[64] PR1_MMPA 002546 (CBD Letter).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 13 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 13 of 52

Plaintiffs also cite the following comment made by the Marine Mammal Commission with regard to the "small numbers" analysis for harbor seals: "This is the total number of takes for the entire five-year period rather than a one-year period.  It is unclear why NMFS did not assess the numbers of takes on an annual basis consistent with all other proposed rules."[65]

It is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions."[66]  CBD's comments to the agency did not directly object to the agency's annual approach for the small numbers determination; instead, CBD merely stated that Hilcorp's activities would take more than small numbers of beluga whales, without explaining their current contention that determining take on an annual basis for a five-year authorization in the small numbers determination violates the MMPA.  The only portion of CBD's comments that mentions the annualized take numbers does so in the context of the negligible impact determination, which is a separate inquiry.[67]  Likewise, the Marine Mammal Commission's comment did not raise the objection to NMFS; that comment was in reference to the small numbers determination for a different species and also seems to encourage rather than object to the annualized approach.  Because the

---

[65] PR1_MMPA 001792 n.30 (Marine Mammal Commission Letter).

[66] *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 553.

[67] *See Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 903 (9th Cir. 2012) (holding that "small numbers" and "negligible impact" inquiries are distinct).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 14 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 14 of 52

comments from CBD and the Marine Mammal Commission mention but do not object to the annual approach of the small numbers determination, these comments could not have alerted NMFS that the agency's small numbers methodology was being challenged.  Nor do Plaintiffs argue that this objection was so obvious as to be preserved despite not having been raised before the agency.  Thus, Plaintiffs may not raise this objection for the first time before this Court.

Accordingly, Plaintiffs have waived their challenge to NFMS's small numbers determination by failing to raise it before the agency during administrative proceedings and may not pursue it here.  However, Plaintiffs have not waived their objections to NMFS's consideration of vessel noise.[68]  Thus, the Court will consider those claims on the merits.

## II. MMPA

The MMPA places a moratorium on the "take" of marine mammals, which means "to harass, hunt, capture, or kill . . . any marine mammal."[69]  Harassment can take the form of "Level A harassment," which means harassment that "has the potential to injure a marine mammal or marine mammal stock in the wild," or "Level

---

[68] The Court also finds that these allegations were sufficiently pleaded in the Supplemental Complaint.  Plaintiffs reference "noise from . . . vessel traffic" as a threat to beluga whales and allege that the BiOp "excluded noise from . . . vessels."  Docket 47 at 47, ¶ 162 and at 31, ¶ 98 (Supplemental Complaint).  Plaintiffs incorporated these allegations by reference into its claims that NMFS "failed to take a 'hard look' at the direct, indirect, and cumulative environmental impacts of its decision" in its EA and "underestimated the extent and degree of take" caused by Hilcorp's activities.  Docket 47 at 53, ¶ 184 and at 47–48, ¶ 163 (Supplemental Complaint).

[69] 16 U.S.C. §§ 1371(a), 1362(13).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 15 of 52

B harassment," which means "any act of pursuit, torment, or annoyance which . . . has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering."[70]   However, the MMPA provides a relevant exception:

> [U]pon request therefor by citizens of the United States who engage in a specified activity (other than commercial fishing) within a specified geographical region, the Secretary shall allow, during periods of not more than five consecutive years each, the incidental, but not intentional, taking by citizens while engaging in that activity within that region of *small numbers* of marine mammals of a species or population stock if the Secretary, after notice . . . and opportunity for public comment—

> (I) finds that the total of such taking during each five-year (or less) period concerned will have a *negligible impact* on such species or stock . . . and

> (II) prescribes regulations setting forth—

>> (aa) permissible methods of taking pursuant to such activity, and other *means of effecting the least practicable adverse impact* on such species or stock and its habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stock for subsistence uses; and

>> (bb) requirements pertaining to the *monitoring and reporting* of such taking.[71]

---

[70] 16 U.S.C. § 1362(18)(A), (C), (D).

[71] 16 U.S.C. § 1371(a)(5)(A)(i) (emphases added).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 16 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 16 of 52

Plaintiffs assert two violations of the foregoing portion of the MMPA.[72]  First, they allege that NMFS ignored Cook Inlet beluga whale take caused by vessels in concluding that Hilcorp's activities would take only small numbers of beluga whales and have a negligible impacts on their stock; second, they allege that NMFS failed to require sufficient mitigation and/or monitoring measures.

## A. Vessel Noise

Plaintiffs contend that although "NMFS admits that Hilcorp's oil and gas activities will increase vessel noise in the Inlet," NMFS disregarded take caused by tugs towing the drill rig and other vessel noise in its small numbers and negligible impact determinations by "summarily claiming that such take is not likely."  Plaintiffs assert that NMFS did not adequately explain its conclusion in light of the fact that NMFS's Recovery Plan for Cook Inlet beluga whales identified noise from tug boats as a major threat to beluga whales, and that Hilcorp's tugs will travel through Cook Inlet beluga whale critical habitat.[73]  Plaintiffs maintain that the best available science suggests that tug and vessel noise regularly exceeds the 120 dB Level B harassment threshold at 100 meters; they cite one recent study that "found

---

[72] Plaintiffs' third alleged MMPA violation—that NMFS impermissibly segmented its "small numbers" analysis by considering beluga take on an annual basis rather than for the whole five-year project period—has been waived.  *See* discussion *supra* at 13–15.

[73] Docket 53-1 at 17 (citing PR1_KeyRef 003211 (Recovery Plan); PR1_ESA 000206 (BiOp)).  The administrative record filed at Docket 68 contains two identical copies of the Recovery Plan; Plaintiffs and Defendants each cite to different copies.  For clarity, the Court cites only to the copy starting at PR1_KeyRef 003121.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 17 of 52

that '[s]ome vessels, such as tugs towing barges or oil rigs, can produce sound capable of harassing marine mammals located over 2 km from the source.'"[74]

Federal Defendants maintain that NMFS reasonably concluded that vessel noise, and specifically tugboat noise, would not take Cook Inlet beluga whales.[75] They contend that NMFS "reasonably considered the relevant factors" related to marine mammal responses to vessel noise, such as "distance from a source, background noise levels, and the context of exposure," in determining that vessel noise would not take belugas, particularly because belugas are generally not found where Hilcorp will be working during operational months.[76] Federal Defendants also assert that NMFS considered the effects of vessel and tugboat noise in the BiOp and concluded that with the implementation of mitigation measures, the impact of vessel noise is "immeasurably small" and poses a very low probability of causing Level B harassment.[77] Federal Defendants also maintain that Plaintiffs mischaracterize studies on beluga whales because Plaintiffs ignore that "the highest concentrations of noise occur in the Upper Cook Inlet," whereas Hilcorp

---

[74] Docket 53-1 at 18–19 (alteration in original) (citing PR1_ESA 000109 (BiOp)).

[75] Docket 61 at 18–19 (citing PR1_MMPA 002257 (ITR)).

[76] Docket 61 at 19–20 (citing PR1_MMPA 002278; PR1_MMPA 002286; PR1_ESA 000181–83; PR1_MMPA 002273; PR1_MMPA 002266–67; and PR1_MMPA 002263).

[77] Docket 61 at 20 (citing PR1_ESA 00183). *See* PR1_MMPA 002261 (ITR); 84 Fed. Reg. 37442, 37451 (July 31, 2019) (referencing the BiOp's conclusion).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 18 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 18 of 52

will be operating in the middle and lower portions of the inlet.[78]  Hilcorp adds that NMFS explained in the BiOp that some whale species "have been noted to tolerate slow-moving vessels within several hundred meters, especially when the vessel is not directed toward the animal and when there are no sudden changes in direction or engine speed," which supports the agency's conclusion that noise from tugboats and other vessels would not take beluga whales.[79]

Plaintiffs reply that Defendants impermissibly conflate whether a take has occurred with the negligible impact determination by relying on the prediction that any behavioral responses would be brief, infrequent, or have "minimal" impacts.[80] Plaintiffs stress that the MMPA prohibits activities that have the "potential" to cause behavioral disruptions.[81]  Plaintiffs also assert that the mitigation measures required by NMFS will not prevent take because the Level B harassment zone for tugs is larger than the monitoring zone created by the ITR, and because even if a beluga is spotted, the tug will not be able to shut down when towing the rig.[82]

---

[78] Docket 61 at 21.

[79] Docket 60 at 22 (citing PR1_ESA 000175 (BiOp)).

[80] Docket 64 at 9–11 (citing *Nat. Res. Def. Council, Inc. v. Evans*, 364 F. Supp. 2d 1083, 1108–09 (N.D. Cal. 2003); *Salazar*, 695 F.3d at 906).

[81] Docket 64 at 9–10 (citing 16 U.S.C. § 1362(13), (18)(A)(ii); *Evans*, 364 F. Supp. 2d at 1109).

[82] Docket 64 at 14 (citing PR1_ESA 00044–45 (BiOp)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 19 of 52

Plaintiffs point out that Hilcorp itself estimated in its application that it would take 15 beluga whales by level B harassment while towing the drill rig to Trading Bay.[83]

The Court finds that NMFS failed to provide a reasoned explanation or identify adequate support in the record for its determination that tug noise from Hilcorp's activities would not take beluga whales. In the ITR, NMFS explained that its quantitative take estimate consists of the "numbers of each marine mammal species that could potentially be exposed to sounds associated with the activities that exceed NMFS's acoustic Level A and B harassment criteria[.]"[84] NMFS used an acoustic threshold of 120 dB for continuous sound generation, such as from a tugboat, as "rising to the level of Level B Harassment."[85] And while the ITR indicates that its take estimates included "the takes that are anticipated from all activities for which take will be authorized across the five-year period,"[86] tugs towing the drill rig are not listed in the ITR as a source of Level B harassment exposure.[87] This is despite the fact that the record clearly indicates both that tugs

---

[83] Docket 64 at 10 (citing PR1_MMPA 0014642).

[84] PR1_MMPA 002292 (ITR); 84 Fed. Reg. 37442, 37482 (July 31, 2019).

[85] 84 Fed. Reg. 37442, 37477.

[86] 84 Fed. Reg. at 37484–85.

[87] *Compare* PR1_MMPA 002304 (ITR) (Table 20) and PR1_MMPA 002304 (Table 11); 84 Fed. Reg. 37442, 37494, 37484 (July 31, 2019). NMFS is not required to quantify its take estimate. *See Salazar*, 695 F.3d at 907 ("The [agency] need not quantify the number of marine mammals that would be taken under the regulations, so long as the agency reasonably determines through some other means that the specified activity will result in take of only 'small numbers' of marine mammals."). But NMFS opted to quantify the estimated take here. *See* Docket 61 at 23. In the ITR, the agency explains that it took its quantitative "initial prediction" and then

---

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 20 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 20 of 52

towing the drill rig will produce sound in excess of the Level B harassment threshold throughout a large radius and that Hilcorp will be operating tugs within the beluga whale's critical habitat.[88] It appears clear from this record that tugs towing the drill rig are quite likely to subject Cook Inlet beluga whales to sound in excess of the 120 dB Level B harassment threshold and therefore cause take within the meaning of the MMPA. In fact, using the same take estimate model as NMFS, Hilcorp itself estimated that its tugboat operations would take 15 Cook Inlet belugas.[89]

Nonetheless, NMFS concludes in its ITR that

[s]imilarly to transiting vessels, although some marine mammals could receive sound levels in exceedance of the general acoustic threshold of 120 dB from the tugs towing the drill rig during this project, take is unlikely to occur, primarily because of the predictable movement of vessels and tugs. Additionally, marine mammal population density in the project area is low . . . and those that are present are likely habituated to the existing baseline of commercial ship traffic. Further, there are no activity-, location-, or species-specific circumstances or other contextual factors that increase concern and the likelihood of take from towing of the drill rig.[90]

---

assessed whether there was "additional information that can qualitatively inform [its] take estimates[.]" 84 Fed. Reg. 37442, 37477 (July 31, 2019). But the ITR does not contain a reasoned explanation for estimating that there would be zero take from tugs towing the drill rig, as explained below.

[88] PR1_ESA 000175 (BiOp) ("We anticipate that noise associated with towing the drill rig would drop to the 120 dB isopleth within 2,154 meters (or less) of the active tugs."). PR1_ESA 000068 (tug path), 000073 (critical habitat map).

[89] PR1_MMPA 001462 (Petition for ITR) ("Using the Goetz model, the estimated Level B exposures is . . . 15 animals associated with the tugs towing the rig to the Trading Bay wells.").

[90] PR1_MMPA 002257 (ITR); 84 Fed. Reg. 37442, 37447 (July 31, 2019).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 21 of 52

But this brief paragraph merely provides conclusions without explaining how those conclusions were reached. Likewise, NMFS also explained in its ITR that "depending on the source type and its intensity, sound from a given activity may be a negligible addition to the local environment or could form a distinctive signal that may affect marine mammals."[91] Yet the ITR did not claim that tugboat noise represents a negligible addition to the local environment, let alone explain what characteristics of tugboat noise make such noise unlikely to disturb marine mammals.[92] To the contrary, NMFS itself has identified tugboat noise as the most important among "a wide variety of anthropogenic noise sources that could potentially interfere with recovery [that] are present in CI beluga habitat . . . based on signal characteristics and the spatio-temporal (space and time) acoustic footprint."[93]

---

[91] Docket 61 at 19 (citing PR1_MMPA 002278, 002286).

[92] The BiOp states that "[w]hale reactions to slow-moving vessels are less dramatic than their reactions to faster and/or erratic vessel movements" and that "[s]ome species have been noted to tolerate slow-moving vessels within several hundred meters, especially when the vessel is not directed toward the animal and when there are no sudden changes in direction or engine speed. Considering that tugs towing the drill rig are only anticipated to travel at ~ 5 knots, we do not anticipate consequential reaction to towing noise." PR1_ESA 000175. But as Hilcorp itself acknowledged, "the activity of towing the rig onsite is not considered 'typical' vessel activity." PR1_MMPA 001443. Even travelling at 5 knots, tugs towing the drill rig will produce significant noise levels. PR1_ESA 000175.

[93] PR1_KeyRef 003211 (Recovery Plan). Federal Defendants argue that this "general finding does not undercut NMFS' activity-specific analysis" that considers low population density in project areas, mitigation measures, and "tugboats operating at slower speeds with lower noise levels." Docket 61 at 19–20. However, as explained above, NMFS has not required shutdown procedures or identified other mitigation measures for tugboats. Moreover, while the Recovery Plan is not binding on the agency, the Court considers it to be persuasive in the absence of record evidence or adequate explanation to the contrary.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 22 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 22 of 52

NMFS also states in its ITR that Cook Inlet beluga whales "spend the ice-free months generally in the upper Cook Inlet," whereas Hilcorp will primarily be active in the middle and lower Cook Inlet.[94] But this passage notes only a "general" distribution trend and explicitly recognizes that not all belugas will be in the upper Cook Inlet during summer months.[95] In fact, NMFS itself acknowledged 143 sightings of beluga whales during summer months "near some potential well sites" in its BiOp, as well as a sighting of approximately 30 belugas in the Kasilof River in April 2018.[96] Additionally, the BiOp shows the tugs towing the drill rig on a path through Cook Inlet beluga whales' critical habitat, which NMFS described as "known fall and winter foraging and transit habitat for beluga whales as well as spring and summer habitat for smaller concentrations of beluga whales."[97] While a lower population density in the lower and middle Cook Inlet during summer months may result in lower take numbers, it does not support a conclusion that the tugboats would not cause any take.[98] This is particularly problematic where Hilcorp

---

[94] PR1_MMPA 002273 (ITR); 84 Fed. Reg. 37442, 37463 (July 1, 2019).

[95] For example, the ITR states that of the 18 beluga whales that have been tagged with satellite transmitters since 1999, "most tagged whales were . . . near the Susitna River Delta from April to July (60 to 90 percent of tagged whales) . . . ." PR1_MMPA 002273 (ITR); 84 Fed. Reg. 37442, 37463 (July 1, 2019).

[96] PR1_ESA 000066, 000067 (BiOp).

[97] PR1_ESA 000068 (tug path), 000073 (critical habitat map), 000071–72 (description of beluga critical habitat).

[98] PR1_MMPA 002301 ("Take estimates for Cook Inlet beluga whales were calculated using densities from both the Goetz model and NMFS aerial surveys . . . .").

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 23 of 52

used the same density models as the agency and estimated that its tugboat operations to Trading Bay would take 15 Cook Inlet belugas, and the agency never addressed this disparity.[99]

Federal Defendants cite portions of the ITR for the proposition that "any exposure to noise from Hilcorp's vessels in these areas will be brief and infrequent and allow belugas . . . to return to any areas that Hilcorp's vessels might transit," and that "such 'brief, transient behavioral response alone should not necessarily be considered as having the potential to disturb by disrupting behavioral patterns' sufficient to equate to Level B harassment."[100]  This position fundamentally misreads the MMPA, as it conflates the take estimate with the negligible impact determination.[101]  The MMPA defines Level B harassment as any act of annoyance that "has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to,

---

[99] PR1_MMPA 001462 (Petition for ITR).

[100] Docket 61 (citing PR1_MMPA 002266–67) (quoting PR1_MMPA 002263).

[101] Moreover, Federal Defendants cite two unrelated portions of the ITR for this point.  The first portion states that the nature of the activities "allows beluga whales to return to favored areas while activity continues in other locations"; this portion seems to concede that this response would constitute take because it goes on to note that "by requesting take Hilcorp is requesting permission to incidentally harass marine mammals by emitting anthropogenic noise."  PR1_MMPA 002266.  In contrast, the portion of the ITR discussing a "brief, transient behavioral response" is in response to a comment by the Marine Mammal Commission recommending a lower threshold for impulse sounds due to examples of animals "responding to sound."  PR1_MMPA 002263.  The two portions thus appear to be describing different and unrelated responses.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 24 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 24 of 52

migration, breathing, nursing, breeding, feeding, or sheltering."[102]  An exposure to noise that results in, for example, a beluga whale leaving an area in which it is foraging for food constitutes a disruption of its feeding pattern and is thus a take by the plain language of the MMPA, even if the beluga returns shortly afterward.[103] Moreover, the MMPA focuses on the "potential" for such disruption to occur; as such, "the statute appears to consider all of the animals in a population to be harassed if there is the potential for the act to disrupt the behavioral patterns of the most sensitive individual in the group."[104]

Nor is NMFS's decision to disregard tugboat noise as a potential source of take supported elsewhere in the record.  For example, Federal Defendants identify a portion of BiOp that states that at distances of 2,154 meters, "a whale or pinniped that perceived the vessel noise is likely to ignore such a signal," and that "[i]f animals do respond, they may exhibit slight deflection from the noise source, engage in low-level avoidance behavior, short-term vigilance behavior, or short-term masking behavior," but concludes that "these behaviors are not likely to result

---

[102] 16 U.S.C. § 1362(18)(A)(ii), (D).

[103] Importantly, the MMPA defines Level B harassment in the context of military readiness activities as a disruption of behavior patterns "to a point where such behavioral patterns are abandoned or significantly altered."  16 U.S.C. § 1362(18)(B)(ii).  This additional language would be rendered superfluous if a requirement of abandonment or significant alteration was read into the definition of Level B harassment for non-military readiness activities.  *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes and Statutory Construction § 46.06, pp 181–86 (rev. 6th ed. 2000) (stating the general rule that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous . . . .").

[104] *Nat. Res. Def. Council v. Evans*, 279 F. Supp. 2d 1129, 1157 (N.D. Cal. 2003).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 25 of 52

in adverse consequences for the animals."[105]   But this portion of the BiOp only describes what happens at distances of 2,154 meters or more; it does not explain what happens if a tugboat is closer than that distance to a beluga whale, or why that is not expected to happen. More fundamentally, this conclusion refers to "adverse consequences" instead of whether the effects would constitute take under the definition of the MMPA, which is the proper inquiry.[106]   Rather, the low-level avoidance behavior acknowledged in this passage concedes that such activities could result in take under the MMPA.

Additionally, in discussing the effects of vessel noise on Cook Inlet beluga whales, the BiOp acknowledges that "vessel noise could affect passage of Cook Inlet beluga whales within their critical habitat . . . or cause temporary abandonment of critical habitat areas used by Cook Inlet beluga whales," but concludes that "[w]ith the implementation of . . . mitigation and monitoring measures, the impact of vessel noise is very minor, and thus adverse effects to

---

[105] Docket 61 at 20 (citing PR1_ESA 000027–29 (BiOp)).  The 2,154 meter figure was based on measurements of a single tug in the Chukchi Sea; Hilcorp's activities will involve three tugs towing the drill rig.  PR1_ESA 000175 (BiOp) ("Shell's drilling activities in 2012 in the Chukchi Sea of the tug *Lauren Foss* towing the *Tuuq* estimated source level at 167 dB at 1 µPa rms at 1 m, with the estimated 120 dB distance threshold of 2,154 m . . . The proposed action involves three tugs (likely two actively towing and one for braking/positioning) transporting the drill rig.").  Moreover, Cook Inlet's shallow depth allows sound to travel further than usual.  PR1_KeyRef 003212 ("Shallow sound channeling exists in Cook Inlet, which allows potential noise impacts to be concentrated in shallow waters and become more spatially extensive (i.e., sound channels can trap noise and allow it to travel farther).").

[106] *See Salazar*, 695 F.3d at 906 (explaining that the MMPA would not permit "a proposed activity [that] might harass a large portion of the relevant mammal population, but have only a negligible impact on the species or stock because the harassment is merely trivial and fleeting . . . because it would result in a take of more than 'small numbers' of mammals").

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 26 of 52

Cook Inlet belugas will be immeasurably small."[107]  Yet the BiOp explains elsewhere that shutdown procedures will not apply to tugs towing the drill rig because a shutdown in that situation would be dangerous.[108]  At oral argument, counsel suggested that Protected Species Observers ("PSOs") would have the authority to order course changes if a beluga whale is seen within the 1,500 meter safety zone for tugs towing the drill rig.[109]  However, the PSO protocols in the BiOp state only that beluga whale presence in the safety zone will be recorded.[110]  Moreover, the 1,500 meter safety zone for tugs is considerably smaller than the Level B harassment isopleth, which is up to 2,154 meters or even more.[111]  Thus, even if tugs towing the drill rig can slow or divert course if a beluga enters the safety zone, they are not required to do so for beluga whales they harass outside of the safety zone.  And like other citations to the BiOp, this conclusion is in reference to "adverse effects," rather than to whether the activities would constitute a take under the MMPA.

In short, the ITR permits Hilcorp to operate tugs that will produce sound in excess of the Level B take threshold through critical habitat used by beluga whales

---

[107] PR1_ESA 000183 (BiOp).

[108] PR1_ESA 000045 n.3 (BiOp).

[109] Docket 72 at 16:18–22.

[110] PR1_ESA 000051 (BiOp).

[111] PR1_ESA 000175 (BiOp).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 27 of 52

without clearly defined mitigation measures. Federal Defendants have failed to identify adequate support in the record for NMFS's determination that this activity will not cause any take of beluga whales. For the foregoing reasons, that determination is arbitrary and capricious.

## B. Mitigation and Monitoring Measures

"NMFS is required to prescribe regulations to achieve the 'least practicable adverse impact' before it can authorize incidental take."[112] The "least practicable impact" requirement is a "stringent standard," and "'[a]lthough the agency has some discretion to choose among possible mitigation measures, it cannot exercise that discretion to vitiate this stringent standard.'"[113] "'Practicable' normally means that something is capable of being done, or practical and effective.'"[114] The Ninth Circuit has explained that in the context of the MMPA, "a mitigation measure that is practicable in reducing the impact of military readiness activities on marine mammals must be both effective in reducing the impact, but also not so restrictive of military activity as to unduly interfere with the government's legitimate needs for military readiness activities."[115] While the MMPA provides factors that should be

---

[112] *Nat. Res. Def. Council, Inc. v. Pritzker*, 828 F.3d 1125, 1134 (9th Cir. 2016).

[113] *Id.* (quoting *Evans*, 279 F. Supp. 2d at 1159).

[114] *Id.* (citing the Oxford English Dictionary and Merriam-Webster for their definitions of "practicable").

[115] *Id.* at 1134–35.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 28 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 28 of 52

considered when determining the "least practicable impact" in the context of a military readiness activity, it does not do so for other contexts.[116]

Plaintiffs contend that "NMFS failed to require 'means [to ensure] the least practicable adverse impact' on the marine mammals to be taken" and also failed to require sufficient monitoring as required by 16 U.S.C. §§ 1371(a)(5)(A)(i)(II)(aa) and (bb).[117]  Plaintiffs contend that Hilcorp is only required to shut down seismic operations and monitor up to a radius of 1,500 meters, but the Level B harassment zone for such operations is 7,330 meters.[118]  Plaintiffs also assert that NMFS failed to ensure "the least practicable impact" by not requiring a shutdown of operations whenever any marine mammal enters the 1,500 meters safety zone, and not just a beluga whale.[119]

Federal Defendants respond that the language of the MMPA "supports considering potential measures under the least practicable adverse impact standard in view of particular species' needs," and that NMFS chose shutdown requirements "in specific recognition of concern about Cook Inlet beluga

---

[116] 16 U.S.C. § 1371(a)(5)(A)(iii).

[117] Docket 53-1 at 23.

[118] Docket 53-1 at 25–26; Docket 64 at 23 (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008)).

[119] Docket 53-1 at 24.  The ITR requires a shut down when other whale species come within 500 meters of the seismic operations.  PR1_CORR 004351.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 29 of 52

whales."[120]  Federal Defendants also maintain that it is "relevant (both in the impact assessment and the practicability assessment) that belugas are only infrequently observed in the lower and mid-Cook Inlet area of operations during the ice-free months when Hilcorp is operating," whereas "[o]ther protected mammal species are much more abundant."[121]  Federal Defendants add that Hilcorp must shut down seismic activities if a beluga whale is spotted at any distance in the Level B zone, even if the whale is more than 1,500 meters away.[122]

Plaintiffs have not established that it would be practicable to monitor the entire 7,330 meter Level B harassment zone during seismic operations.  In the ITR, NMFS explains that it "carefully consider[ed] two primary factors: (1) the manner in which, and the degree to which, the successful implementation of the measure(s) is expected to reduce impacts to marine mammals," including "the nature of the potential adverse impacts being mitigated" and the "likelihood that the measure will be effective"; and "(2) the practicability of the measures for applicant implementation, which may consider such things as cost [and] impact on operations . . . ."[123]  This formulation comports with the MMPA's requirements by considering a measure's effectiveness as well its "capability of being done," and

---

[120] Docket 61 at 28.

[121] Docket 61 at 29.

[122] Docket 61 at 29 (citing PR1_MMPA 002265 (ITR); 50 C.F.R. 217.164(g)(6)).

[123] PR1 MMPA 002303–04 (ITR); 84 Fed. Reg. 37442, 37493–94 (July 31, 2019).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 30 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 30 of 52

as such does not "vitiate" the "least practicable adverse impact" standard.[124] NMFS applied these factors and found that requiring observers on mitigation vessels to monitor the entire Level B harassment zone is not practicable.[125] However, NMFS also required aerial overflights prior each day prior to commencing seismic activities "in an effort to ensure areas of seismic surveying are free of beluga whales" along with season closures in sensitive areas.[126] Plaintiffs' argument does not address why NMFS should have determined that monitoring the entire Level B harassment area by vessel was practicable; nor do Plaintiffs suggest alternative practicable means that NMFS could have used to monitor the entire Level B harassment zone.

Plaintiffs cite *National Wildlife Federation v. National Marine Fisheries Service.* The agency there relied on future, non-binding plans to install mitigation measures in finding that the action at issue would not jeopardize an endangered

---

[124] *See Pritzker*, 828 F.3d at 1134 (citing the Oxford English Dictionary and Merriam-Webster for their definitions of "practicable").

[125] PR1_MMPA 002265 (ITR); 84 Fed. Reg. 37442, 37455 (July 31, 2019) ("NMFS has revised the mitigation and monitoring scheme, taking into consideration comments received during the public comment period. A 7,300 m monitoring zone is not required as it is not feasible or practicable to cover that area during seismic surveying. Instead, a 1,500 m safety zone will be implemented. This 1,500 m safety zone requires observers on the source vessel and the mitigation vessel to observe to a distance of 1,500 m during seismic activity . . . . However, in light of concerns surrounding the status of Cook Inlet beluga whales, NMFS implemented a shutdown measure that requires Hilcorp to shut down active sound sources from which take could occur if a Cook Inlet beluga whale is sighted at any distance within the relevant Level B harassment isopleths.").

[126] Docket 61 at 30–31; PR1_MMPA 002269 (ITR); 84 Fed. Reg. 37442, 37459 (July 31, 2019).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 31 of 52

species, which the Ninth Circuit held impermissible.[127] Here, NMFS determined that broader visual monitoring from vessels was not practicable and recognized that this could lead to take, which informed its take estimate. *National Wildlife Federation* is inapposite, as it concerned a future non-binding mitigation measure; this case focuses on whether a measure can be practicably implemented in the first place.[128]

NMFS also did not violate the mitigation requirements of the MMPA by mandating shutdowns of seismic operations when a beluga comes within 1,500 meters, but only 500 meters for other whale species. NMFS reasonably concluded that requiring shutdowns for more numerous marine mammals would be less practicable and overly restrictive of Hilcorp's activities. Moreover, NMFS's consideration of the individualized needs of different species permissibly reflects whether measures will be effective in reducing the impacts of Hilcorp's activities. Plaintiffs point to a request by Hilcorp to increase the shutdown zone to 1,200 meters for four species of whale for 3D seismic operations after a sound source verification analysis as evidence that expanding the shutdown zone is practicable.[129] However, the 3D seismic portion of Hilcorp's activities have already

---

[127] 524 F.3d at 935–36.

[128] PR1_MMPA 002301 (ITR) (acknowledging that safety zones "are generally smaller than the Level B harassment zones from various sources" and providing that "Level B harassment exposures will be recorded and extrapolated based upon the number of observed take and the percentage of the Level B harassment zone that is not visible").

[129] PR1_CORR 004351.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 32 of 52

been completed, and Plaintiffs do not explain why this shows that expanding the shutdown zone for 2D seismic or other activities is practicable. While NMFS's discretion is not unbounded, its choice of mitigation and monitoring measures here did not negate the independent significance of the "least practicable adverse impact" standard.

However, shutdown procedures do not apply to tugs towing the drill rig, and the Court is not aware of any other mitigation measures that apply to that activity. On remand, NMFS should consider whether any additional mitigation measures for tugs towing the drill rig are necessary to comport with the MMPA's least practicable adverse impact requirement.

## III. ESA

"The ESA was enacted to prevent the extinction of fish, wildlife, and plant species."[130]   To accomplish this goal, "[t]he ESA permits federal agencies to authorize actions that will result in the taking of endangered or threatened species only if the projected take 'is not likely to jeopardize the continued existence of' any listed species."[131]   To "take" under the ESA means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such

---

[130] *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004) (citing *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir. 2003)).

[131] *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 735 (9th Cir. 2017) (quoting 16 U.S.C. § 1536(a)(2)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 33 of 52

conduct."[132]   Under the ESA's implementing regulations, harassment requires a "likelihood of injury [to a listed species] by annoying it to such an extent as to significantly disrupt normal behavioral patterns . . . ."[133]   An action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."[134]   If an agency authorizing an action determines the action "may affect listed [endangered] species or critical habitat" of a marine species, it must formally consult with NMFS, which is the agency responsible for administering and enforcing the ESA with regard to marine life.[135]   NMFS then "prepares a BiOp evaluating the effects of the proposed action on the survival and recovery of the species," taking into account "the proposed action's direct, indirect, and cumulative effects . . . in relation to the environmental baseline, and opines on whether the action is likely to jeopardize the species' survival."[136]   NMFS's conclusions in the BiOp must be based on "evidence supported by 'the best scientific and commercial

---

[132] 16 U.S.C. § 1532(19).

[133] 50 C.F.R. § 17.3.

[134] 50 C.F.R. § 402.02.

[135] 50 C.F.R. § 402.14(a), (g); *Westlands Water Dist.*, 376 F.3d at 873.

[136] *Turtle Island Restoration Network*, 878 F.3d at 736 (citing 16 U.S.C. § 1536(c); 50 C.F.R. § 402.14(g)(4); and *Nat'l Wildlife Fed'n*, 524 F.3d at 924).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 34 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 34 of 52

data available.'"[137]   After the BiOp is prepared, reinitiation of consultation is required "[i]f new information reveals effects of the action that may affect listed [endangered] species or habitat in a manner or to an extent not previously considered."[138]

In this case, the NMFS Office of Protected Resources, Permits and Conservation Division, in conjunction with the Bureau of Ocean Energy Management, engaged in formal consultation with the NMFS Alaska Region.[139] On June 18, 2019, the NMFS Alaska Region issued a BiOp, concluding that "[a]fter reviewing the current status of the listed species, the environmental baseline within the action area, the effects of the proposed action (including the likely continuation of similar activities 30 years into the future), and cumulative effects, . . . the proposed action is not likely to jeopardize the continued existence of Cook Inlet beluga whales" or destroy or adversely modify their critical habitat.[140]

Plaintiffs claim that NMFS violated the ESA in three ways: (1) NMFS's BiOp failed to properly consider the full effects of the action on the survival and recovery of the Cook Inlet beluga whale; (2) NMFS failed to properly consider the cumulative

---

[137] *Id.* (quoting 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8)).

[138] 50 C.F.R. § 402.16(a)(2).

[139] PR1_ESA 000012 (BiOp).  The Court does not distinguish between the two NMFS offices elsewhere in this order, as the distinction is largely procedural and has no apparent bearing on the merits of this case.

[140] PR1_ESA 000225 (BiOp).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 35 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 35 of 52

effects on Cook Inlet belugas; and (3) NMFS failed to reinitiate consultation despite new information triggering that requirement.

## A. Effects of the Action

In the BiOp, NMFS noted that tugs towing the drill rig "may cause disturbance," but "were not used to estimate Level A or B acoustic harassment . . . ."[141] NMFS also concluded that "[w]ith the implementation of . . . mitigation and monitoring measures, the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small" and "extremely unlikely to occur."[142] Plaintiffs assert that "NMFS's conclusory dismissal does not equate to the careful analysis the ESA mandates."[143] Plaintiffs add that rather than resolving scientific disagreement, NMFS flatly ignored the science outlined in its Recovery Plan and a recent study by an NMFS scientist showing the "significant threat to Cook Inlet belugas" posed by tugboat and other vessel noise.[144]

Federal Defendants respond that "NMFS' BiOp expressly considered the potential effects of anthropogenic noise on Cook Inlet beluga whales, including vessel noise from Hilcorp's proposed activities," and NMFS concluded that vessel

---

[141] PR1_ESA 000172 (BiOp).

[142] PR1_ESA 000183 (BiOp).

[143] Docket 64 at 24.

[144] Docket 64 at 25.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 36 of 52

noise was not likely to adversely affect the Cook Inlet beluga whale or its critical habitat.[145]

The Court agrees with Plaintiffs that NMFS failed to adequately consider the effects of noise from tugboats on the Cook Inlet beluga whale and its critical habitat for many of the reasons already discussed in the MMPA section of this order. In concluding that the adverse effects on beluga whales from tugs towing the drill rig were "insignificant," NMFS referenced mitigation measures[146]; however, the BiOp explains that "[t]ug operations cannot discontinue controlling rig transport without causing risk to life, property, or the environment, but PSOs will continue to monitor for, and report on, the presence of mammals within 1,500 m of a tug."[147] Moreover, the 1,500 meter safety zone for monitoring and reporting take is considerably less than the distance threshold of 2,154 meters for Level B harassment that was estimated in the Chukchi Sea for Shell's single tug.[148] The BiOp explains that "[a]t these distances, a whale or pinniped that perceived the vessel noise is likely to

---

[145] Docket 61 at 31 (citing PR1_ESA 000172 and PR1_ESA 000136–40; AKR3014211 (2019 study).

[146] PR1_ESA 000175, 000178.

[147] PR1_ESA 000045 n.3 (BiOp). It is not clear whether the ITR requires PSOs aboard the tugs while towing the drill rig. *But see* PR1_ESA 000051 ("PSOs aboard the tugs will monitor the SZ around each vessel while it is under power.").

[148] *Compare* PR1_ESA 000041 (safety zone) *with* PR1_ESA 000175 ("Shell's drilling activities in 2012 in the Chukchi Sea of the tug *Lauren Foss* towing the *Tuuq* estimated source level at 167 dB at 1 μPa rms at 1 m, with the estimated 120 dB distance threshold of 2,154 m . . . We anticipate that noise associated with towing the drill rig would drop to the 120 dB isopleth within 2,154 meters (or less) of active tugs.").

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 37 of 52

ignore such a signal," and that "[i]f animals do respond, they may exhibit slight deflection from the noise source"[149]; but the BiOp does not address the effects on beluga whales that are closer to the tugboats, nor explain why beluga whales are not expected to be encountered at closer distances. In short, the BiOp disregarded the very real possibility that beluga whales would be subjected to high levels of sound from the tugboats that could cause adverse effects.

Moreover, NMFS itself has identified noise from tugboats and other vessels as a significant threat to Cook Inlet beluga whales.[150] NMFS is tasked with using its expertise to resolve scientific uncertainty and is not bound by recommendations in previous studies or recovery plans. But here NMFS simply disregarded evidence of the effects of tugboat noise without identifying mitigation measures or contrary evidence on which it based its conclusion that the effects of the noise on the Cook Inlet beluga were "insignificant."[151] Furthermore, despite Federal Defendants' assertion that Plaintiffs misconstrue recent studies on the harmful effects of tug and other vessel noise by ignoring population distribution, Hilcorp will be operating tugs through the beluga whale's critical habitat and near where large

---

[149] PR1_ESA 000175–76 (BiOp).

[150] Docket 61 at 21; PR1_KeyRef 003211 (Recovery Plan); AKR3014211 (2019 study).

[151] PR1_ESA 000178 (BiOp).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 38 of 52

Case 3:19-cv-00238-SLG    Document 73    Filed 03/30/21    Page 38 of 52

numbers of belugas have been recently seen during months when Hilcorp will be operating.[152]

NMFS's BiOp did not provide a reasoned explanation for its decision to not include tugboat noise when considering the effects of the ITR on beluga whales, and that determination is not supported by the record  As such, the agency's direct effects analysis was arbitrary and capricious.

## B. Cumulative Effects

Plaintiffs assert that in determining that "noise and other impacts from Hilcorp's oil and gas activities would not jeopardize the species," NMFS ignored "the effects of the regulations when *combined* with the baseline, cumulative impacts, and the grim status of the species."[153]  Plaintiffs stress that "the Ninth Circuit has repeatedly rejected jeopardy analyses that fail to consider the impacts of the action under review when *added to* baseline conditions that have already contributed to a species' decline."[154]  They maintain that "[s]uch failure is especially arbitrary considering NMFS's own Recovery Plan for Cook Inlet beluga whales states that '[e]xposure to any given stressor at a sub-lethal level may predispose individual belugas to greater susceptibility to mortality or long-term effects (for example, reproductive failure) from other stressors . . . . [T]he additive effects of

---

[152] PR1_ESA 000066, 000067 (BiOp); PR1_ESA 000068 (tug path), 000073 (critical habitat map) 000071 (description of beluga critical habitat).

[153] Docket 53-1 at 34 (emphasis in original).

[154] Docket 53-1 at 32 (citing *Turtle Island Restoration Network*, 878 F.3d at 735).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 39 of 52

multiple noise sources, as well as the combination of noise and other stressors, are of particular concern.'"[155]

Federal Defendants assert that "NMFS' BiOp contains the required analysis" because it "considered the cumulative effects, environmental baseline, the proposed ITR, and Hilcorp's proposed future oil and gas activities in light of the status of the species all together in its 'Integration and Synthesis' section."[156] Federal Defendants contend that Plaintiffs misconstrue the jeopardy analysis required by the ESA because the "ESA does not recognize a 'baseline jeopardy' status of a species such that additional take is impermissible"; instead, "[t]he focus is whether the action *itself* is the cause of the appreciable reduction of a species' likelihood of survival and recovery."[157] Federal Defendants assert that "NMFS made its expert judgment here that any Level B harassment of belugas is unlikely to reduce the fitness, reproduction, or survival of individual whales and thus unlikely to have material consequences at the population level, even in the context of an endangered population and cumulative effects."[158]

Plaintiffs reply that they "are not arguing that NMFS was required to determine that the baseline constitutes jeopardy . . . . Rather Plaintiffs maintain

---

[155] Docket 53-1 at 34 (quoting PR1_KeyRef 003230).

[156] Docket 61 at 34 (citing PR1_ESA 000213–25).

[157] Docket 61 at 34–35 (citing *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 246 (D.D.C. 2015) and *Nat. Wildlife Fed'n*, 524 F.3d at 930).

[158] Docket 61 at 36.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 40 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 40 of 52

NMFS failed to consider the total impacts from Hilcorp's activities in light of the baseline, cumulative effects, and status of the species."[159]  Plaintiffs assert that Defendants "admit[] that some whales would suffer behavior changes from Hilcorp's activities," but "never considered the larger or compound impacts, such as how this behavioral response could push belugas into other areas—where they would also be subject to noise disturbance."[160]

The parties seem to be in agreement that the requirement that a federal action be considered in its broader context does not require that the action be analyzed as if it "include[s] all independent or baseline harms to listed species."[161] However, in light of the Court's finding that the BiOp failed to adequately consider the potential effects of tugboat noise on Cook Inlet beluga whales, on remand NMFS should include any such effects in considering the cumulative effects of the action.

## C. Reinitiation of Consultation

Because the Court finds that the BiOp is inadequate, the Court does not reach the issue of whether NMFS is required to reinitiate consultation.

---

[159] Docket 64 at 26.

[160] Docket 64 at 26–27 (citing PR1_ESA 000164, 000168–69 (BiOp)).

[161] *Nat'l Wildlife Federation*, 524 F.3d at 930 ("[T]he suffix '-ize' in 'jeopardize' indicates some active change of status: an agency may not 'cause [a species] to be or to become' in a state of jeopardy or 'subject [a species] to' jeopardy.").

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 41 of 52

## IV. NEPA

The National Environmental Policy Act ("NEPA") established the Council on Environmental Quality ("CEQ") and created procedures that require "that federal agencies take a 'hard look' at the environmental consequences of their actions."[162] NEPA requires that agencies prepare an environmental impact statement for all "major Federal actions significantly affecting the quality of the human environment."[163] "[A]n agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS."[164] An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an EIS . . . ."[165] If the agency concludes in the EA that an EIS in not required, it issues a finding of no significant impact ("FONSI").[166] An EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."[167] The EA must also address the direct effects of an action, as well as its cumulative

---

[162] *California v. Norton*, 311 F.3d 1162, 1175 (9th Cir. 2002) (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000)); 42 U.S.C. §§ 4321–4370m-12.

[163] 42 U.S.C. § 4332(C). *Accord Metcalf*, 214 F.3d at 1142.

[164] *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing 40 C.F.R. § 1508.9).

[165] *Id.* (citing 40 C.F.R. § 1508.9).

[166] 40 C.F.R. § 1501.4(e).

[167] 40 C.F.R. § 1508.9(a)(1).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 42 of 52

effects.[168]   A court reviews whether an agency has "taken a 'hard look' at the consequences of its actions, 'based [its decision] on a consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant'" under the arbitrary and capricious standard.[169]

Here, Plaintiffs claim that NMFS violated NEPA in preparing the EA by: (1) failing to properly consider the direct impacts of noise from tugboats and other vessels on Cook Inlet belugas; and (2) failing to take a hard look at the cumulative effects of the take authorization.

## A. Direct Impacts

Plaintiffs maintain that NMFS "fail[ed] to comply with NEPA's hard look requirement" by "summarily claiming that any animals present in the project area 'are likely habituated to the existing baseline of commercial ship traffic' and there are no 'species-specific circumstances or other contextual factors that would increase concern and the likelihood of take from towing of the drill rig.'"[170]  Plaintiffs contend that the EA ignored the "'species-specific circumstances' . . . described at

---

[168] 40 C.F.R. § 1508.9(b); *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 602 (9th Cir. 2010) (citing *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1076 (9th Cir. 2002)) ("We also require that an EA fully address cumulative environmental effects or "cumulative impacts.").

[169] *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001) (quoting *Metcalf*, 214 F.3d at 1142) (alteration in *Babbitt*), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).

[170] Docket 53-1 at 40 (quoting PR1_NEPA 000059–60 and citing *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 892 (9th Cir. 2007)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 43 of 52

length in . . . the agency's own Recovery Plan" and "'improperly minimize[d] negative side effects' to Cook Inlet beluga whales . . . ."[171]

In response, Federal Defendants assert that "NMFS specifically addressed the impact of vessel traffic, including tugboats and other vessels, on noise levels leaving from" several ports in Cook Inlet.[172] Federal Defendants characterize NMFS's discussion of tugboat and other vessel noise not as "mere summary statements," but rather as "conclusions made on the science and studies before NMFS."[173] Hilcorp adds that "both the EA and the FONSI specifically reference the agency's BiOp, which provides NMFS's comprehensive analysis of vessel noise and concludes that "the impact of vessel noise is very minor, and thus adverse effects to Cook Inlet belugas will be immeasurably small."[174] For its part, the State points to portions of the EA that describe the impacts of sound produced by Hilcorp's activities on marine mammals.[175]

Plaintiffs reply that NMFS merely listed "tugs or vessels" as an anticipated noise source without describing or analyzing "the direct impacts of those

---

[171] Docket 53-1 at 40–41 (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011)).

[172] Docket 61 at 40 (citing PR1_NEPA 000094).

[173] Docket 61 at 40–41 (citing PR1_NEPA 000053–74, 94, 95 (EA); PR1_ESA 000182–83 (BiOp)).

[174] Docket 60 at 43 (citing PR1_ESA 000183 (BiOp); *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006); *Nw. Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp. 2d 1221, 1247 (D. Or. 2009)).

[175] Docket 62 at 36 (citing PR1_NEPA 000083–90 (EA)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 44 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 44 of 52

vessels."[176] Plaintiffs contend that Federal Defendants' citations to the Cumulative Effects section of the EA mistakes "direct impacts" for actions likely to cause take; they add that "the EA itself 'contains virtually no references to any material in support of or in opposition to its conclusion[]'" regarding the habituation of beluga to vessel noise.[177] Plaintiffs also maintain that a reference to the BiOp is insufficient because "[a] 'no jeopardy' BiOp does not equate to a review under NEPA."[178]

Plaintiffs cite *Western Watersheds Project v. Kraayenbrink*, in which the Ninth Circuit invalidated regulations because the agency "failed to address concerns raised by its own experts," along with other state and federal agencies.[179] In doing so, the agency "offered no reasoned analysis whatsoever in support of its conclusion—which is in direct conflict with the conclusion of its own experts and sister agency . . . —that there will be no environmental effect caused by" the federal action.[180] Plaintiffs also cite *Oregon Natural Resources Council Fund v. Goodman.*[181] The Ninth Circuit there determined that the agency violated NEPA

---

[176] Docket 64 at 31 (citing PR1_NEPA 000055).

[177] Docket 64 at 31–32 (quoting *Blue Mountains Biodiversity Project*, 161 F.3d at 1214).

[178] Docket 64 at 32 (citing *Makua v. Rumsfeld*, 163 F. Supp. 2d 1202, 1218 (D. Haw. 2001); *Pac. Rivers Council v. U.S. Forest Serv.*, 668 F.3d 609, 628 (9th Cir. 2012)).

[179] Docket 53-1 at 40–41 (citing 632 F.3d at 492).

[180] *Id.*

[181] Docket 53-1 at 40 (505 F.3d at 892).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 45 of 52

by failing to adequately discuss the impact of a federal action on the Pacific fisher in its NEPA analysis; instead, its environmental impact statement "simply states that '[n]o adverse cumulative effects are anticipated.'" The agency argued that "it did not have to detail these projects' impact on the fisher because the ski area expansion is modest."[182] The Ninth Circuit rejected this approach, stating that "[w]e have repeatedly explained that generalized, conclusory assertions from agency experts are not sufficient; the agency must provide the underlying data supporting the assertion in language intelligible to the public."[183]

The same is true here. The portions of the EA cited by Defendants fail to provide reasoned support for NMFS's determination that Hilcorp's tug operations will not significantly impact the environment. For example, the portions cited by Federal Defendants either repeat the conclusory statements the Court determined were insufficient in the MMPA section of this order,[184] list tugs as a potential source of noise without explaining why the effects of that noise on Cook Inlet beluga whales will be insignificant,[185] or fail to mention tugs towing the drill rig or mitigation measures that apply to tugs towing the drill rig while describing mitigation

---

[182] *Id.* at 892–93.

[183] *Id.* at 893 (citing *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864 (9th Cir. 2005) and *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004)).

[184] *See supra* at p. 21; PR1_NEPA 000059–60 (EA).

[185] PR1_NEPA 000055–56 (EA).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 46 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 46 of 52

measures that apply to other activities.[186]  The portions of the EA cited by the State similarly fail to discuss tugs towing the drill rig specifically and reference take estimates the Court has determined were inadequate earlier in this order.[187] Additionally, while an EA may rely on analysis in a corresponding BiOp, the analysis in NMFS's BiOp also failed to properly address the effects of tugs on Cook Inlet beluga whales, as discussed earlier in this order.[188]

For the foregoing reasons, the Court finds that the EA failed to take the requisite hard look at the effects of Hilcorp's tugs towing the drill rig on Cook Inlet beluga whales.

### B. Cumulative Impacts

Plaintiffs assert that "NMFS's EA failed to take a hard look at the cumulative impacts of the regulations" because its analysis of cumulative impacts "amounts to nothing more than general descriptions of categories of activities and projects that impact Cook Inlet beluga whales," which while necessary, does not amount to a "'description of *actual* environmental effects.'"[189]  They assert that the "EA's Cumulative Effects section lists types of impacts and minimally describes some

---

[186] PR1_NEPA 000094–95; PR1_NEPA 000065–67 (EA).

[187] *See supra* p. 27; PR1_NEPA 000086–87; PR1_NEPA 000088–90 (EA).

[188]  *See supra* p. 28; *see also Envtl. Prot. Info. Ctr.*, 451 F.3d at 1012 ("Clearly, NEPA and the ESA involve different standards, but this does not require USFS to disregard the findings made by FWS in connection with formal consultation mandated by the ESA.").

[189] Docket 53-1 at 41 (quoting *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 995).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 47 of 52

projects in the area," but "does not contain [] any *analysis* related to cumulative impacts, in particular on Cook Inlet belugas."[190]   Additionally, Plaintiffs maintain that "[n]owhere does NMFS actually analyze the effects of "numerous other projects in the Inlet that will overlap with Hilcorp's activities" that NMFS has or may authorize, as well as "impacts from other activities NMFS has not authorized, but may be impacting the species."[191]   Plaintiffs add that the EA's "failure to report and analyze the total estimated take of, and other impacts to, Cook Inlet beluga whales stymies an assessment of the cumulative impacts to the whales from Hilcorp's activities."[192]

Federal Defendants respond that "NMFS's cumulative impacts analysis is adequate because NEPA simply requires that an EA's cumulative impacts analysis contain 'a sufficiently detailed catalogue of past, present, and future projects, and provide[s] adequate analysis about how [those] projects[] and differences between' them might impact the environment."[193]   Federal Defendants assert that NMFS "took into account the cumulative environmental impacts on Cook Inlet belugas" by considering "the subsistence hunting of beluga by Alaska Native communities

---

[190] Docket 64 at 33 (emphasis in original).

[191] Docket 53-1 at 42 (citing 84 Fed. Reg. 30991 (June 28, 2019); 85 Fed. Reg 19294 (Apr. 6, 2020); PR1_KeyRef 003274; AKR3014188, 206.

[192] Docket 53-1 at 42 (citing PR1_MMPA 001787 (Marine Mammal Commission Letter).

[193] Docket 61 at 41 (alterations in original) (quoting *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005); 40 C.F.R. § 1508.7).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 48 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 48 of 52

and the current long-term harvest limits based on population density"; "the Cook Inlet beluga Recovery Plan"; "Hilcorp's 2018 pipeline installation project and its authorization for incidental Level B harassment of 40 Cook Inlet beluga whales"; the status of "beluga whales as an ESA-listed species for which permits will be issued to study in the future"; "the impact climate change may have on belugas" feeding and prey; and "several other impacts on marine mammals general, like the impact of acoustic sources from vessel traffic throughout Cook Inlet."[194] They maintain that NMFS also considered activities for which authorization was pending, as well as various activities that do not require authorization.[195] Hilcorp asserts that Plaintiffs' argument was rejected in *Native Village of Chickaloon*, which concerned the cumulative effects analysis in an EA that Hilcorp characterizes as "remarkably similar" to the one at issue here.[196]

NEPA requires an agency to "'consider' cumulative effects, which 'result[] from the incremental impact of the action when added to other past, present and reasonably foreseeable actions regardless of what agency . . . or person undertakes such other actions."[197] An agency's discussion of cumulative impacts

---

[194] Docket 61 at 41–42 (citing PR1_NEPA 000097, 99, 100, 94–95; PR1_ESA 000182–83 (BiOp)).

[195] Docket 61 at 43.

[196] Docket 60 at 44–45; 947 F. Supp. 2d at 1073.

[197] *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (*quoting Nat. Res. Def. Council, Inc. v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 49 of 52

in an EA "'must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.'"[198] "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."[199] However, "under NEPA [courts] defer to an agency's determination of the scope of its cumulative effects review."[200]

The EA prepared by NMFS catalogues a wide variety of potential impacts, including past, present, and future projects, as well as vessel noise, pollution, subsistence hunting, and climate change.[201] NMFS acknowledged the various contributors to vessel traffic in Cook Inlet and noted that such effects are accounted for in the ITR, which requires various mitigation measures.[202] Plaintiffs fail to identify any individual impact that NMFS ignored and instead urge the Court to find that NMFS failed to analyze the impacts, but simply listed them. The Court

---

[198] *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (quoting *Lands Council*, 395 F.3d at 1028).

[199] *Id.* (quoting *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998)).

[200] *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 959 (9th Cir. 2003) (quoting *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002)). *See Salazar*, 695 F.3d at 917 (holding agency's failure to mention possibility of major oil spill not arbitrary and capricious due to narrow scope of five-year take authorization).

[201] PR1_NEPA 000092–100 (EA).

[202] PR1_NEPA 000094–95 (EA); PR1_NEPA 000065–66 (EA) (summarizing mitigation requirements).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 50 of 52

disagrees.  NMFS provided a well-developed discussion of the various impacts.[203]

NFMS's EA does not resemble the EA described in *Klamath-Siskiyou Wildland Center v. Bureau of Land Management*, cited by Plaintiffs, in which "[a] considerable portion of each [cumulative effects] section discusses only the direct effects of the project at issue on its own minor watershed" and in which "[t]he reader is not told what data the conclusion was based on, or why objective data cannot be provided" regarding the other impacts mentioned.[204]  Here, NMFS provided reasoned discussion of other impacts along with, where applicable, references to studies, population estimates, and other information.[205]

However, due to the failure to consider the direct impacts on Cook Inlet beluga whales of tugs towing the drill rig in the EA, the cumulative effects analysis similarly lacks such consideration.  On remand, NMFS should consider the cumulative effects of Hilcorp's tug operations in the context of past, present, and future activities in Cook Inlet.

## CONCLUSION

In light of the foregoing, Plaintiff's Motion for Summary Judgment at Docket 53 is GRANTED in part and DENIED in part.  The Court upholds the National

---

[203] PR1_NEPA 000092–100 (EA).

[204] Docket 53-1 at 41; *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 994–55.

[205] *See, e.g.*, PR1_NEPA 000099–100 (discussing the data and effects of climate change but noting uncertainty in future government response and scientific models); PR1_NEPA 000093–94 (describing the history of subsistence hunting in Cook Inlet and providing citations to various studies).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 51 of 52

Case 3:19-cv-00238-SLG   Document 73   Filed 03/30/21   Page 51 of 52

Marine Fisheries Service's mitigation and monitoring measures for seismic surveying under the Marine Mammal Protection Act.[206]  But the Court finds that the agency's determination that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales is arbitrary and capricious for the reasons set forth herein, and the agency relied on this erroneous determination in its issuance of the Incidental Take Regulations, the Biological Opinion, and the Environmental Assessment.  The State of Alaska's Cross Motion for Summary Judgment at Docket 63 is DENIED.

Federal Defendants' request for supplemental briefing on the appropriate remedy is GRANTED.  Each party may file a brief addressing the appropriate remedy that should occur in this matter **within 14 days of the date of this order**; each party may file a response to the other parties' remedies filing **within 7 days thereafter**.

DATED this March 30, 2021, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[206] *But see supra* at p. 33 (holding that on remand, NMFS should consider whether any additional mitigation measures for tugs are warranted).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order re Cross Motions for Summary Judgment
Page 52 of 52