TREG R. TAYLOR
ATTORNEY GENERAL

Aaron Peterson (Alaska Bar No. 1011087)
Jeff Pickett (Alaska Bar No. 9906022)
Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov
       jeff.pickett@alaska.gov

*Attorneys for Intervenor-Defendant State of Alaska*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| COOK INLETKEEPER and CENTER FOR BIOLOGICAL DIVERSITY, </br></br> Plaintiffs, </br></br> v. </br></br> WILBUR ROSS, JAMES BALSIGER, and NATIONAL FISHERIES SERVICE, </br></br> Defendants, </br></br> HILCORP ALASKA, LLC, and STATE OF ALASKA, DEPARTMENT OF LAW, </br></br> Intervenor-Defendants. | Case No.: 3:19-cv-00238-SLG </br></br> **STATE OF ALASKA'S SUPPLMEMENTAL REMEDY BRIEFING** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

AUTHORITIES PRINCIPALLY RELIED UPON ....................................................... iii

    I.    INTRODUCTION ...................................................................................... 1

    II.    DISCUSSION ............................................................................................. 2

        A.    Legal Standards ............................................................................... 2

        B.    Vacatur is not merited here. ............................................................ 3

            1.    The balance of the equities favors remand without vacatur. ................................................................................ 4

                a.    *Conservation Interest* ............................................ 4

                b.    *Economic Interest* .................................................. 5

        C.    Remand without vacatur is the most appropriate remedy in light of the Court's order. ..................................................................... 7

            1.    Because the issues identified by the Court are likely to be cured during remand, the first *Allied-Signal* factor weighs against vacatur. ............................................................. 8

            2.    Because vacatur threatens significant economic harm, the second *Allied-Signal* factor weighs against vacatur. ........... 10

    III.    CONCLUSION ........................................................................................ 12

# TABLE OF AUTHORITIES

**Cases**

*Alaska Ctr. for the Env't v. Browner,*
 20 F.3d 981, 986 (9th Cir.1994) ................................................................................ 3

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
 988 F.2d 146, 150-51 (D.C. Cir. 1993) ........................................................... 3, 8, 10

*Apache Corp. v. FERC,*
 627 F.3d 1220, 1223 (D.C. Cir. 2010) ...................................................................... 9

*California v. Azar,*
 911 F.3d 558, 582 (9th Cir. 2018) ............................................................................ 4

*California Communities Against Toxics v. U.S. Envtl. Prot. Agency (Cal. Communities),*
 688 F.3d 989, 993–94 (9th Cir. 2012) ................................................... 2, 3, 7, 8, 10

*Fla. Power & Light v. Lorion,*
 470 U.S. 729, 744 (1985) ......................................................................................... 2

*Heartland Reg'l Med. Ctr. v. Sebelius,*
 566 F.3d 193, 198 (D.C. Cir. 2009) .......................................................................... 7

*Idaho Farm Bureau Fed'n v. Babbitt,*
 58 F.3d 1392, 1405 (9th Cir. 1995) ................................................................. 2, 3, 8

*Klamath-Siskiyou Wildlands Ctr. v. NMFS,*
 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) .......................................................... 3

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
 184 F. Supp. 3d 861, 949 (D. Or. 2016) ................................................................... 2

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
 747 F.3d 581, 602 (9th Cir. 2014) ............................................................................ 9

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579, 609 (1952) ......................................................................................... 4

**Alaska Regulations**

20 AAC 25.105 ................................................................................................................ 11
20 AAC 25.112 ................................................................................................................ 11

# AUTHORITIES PRINCIPALLY RELIED UPON

**Alaska Regulations:**

**20 AAC 25.105. Abandonment of wells.**

   (a) All wells that have been permitted on a property under 20 AAC 25.005 must be abandoned before expiration of the owner's rights in that property or if, after notice and hearing, the commission orders abandonment for safety reasons or because the operator has effectively abandoned operations prior to the expiration of the lease. If the owner is the landowner, all wells that have been permitted on a property by 20 AAC 25.005 must be abandoned within one year following permanent cessation of the operator's oil and gas activity within the field where the wells are located or according to an abandonment schedule approved by the commission, unless the wells are earlier abandoned for safety reasons.

   (b) A well drilled onshore or from a fixed offshore platform must be abandoned before removal of the drill rig unless the well is completed as an oil, gas, or service well or is suspended, or unless well operations are shut down in accordance with 20 AAC 25.072. Each well drilled from a fixed offshore platform must be abandoned before the platform is removed or dismantled.

   (c) A well drilled offshore from a mobile bottom-founded structure, jack-up rig, or floating drilling vessel must be abandoned before removal of the drill rig unless

      (1) the well is completed as an oil, gas, or service well; or

      (2) subsea equipment for well re-entry is properly installed and either the well is suspended or well operations are shut down in accordance with 20 AAC 25.072.

   (d) A well drilled from a beach, artificial island, or shifting natural island must be abandoned before removal of the drill rig unless the well is completed as an oil, gas, or service well or is suspended, or unless well operations are shut down in accordance with 20 AAC 25.072 and plans for maintaining the integrity of the location are approved by the commission.

   (e) An Application for Sundry Approvals (Form 10-403) must be submitted to and approved by the commission before work is begun to abandon a well, except that oral approval may be obtained from the commission if it is followed within three days by the submission of an Application for Sundry Approvals for final approval by the commission. The commission will attach conditions to its approval as necessary to protect freshwater and hydrocarbon resources. The Application for Sundry Approvals must include

      (1) the reason for abandoning the well; and

      (2) a statement of proposed work, including

         (A) information on abnormally geo-pressured strata;

         (B) the manner of placement, kind, size, and location, by measured depth, of existing and proposed plugs;

(C) plans for cementing, shooting, testing, and removing casing;
(D) if the Application for Sundry Approvals is submitted after beginning work, the name of the representative of the commission who provided oral approval, and the date of the approval; and
(E) other information pertinent to abandonment of the well.

**20 AAC 25.112.  Well plugging requirements.**

**(a)** Plugging of the uncased portion of a wellbore must be performed in a manner that ensures that all hydrocarbons and freshwater are confined to their respective indigenous strata and are prevented from migrating into other strata or to the surface. The minimum requirements for plugging the uncased portion of a wellbore are as follows:
(1) by the displacement method, a cement plug must be placed
(A) from 100 feet below the base to 100 feet above the top of all hydrocarbon-bearing strata;
(B) from the well's total depth to 100 feet above the top of all hydrocarbon-bearing strata;
(C) from the well's plugged back total depth to 100 feet above the top of all hydrocarbon-bearing strata, if all hydrocarbon-bearing, abnormally geo-pressured, and freshwater strata below are isolated; however, the commission will approve plugging from the top of fill or the top of junk instead of from the plugged back total depth, if the commission determines that the objectives of this subsection will be met; or
(D) from 100 feet below the base to 50 feet above the base of each significant hydrocarbon-bearing stratum and from 50 feet below the top to 100 feet above the top of each significant hydrocarbon-bearing stratum;
(2) by the displacement method, a cement plug must be placed from 100 feet below the base to 50 feet above the base of each abnormally geo-pressured stratum and from 50 feet below the top to 100 feet above the top of each abnormally geo-pressured stratum;
(3) by the displacement method, a cement plug must be placed from 150 feet below the base to 50 feet above the base of the deepest freshwater stratum.
**(b)** Plugging of a well must include effectively segregating uncased and cased portions of the wellbore to prevent vertical movement of fluid within the wellbore. The minimum requirement for plugging to segregate uncased and cased portions of a wellbore is one of the following:
(1) by the displacement method, a continuous cement plug must be placed from 100 feet below to 100 feet above the casing shoe;
(2) by the downsqueeze method using a retainer set no less than 50 feet but no more than 100 feet above the casing shoe, a volume of cement sufficient to fill the wellbore from the retainer to 100 feet below the casing shoe must be pumped through the retainer, and cement must be pumped above the retainer to cap it with a 50 foot cement plug;

(3) by the downsqueeze method using a production packer set no less than 50 feet but no more than 500 feet above the casing shoe, a volume of cement sufficient to fill the wellbore from 100 feet below the casing shoe to the packer must be pumped through the packer, and cement must be pumped above the packer to cap it with a 50 foot cement plug.

**(c)** Plugging of cased portions of a wellbore must be performed in a manner that ensures that all hydrocarbons and freshwater are confined to their respective indigenous strata and are prevented from migrating into other strata or to the surface. The minimum requirements for plugging cased portions of a wellbore are as follows:

(1) perforated intervals must be plugged by one of the following methods:

(A) by the displacement method, a cement plug placed from 100 feet below the base to 50 feet above the base of the perforated interval and from 50 feet below the top to 100 feet above the top of the perforated interval;

(B) by the displacement method, a cement plug placed from the well's total depth to 100 feet above the top of the perforated interval;

(C) by the displacement method, a cement plug placed from the well's plugged-back total depth to 100 feet above the top of the perforated interval, if all hydrocarbon-bearing, abnormally geo-pressured, and freshwater strata below are isolated; however, the commission will approve plugging from the top of fill or the top of junk instead of from the plugged-back total depth, if the commission determines that the objectives of this subsection will be met;

(D) by the downsqueeze method using a cement retainer or production packer set no less than 50 feet but no more than 500 feet above the perforated interval, a volume of cement pumped through the retainer or packer sufficient to fill the wellbore from 100 feet below the base of the perforated interval to the retainer or packer;

(E) if the perforations are isolated from open hole below, a mechanical bridge plug set no more than 50 feet above the top of the perforated interval, and either a minimum of 75 feet of cement placed on top of the plug by the displacement method or a minimum of 25 feet of cement placed on top of the plug with a dump bailer;

(2) casing stubs within outer casing must be plugged by one of the following methods:

(A) by the displacement method, a cement plug placed from 100 feet below the stub to 100 feet above the stub;

(B) by the downsqueeze method using a retainer set 50 feet above the stub, a volume of cement pumped below the retainer sufficient to fill the casing stub with 150 feet of cement, and cement pumped above the retainer to cap it with a 50 foot cement plug;

(C) if the casing stub annulus is cemented, a mechanical bridge plug set no more than 25 feet above the casing stub, and either a minimum of 75 feet of cement placed on top of the plug by the displacement method or a minimum of 25 feet of cement placed on top of the plug with a dump bailer;

(3) if freshwater is present, the smallest diameter casing string extending to the surface must be plugged by one of the following methods:

v

    (A) by the displacement method, a cement plug placed from 100 feet below the depth of the surface casing shoe to 100 feet above the depth of the shoe;
    (B) a mechanical bridge plug set 100 feet below the depth of the surface casing shoe and at least 200 feet of cement placed on top of the plug.
  **(d)** Plugging of the surface of a well must meet the following requirements:
    (1) by the displacement method, a cement plug at least 150 feet in length, with the top of the cement no more than five feet below original ground level onshore, or between 10 and 30 feet below the mudline datum offshore, must be placed within the smallest diameter casing string;
    (2) either
    (A) all annular space open at the surface onshore, or in communication with open hole and extending to the mudline datum offshore, must be plugged with cement to seal the annular space in a manner satisfactory to the commission; or
    (B) all casing interior to the surface casing must be recovered to a depth of 100 feet or more below the original ground level onshore or the mudline datum offshore and the casing stubs plugged with cement as provided in (c)(2)(A) of this section; if the cement plug is extended to within the distance from the surface specified in (1) of this subsection, the requirement of (1) of this subsection need not be met.
  **(e)** Cement used for plugging within zones of permafrost must be designed to set before freezing and have a low heat of hydration.
  **(f)** Each of the respective intervals of a wellbore between the various plugs must be filled with fluid of sufficient density to exert a hydrostatic pressure exceeding the greatest formation pressure of permeable formations in the intervals between the plugs at the time of abandonment.
  **(g)** Except for surface plugs, the operator shall record the actual location and integrity of cement plugs, cement retainers, or bridge plugs required by this section, using one of the following methods, which in the case of a cement retainer or bridge plug may be performed before cement is placed on top of the plug:
    (1) placing sufficient weight on the plug to confirm its location and to confirm that the plug has set and a competent plug is in place;
    (2) testing the plug to hold a surface pressure of 1,500 psig or 0.25 psi/ft multiplied by the true vertical depth of the casing shoe, whichever is greater, and tagging the plug to confirm location; however, surface pressure may not subject the casing to a hoop stress that will exceed 70 percent of the minimum yield strength of the casing.
  **(h)** At least 24 hours notice of plugging operations must be given to the commission so that a representative of the commission can witness the operations.
  **(i)** The commission will, in its discretion, approve a variance from the requirements of this section if the variance provides for at least equally effective plugging of the well and prevention of fluid movement into sources of hydrocarbons or freshwater.

## I. INTRODUCTION

Plaintiffs Cook Inletkeeper and Center for Biological Diversity ("Plaintiffs") challenged the incidental take regulations ("ITR") promulgated by the National Marine Fisheries Service ("NMFS") that authorize Hilcorp Alaska, LLC ("Hilcorp") to conduct certain oil and gas exploration and production activities in Cook Inlet between 2019 and 2024. (Dkt. 73, p. 1) After briefing and argument on cross-motions for summary judgment, this Court found that "the agency's determination that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales ("CI belugas") is arbitrary and capricious," and "the agency relied on this erroneous determination in its issuance of the Incidental Take Regulations, the Biological Opinion, and the Environmental Assessment." (Dkt. 73, p. 52) The Court ordered supplemental briefing on the appropriate remedy in light of its order (Dkt. 72, p. 52), and Intervenor State of Alaska ("Alaska" or "State") submits this brief in response.

The State's interest is two-fold. As a sovereign government, it is entrusted by its citizens to manage and conserve all wildlife and other natural resources within its jurisdiction, including CI belugas, their habitat, and their food sources. It also must ensure the health of the economy that its citizens and visitors depend on to live and thrive. (Dkt. 33, p. 3, ¶ 3) The latter interest requires the careful development and management of the state's natural resources, including its oil and gas resources, as well as the facilitation of the transportation of essential goods into its commercial centers, including the Port of Alaska situated at the northern terminus of Cook Inlet. Fortunately, the State has demonstrated that its two interests can co-exist. The State believes that on

1

remand NMFS will adequately address the court's concerns regarding the ITR and that those twin interests can be satisfied in this instance.

Given the significant disruption to the second of these interests if the Court were to vacate the ITR, effectively halting an entire range of activities with which the Court found no fault, Alaska strongly believes that the appropriate relief here is to remand the matter to NMFS without vacatur. NMFS will then have the opportunity to consider what additional mitigation measures for tugs towing the drill rig are necessary to comport with the MMPA's least practicable adverse impact requirement. Thus, the State requests that the ITR remain in effect while the matter is on remand.

**II.     DISCUSSION**

Plaintiffs ask the Court to vacate the Final Rule as well as the BiOp, EA, and FONSI. (Dkt. 53-1 at p. 35). Their request threatens to disrupt vital economic activity for no discernable conservation gain and granting it is not required under the law. The Court should deny it.

   A.     <u>Legal Standards</u>

When a biological opinion is unlawful, the ordinary remedy is to vacate and remand for immediate reinitiation of consultation. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 949 (D. Or. 2016) (citing *Fla. Power & Light v. Lorion*, 470 U.S. 729, 744 (1985)). However, vacatur is not the only or automatic remedy in the ESA or NEPA context: "When equity demands, the regulation can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *see also California Communities Against*

*Toxics v. U.S. Envtl. Prot. Agency (Cal. Communities)*, 688 F.3d 989, 993–94 (9th Cir. 2012). "Whether agency action should be vacated depends on [1] how serious the agency's errors are and [2] the disruptive consequences of an interim change that may itself be changed." *Cal. Communities*, 688 F.3d at 992.[1] Courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error. *Klamath-Siskiyou Wildlands Ctr. v. NMFS*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015).

B.   Vacatur is not merited here.

In considering an appropriate remedy, the district court has broad latitude in fashioning equitable relief when necessary to remedy an established wrong. *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir.1994). Here, like in *Idaho Farm Bureau*, the balance of the equities clearly favors leaving the ITR in place while on remand. The Court directed that NMFS "consider whether any additional mitigation measures for tugs towing the drill rig are necessary to comport with the MMPA's least practicable adverse impact requirement," and, regarding the BiOp, that NMFS "include any such effects in considering the cumulative effects of the action." (Dkt. 73. at pp 33, 41). NMFS can undertake this review without any negative impact on CI belugas—and without the risk of disruption to essential economic activity in Cook Inlet—with the current ITR in place.

---

[1] This is often referred to as the two-part *Allied–Signal* test, and is explained in more detail infra at C.

3

1. <u>The balance of the equities favors remand without vacatur</u>.

Balancing the equities is not an exact science; rather it is "lawyers' jargon for choosing between conflicting public interests." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J., concurring). The competing interests here are both of significant importance to the State. Protecting CI belugas on the one hand, and preserving the State's economic vitality as well as ensuring the delivery of essential goods to the state on the other, can be balanced in a manner that does not require jettisoning the protection afforded by the ITR and LOA while NMFS considers the narrow issue on remand.

    a.    *Conservation Interest*

As noted above and described in its opposition and cross-motion for summary judgment, the State is dedicated to the conservation of all fish and wildlife within its borders, including CI belugas. While CI belugas are subject to the MMPA, Alaska retains management authority that is not displaced by the MMPA or ESA. Dkt. 32 at 6, ¶ 11. Alaska actively manages CI beluga habitat; conducts extensive research and gathers and disseminates essential data; partners with other governmental agencies and entities, including NMFS, in undertaking its management activities and research; conducts research into and manages CI beluga whale prey species; and performs a myriad of other activities, including formulating and implementing conservation practices and imposing mitigation requirements on entities engaged in State-regulated activities that have the potential to impact CI beluga whales. *Id*. In light of the Court's finding this interest may militate in favor of remand, so that NMFS can consider additional or different

4

protections, but vacatur would not augment those protections in this particular situation. Indeed, vacatur of the ITR could negatively impact the State's management of its wildlife, including CI belugas, insofar as that regulation imposes a baseline of protection to the whales accounted for in the State's management practices.

      b.    *Economic Interest*

The State's economic interest in the activities permitted under the ITR comprises another component of the equitable analysis. Any order that substantially delays or effectively revokes the ITR or LOA issued to Hilcorp would have a direct, negative impact on the State's economic interests. The State's oil and gas leasing activities, together with federal offshore oil and gas leasing activities, provide essential revenue to the State that funds a host of critical state services, including wildlife management. Dkt. 32 at 8, ¶ 14.

It is well-known to Alaskans that the energy industry, which includes oil and gas development, is Alaska's largest industry. Dkt. 33 at 2, ¶ 4. The development and production of oil and gas accounted for 5.2 percent of private sector jobs and 16.1 percent of private sector payroll in 2018. *Id*.

Cook Inlet is an important area for oil and gas development in Alaska. To obtain leases, interested parties bid on available tracts in Cook Inlet on a per acre basis. Dkt. 33 at 5, ¶ 14. The winning bidder pays that amount, also called a bonus bid, directly to the State for the right to lease the tract for exploration and development. *Id*. The State has received more than $23 million in Cook Inlet bonus bids since 2010. *Id*.

5

In addition to the bid revenue, each lease sold generates annual rental payments. Dkt. 33 at 6, ¶ 15. For Cook Inlet leases sold in 2019, rental rates are $5.00 per acre in years 1 to 4, and $10 per acre in years 5 to 8. *Id*. For leases sold in 2018, rental rates are $10 per acre for years l through 8. State rental income from Cook Inlet leases for 2018 totaled approximately $1.8 million. *Id*.

The State also receives royalties from each lease. Dkt. 33 at 6, ¶ 16. The royalties represent the State's share of production as the mineral interest owner and are dependent on the actual development of leased property. *Id*. State oil and gas lease royalty rates vary depending on the area and are generally 12.5 percent in Cook Inlet. *Id*. Overall, royalties provided more than $1.0 billion in revenue to the state in FY 2018. *Id*.

Finally, Alaska receives tax revenue for oil and gas exploration in the form of both corporate income and property tax. In FY 2018, oil and gas corporate and production taxes totaled $816.3 million, and petroleum property taxes amounted to $121.6 million. Dkt. 33 at 6, ¶ 17. In total, these revenue streams comprised approximately 80% of the State's general fund unrestricted revenue in FY 2018. Dkt. 33 at 6, ¶ 18.

The sale of Cook Inlet Areawide leases, such as those acquired by Hilcorp,[2] provides a direct and continuing benefit to the State of Alaska and its municipalities in the form of bonuses, taxes, rents, royalties and other income streams arising from the lease interest. Dkt. 33 at 5, ¶13. And while it is true that any delay in the exploration and

---

[2] Hilcorp currently holds 179 leases and three bids on lease tracts where it was the high bidder in the Cook Inlet areawide sale in 2019. Dkt. 33 at 5, ¶12. Hilcorp's state leases cover an estimated total of 155,940 offshore acres and 109,180 onshore acres. *Id*.

development of Hilcorp's leased property threatens a direct and tangible pecuniary harm to the State in the form of lost revenues, the considerable delay that would result from vacatur would be far worse than a remand order narrowly tailored to address the issues identified in this Court's summary judgment ruling. In a worst-case scenario, if the project were abandoned altogether the loss of direct revenue to the State would be compounded by the loss of jobs and the associated ripple effects in the economy. Dkt. 33 at 7, ¶ 21.

Vacatur poses the prospect of both current and future economic harm to Alaska. The State has five oil and gas lease sales scheduled annually for the next five years, including annual lease sales for Cook Inlet. Dkt. 33 at 7, ¶22. Future investors are far less likely to participate and bid at State lease sales if a single discrete finding of this nature were likely to result in vacatur of the entire ITR. It is not difficult to imagine how granting Plaintiffs' requested relief would have a chilling effect on future oil and gas lease sales in Cook Inlet and around the state.

C. <u>Remand without vacatur is the most appropriate remedy in light of the Court's order</u>.

An agency's flawed determinations "need not be vacated," even if "the agency's error was significant." *Cal. Communities*, 688 F.3d 992. *See also Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("the terms 'invalid' and 'vacated' are not synonyms"). In *Cal. Communities* plaintiffs challenged the EPA's final rule approving the transfer of reduction credits to a new power plant. 688 F.3d at 991-92. The EPA agreed with the plaintiffs that both procedural and substantive flaws existed in

7
Case 3:19-cv-00238-SLG   Document 77   Filed 04/27/21   Page 14 of 20

the final rule and requested remand. *Id*. at 992. The Ninth Circuit remanded the matter but declined to vacate an invalidated rule because "significant public harms" would result from stopping power plant construction, including power shortages, the loss of 350 jobs, and duplicative legislative efforts. *Id*. at 994. The court specifically noted that "[s]topping construction would also be economically disastrous" and, referencing the holding in *Idaho Farm Bureau*, stated that "if saving a snail warrants judicial restraint, so does saving the power supply." *Id*. (citation omitted). The court explained that "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Communities*, at 992 (*quoting Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

The same considerations are true here. The Court should not disturb the ITR and LOA while Federal Defendants work to address the Court's concerns on remand. Remand without vacatur will permit the protection of CI belugas while not critically injuring the State's economic interest in oil and gas development.

        1.    <u>Because the issues identified by the Court are likely to be cured during remand, the first *Allied-Signal* factor weighs against vacatur</u>.

When deciding to remand to an agency, with or without vacatur, the legal standard involves the two-part test articulated in *Allied-Signal. Allied–Signal's* first prong requires the court to weigh the "the seriousness of the order's deficiencies." *Id*. at 150. Under this prong, courts have found that vacatur may not be an appropriate remedy where there is a

8

likelihood that the agency can cure any defects and justify the defective ruling on remand. *Apache Corp. v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010).

When making this determination, courts defer to the expert agency which Congress has chosen to implement its legislative design to reconsider and repair its own errors. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("When examining this kind of scientific determination [under the ESA], as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.") (citation omitted). Here, NMFS can consider the potential effects of tugboat noise on CI belugas and analyze whether any additional mitigation measures for tugs towing the drill rig are necessary to comport with the MMPA's least practicable adverse impact requirement while the ITR and LOA remain intact.

As noted above, the Court found that NMFS's "determination that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales is arbitrary and capricious," and "the agency relied on this erroneous determination in its issuance of the Incidental Take Regulations, the Biological Opinion, and the Environmental Assessment." (Dkt. 73, p. 52) Importantly, the Court did not identify any other infirmities with the myriad other findings the ITR rests upon. This narrow—and eminently remediable—defect is the type that can and should be addressed on remand while the remaining ITR is left in place so that permitted activities with which the Court found no fault may continue.

9

2. <u>Because vacatur threatens significant economic harm, the second *Allied-Signal* factor weighs against vacatur.</u>

*Allied-Signal's* second prong requires the court to weigh the "disruptive consequences of an interim change that may itself be changed." *Allied-Signal*, 150–51. According to the Ninth Circuit, economic impacts are a worthy consideration with respect to the disruptive consequences of vacatur, and thus, this Court should fully consider them. *See e.g. Cal. Communities.*

This second prong of the *Allied-Signal* test weighs heavily in favor of remand without vacatur. Tugs towing drill rigs comprises an extremely limited portion of the overall activity contemplated in the ITR. Hilcorp can still conduct the vast majority of its activities under the ITR and year three LOA provided they are not vacated.[3] The planned activities for 2021-2022 include an Anchor Point 2D seismic survey in the Lower Cook Inlet area from Anchor Point to Kasilof; OCS geohazard survey in Lower Cook Inlet; Iniskin Peninsula exploration and development, including causeway construction, vibratory sheet pile driving, and dredging; and ongoing platform and pipeline maintenance. PR1_MMPA 002253. Nowhere in its order did the Court rule that the planned activities for 2021-2022 listed above violate the ESA, MMPA, or NEPA.[4]

---

[3] PR1_MMPA 002295 ("Table 12—Summary of Activities Considered by Year" indicates that OCS drilling activities (geohazard, pipe driving, VSP) at 1 well, 2D seismic, and Pipeline maintenance (geohazard, water jet) activities are identified as Year 3 activities.)

[4] The OCS exploratory well that was scheduled to take place in 2020-2022 contemplated using a tug for towing a rig, and that will likely be delayed until the deficiency can be cured on remand. [PR1-MMPA 002253]

The disruptive consequences of vacating the entire ITR and LOA would be disproportionate and unnecessary and would negatively impact Alaska's economy. While oil and gas lease sales, rental income, and property taxes are all important to the State, royalties and production taxes provided more than $1.8 billion in revenue to the State in FY 2018. Moving this project forward toward productivity is critically important for both local employment and the State's economy as a whole. These are exactly the type of economic impacts that the Ninth Circuit regarded as a "worthy consideration" with respect to the disruptive consequences of vacatur.

In addition to economic harm, vacatur could also result in serious environmental damage. The ITR and LOA cover a range of activity related to well and pipeline maintenance, as well as well abandonment or decommissioning operations. The State has a significant interest in wells on state land, or even in the adjacent Exclusive Economic Zone, being properly decommissioned in accordance with AOGCC regulations (20 AAC 25.105 and 20 AAC 25.112). The Year 3 LOA calls for the decommissioning of the Drift River terminal, which is on state land. The decommissioning does not involve tugs, but it is contemplated in the ITR. As such, if the ITR is vacated it would delay this critical work that is necessary to prevent potential environmental damage.

The North Cook Inlet unit subsea well-plugging and abandonment plan calls for the use of three ocean-going tugs. [PR1_MMPA 002260] The discovery well was drilled over 50 years ago and is planned to be abandoned. Thus, in 2020 Hilcorp planned to conduct a geohazard survey to locate the well and conduct plugging and abandonment

activities. *Id*. That work has already been delayed and was to set occur in 2021.

As explained in the final rule:

> Hilcorp plans to conduct plugging and abandonment activities. The jack-up rig will be towed onsite using up to three oceangoing tugs. The well will be entered and well casings will be plugged with mechanical devices and cement and then cutoff and pulled. Activities associated with the well abandonment will be performed in accordance to Alaska Oil and Gas Conservation Commission (AOGCC) regulations.

This work is critical to ensuring the health of the Cook Inlet environment and will likely not occur in the near future if the ITR is vacated.

The economic and environmental consequences of vacatur far outweigh the risk to CI belugas, which—absent any judicial intervention whatsoever—were believed to have been taken in "small numbers" under the activities considered in the ITR. [PR1_MMPA 002310] NMFS specifically found that the take of marine mammals from all activity covered in the ITR would "have a negligible impact on all affected marine mammal species or stocks." *Id*. After weighing disruptive consequences of vacatur against the certain economic damage and potential environmental damage the Court should order the matter be remanded, without vacatur, to cure the specific infirmity identified by the Court.

## III. CONCLUSION

In this case, vacating the ITR, BiOp, EA and FONSI would result in significant harms to Alaska, including the loss of employment and future job opportunities, loss of tax revenue and royalties, and the creation of an uncertain regulatory environment that will damage Alaska's ability to develop its resources. Vacatur would also interfere with

Alaska's ability to manage its wildlife. Remanding to NMFS for consideration of what additional or modified regulations would address the Court's findings without vacatur does not threaten the CI belugas. Rather, it offers a baseline of protection without causing significant economic disruption to the State. The Court should order remand without vacatur.

DATED: April 27, 2021.

    TREG R. TAYLOR
    ATTORNEY GENERAL

By:   /s/Aaron C. Peterson
      Aaron C. Peterson
      Senior Assistant Attorney General
      Alaska Bar No. 1011087

By:   /s/Jeffrey G. Pickett
      Jeffrey G. Pickett
      Senior Assistant Attorney General
      Alaska Bar No. 9906022
      Department of Law
      1031 W. 4th Ave., Suite 200
      Anchorage, AK 99501
      Tel: (907) 269-5275
      Fax: (907) 279-3697
      *Attorneys for Intervenor-Defendant*
      *State of Alaska*

**CERTIFICATE OF SERVICE**

I hereby certify that on **April 27, 2021** a true and correct copy of the, **STATE OF ALASKA'S SUPPLEMENTAL REMEDY BRIEFING**, was filed with the Clerk of the Court for the United States District Court – District of Alaska by using the CM/ECF system. Participants in Case No.:3:19-cv-00238-SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Leilani J. Tufaga
Leilani J. Tufaga
Law Office Assistant II