Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
James C. Feldman (Bar No. 1702003)
james.feldman@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

Attorneys for Hilcorp Alaska, LLC

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER and CENTER FOR BIOLOGICAL DIVERSITY, | No.: 3:19-cv-00238-SLG |
| Plaintiffs, | |
| v. | |
| GINA RAIMONDO, Secretary of Commerce; JIM BALSIGER, Regional Administrator of National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants, | |
| HILCORP ALASKA, LLC; and STATE OF ALASKA, | |
| Intervenor-Defendants. | |

**INTERVENOR-DEFENDANT HILCORP ALASKA, LLC'S
REMEDY BRIEF**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................ii

I. INTRODUCTION.................................................................................... 1

II. PLANNED ACTIVITIES AND MITIGATION MEASURES................................... 4

    A.    Hilcorp's Planned Activities Covered by the Year 3 LOA......................... 4

        1.    Platform and Pipeline Maintenance. ................................................. 5

        2.    OCS Geotechnical and Geohazard Survey. ...................................... 6

        3.    North Cook Inlet Unit Subsea Well and Geohazard Survey.............. 7

        4.    North Cook Inlet Unit Well Abandonment Activities. ..................... 7

    B.    Planned 2021 Activity Not Covered by ITR or Year 3 LOA. ..................... 8

    C.    Potential Activities in Years 4 and 5 of the ITR. ......................................... 9

    D.    Mitigation and Monitoring Measures......................................................... 10

III. ARGUMENT ...................................................................................... 12

    A.    The Court Should Remand Without Vacatur. ............................................ 12

        1.    Vacatur would be highly disruptive and inequitable. ...................... 14

        2.    A remand order without vacatur presents no risk to the Cook Inlet beluga whale. .......................................................................... 18

    B.    The Remand Should Be Narrowly Focused and Time-Limited. ............... 19

IV. CONCLUSION ...................................................................................... 21

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No. 3:19-cv-00238-SLG       i

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

**Cases**

*All. For the Wild Rockies v. Savage*,
375 F. Supp. 3d 1152 (D. Mont. 2019) ........................................................................ 14

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
988 F.2d 146 (D.C. Cir. 1993) .................................................................................... 12

*American Farm Bureau Fed'n v. EPA*,
559 F.3d 512 (D.C. Cir. 2009) .................................................................................... 13

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ...................................................................................... 12

*Ctr. for Biological Diversity v. BLM*,
2011 WL 337364 (N.D. Cal. Jan. 29, 2011) ................................................................. 5

*Ctr for Biological Diversity v. Ross*,
480 F. Supp. 3d 236 (D.D.C. 2020) ............................................................................ 13

*Esch v. Yuetter*,
876 F.2d 976 (D.C. Cir. 1989) ...................................................................................... 5

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
528 U.S. 167 (2000) .................................................................................................... 19

*Hapner v. Tidwell*,
621 F.3d 1239 (9th Cir. 2010) .................................................................................... 20

*Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
288 F. Supp. 2d 7 (D.D.C. 2003) ................................................................................ 13

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) .................................................................................... 13

*Humane Soc. of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .................................................................................... 13

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ................................................................................ 12, 13

*Kunaknana v. U.S. Army Corps of Engineers,*
2014 WL 12813625 (D. Alaska 2014) ........................................................ 20

*Marathon Oil Co. v. EPA,*
564 F.2d 1253 (9th Cir. 1977) ................................................................. 20

*Milk Train, Inc. v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) ................................................................ 13

*Nat. Res. Def. Council, Inc. v. Evans,*
2003 WL 22025005 (N.D. Cal. 2003) ....................................................... 5

*Nat'l Wildlife Fed'n v. Espy,*
45 F.3d 1337 (9th Cir. 1995) ................................................................. 12

*Pac. Rivers Council v. U.S. Forest Serv.,*
942 F. Supp. 2d 1014 (E.D. Cal. 2013) .................................................... 12

*Schlesinger v. Reservists Comm. To Stop the War,*
418 U.S. 208 (1974) .............................................................................. 19

*Southeast Alaska Conservation Council v. U.S. Forest Service,*
468 F. Supp. 3d 1148 (D. Alaska 2020) ................................................... 14

*Today's IV, Inc. v. Fed. Transit Admin.,*
No. LA CV13-00378 JAK, 2014 WL 5313943 (C.D. Cal. Sept. 12,
2014), *aff'd sub nom. Japanese Vill., LLC v. Fed. Transit Admin.,* 843
F.3d 445 (9th Cir. 2016) ........................................................................ 14

*W. Oil & Gas Ass'n v. EPA,*
633 F.2d 803 (9th Cir. 1980) ................................................................. 12

**Statutes**

5 U.S.C. § 706(2) ................................................................................. 5, 12

16 U.S.C. § 101(a)(5) .............................................................................. 1

**Regulations**

86 Fed. Reg. 19,228 (Apr. 13, 2021) ......................................................... 4

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

# I.  INTRODUCTION

The Marine Mammal Protection Act ("MMPA")[1] incidental take regulation ("ITR") at issue in this case applies to a broad class of activities—*i.e.*, operations and maintenance, production, and exploration—to be carried out by Hilcorp Alaska, LLC ("Hilcorp") in Cook Inlet over a five-year period. Hilcorp petitioned for the ITR because these activities may incidentally cause non-lethal and temporary harassment (*i.e.*, "take") of small numbers of marine mammals in Cook Inlet. The ITR authorizes marine mammal incidental take (through subsequent "letters of authorization," or "LOAs"), while the activities themselves are separately permitted under other federal and state authorities.[2]

Hilcorp chose this regulatory path—instead of requesting numerous one-year "incidental harassment authorizations"—to establish a comprehensive framework under which Hilcorp can carry out its activities in compliance with applicable law in a protective, predictable, and transparent manner. The integrity of this regulatory framework is important because Hilcorp's activities are essential for compliance with other federal and state laws, maintaining environmental health and safety, and ensuring a reliable natural gas supply to communities along the Railbelt.

---

[1] 16 U.S.C. §§ 1361–1421.

[2] Respectfully, the Court's summary judgment order incorrectly states that "the ITR permits Hilcorp to operate tugs. . . ." Dkt. 73 at 27–28. The ITR does not permit tug operation or any other activities. The ITR only allows for the authorization of marine mammal incidental take pursuant to Section 101(a)(5) of the MMPA. None of the permits authorizing the underlying activities have been challenged in this lawsuit.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No. 3:19-cv-00238-SLG

The Court's order on cross-motions for summary judgment found fault with a *single narrow element* of NMFS's decision to issue the ITR—*i.e.*, NMFS's "determination that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales. . . ."[3] Plaintiffs Cook Inletkeeper and Center for Biological Diversity ("Plaintiffs") have argued that the Court should "vacate NMFS's regulations, BiOp, EA, and FONSI because vacatur is the presumptive and appropriate remedy."[4] However, vacatur—whether in whole or in part—would do far more harm than good, would be manifestly unjust, and would be disproportionate to the limited error identified by the Court. Vacatur is not the appropriate remedy in this case.

In fact, most of the activities covered by the ITR do not involve tugs towing rigs.[5] And the primary activity covered by the ITR that involves tugs towing a rig—exploration drilling—is not planned to occur until 2023, well after any remand is complete. During the likely period of a remand, the only activity covered by the ITR that will require tugs towing a drill rig is the plugging and abandonment work in the North Cook Inlet Unit, which has long been planned to occur this year, is necessary to take an old well out of service, and is essential for meeting environmental standards. The Alaska Oil and Gas Conservation Commission ("AOGCC") has mandated this work to be completed no later than September 2, 2021.

---

[3] Dkt. 73 at 51–52.

[4] Dkt. 64 at 28.

[5] *See* PR1_MMPA 2253–54 (Final Rule, Table 1).

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

As described below and in the accompanying declarations, the rig-towing portion of the plugging and abandonment work is low-impact and is estimated, without mitigation, to expose *approximately one* beluga whale to Level B harassment sound levels. Moreover, Hilcorp will implement a suite of mitigation and monitoring measures for tugs towing rigs that are not otherwise required by the ITR, which will further reduce the likelihood of incidental Level B harassment.

Based on these circumstances and those discussed more fully below, Hilcorp respectfully requests that the Court exercise its equitable discretion to remand this matter to NMFS *without* any vacatur, and to limit the remand to the specific error identified by the Court—*i.e.*, the agency's insufficiently explained finding regarding the potential effects of noise associated with tugs towing drill rigs on Cook Inlet beluga whales. This approach to the remedy will ensure that the legal error identified by the Court is properly and promptly addressed on remand by NMFS while also allowing important activities to proceed with negligible (if any) risk to beluga whales.[6]

---

[6] One other activity scheduled for this year—the drilling of two production wells in the North Cook Inlet Unit—will also require tugs towing a drill rig. As described below, this activity is not covered by the ITR because production drilling (as opposed to exploration drilling) does not create sound at levels with the potential for marine mammal incidental take. Hilcorp will also apply the additional mitigation and monitoring measures to the tugs for this activity, which is similarly predicted to result in minimal (if any) beluga whale harassment.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

## II. PLANNED ACTIVITIES AND MITIGATION MEASURES

**A.    Hilcorp's Planned Activities Covered by the Year 3 LOA.**

The ITR covers a broad class of activities for a five-year period, including platform and pipeline maintenance, various geohazard surveys, 2D and 3D seismic surveys, exploration drilling, development activities (construction), abandonment activities, and terminal decommissioning.[7] The annual LOAs for years 1 and 2 have expired.[8] The LOA for the third year (the "Year 3 LOA") was issued on April 13, 2021, and authorizes incidental take for activities through March 30, 2022.[9] Assuming that NMFS completes a remand before March 30, 2022, the relevant activities for purposes of considering the remedy are those covered by the Year 3 LOA, which include:

- An outer continental shelf ("OCS") geohazard survey;

- OCS exploratory well drilling;

- Platform and pipeline maintenance;

- A North Cook Inlet Unit subsea well and geohazard survey; and

- North Cook Inlet Unit well abandonment activities.[10]

Of these covered activities, only OCS exploratory well drilling and the North Cook Inlet Unit well abandonment activities involve tugs towing rigs.[11] The OCS

---

[7] PR1_MMPA 2253–54 (Final Rule, Table 1).

[8] Dkt. 73 at 5 n.24.

[9] 86 Fed. Reg. 19,228 (Apr. 13, 2021).

[10] Declaration of Amy Peloza ("Peloza Decl."), Ex. D (Year 3 LOA).

[11] *Id.*

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No.: 3:19-cv-00238-SLG      4

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

exploration drilling is no longer planned for the Year 3 LOA time period, and is currently not planned to occur until sometime in 2023 at the earliest.[12] The North Cook Inlet Unit well abandonment activities are scheduled to occur in less than two months.[13] All of the planned activities under the Year 3 LOA are described in the Declarations of Amy Peloza and Kate Kaufman (and associated exhibits), and are summarized below.[14]

### 1. Platform and Pipeline Maintenance.

Each year, Hilcorp verifies the structural integrity of its platforms and pipelines in Cook Inlet. These maintenance activities include (i) subsea pipeline inspections, stabilizations, and repairs; (ii) platform leg inspections and repairs; and (iii) anode sled installations or replacements. This work is essential for Hilcorp to maintain compliance with, *inter alia*, Pipeline and Hazardous Materials Safety Administration ("PHMSA") and Alaska Department of Environmental Conservation ("ADEC") regulatory requirements. As an example of an important pipeline maintenance activity, Hilcorp plans to replace approximately 1,291 meters of existing subsea pipe (which dates to 1966) at its Monopod Platform, beginning in early June 2021. This pipeline replacement

---

[12] Declaration of Kate Kaufman ("Kaufman Decl.") ¶¶ 12-13.

[13] Peloza Decl. ¶¶ 17-20.

[14] The Court may consider these extra-record declarations and exhibits when fashioning the remedy. *See* 5 U.S.C. § 706(2) (record review rule applicable only to substantive review of agency decision); *see Esch v. Yuetter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (recognizing consideration of extra-record evidence "in cases where relief is at issue"); *Ctr. for Biological Diversity v. BLM*, 2011 WL 337364 at *1 (N.D. Cal. Jan. 29, 2011) (extra-record evidence considered in remedy stage); *Nat. Res. Def. Council, Inc. v. Evans*, 2003 WL 22025005, *5 (N.D. Cal. 2003) (extra-record evidence considered "with respect to remedy but not with respect to the merits").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

work is necessary for compliance with PHMSA and ADEC requirements and for

maintaining the integrity of Hilcorp's infrastructure and environmental health and safety.

None of the pipeline and platform maintenance activities involve tugs towing drill rigs.[15]

Any potential take associated with these activities is authorized by the Year 3 LOA.

## 2.    OCS Geotechnical and Geohazard Survey.

Geotechnical and geohazard ("G&G") surveys are performed after an operator

conducts a 3D seismic survey in order to identify natural and manmade hazards before

exploration wells are drilled. In 2019, Hilcorp conducted a seismic survey in Lower Cook

Inlet (*with no beluga whale harassments*). Hilcorp planned to conduct the follow-up

G&G survey in 2020 prior to exploratory drilling, but had to cancel the survey due to

COVID-related complications. Hilcorp is therefore planning to conduct the survey in

2021. The G&G survey does not involve any tugs towing rigs.[16] The small amount of

possible incidental take associated with this activity is authorized by the Year 3 LOA.[17]

This activity is very important because it is a required condition of Hilcorp's Exploration

---

[15] *See* Peloza Decl. ¶¶ 14-15. Sometimes tug use that does not involve rig-towing is required to help provide crews and supplies for maintenance and operations. For example, every two to five years, winter ice conditions require limited tug use to clear ice for supply vesssels. *Id.* ¶ 16. The tugs generally travel at very low speeds (0-4 knots), using the tide to move them into the ice when it is safe to do so. *Id.* As another example, tugs can assist the movement of barges carrying materials, as will be done when pipe spools are transported for the Monopod pipeline repair project. *Id.*

[16] *See* Kaufman Decl. ¶¶ 9-11.

[17] Peloza Decl., Ex. D.

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No. 3:19-cv-00238-SLG                                6

Plan and the Bureau of Ocean Energy Management will make no further decisions or authorizations for exploration drilling until the G&G survey is complete.[18]

### 3. North Cook Inlet Unit Subsea Well and Geohazard Survey.

Before plugging and abandoning the North Cook Inlet Unit subsea well (described in the following section), Hilcorp must conduct a geohazard survey to locate the well. The survey will occur over a period of approximately seven days in an area just south of Hilcorp's Tyonek platform, and is scheduled to begin in early June 2021.[19] The survey will not involve tugs towing rigs. Any potential take associated with this activity is authorized by the Year 3 LOA.[20]

### 4. North Cook Inlet Unit Well Abandonment Activities.

The discovery well in the North Cook Inlet Unit was drilled over 50 years ago and is required to be plugged and abandoned under state law. This work was planned for 2020, but could not occur due to COVID-related complications. The work is required to be completed no later than September 2021 by AOGCC mandate, and is necessary to take the well out of service and maintain important environmental standards. The work will necessarily require tugs to pull a jack-up rig to the well site, which is described in detail in the Peloza Declaration.[21]

---

[18] Kaufman Decl. ¶¶ 11-14.

[19] Peloza Decl. ¶ 17.

[20] *Id*., Ex. D.

[21] *Id*. ¶¶ 18-20.

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No. 3:19-cv-00238-SLG

Case 3:19-cv-00238-SLG   Document 78   Filed 04/27/21   Page 11 of 28

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

Any incidental harassment associated with the plug and abandonment activities (except for the tugs towing rigs) is authorized by the Year 3 LOA.[22] The rig-towing portion of the work is estimated to expose approximately one beluga whale to Level B harassment sound levels and the likelihood of that potential exposure will be reduced by mitigation measures to be employed by Hilcorp (*see* Section II.D *infra*).[23]

**B.     Planned 2021 Activity Not Covered by ITR or Year 3 LOA.**

In conjunction with the North Cook Inlet Unit well abandonment activities described above, Hilcorp plans to drill two production wells at its Tyonek Platform in 2021. This will require tugs to tow the drill rig used for the abandonment activities approximately one-half mile to the drill site for the two production wells.[24] This production drilling work is not covered in the Year 3 LOA or the ITR because, although the ITR evaluates the effects of noise associated production drilling (with and without mobile rigs), NMFS concluded that production drilling will not cause incidental marine mammal harassment because (i) "routine drilling noise" does not result in harassment and (ii) production drilling does not involve pipe driving (which is involved in exploration drilling).[25] However, since this activity uses tugs towing a drill rig, Hilcorp has evaluated the potential for incidental harassment of beluga whales. The unmitigated tug-towing

---

[22] *Id*., Ex. D.

[23] *See* Declaration of Meghan Larson ("Larson Decl.") ¶ 12; Peloza Decl. ¶¶ 33-43.

[24] *See* Peloza Decl. ¶¶ 21-23.

[25] PR1_MMPA 2257–58; Peloza Decl. ¶ 21.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No. 3:19-cv-00238-SLG     8

activity needed for this project is estimated to expose approximately one beluga whale to Level B harassment sound levels.[26] With the mitigation measures Hilcorp plans to employ, the potential for such exposure is reduced to near-zero.[27]

## C. Potential Activities in Years 4 and 5 of the ITR.

As addressed in Section III.B *infra*, Hilcorp believes a remand can and should be completed with enough time for Hilcorp to apply for and receive a Year 4 LOA. With that said, Hilcorp expects that platform and pipeline maintenance activities will be required during each of the Year 4 and Year 5 LOA periods and that the work will be similar to the maintenance work performed under the Year 3 LOA.[28] For example, Hilcorp is planning to conduct a similar pipeline repair project in the summer of either Year 4 or Year 5.[29] Additionally, Hilcorp is currently planning to conduct the delayed OCS exploration drilling in 2023 under the Year 4 and/or Year 5 LOAs, as well as causeway construction work in Iniskin Bay.[30] Production drilling similar to the planned Year 3 work at the Tyonek Platform will also likely occur in both Years 4 and 5 (although that activity is not covered by the ITR, for the reasons described above).[31]

Notably, Hilcorp is no longer planning to conduct the Trading Bay geohazard survey or exploratory well work described in the ITR before the ITR expires. Hilcorp's

---

[26] *See* Larson Decl. ¶ 12.

[27] *Id.* ¶ 13; *see* Peloza Decl. ¶¶ 33-43.

[28] Peloza Decl. ¶ 24.

[29] *Id.*

[30] Kaufman Decl. ¶¶ 12-13.

[31] Peloza Decl. ¶ 24.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

ITR petition estimated that the Trading Bay geohazard survey and exploratory well work could cause up to 15 Level B beluga whale harassments, which is no longer relevant.[32]

## D. Mitigation and Monitoring Measures.

The ITR prescribes numerous mitigation and monitoring measures designed to minimize and avoid any potential impacts to marine mammals from Hilcorp's activities.[33] The Year 3 LOA requires Hilcorp to comply with all of the ITR's specified mitigation and monitoring measures, as relevant to the covered activities to be performed in Year 3. The Court rejected Plaintiffs' challenges to some of these measures and none of the other measures are in dispute.[34] There is no reasonable dispute that these measures are effective. Accordingly, all of the Year 3 LOA activities that do not involve tugs towing rigs will be fully and sufficiently mitigated and monitored pursuant to the terms of the Year 3 LOA.

In addition to the mitigation and monitoring requirements of the Year 3 LOA, Hilcorp will implement the following measures applicable to tugs towing rigs:

- Two Protected Species Observers ("PSOs") will be stationed on a tug and will follow all of the protocols applicable to PSOs under the ITR.

- All ITR safety zone and exclusion zone protocols will apply to tugs towing rigs.

---

[32] *See* Peloza Decl. ¶ 25; PR1_MMPA 1464 (Hilcorp petition); Dkt. 73 at 5.

[33] PR1_MMPA 2303–08.

[34] Dkt. 73 at 28–33.

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

- Daily aerial overflights will be conducted for activities involving tugs towing rigs under similar protocols applicable to seismic surveys.

- Tugs towing rigs will reduce throttle/thrust and change course, as necessary and practicable, if beluga whales are observed.

- When practicable, tugs towing rigs will travel with the tide to reduce the extra propeller cavitation and associated noise that occurs when tugs transit against the tide.

- When practicable, tugs towing rigs will be routed to the center channel in Cook Inlet during transit in order to avoid nearshore areas where beluga whales are more likely to be present.

- PSOs will be stationed on a separate observation vessel located in front of tugs towing rigs to monitor for beluga whales.

- All existing ITR and LOA recording and reporting requirements will be carried out for tugs towing rigs.[35]

Implementation of this suite of significant and effective measures will ensure that any potential incidental harassment of beluga whales associated with tugs towing a rig is at or near zero.[36]

---

[35] *See* Peloza Decl. ¶¶ 33-43. These measures are similar to, and more rigorous than, the measures required for rig-towing activity in NMFS's biological opinion for Furie's Cook Inlet activities. *See* AKR 1001466 (Furie BiOp).

[36] *See* Larson Decl. ¶ 13; Peloza Decl. ¶ 33-43.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

## III.  ARGUMENT

### A.    The Court Should Remand Without Vacatur.

Although an agency action that is held to be unlawful can be set aside under the APA,[37] vacatur is "a species of equitable relief," and "courts are not mechanically obligated to vacate agency decisions that they find invalid."[38] "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[39] Courts will decline to vacate "when equity demands."[40] The Ninth Circuit has made clear that in considering whether vacatur is appropriate, courts should consider practical concerns.[41]

The caselaw in the Ninth Circuit and elsewhere demonstrates that district courts setting aside an agency decision have the discretionary authority to order remand in whole or in limited part without vacatur, remand with partial or full vacatur, remand with vacatur granted but stayed pending completion of the remand, or some other combination

---

[37] 5 U.S.C. § 706(2).

[38] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) ("Although the district court has power to do so, *it is not required to set aside every unlawful agency action*." (emphasis added)); *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980) ("[G]uided by authorities that recognize that a reviewing court has discretion to shape an equitable remedy, we leave the challenged designations in effect.").

[39] *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 993 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

[40] *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

[41] *See Cal. Cmtys*, 688 F.3d at 994 ("[I]f saving a snail warrants judicial restraint, so does saving the power supply." (citation omitted)).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main (206) 624-0900 Fax (206) 386-7500

of relief.[42] Indeed, there are many cases in which courts have remanded an agency action without vacatur.[43] The unifying theme in the caselaw is that *a court should tailor the remedy to appropriately address the legal and equitable circumstances presented in each case*.

For the reasons described below, "equity demands" that the Court remand without vacatur. Such a remedy would avoid highly disruptive consequences, including serious risks to human health, environmental integrity, and Railbelt energy supplies, and present *de minimis* (or no) risk to the Cook Inlet beluga whale. Moreover, it would allow a multi-faceted agency decision—that has been substantially upheld—to remain intact while the narrow flaw identified by the Court is efficiently addressed on remand.

---

[42] *See, e.g.*, *Idaho Farm Bureau*, 58 F.3d at 1405 (leaving agency action in place while defect is cured on remand); *Ctr for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 256 (D.D.C. 2020) (staying implementation of order vacating portion of biological opinion); *Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7, 11-12 (D.D.C. 2003) (district court is "vested with equitable authority to stay the mandate" pending completion of the remand).

[43] *See* cases cited *supra; see also, e.g., American Farm Bureau Fed'n v. EPA,* 559 F.3d 512, 528 (D.C. Cir. 2009) (remand without vacatur because the agency's "failure to adequately explain itself is in principle a curable defect"); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 755-56 (D.C. Cir. 2002) (remand rather than vacatur is appropriate where deficiencies may be corrected); *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 (9th Cir. 2010) (remand without vacatur appropriate "'[w]hen an agency may be able readily to cure a defect in its explanation of a decision'" (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009))).

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

### 1. Vacatur would be highly disruptive and inequitable.

The error identified by the Court involves a narrow slice of the spectrum of activities covered by the ITR, which includes many activities other than tugs towing rigs. Those other activities are already fully evaluated, mitigated, and monitored under the ITR and the Year 3 LOA. The Court found no fault with NMFS's analysis of those activities. Nor did the Court find any error in the agency's application of the substantive MMPA, ESA, or NEPA standards or with the agency's prescribed mitigation and monitoring measures. In short, this is not a situation, such as was presented in *Southeast Alaska Conservation Council v. U.S. Forest Service*, in which the agency decision is "fundamentally invalid at a structural level."[44] The error here is limited and discrete. For this reason alone, vacatur of the ITR is inappropriate.[45]

In addition, partial or full vacatur will have inequitable and highly disruptive consequences. Although the ITR does not authorize the activities themselves, vacatur of the ITR and NMFS's associated ESA and NEPA decision documents would effectively prevent Hilcorp from undertaking any activities for which incidental take is authorized

---

[44] 468 F. Supp. 3d 1148, 1151-52 (D. Alaska 2020).

[45] *See Today's IV, Inc. v. Fed. Transit Admin.*, No. LA CV13-00378 JAK, 2014 WL 5313943, at *18 (C.D. Cal. Sept. 12, 2014), *aff'd sub nom. Japanese Vill., LLC v. Fed. Transit Admin.*, 843 F.3d 445 (9th Cir. 2016) (declining to vacate record of decision where "the deficiency in the FEIS was limited....Because the NEPA violation was so narrow, a complete vacatur of the ROD is inappropriate.... A complete vacatur would also have significant consequences, i.e., substantial delay to parts of the Project for which no NEPA violation has been identified."); *All. For the Wild Rockies v. Savage*, 375 F. Supp. 3d 1152, 1156 (D. Mont. 2019) ("Here, the agency's error is limited in scope and severity, and vacatur would result in a disproportionate disruption to the Project, which has largely withstood Alliance's legal challenge.").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

under the ITR. Some of the underlying permits for those activities rely upon Hilcorp's MMPA and ESA incidental take authorizations. And Hilcorp would otherwise be forced to forego any ITR-covered activities in the event of a vacatur to avoid potential take liability under the MMPA or ESA.[46] Consequently, vacatur of the ITR would result in Hilcorp carrying out none of the activities for which incidental take is authorized under the Year 3 LOA. This would be a particularly unfair result for activities that have no relation to the error identified by the Court and for which incidental take is fully and lawfully authorized.

Moreover, partial or full vacatur would present significant risks to human health and environmental integrity, and the reliability of the energy supplied by Cook Inlet, because essential planned activities covered by the Year 3 LOA—involving tugs towing rigs and not involving tugs—would not proceed. Many of those activities are required by other federal or state laws and mandates, with which Hilcorp would be unable to comply. The negative consequences of foregoing the activities covered by the Year 3 LOA are addressed in the Peloza and Kaufman Declarations and summarized as follows.[47]

Platform and Pipeline Maintenance. Hilcorp would be unable to perform the platform and pipeline maintenance activities covered by the Year 3 LOA, which include necessary tasks for the maintenance of human and environmental health and safety, such as the repair of pipelines in accordance with federal and state laws. If these activities do

---

[46] Peloza Decl. ¶ 46; Kaufman Decl. ¶ 14.

[47] *See* Peloza Decl. ¶¶ 26-32; Kaufman Decl. ¶¶ 14-15. As described in Section II *supra*, Hilcorp plans no exploratory well drilling during the Year 3 LOA time period.

*Cook Inletkeeper, et al. v. Raimondo, et al.*
Case No. 3:19-cv-00238-SLG

not proceed, then Hilcorp's Cook Inlet platform and pipeline infrastructure will not be maintained according to federal and state legal standards. As a consequence, Hilcorp would very likely be required to "shut in" its platforms, which would cease oil and gas production, resulting in the elimination of approximately 20% of the natural gas generated for Southcentral Alaska. This would, in turn, result in significant job losses and cancellation of service contracts, both of which would have negative effects on the local economy and the individuals affected.[48]

OCS G&G Survey. The planned OCS G&G survey has already been delayed for one year. Another delay of this survey (which does not involve tugs) would not only be manifestly unfair, but it would also result in Hilcorp failing to carry out a condition of its Exploration Plan, which in turn would indefinitely delay Hilcorp's exploration well program. Cancellation of the OCS survey would undermine Hilcorp's ability to explore and develop the resources to which it is lawfully entitled under the terms of its OCS leases. It would also adversely impact Hilcorp's investment in the survey and its $20 million investment in these OCS lease blocks.[49]

North Cook Inlet Unit Subsea Well and Geohazard Survey. If Hilcorp is unable to perform the North Cook Inlet Unit geohazard survey to locate the decommissioned well (which does not involve tugs), then it will be unable to perform the necessary and already permitted work to plug and abandon that well. Accordingly, the very-negative

---

[48] *See* Peloza Decl. ¶¶ 27-32.

[49] *See* Kaufman Decl. ¶ 15.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

consequences associated with delaying the abandonment work (described below) will manifest if the geohazard survey cannot proceed.

North Cook Inlet Unit Well Abandonment Activities. Hilcorp would be unable to perform this already-delayed, necessary, and legally required well abandonment work. The well abandonment is required by state law and AOGCC has ordered it to be completed by September 2021. Hilcorp has already invested over $3,000,000 into this project, which is scheduled to begin *in June*. If this work does not proceed, Hilcorp will not be able to comply with AOGCC's order and AOGCC may withhold future permits for important operations, which would further undermine Hilcorp's Cook Inlet operations, its investment in this project, and its ability to continue to explore and produce natural gas to meet the demand of Southcentral Alaska.[50]

In sum, it would be both inequitable and highly disruptive for the Court to vacate the ITR and NMFS's associated decision documents—whether in whole or in any part— and consequently prevent activities for which incidental take is lawfully authorized, monitored, and mitigated. *All* work planned and covered by the Year 3 LOA is absolutely necessary, and vacatur of any part of the ITR that prevents any of those activities from occurring will have severe negative consequences for Hilcorp and for the public interest.[51]

---

[50] Peloza Decl. ¶¶ 17-20, 30.

[51] An order vacating the ITR would have no direct consequence for Hilcorp's planned drilling of two production wells in the North Cook Inlet Unit because, as explained above, the ITR does not authorize any incidental harassment for production drilling and it is not a covered activity under either the ITR or Year 3 LOA.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

## 2. A remand order without vacatur presents no risk to the Cook Inlet beluga whale.

The Year 3 LOA activities—including the limited use of towing tugs—will have, at most, a negligible impact on the Cook Inlet beluga whale. In the ITR, NMFS reached "small numbers" and "negligible impact" findings for the authorization of 35 instances of Level B harassment of beluga whales *per year*.[52] In Year 1 of the ITR, there were *zero* observed beluga whale takes.[53] In Year 2 of the ITR, there were *zero* observed beluga whale takes.[54] The Year 3 LOA authorizes a total of 10 Level B harassments of beluga whales (out of the 35 authorized by the ITR).[55] Thus, in the first three years of the ITR combined, there will be, at most, 10 beluga whale incidental Level B harassments, compared to 105 Level B harassments authorized by the ITR for the first three years (and for which a "negligible impact" determination was reached).

Hilcorp recognizes that the calculations above do not include any instances of beluga whale take resulting from the tugs towing the rig for the North Cook Inlet Unit plug and abandonment work. Accordingly, Hilcorp has prepared estimates of potential beluga whale exposure to MMPA harassment levels from the rig-towing activity associated with that work.[56] That analysis shows that the rig-towing activity will cause no

---

[52] PR1_MMPA 2301, 2310-11 (ITR).

[53] Peloza Decl. ¶ 7; JOINTSUPP 100297–99.

[54] Peloza Decl. ¶ 9.

[55] *Id.*, Ex. D.

[56] *See generally* Larson Declaration; Declaration of Briony Croft ("Croft Decl.").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*

Level A harassments of beluga whales.[57] The analysis also shows that approximately one beluga whale is predicted to be exposed to sound at Level B harassment levels from the rig-towing activity.[58] With the mitigation measures Hilcorp will apply to tugs towing the drill rig (*see supra* Section II.D), the potential for incidental Level B harassment of beluga whales is expected to be at or near zero.[59] Accordingly, a partial or full vacatur of the ITR and related decision documents would have no material benefit to the Cook Inlet beluga whale and in no event would cause any exceedance of the beluga whale incidental take levels determined by NMFS to be "small numbers" and result in a "negligible impact."[60]

**B.      The Remand Should Be Narrowly Focused and Time-Limited.**

The Court has the discretion to tailor a remand order to the specific facts of the case.[61] Hilcorp respectfully submits that the following recommendations are appropriate

---

[57] Larson Decl. ¶¶ 6-12; Croft Decl. ¶¶ 14-16, 18.

[58] Larson Decl. ¶¶ 6-12; Croft Decl. ¶¶ 14-16, 17. The Croft Declaration also explains why using three tugs versus a single towing tug does not materially increase the magnitude of the overall sound emission level. Croft Decl. ¶ 13.

[59] Larson Decl. ¶ 13. Although production drilling is not an activity covered by the ITR or Year 3 LOA, Hilcorp also estimated beluga whale take exposure for the rig-towing portion of the activity. Larson Decl. ¶¶ 6-12; Croft Decl. ¶¶ 14-18. That analysis predicts zero Level A harassments and approximately one Level B harassment. Larson Decl. ¶ 12; Croft Decl. ¶¶ 14-18. The potential exposure risk is further reduced because Hilcorp will also carry out the mitigation and monitoring measures for the tugs towing the rig for production drilling. Peloza Decl. ¶¶ 33-43; Larson Decl. ¶ 13.

[60] PR1_MMPA 2309-11 (ITR).

[61] *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 193 (2000), quoting *Schlesinger v. Reservists Comm. To Stop the War*, 418 U.S. 208, 222 (1974) ("[F]ederal courts should aim to ensure 'the framing of relief no broader than required by the precise facts.'").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

for the circumstances presented in this case and will ensure a remand that both addresses the Court's summary judgment order and is efficiently completed.

*First*, the Court's remand order should specifically instruct NMFS to address the error identified by the Court—namely, the Court's "determination that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales is arbitrary and capricious …, and the agency relied on this erroneous determination in its issuance of the Incidental Take Regulations, the Biological Opinion, and the Environmental Assessment."[62] The Court found no error with any other elements of the ITR, Biological Opinion, or EA, and NMFS should not be required on remand to re-evaluate issues for which there has been no error, especially given that the ITR will expire of its own accord in 2024.

*Second*, the Court's remedy order should not prescribe *how* NMFS must address the error identified by the Court. How NMFS addresses the error will almost certainly be dictated by NMFS's assessment of the effects of noise from tugs towing rigs. NMFS may, for example, analyze the error identified by the Court and confirm its initial determination, with additional explanation and analysis, that no beluga harassment will

---

[62] Dkt. 73 at 51-52; *see Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1256 (9th Cir. 1977) (ordering remand "for the limited purpose of considering certain specific matters delineated in the course of [the] opinion"); *Hapner v. Tidwell*, 621 F.3d 1239, 1251 (9th Cir. 2010) (limiting remand to sole error); *Kunaknana v. U.S. Army Corps of Engineers*, 2014 WL 12813625, *4 (D. Alaska 2014) (remanding "for the limited purpose of remedying errors identified in the Court's Order re Motions for Summary Judgment at Docket 175 and addressing post-2004 climate change information").

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

occur as a result of tugs towing rigs. Alternatively, NMFS may determine on remand to include the authorization of some amount of incidental harassment related to tugs towing rigs in the ITR, which may result in an administrative process to amend the ITR and associated decision documents. On remand, NMFS should be given the flexibility to pursue the process that is best suited to its analysis of tugs towing rigs.

*Third*, the Court's remedy order should require NMFS to complete the remand by a date-certain. Specifically, Hilcorp requests that the Court order NMFS to complete the remand and any related necessary actions by no later than December 31, 2021, which will provide Hilcorp with sufficient time to prepare and submit its application for the Year 4 LOA under the ITR and for NMFS to process that application and issue the Year 4 LOA by March 30, 2022. This would allow NMFS seven months to complete the remand, which should be more than sufficient for NMFS to address the limited single error identified by the Court.

*Finally*, Hilcorp requests that the Court order NMFS to provide the parties and the Court with bi-monthly status reports until the remand is complete. This will keep the parties and the Court apprised of the agency's progress on remand.

## IV. CONCLUSION

For the reasons set forth above, the Court should order a remand without vacatur because, under the circumstances presented here, vacatur in whole or in part would be inequitable and highly disruptive. The remand order should direct NMFS to address the specific error identified by the Court, not prescribe a particular administrative process,

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main (206) 624-0900 Fax (206) 386-7500

require the remand to be completed by December 31, 2021, and require NMFS to provide bi-monthly status reports.

DATED: April 27, 2021.

STOEL RIVES LLP

By: _/s/ Ryan P. Steen_
    Ryan P. Steen (Bar No. 0912084)
    Jason T. Morgan (Bar No. 1602010)
    James C. Feldman (Bar No. 1702003)

*Attorneys for Hilcorp Alaska, LLC*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 5,680 words, excluding items exempted by

Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Rule 7.4(a)(2) .

Respectfully submitted this 27th day of April, 2021.

/s/ Ryan P. Steen
Ryan P. Steen

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2021, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this Case No. 3:19-cv-00238-SLG who are registered CM/ECF users will be served by the CM/ECF system.

| | |
|---|---|
| Cheryl R. Brooking | cheryl.brooking@alaska.gov |
| John H. Martin | john.h.martin@usdoj.gov |
| Kristen Angela Monsell | kmonsell@biologicaldiversity.org |
| Aaron Christian Peterson | aaron.peterson@alaska.gov |
| Jeffrey G. Pickett | jeff.pickett@alaska.gov |
| Kassia Rhoades Siegel | ksiegel@biologicaldiversity.org |
| Julie Teel Simmonds | jteelsimmonds@biologicaldiversity.org |

*/s/ Ryan P. Steen*
Ryan P. Steen

110436343.4 0066502-00011

**STOEL RIVES** LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main (206) 624-0900 Fax (206) 386-7500*