Kassia Siegel (AK Bar # 0106044)
Julie Teel Simmonds (*Pro Hac Vice*)
Kristen Monsell (*Pro Hac Vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
T: (510) 844-7100
F: (510) 844-7150
E: ksiegel@biologicaldiversity.org
kmonsell@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

*Attorneys for Plaintiffs Cook Inletkeeper and*
*Center for Biological Diversity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER, et al., | |
| *Plaintiffs*, | |
| v. | |
| GINA RAIMONDO, Secretary of Commerce, et al., | Civil Action No. 3:19-cv-00238-SLG |
| *Defendants*, | |
| and | |
| HILCORP ALASKA, LLC, et al., | |
| *Intervenor-Defendants.* | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF ADDRESSING REMEDY

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 4

   I.  Vacatur Is the Presumptive Remedy Under the APA ................................. 4

  II.  The Court Should Vacate the Incidental Take Regulations, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact ......................... 6

    A.  The Seriousness of NMFS's Violations Weighs Heavily in Favor of Vacatur ..... 7

    B.  The Disruptive Consequences Prong Also Weighs in Favor of Vacatur............. 14

CONCLUSION ........................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987) ....................................................................................... 19

*Cal ex. rel. Lockyer v. U.S. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ........................................................................ 11

*Cal. Cmtys. Against Toxics v. U.S. Env'tl Prot. Agency*,
  688 F.3d 989 (9th Cir. 2012) ........................................................................ 17

*California v. Bernhardt*,
  472 F. Supp. 3d 573 (N.D. Cal. 2020) .................................................... 7, 12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ......................................................................................... 4

*Comcast Corp. v. FCC*,
  579 F.3d 1 (D.C. Cir. 2009) ......................................................................... 15

*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*,
  97 F. Supp. 3d 1210 (D. Haw. 2015) .............................................................. 9

*Cottonwood Env'tl Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ...................................................................... 19

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) .................................................................... 5, 17

*Ctr. for Biological Diversity v. Norton*,
  240 F. Supp. 2d 1090 (D. Ariz. 2003) .......................................................... 19

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  698 F.3d 1101 (9th Cir. 2012) .................................................................. 5, 17

*Ctr. for Food Safety v. Vilsack*,
  734 F. Supp. 2d 948 (N.D. Cal. 2010) ..................................................... 13, 15

*Ctr. for Native Ecosystems v. Salazar*,
  795 F. Supp. 2d 1236 (D. Colo. 2011) ......................................................... 15

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................................ 4

*FCC v. NextWave Pers. Commc'ns*,
537 U.S. 293 (2003) ........................................................................... 4

*Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*,
381 F. Supp. 3d 1127 (D. Alaska 2019) ............................................ 10

*Humane Soc'y of the U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ........................................................ 4, 5

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) .......................................................... 19

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
109 F. Supp. 3d 1238 (N.D. Cal. 2015) ........................... 5, 7, 11, 12

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*,
839 F.2d 795 (D.C. Cir. 1988) ........................................................ 6, 8

*Metcalf v. Daley*,
214 F.3d 1135 (9th Cir. 2000) .......................................................... 13

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........................................................................... 4

*Nat. Res. Def. Council v. Evans*,
232 F. Supp. 2d 1003 (N.D. Cal. 2002) ............................................. 8

*Nat. Res. Def. Council v. Pritzker*,
828 F.3d 1125 (9th Cir. 2016) ........................................................... 9

*Nat'l Family Farm Coal. v. U.S. Env'tl Prot. Agency*,
960 F.3d 1120 (9th Cir. 2020) .............................................. 5, 15, 16

*Pollinator Stewardship Council v. U.S. Env'tl Prot. Agency*,
806 F.3d 520 (9th Cir. 2015) ................................................ 5, 15, 16

*Pub. Emps. for Env'tl Resp. v. U.S. Fish & Wildlife Serv.*,
189 F. Supp. 3d 1 (D.D.C. 2016) ............................................... 12, 18

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ......................................................................... 13

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                    iv

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
    468 F. Supp. 3d 1148 (D. Alaska 2020) ................................................. 4, 5, 13

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ........................................................................ 13

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) .......................................................................... 5

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ........................................................................ 6, 7, 18, 19

*Thomas v. Peterson*,
    753 F.2d 754 (9th Cir. 1985) .......................................................................... 11

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
    878 F.3d 725 (9th Cir. 2017) .......................................................................... 12

*United States v. Oakland Cannabis Buyers' Coop.*,
    532 U.S. 483 (2001) ...................................................................................... 18

*W. Watersheds Project v. Zinke*,
    441 F. Supp. 3d 1042 (D. Idaho 2020) ............................................................ 5

**Statutes**

5 U.S.C. § 706(2) ................................................................................................ 2

5 U.S.C. § 706(2)(A)–(D) .................................................................................. 4

16 U.S.C. § 1361(1) ........................................................................................... 8

16 U.S.C. § 1361(6) ........................................................................................... 8

16 U.S.C. § 1362(8) ........................................................................................... 8

16 U.S.C. § 1371(a) ........................................................................................... 8

16 U.S.C. § 1371(a)(5)(A)(i) .............................................................................. 9

16 U.S.C. § 1371(a)(5)(D) ................................................................................ 18

16 U.S.C. § 1372(a) ........................................................................................... 8

16 U.S.C. § 1536(a)(2) ..................................................................................... 11

**Regulations**

50 C.F.R. § 216.103 ................................................................................................ 9

50 C.F.R. § 217.160 ................................................................................................ 9

50 C.F.R. §§ 402.12–402.17 .................................................................................. 11

50 C.F.R. § 402.14(g) ............................................................................................ 11

50 C.F.R. § 402.14(g)(4) ....................................................................................... 12

**Other Authorities**

86 Fed. Reg. 19,228 (Apr. 13, 2021) ..................................................................... 3

*Cook Inletkeeper, et al. v. Ross, et al.*, Order Re Cross Motions for Summary Judgment, ECF No. 73 ................................................................... 1, 2, 8, 10, 12

NMFS, *Species in the Spotlight: Cook Inlet Beluga Whale, Priority Actions: 2021-2025* (March 2021) ................................................................................. 2

Pursuant to this Court's order of March 30, 2021, *Cook Inletkeeper, et al. v. Ross, et al.*, Order Re Cross Motions for Summary Judgment, ECF No. 73 at 52, Plaintiffs Cook Inletkeeper and Center for Biological Diversity submit this supplemental brief addressing the proper remedy to accompany the Court's issuance of declaratory relief.

## INTRODUCTION

On March 30, 2021, this Court granted Plaintiffs' motion for summary judgment on several of their claims. The Court held that the National Marine Fisheries Service (NMFS) failed to comply with the Marine Mammal Protection Act (MMPA), 16 U.S.C. §§ 1361–1421, Endangered Species Act (ESA), *id*. §§ 1531–1544, and National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370, in issuing regulations allowing Hilcorp Alaska, LLC (Hilcorp) to harass critically endangered Cook Inlet beluga whales incidental to its oil and gas operations in Cook Inlet for the next five years. In its Order, the Court held that "the agency's determination that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales is arbitrary and capricious . . . , and the agency relied on this erroneous determination in its issuance of the Incidental Take Regulations, the Biological Opinion, and the Environmental Assessment." ECF No. 73 at 52.

These serious violations of law expose the whales to increased risk of harm from noise—a stressor the agency has repeatedly recognized as one of the primary threats to the species' continued existence along with the cumulative effects of multiple stressors. PR1_KeyRef003136 (Recovery Plan). Indeed, NMFS has categorized the reduction of

human-caused noise pollution in Cook Inlet as the number one priority to stabilize the population's decline and promote the recovery of these highly imperiled whales. JOINTSUPP200883 (Five-year Action Plan for Species in the Spotlight).[1] And it considers noise from tugboats as the noise source of highest concern to the species. PR1_KeyRef 003211 (Recovery Plan). Yet NMFS arbitrarily ignored the impact of tugboat noise both individually and cumulatively in issuing the regulations at issue in this case. ECF No. 73 at 28, 41, 51, 52.

The Court has already declared the incidental take regulations (ITRs) and associated Biological Opinion and Environmental Assessment unlawful and provided the agency with several instructions for remand. The question now before the Court is whether the ITRs and related decision documents should remain in place during that remand. Under both the law of this Circuit and the circumstances of this case, the answer is no. The Court should provide the ordinary and presumptive remedy under the Administrative Procedure Act (APA) for final agency actions held contrary to law and vacate the ITRs, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact. *See* 5 U.S.C. § 706(2).

---

[1] On April 21, 2021, NMFS released 2021-2025 Action Plans for its Species in the Spotlight. In doing so, NMFS reiterated that Cook Inlet belugas are one of just nine priority species "whose extinction is almost certain in the immediate future" and that "[r]educing in-water noise is an especially important focal effort due to the importance of hearing to the Cook Inlet belugas' survival." NMFS, *Species in the Spotlight: Cook Inlet Beluga Whale, Priority Actions: 2021-2025* (March 2021), at 1, 3, *available at* https://www.fisheries.noaa.gov/resource/document/species-spotlight-priority-actions-2021-2025-cook-inlet-beluga-whale.

Defendants cannot meet their burden to show that the rare or limited circumstances in which remand without vacatur is appropriate are present here. To the contrary, NMFS's significant legal errors—which cut to the core of several environmental laws—necessitate new analyses and decisions, rendering remand without vacatur inappropriate. Vacatur is the only way to ensure that NMFS will not just paper over its significant errors by restating conclusions already made while continuing to authorize take under the flawed regulations and decision documents without any additional mitigation measures or other changes.

Strikingly, despite this Court's Order and the pending briefing on remedy, on April 13, 2021, NMFS issued a one-year letter of authorization (LOA) to Hilcorp based on the pre-existing ITRs and decision documents. The LOA allows the company to take Cook Inlet belugas and other marine mammals incidental to certain oil and gas activities, including exploratory well drilling. *Notice; Issuance of Letter of Authorization*, 86 Fed. Reg. 19,228 (Apr. 13, 2021).[2] NMFS's issuance of this LOA only further demonstrates why vacatur is necessary to guarantee NMFS does not treat remand as a paperwork exercise. Moreover, vacatur of NMFS's actions will protect the environment during remand and is the only way to ensure the public will have an opportunity to meaningfully

---

[2] The Federal Register notice issued by NMFS states that it issued an LOA to Hilcorp "for the potential harassment of small numbers of four marine mammal species," 86 Fed. Reg. at 19,228, while the LOA itself purports to authorize the take of eleven species, including take of ten beluga whales. NMFS provided the following link to the LOA in its Federal Register notice: https://www.fisheries.noaa.gov/action/incidental-take-authorization-hilcorp-alaska-llc-oil-and-gas-activities-cook-inlet-alaska. *See id.*

*Cook Inletkeeper v. Ross*, Case No. 3:19-cv-00238-SLG                                           3

comment on the agency's new rulemaking as required by law.

## ARGUMENT

### I.      Vacatur Is the Presumptive Remedy Under the APA

Vacatur is the presumptive remedy for agency actions held contrary to law. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1901 (2020) (because an agency decision violated the APA, it "must be vacated"); *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action *must be set aside* if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.") (emphasis added) (quoting 5 U.S.C. § 706(2)(A)–(D)); *see also FCC v. NextWave Pers. Commc'ns*, 537 U.S. 293, 300 (2003) ("The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law' . . . which means, of course, *any* law, and not merely those laws that the agency itself is charged with administering.") (citation omitted); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1149 (D. Alaska 2020) ("Vacatur is the normal remedy under the APA"). The Supreme Court considers vacatur of unlawful agency actions to be a "less drastic remedy" than an injunction. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

As such, courts regularly vacate agency actions that fail to comply with the MMPA, biological opinions that fail to comply with the ESA, and environmental analyses that fail to comply with NEPA. *See, e.g.*, *Humane Soc'y of the U.S. v. Locke*,

626 F.3d 1040, 1059 (9th Cir. 2010) (vacating a decision issued under section 120 of the MMPA); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th Cir. 2012) (vacating and remanding a biological opinion issued under the ESA); *Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1156 (vacating the portions of a "large landscape-scale NEPA analysis" challenged by plaintiffs) (citation omitted). Indeed, courts routinely vacate an agency's decision held unlawful without any analysis of the consequences. *See, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 751 (9th Cir. 2020) (vacating an agency's approval of an oil development project upon finding violations of the ESA and NEPA).

Remand without vacatur is only appropriate in "rare," *Humane Soc'y of the U.S.*, 626 F.3d at 1053 n.7, or "limited circumstances." *Pollinator Stewardship Council v. U.S. Env'tl Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted). To determine if these "rare" circumstances are present, courts "weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Nat'l Family Farm Coal. v. U.S. Env'tl Prot. Agency*, 960 F.3d 1120, 1144 (9th Cir. 2020) (citation omitted). "The burden is on [the agency] to show that compelling equities demand anything less than vacatur." *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1083 (D. Idaho 2020). Further, in balancing these factors in ESA cases, "courts will tip the scales in favor of the endangered species under the 'institutionalized caution' mandate." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) (quoting *Sierra Club v. Marsh*, 816

F.2d 1376, 1383 (9th Cir. 1987)).

## II. The Court Should Vacate the Incidental Take Regulations, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact

Each of the relevant factors points strongly in favor of the Court's vacatur of the ITRs, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact. Defendants cannot meet their burden to demonstrate otherwise.

First, NMFS's legal errors in the ITRs, the Biological Opinion, and Environmental Assessment/Finding of No Significant Impact are serious violations of the agency's mandates under the MMPA, ESA, and NEPA. NMFS's legal errors mean the agency has failed to ensure that Hilcorp's oil and gas activities will take no more than small numbers of and have no more than a negligible impact on Cook Inlet beluga whales; failed to ensure Hilcorp's activities will not jeopardize the species' continued existence; and failed to take the requisite hard look at the direct and cumulative impacts of these noisy activities. The agency's legal failures also undermine congressional intent that federal agencies "afford first priority to the declared national policy of saving endangered species," *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978), and prioritize "maintaining healthy populations of marine mammals." *Kokechik Fishermen's Ass'n v. Sec'y of Com.*, 839 F.2d 795, 800, 802 (D.C. Cir. 1988).

These are not minor errors that can be readily rehabilitated with a stroke of the pen or additional cites to the record. The agency has no option other than to issue new ITRs under the MMPA, a new biological opinion under the ESA, and a new environmental analysis under NEPA that properly and comprehensively consider the impacts of all the

activities authorized by the ITRs, including tugboat noise, on Cook Inlet beluga whales.

Second, vacatur is the environmentally protective remedy. Vacatur will ensure the whales are protected from the potentially significant impacts of noise pollution from Hilcorp's activities during the pendency of remand. Any alleged economic harm from vacatur cannot trump the "incalculable" value of the critically endangered—and ever-dwindling—Cook Inlet beluga whale. *See Tenn. Valley Auth*., 437 U.S. at 187–88.

A. The Seriousness of NMFS's Violations Weighs Heavily in Favor of Vacatur

The first prong of this Court's inquiry—the seriousness of the agency's legal violations—weighs heavily in favor of vacatur. Courts generally only remand without vacatur when the errors are "mere technical or procedural formalities that the [agencies] can easily cure." *Klamath-Siskiyou*, 109 F. Supp. 3d at 1244; *see also California v. Bernhardt*, 472 F. Supp. 3d 573, 630 (N.D. Cal. 2020) ("[C]ourts generally only remand without vacatur when the errors are minor procedural mistakes, such as failing to publish certain documents in the electronic docket of a notice-and-comment rulemaking.") (citation omitted).

Here, in contrast, NMFS committed serious errors by violating key provisions of three separate statutes enacted by Congress to protect marine mammals, endangered species, and the environment. Each of these statutes requires NMFS to conduct a careful, comprehensive analysis of the impacts of an activity before allowing that activity to proceed—the exact analyses NMFS failed to conduct in issuing the ITRs. NMFS's arbitrary and capricious failure to consider noise from tugs under each of these statutes

does not constitute a minor technicality warranting departure from the presumptive remedy of vacatur.

First, the Court held that NMFS's ITRs issued under the MMPA are arbitrary and capricious because the agency disregarded takes from tugs. ECF No. 73 at 27–28. In so holding, the Court noted that "[i]t appears clear from this record that tugs towing the drill rig are quite likely to subject Cook Inlet beluga whales to sound in excess of the 120 dB Level B harassment threshold and therefore cause take within the meaning of the MMPA," *id.* at 21, and highlighted that NMFS has elsewhere explicitly recognized the significant threat tugs pose to belugas. *Id.* at 22. The Court also clarified that NMFS's error in disregarding noise from tugs requires the agency to revisit "whether any additional mitigation measures for tugs towing the drill rig are necessary to comport with the MMPA's least practicable adverse impact requirements." *Id.* at 33.

These are substantial errors. The MMPA's requirements that NMFS ensure a "specified activity" will take of only "small numbers" of marine mammals and have no more than a "negligible impact" on the species to be taken, along with its command that NMFS prescribe measures to ensure "the least practicable adverse impact," are critical to achieving the statute's primary purpose of protecting and maintaining healthy populations of marine mammals. *See, e.g.*, 16 U.S.C. §§ 1361(1), (6), 1371(a), 1372(a), 1362(8); *Kokechik Fishermen's Ass'n*, 839 F.2d at 800, 802. Accordingly, if an activity will have more than a negligible impact on the species to be taken, or will take more than a small number of marine mammals, NMFS cannot authorize the activity. *See Nat. Res. Def.*

*Council v. Evans*, 232 F. Supp. 2d 1003, 1025 (N.D. Cal. 2002) (citing legislative history). Nor can NMFS authorize an activity without first "prescrib[ing] regulations to achieve the 'least practicable adverse impact.'" *Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1134 (9th Cir. 2016).

Without considering take from tugs, NMFS cannot ensure Hilcorp's activities will satisfy any of these key statutory standards. In conducting its negligible impact determination, for example, NMFS must assess the impacts of take from the "specified activity" as a whole. *See, e.g.*, *Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1221 (D. Haw. 2015) (NMFS can only authorize "the incidental . . . taking . . . of . . . marine mammals of a species or population stock if [NMFS] . . . finds that the *total of such taking* . . . will have a negligible impact on such species or stock.") (citing 16 U.S.C. § 1371(a)(5)(A)(i)). Here, the "specified activity" is Hilcorp's oil and gas program in the Inlet, *see, e.g.*, 50 C.F.R. § 217.160, which includes tugs towing rigs. PR1_MMPA 002253–54 (Final Rule). Accordingly, the MMPA requires NMFS to consider whether takes from tugboat noise—along with all of Hilcorp's other oil and gas activities in Cook Inlet—are "likely to[] adversely affect the species . . . through effects on annual rates of recruitment or survival." *See* 50 C.F.R. § 216.103 (defining negligible impact); *see also* PR1_MMPA 002261 (Final Rule in which NMFS acknowledges that it must "make its required determinations at the specified activities level").

Additionally, in making its small numbers finding, NMFS looks at "the numbers

of individuals taken relative to the stock or population abundance." *See* PR1_MMPA

002269 (Final Rule describing approach to small numbers analysis). To make a proper

finding, NMFS must therefore consider *all* the take that could occur from *all* sources.

Similarly, to ensure its regulations satisfy "the least practicable adverse impact" standard,

NMFS must also consider all sources of take.

Yet NMFS did not do so. NMFS's failure to comply with these three distinct

requirements of the MMPA by considering all the relevant sources of take is a serious,

non-trivial error. *See, e.g.*, *Friends of Alaska Nat'l Wildlife Refuges v. Bernhardt*, 381 F.

Supp. 3d 1127, 1143 (D. Alaska 2019) (finding "serious errors" warranting vacatur where

agency failed to provide a "reasoned explanation" for its decision in the context of a

policy change). To cure these errors, NMFS must conduct a new small numbers finding,

a new negligible impact determination, and a new analysis of what mitigation measures

are necessary to ensure the least practicable adverse impact.

Second, NMFS's failure to consider noise from tugs permeates its ESA

determination, and the Court held that "the BiOp is inadequate." ECF No. 73 at 41.

NMFS "disregarded the very real possibility that beluga whales would be subjected to

high levels of sound from the tugboats that could cause adverse effects." *Id.* at 38. The

Court concluded that NMFS's ESA determination was "not supported by the record" and

consequently was arbitrary and capricious. ECF No. 73 at 39; *id.* at 41 (directing NMFS

on remand to also include tugs in its consideration of the project's cumulative effects).

There is little question that failure to comply with the ESA's consultation

mandates is a serious error of law. The ESA's consultation requirement is how agencies carry out the ESA's substantive mandate to protect endangered species from jeopardy and adverse modification to their critical habitat. *See* 50 C.F.R. §§ 402.12–402.17; *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985) ("[T]he strict substantive provisions of the ESA justify *more* stringent enforcement of its procedural requirements, because the procedural requirements are designed to ensure compliance with the substantive provisions."). Section 7 is the very "heart" of the ESA for federal agencies, *Cal ex. rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009), and NMFS's violation cuts to the core of the statute.

In other words, NMFS's ESA violations are substantial errors, not "mere technical or procedural formalities that the [agency] can easily cure." *Klamath-Siskiyou*, 109 F. Supp. 3d at 1244. In *Klamath-Siskiyou*, the court provided as one example of the seriousness of NMFS's errors its failure to consider the short-term impacts of issuing an incidental take permit on threatened coho salmon. *Id.* Here, NMFS committed similar errors in failing to consider a category of impacts on the endangered Cook Inlet beluga whale. The proper remedy for these ESA violations, as in *Klamath-Siskiyou*, is vacatur of the ITRs and Biological Opinion.

NMFS must issue a new biological opinion that properly considers the effects of the five years of activities authorized by the ITRs added to the cumulative effects. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g). NMFS must consider the aggregate effects of the multiple noise sources from Hilcorp's activities, including tugs, together with other

stressors that threaten this species. *See, e.g.*, 50 C.F.R. § 402.14(g)(4) (NMFS must

"[a]dd the effects of the action and cumulative effects to the environmental baseline.");

*see also Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 736 (9th

Cir. 2017) (the ESA "requires agencies to rigorously ensure that their actions will not 'tip

[] species from a state of precarious survival into a state of likely extinction.'") (citation

omitted). Such analysis is especially important here where "the additive effects of

multiple noise sources, as well as the combination of noise and other stressors, are of

particular concern" for this highly endangered species. PR1_KeyRef 003230 (Recovery

Plan). The Court "cannot simply accept defendants' reassurances that they can readily

cure these errors" and forego vacatur. *Klamath-Siskiyou*, 109 F. Supp. 3d at 1245.

Third, NMFS's violations of NEPA are serious and require the agency to re-assess

the environmental consequences of its action, including tug noise impacts to Cook Inlet

belugas, in a new analysis. *See, e.g.*, *California v. Bernhardt*, 472 F. Supp. 3d at 630

("Vacatur is the standard remedy under the APA and NEPA if a court determines that an

agency action is unlawful."); *Pub. Emps. for Env'tl Resp. v. U.S. Fish & Wildlife Serv.*,

189 F. Supp. 3d 1, 2–3 (D.D.C. 2016) (finding that "[a] review of NEPA cases in this

district bears out the primacy of vacatur to remedy NEPA violations."). The Court held

that NMFS's Environmental Assessment "fail[ed] to provide reasoned support for [its]

determination that Hilcorp's tug operations will not significantly impact the

environment," ECF No. 73 at 46, and concluded that the agency had not taken the

requisite "hard look" at the effects of tugs on Cook Inlet beluga whales. *Id.* at 47.

This requisite "hard look" is an integral part of NEPA's "action-forcing" procedures. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation omitted); *see also Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir. 2000) ("NEPA's effectiveness depends entirely on involving environmental considerations in the initial decisionmaking process."). To leave a faulty NEPA decision in place while ordering its re-evaluation contradicts NEPA's directive that an agency "look before it leaps" and not engage in post-hoc rationalization of predetermined outcomes. *See, e.g.*, *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) ("[A]llowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA.").

For example, in *Ctr. for Food Safety v. Vilsack*, the court rejected arguments made by the defendants and intervenor-defendant that it should remand an Animal and Plant Health Inspection Service (APHIS) decision without vacatur because the agency's NEPA violations "were not that serious or numerous" and the agency would likely affirm its decision on remand. 734 F. Supp. 2d 948, 953 (N.D. Cal. 2010). In doing so, the court reiterated NEPA's primary purpose to "ensure comprehensive consideration of the environmental consequences of agency action" and expressed concern about the agency's "apparent position that it is merely a matter of time before they reinstate the same . . . decision, or a modified version of this decision, and thus apparent perception that [] conducting the requisite comprehensive review is a mere formality." *Id.*; *see also Se. Alaska Conservation Council*, 468 F. Supp. 3d at 1152 (an agency's failure to take the

"requisite hard look" in a NEPA analysis weighed strongly in favor of vacatur so as not to undermine NEPA's fundamental objectives of careful consideration of impacts and opportunity for public comment).

This Court should similarly reject any request by Defendants to remand the ITRs and Environmental Assessment/Finding of No Significant Impact without vacatur. NMFS's failure to consider the impacts of tug activity permeated the agency's consideration of the direct and cumulative impacts of the ITRs. These deficiencies precluded NMFS from taking the requisite hard look at the full impacts of its action.

In short, NMFS's failure to consider tug noise in its analyses of the impacts and issuance of the ITRs constitutes a fundamental flaw that runs through the agency's decisions under the MMPA, ESA, and NEPA. Vacatur is the only appropriate remedy.

B. The Disruptive Consequences Prong Also Weighs in Favor of Vacatur

The disruptive consequences prong also weighs heavily in favor of vacatur for three primary reasons: (1) the agency will have to issue a new decision on remand; (2) vacatur is the environmentally preferable alternative; and (3) any alleged economic harm from vacatur cannot trump the interests of protecting critically endangered Cook Inlet beluga whales.

First, the agency's MMPA, ESA, and NEPA violations are so serious that NMFS cannot reinstate the exact same ITRs, Biological Opinion, or Environmental Assessment/Finding of No Significant Impact. This should end the Court's remedy inquiry. This is because the disruptive consequences from vacatur are "weighty only

insofar as the agency may be able to rehabilitate its rationale for the regulation." *Ctr. for Food Safety*, 734 F. Supp. 2d at 952 (quoting *Comcast Corp. v. FCC*, 579 F.3d 1, 9 (D.C. Cir. 2009)). In contrast, if "a different result *may* be reached," that undermines any "disruptive consequences of an interim change that may itself be changed" and supports vacatur. *Pollinator Stewardship Council*, 806 F.3d at 532 (emphasis added). That is the case here—any future decision from NMFS will have to include a new small numbers finding, a new negligible impact determination, a new least practicable adverse impact determination, and new ESA and NEPA analyses, all of which must adequately consider tugboat noise and the cumulative impacts. *See supra* pp. 7–14. In other words, NMFS will have to issue new decisions on remand, rendering remand without vacatur inappropriate.

Second, in environmental cases such as this one, it is harm to the environment, not economic impact, that matters for the disruptive consequences analysis. *See Ctr. for Food Safety*, 734 F. Supp. 2d at 953 ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury."); *Nat'l Family Farm Coal.*, 960 F.3d at 1144–45 (courts "consider the extent to which either vacating or leaving the decision in place would risk environmental harm."); *see also Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1243 (D. Colo. 2011) (finding delay and economic impacts of vacatur on state's transportation, energy development, and agriculture projects to be "irrelevant" in an ESA case). For example, in *Pollinator Stewardship Council*, the Ninth Circuit held

that the Environmental Protection Agency's (EPA) approval of the use of an insecticide

was unlawful because the agency failed to properly analyze the impacts of its use on

bees, despite initial studies indicating the insecticide was highly toxic to honey bees. 806

F.3d at 522. The court vacated the agency's approval because "leaving the EPA's

registration of [the insecticide] in place risks more potential environmental harm than

vacating it." *Id.* at 532–33. And it did so without any analysis of the disruptive

consequences. *See id.*; *see also Nat'l Family Farm Coal.*, 960 F.3d at 1145 (vacating

approval of a pesticide despite "adverse impact" on thousands of farmers who had

already bought the pesticides).

The same is true here. Vacating the ITRs, Biological Opinion, and Environmental

Assessment/Finding of No Significant Impact is the environmentally preferable

alternative. This is because Hilcorp will not be able to engage in its exploratory drilling

and other oil and gas activities while the regulations are vacated. *See, e.g.*, ECF No. 16 at

4, 13–14 (Hilcorp's brief in support of intervention); ECF No. 17 at ¶ 14 (declaration of

Hilcorp's Land Manager in support of intervention). In other words, vacating the ITRs

and associated decision documents means that critically endangered Cook Inlet beluga

whales (and other marine mammals) will be protected from the harmful noise pollution

generated by such activities.

Conversely, remanding without vacatur means that the regulations allowing

Hilcorp to harass beluga whales will remain in place and subject these critically

endangered whales to the very impacts that NMFS will be examining on remand. This is

a serious concern, as NMFS has identified reducing human-caused noise pollution as one of the top priorities to save these highly imperiled animals (along with mitigating the cumulative impacts of multiple stressors). *See, e.g.*, PR1_KeyRef 003230 (Recovery Plan).

Given vacatur would protect the environment, allegations of economic harm alone are insufficient to overcome the presumption of vacatur. While some courts have considered economic impacts from vacatur, they have done so in situations where there is first a showing of environmental harm from vacatur. For instance, in *Cal. Cmtys. Against Toxics v. U.S. Env'tl Prot. Agency*, relied on by Hilcorp in its summary judgment briefing, ECF No. 60 at 38, the Ninth Circuit considered the economic impact from vacatur only after determining that vacatur would cause environmental harm by risking blackouts that would necessitate diesel generator use, which in turn would pollute the air. 688 F.3d 989, 992–93 (9th Cir. 2012). Indeed, the Ninth Circuit regularly vacates unlawful agency actions in environmental cases—including those involving oil and gas activities—without any analysis of the economic impact. *See, e.g.*, *Bureau of Land Mgmt.*, 698 F.3d at 1106, 1128 (vacating approval of 670+ mile pipeline); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d at 731, 751 (vacating approval of an oil development project in the Arctic Ocean).

Plaintiffs recognize that the ITRs cover noise-producing activity other than exploratory and developmental drilling activities that can help prevent environmental harm—namely routine pipeline and platform maintenance activities. *See, e.g.*,

PR1_MMPA 002258 (Final Rule stating the elements of these maintenance activities "that could produce underwater noise"). However, this does not change the remedy result. Only a subset of these maintenance activities generate underwater noise. *See id.* To the extent that Hilcorp intends to use any of these noise-generating methods to inspect or repair its platforms or pipelines during the pendency of remand and vacatur, Hilcorp can seek an incidental harassment authorization from NMFS for these limited, routine activities. *See* 16 U.S.C. § 1371(a)(5)(D) (allowing NMFS to authorize "the taking by harassment" of marine mammals incidental to an otherwise lawful activity for up to a one-year period). "The availability of th[is] alternative measure[] counsels in favor of vacatur." *Pub. Emps. for Env'tl Resp.*, 189 F. Supp. 3d at 5 (vacating orders authorizing the killing of double-crested cormorants noting that other means exist to manage cormorant populations, including "through individual predation permits.").[3]

Third, any alleged economic impact from vacatur has even less of a place in the remedy equation here because the agency's legal violations involve critically endangered Cook Inlet beluga whales. As the Supreme Court has made plain, because Congress intended that endangered species conservation be given paramount importance, courts cannot use equities to strike a different balance. *Tenn. Valley Auth.*, 437 U.S. at 194; *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001); *see also*

---

[3] To the extent the Court prefers to allow this limited set of preventative activities to proceed, it may also vacate the ITRs with the exception of take authorized incidental to routine platform and pipeline maintenance.

*Cottonwood Env'tl Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015)

("[C]ourts do not have discretion to balance the parties' competing interests in ESA

cases"). In other words, any alleged financial harm stemming from vacatur simply cannot

override Congress's directive in the ESA that listed species be protected "whatever the

cost." *Tenn. Valley Auth.*, 437 U.S. at 184; *see also Amoco Prod. Co. v. Vill. of Gambell*,

480 U.S. 531, 542–43 (1987) (when remedying the violation of a statute, courts should

vindicate the underlying purposes sought to be served by that statute).

    As such, the Ninth Circuit has declined to vacate actions that violate the ESA only

where vacatur itself could result in harm to endangered species. *See, e.g.*, *Idaho Farm*

*Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995) (declining to vacate a

rule listing a species as endangered under the ESA where doing so would risk the

"potential extinction" of the species); *see also Ctr. for Biological Diversity v. Norton*, 240

F. Supp. 2d 1090, 1109 (D. Ariz. 2003) (holding rule designating critical habitat unlawful

but leaving rule in place during remand).[4]

## CONCLUSION

    For the foregoing reasons, the Court should vacate the ITRs and associated

Biological Opinion and Environmental Assessment/Finding of No Significant Impact.

---

[4] For these reasons, the Court also should reject any attempt by Hilcorp to introduce
extraneous information that it previewed in the parties' Stipulated Motion for Revised
Briefing Schedule, where it expressed its position that it would take the additional time to
develop "informative remedy briefing, which necessarily involves the participation and
coordination of multiple Hilcorp personnel." ECF No. 74 at 3, ¶ 4.

Respectfully submitted this 27th day of April, 2021.

/s/ Kristen Monsell
Kristen Monsell
(CA Bar #304793; *Pro Hac Vice*)

/s/ Julie Teel Simmonds
Julie Teel Simmonds
(CO Bar # 32822; *Pro Hac Vice*)

/s/ Kassia Siegel
Kassia Siegel (AK Bar # 0106044)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiffs Cook Inletkeeper and*
*Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2021, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ *Kristen Monsell*
Kristen Monsell