# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| COOK INLETKEEPER and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>      Plaintiffs,<br><br>      v.<br><br>GINA RAIMONDO, Secretary of Commerce, *et al.*,<br><br>      Defendants,<br><br>      and<br><br>HILCORP ALASKA, LLC, *et al.*,<br><br>      Intervenor-Defendants. | Case No. 3:19-cv-00238-SLG |

## ORDER ON REMEDY

On March 30, 2021, the Court entered an order holding that the Incidental Take Regulations ("ITR"), Biological Opinion ("BiOp"), and Environmental Assessment/Finding of No Significant Impact ("EA/FONSI") relating to Hilcorp Alaska, LLC's oil and gas activities in Cook Inlet over a period of five years violated the Marine Mammal Protection Act ("MMPA"), the Endangered Species Act ("ESA"), and the National Environmental Policy Act ("NEPA"), and were therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law," pursuant to § 706(2)(A) of the Administrative Procedure Act ("APA").[1] Specifically, the Court determined that NMFS's conclusion "that noise from Hilcorp's tugs towing the drill rig would not cause any take by harassment of Cook Inlet beluga whales is arbitrary and capricious . . . , and the agency relied on this erroneous determination in its issuance of the Incidental Take Regulations, the Biological Opinion, and the Environmental Assessment."[2] The Court ordered supplemental briefing regarding the appropriate remedy.[3] The parties have completed that briefing and the issue is now before the Court.[4]

## LEGAL STANDARD

Vacatur is the normal remedy under the APA, which directs reviewing courts to "set aside" unlawful agency action.[5] However, "[a] flawed rule need not be

---

[1] *See generally* Docket 73 (Order).

[2] Docket 73 at 51–52.

[3] Docket 73 at 52.

[4] Federal Defendants' opening brief on the remedy is at Docket 76 and their response at Docket 81. The State of Alaska's (the "State") opening brief on the remedy is at Docket 77 and its response is at Docket 80. Hilcorp Alaska, LLC's ("Hilcorp") opening brief on the remedy is at Docket 78 and its response is at Docket 82. Plaintiffs' opening brief on the remedy is at Docket 79 and their response is at Docket 83. Federal Defendants are Gina Raimondo, in her official capacity as Secretary of Commerce; James Balsiger, in his official capacity as Regional Administrator of the National Marine Fisheries Service; and the National Marine Fisheries Service.

[5] 5 U.S.C. § 706(2)(A); *see also Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to set aside the action. In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." (internal quotation marks and citations omitted), *rev'd on other grounds sub nom.*, *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261 (2009)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 2 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 2 of 18

vacated."[6] Instead, "when equity demands, the regulation can be left in place while the agency follows the necessary procedures" to correct its error.[7] And yet, the Ninth Circuit has explained that remand without vacatur is appropriate "only in 'limited circumstances.'"[8] To determine whether to remand an action without vacatur, a court is to "weigh the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'"[9] "Put differently, 'courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error.'"[10] Partial vacatur is also an acceptable form of relief under the APA.[11]

---

[6] *Cal. Cmties. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) and *W. Oil & Gas Ass'n v. EPA*, 663 F.2d 803, 813 (9th Cir. 1980)).

[7] *Id.* (quoting *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405).

[8] *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmties. Against Toxics*, 688 F.3d at 994).

[9] *Id.* (quoting *Cal. Cmties. Against Toxics*, 688 F.3d at 992).

[10] *AquAlliance v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 881 (E.D. Cal. 2018) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015)).

[11] *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of APHIS's deregulation decision) was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 3 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 3 of 18

**DISCUSSION**

The parties disagree as to whether vacatur is appropriate here. Plaintiffs request complete vacatur of the ITR, BiOp, and EA/FONSI, while the Federal Defendants and Intervenor-Defendants request remand without vacatur.

**A. Seriousness of the Violations**

Plaintiffs assert that NMFS committed substantial errors by failing to consider take from tugs, which in turn affected NMFS's small numbers, negligible impact, and least practicable adverse impact analyses under the MMPA.[12] Plaintiffs also contend that the agency's failure to consider the effects from tug noise "permeates [NMFS's] ESA determination," and that "NMFS must issue a new biological opinion" that considers "the aggregate effects of the multiple noise sources from Hilcorp's activities, including tugs, together with other stressors that threaten this species."[13] Plaintiffs also assert that the EA/FONSI should be vacated, and that "[t]o leave a faulty NEPA decision in place while ordering its re-evaluation contradicts NEPA's directive that an agency 'look before it leaps' and not engage in post-hoc rationalization of predetermined outcomes."[14]

Federal Defendants assert that "[v]acatur of the ITR, BiOp, and EA would be inequitable here where the Court upheld significant parts of NMFS's analysis in

---

[12] Docket 79 at 14–15.

[13] Docket 79 at 16–18.

[14] Docket 79 at 19 (citing *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007)).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 4 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 4 of 18

those documents regarding the impacts of seismic surveys and other of Hilcorp's activities."[15] Federal Defendants maintain that "it is entirely reasonable . . . that NMFS could remedy its analysis under the MMPA, as well as . . . under the ESA and NEPA, with further evaluation and discussion of the potential impact of . . . noise from tugboats towing drill rigs, as well as additional mitigation measures for this activity."[16] Hilcorp adds that remanding without vacatur would present no risk to the Cook Inlet beluga whale because "[t]he Year 3 [Letter of Authorization ("LOA")] activities—including the limited use of towing tugs—will have, at most, a negligible impact on the Cook Inlet beluga whale."[17] In support of this assertion, "Hilcorp has prepared estimates of potential beluga whales exposure to MMPA harassment levels from the rig-towing activity associated" with the Year 3 LOA, which "shows that approximately one beluga whale is predicted to be exposed to sound at Level B harassment levels from the rig-towing activity."[18] Hilcorp also states that it plans to implement numerous mitigation measures focused on the tug boats that will render "the potential for incidental Level B harassment of beluga whales . . . to be at or near zero."[19]

---

[15] Docket 76 at 7.

[16] Docket 76 at 7–8.

[17] Docket 78 at 22.

[18] Docket 78 at 22–23.

[19] Docket 78 at 14–15, 23.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 5 of 18

Plaintiffs respond that "[i]f vacatur could be avoided wherever there is some possibility of reaching the same result, it would virtually never be imposed," thus upending the APA's "presumptive remedy of vacatur."[20] Plaintiffs also rebut Defendants' characterization of the violations as "narrow," stressing that NMFS's error "embodies one of the most significant threats to one of the world's most endangered marine mammals."[21]

In its March 30, 2021 order, this Court concluded that "NMFS failed to provide a reasoned explanation or identify adequate support in the record for its determination that tug noise from Hilcorp's activities would not take beluga whales," an error that was reflected in its ITR, BiOp, and EA/FONSI.[22] NMFS's failure to consider the noise from Hilcorp's tug boats in issuing the ITR is a serious error that is particularly troublesome because Cook Inlet beluga whales are listed as an endangered species and have a declining population despite ongoing efforts, as detailed in that order.[23] Moreover, NMFS's own Recovery Plan for Cook Inlet beluga whales identified noise from tug boats as a major threat to beluga whales,

---

[20] Docket 83 at 7 (emphasis omitted).

[21] Docket 83 at 10.

[22] Docket 73 at 20, 52 (Order).

[23] Docket 73 at 2–3 (Order); *Native Fish Soc. v. NMFS*, Case No. 3:12–CV–00431–HA, 2014 WL 1030479, at *3 (D. Or. March 14, 2014) ("In weighing these [vacatur factors], the court notes that in cases involving listed species, the scales are tipped in favor of the species through the ESA's 'institutionalized caution' mandate.'").

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 6 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 6 of 18

and Hilcorp's tugs were slated to travel through the Cook Inlet beluga whale's critical habitat.[24]

NMFS's errors are distinguishable from the "technical" violation at issue in *National Family Farm Coalition v. U.S. EPA*, cited by Federal Defendants.[25] There, the EPA registered a pesticide to kill weeds on various crops without considering whether its use to kill milkweed targeted by farmers would unreasonably adversely impact monarch butterflies pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"). In litigation, the EPA contended that "it was not required to do so because 'farmers will control the same amount of milkweed on their crops through the use of . . . other means, . . . with or without" the challenged pesticide.[26] "Despite the intuitive appeal of EPA's argument," the Ninth Circuit rejected that justification because the EPA had not invoked that reasoning when it took the challenged action.[27] Nonetheless, the Ninth Circuit remanded without vacatur, holding that the error was not serious, "especially in light of EPA's full compliance with the ESA and substantial compliance with FIFRA."[28] The court additionally reasoned that "given the technical nature of EPA's error, EPA will

---

[24] PR1_KeyRef 003211 (Recovery Plan); PR1_ESA 000206 (BiOp).

[25] Docket 81 at 5 (citing 966 F.3d 893 (9th Cir. 2020)).

[26] 966 F.3d at 917.

[27] *Id.*

[28] *Id.* at 929.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 7 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 7 of 18

'likely be able to offer better reasoning' and 'adopt the same rule on remand.'"[29] The same is not true here. While it is possible that NMFS may reach the same conclusion regarding the effects of tugs towing the drill rig, NMFS has not offered convincing reasoning for its determination that Hilcorp's tugs would not cause any take.[30] NMFS may well need to require additional mitigation measures for authorized tug activities in order to meet its statutory obligations. Thus, it does not appear "likely," as opposed to possible, that NMFS will produce the exact same determinations on remand. Moreover, NMFS violated several statutes, whereas the agency in *National Family Farm Coalition* only violated one statute that it otherwise substantially complied with.[31] As such, the seriousness of NMFS's violations weighs toward vacatur of the ITR, BiOp, and EA/FONSI.

However, while NMFS's error permeated each of the challenged documents, it pertained only to a limited set of activities authorized in the ITR. For example, the error did not affect Hilcorp's seismic operations; indeed, the Court specifically

---

[29] *Id.* at 929 (citing *Pollinator Stewardship Council*, 806 F.3d at 532); *see also Native Fish Soc.*, 2014 WL 1030479, at *3 (finding agency error in approving Hatchery Genetic Management Plans not serious because "[w]hile NMFS failed to adequately explain its decisions, it appears that the agency's predictions largely proved correct" but also that "the agency's approval of a ten percent stray rate based on the genetic similarity of hatchery and wild fish" was not minor because "[a]lthough it is possible that the fish are no more than moderately genetically divergent, the court has not seen a convincing explanation for that premise").

[30] Hilcorp itself has estimated that its tug operations will take Cook Inlet belugas in the absence of mitigation measures. PR1_MMPA 001462 (Petition for ITR) ("Using the Goetz model, the estimated Level B exposures is . . . 15 animals associated with the tugs towing the rig to the Trading Bay wells.").

[31] 966 F.3d at 929.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 8 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 8 of 18

upheld the mitigation measures required in the ITR for seismic surveys.[32] Thus, while the violations are serious, they are also limited in scope. This is distinguishable from the errors in *Klamath-Siskiyou Wildlands Center v. NOAA*, cited by Plaintiffs, that were central to the agency's analyses.[33] The agency errors there involved "the very factors FWS chose to use as the basis for its conservation-value calculation" and the agency "failed to perform a cumulative impacts analysis . . . of its proposed actions in three different areas" as required by NEPA.[34] In contrast, NMFS's errors here affect only a discrete set of tug operations. Plaintiffs correctly point out that on remand, further analysis of the effects of Hilcorp's tug operations may affect NMFS's evaluation of the aggregate effects of Hilcorp's activities as a whole and whether those activities as a whole will have a negligible impact. In the interim, the Court finds that the nature of NMFS's violations does not warrant the complete vacatur of the ITR, BiOp, and EA/FONSI.

## B. Disruptive Consequences

Plaintiffs assert that "disruptive consequences from vacatur are 'weighty only insofar as the agency may be able to rehabilitate its rationale for the regulation,'" which they contend NMFS will not be able to do given the seriousness

---

[32] Docket 73 at 31–33 (Order).

[33] Docket 79 at 17 (citing 109 F. Supp. 3d 1238).

[34] 109 F. Supp. 3d at 1244–45.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 9 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 9 of 18

of the violations.[35] Plaintiffs also maintain that "in environmental cases such as this one, it is harm to the environment, not economic impact, that matters for the disruptive consequences analysis," and maintain that vacatur "is the environmentally preferable alternative" in this case.[36] Relatedly, Plaintiffs contend that "because Congress intended that endangered species conservation be given paramount importance, courts cannot use equities to strike a different balance" as is the case here where the endangered Cook Inlet beluga whales are impacted.[37]

Hilcorp asserts that "partial or full vacatur will have inequitable and highly disruptive consequences."[38] It stresses that vacating the ITR and associated ESA and NEPA documents would "effectively prevent Hilcorp from undertaking any activities for which incidental take is authorized under the ITR."[39] Hilcorp maintains that this "would be a particularly unfair result for activities that have no relation to the error identified by the Court."[40] Additionally, Hilcorp contends that "partial or

---

[35] Docket 79 at 20–21 (quoting *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 952 (N.D. Cal. 2010)).

[36] Docket 79 at 21–22 (citing *Ctr. for Food Safety*, 734 F. Supp. 2d at 953; *Nat'l Family Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1144–45 (9th Cir. 2020); and *Ctr. for Native Ecosystems v. Salazar*, 795 F. Supp. 2d 1236, 1243 (D. Colo. 2011)).

[37] Docket 79 at 24–25 (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001); and *Cottonwood Env'tl Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015)).

[38] Docket 78 at 18.

[39] Docket 78 at 18–19.

[40] Docket 78 at 19.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 10 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 10 of 18

full vacatur would present significant risks to human health and environmental integrity, and the reliability of the energy supplied by Cook Inlet" by preventing "planned activities covered by the Year 3 LOA," such as routine maintenance and well decommissioning.[41] The State adds that it has ordered Hilcorp to plug and abandon a well, and that further delay would "create[] a considerably higher likelihood that hydrocarbons from that well will migrate into other strata or to the surface."[42] The State also asserts that revenue streams from oil and gas leasing, development, royalties, and taxes contribute as much as "80% of the State's general fund unrestricted revenue" in a given year, and that vacating the entire ITR would cause "[f]uture investors [to be] far less likely to participate" in future lease sales, thereby economically harming the State.[43]

The Court finds that the disruptive consequences of vacatur weigh against complete vacatur of the ITR, BiOp, and EA/FONSI. Vacating the entire ITR would foreclose Hilcorp's planned platform and pipeline maintenance activities, thereby impacting the safety and reliability of Hilcorp's oil and gas production, which provides approximately 20% of the natural gas needs of Southcentral Alaska.[44] While Plaintiffs contend that the primary consequences to be considered when

---

[41] Docket 78 at 19.

[42] Docket 80 at 11–12 (internal quotation omitted).

[43] Docket 77 at 13–14.

[44] Docket 78-1 at 12, ¶ 27 (Decl. of Amy Peloza).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 11 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 11 of 18

assessing the disruptive impact of vacatur are environmental harms, the Ninth Circuit has explicitly considered the economic consequences of vacatur where vacatur would halt a "billion-dollar venture employing 350 workers."[45] Moreover, Hilcorp's planned maintenance activities do not involve tug boats towing drill rigs and thus are not directly implicated in the Court's order granting partial summary judgment.[46]

Apart from economic consequences, complete vacatur here could potentially cause "harmful environmental consequences."[47] Prohibiting pipeline and platform maintenance would increase the risk of an oil or gas leak in Cook Inlet.[48] And vacating the ITR with respect to the well decommissioning activity planned for June 2021 increases the risks that "hydrocarbons will migrate into other strata or to the surface."[49] Plaintiffs note that the well abandonment work has already been delayed from the original completion date of 2018; but that fact does not negate the risk posed by further delay of the project.[50] Moreover, the risks posed to beluga whales by allowing the use of tugs for the well abandonment

---

[45] *Cal. Cmties. Against Toxics*, 688 F.3d at 994.

[46] *See generally* Docket 73 (Order).

[47] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1022 (E.D. Cal. 2013) (leaving invalid rule in place where it was environmentally preferable to vacatur).

[48] Docket 78-1 at 12, ¶ 27 (Decl. of Amy Peloza).

[49] Docket 80 at 11 (internal quotation marks omitted).

[50] Docket 78-1 at 13, ¶ 30 (Decl. of Amy Peloza).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 12 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 12 of 18

will be tempered by Hilcorp's proposed mitigation measures. Those measures resemble or exceed the measures included in a biological opinion for similar oil and gas activities that Plaintiffs described as a "careful analysis" of the effects of tug noise, and that found the effects of tug noise discountable with those mitigation measures.[51]

Plaintiffs suggest that any disruptive consequences could be avoided by Hilcorp seeking a one-year Incidental Harassment Authorization ("IHA") for the activities that do not involve tugs towing a rig.[52] However, as Hilcorp and NMFS point out, IHAs require notice-and-comment rulemaking and would not be a practicable solution for the maintenance and well decommissioning activities planned for this summer.[53] For the foregoing reasons, the Court will not order vacatur of the ITR, BiOp, and EA/FONSI with respect to Hilcorp's planned maintenance and well decommissioning activities.

Hilcorp also plans to drill two production wells in the North Cook Inlet Unit at the Tyonek Platform this summer, which would require the use of tugs towing a

---

[51] *Compare* AKR1001398–403 (mitigation measures for Furie offshore drilling in Cook Inlet) *with* Docket 78 at 14–15 (Hilcorp's proposed mitigation measures); AKR1001467 (analysis of effects of tug noise for Furie offshore drilling in Cook Inlet) (finding that "[w]ith the addition of PSOs and mitigation measures to reduce noise propagation, we consider the likelihood of exposure to towing operations from Nikiski to be extremely unlikely to occur and therefore discountable"); Docket 84 at 3 (transcript of oral argument); Docket 64 at 12. AKR refers to the administrative record lodged by Federal Defendants. *See* Docket 40 (Notice of Lodging of Administrative Record).

[52] Docket 79 at 24.

[53] Docket 82 at 12–13; Docket 81 at 8. .

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 13 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 13 of 18

drill rig. Hilcorp contends that "this activity is not covered by the ITR because production drilling . . . does not create sound at levels with the potential for marine mammal incidental take."[54] Therefore, according to Hilcorp, "[a]n order vacating the ITR would have no direct consequence for Hilcorp's planned drilling" because "the ITR does not authorize any incidental harassment for production drilling and it is not a covered activity under either the ITR or Year 3 LOA."[55] The Court disagrees; the specified activities in the ITR are "Hilcorp's oil and gas activities" that "occur[] within the action area defined in Cook Inlet, Alaska."[56] This plainly includes production drilling at the Tyonek Platform. Moreover, in its ITR, NMFS specifically noted that some production wells "do not have drill rigs, and the use of a mobile drill rig is required."[57] Thus, NMFS's determination that "take is unlikely to occur" from tugs towing the drill rig plainly applies to the use of tugs in production drilling. That determination was deemed arbitrary and capricious in the Court's March 30, 2021 order.[58] The Court did not exclude NMFS's determination as to certain tugs; instead, the order applies to all of Hilcorp's tug operations during the five-year period specified in the ITR. The Court therefore rejects Hilcorp's view

---

[54] Docket 78 at 7 n.6.

[55] Docket 78 at 21 n. 51.

[56] 50 C.F.R. § 217.160.

[57] PR1_MMPA 2258.

[58] *See* Docket 73 at 52 (Order).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 14 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 14 of 18

that towing the drill rig to and from the Tyonek Platform or other production locations is not covered in the ITR nor subject to the Court's March 30, 2021 order. As such, NMFS's determination regarding that activity is subject to vacatur the same as NMFS's determination regarding the use of tugs for exploration activities.

Turning to the disruptive consequences of vacatur, Hilcorp recognizes that tugs towing the drill rig to and from the Tyonek Platform for production drilling could potentially cause take of Cook Inlet beluga whales.[59] But due to the proximity of the Tyonek Platform to the well slated for decommissioning, Hilcorp states that this activity "will require tugs to tow the drill rig used for the abandonment activities approximately one-half mile to the drill site for the two production wells."[60] In addition, Hilcorp indicates that the tugs would not stay at the platform during the several months of production drilling.[61] Instead, the tugs would need to travel to the Tyonek Platform to retrieve the drill rig when the production drilling is completed in the fall. However, the record indicates that tugs not under load generate far less noise than tugs towing a drill rig.[62] Moreover, Hilcorp towing the drill rig approximately one-half mile to the Tyonek Platform for production activities

---

[59] Docket 78 at 12.

[60] Docket 78 at 12.

[61] Docket 78-1 at 9–10, ¶¶ 22–23 (Decl. of Amy Peloza) ("The tugs are under contract to Hilcorp only at the times when they are towing the jack-up rig.").

[62] AKR1001398 (Furie BiOp) (exclusion zone for tugs not under load is 100 meters but 2,200 meters for tugs towing the rig); *compare* AKR1001467 (Furie BiOp) *with* PR1_ESA 175 (BiOp) (basing 2,154-meter Level B isopleth on same tug noise study).

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 15 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 15 of 18

this summer means the drill rig would only make the 40-mile round-trip Nikiski to the North Cook Inlet Unit once rather than twice, thus eliminating Hilcorp's need to seek take authorization for up to 80 additional miles of transit for tugs towing the rig to undertake this production drilling at some future time.[63] As such, vacatur of the ITR to prohibit this particular production activity would pose more of a risk of incidental take than leaving this portion of the agency's rule intact. Therefore, while the Court's March 30, 2021 order applies to the use of tugs towing the drill rig in connection with production activities, the Court will not vacate the ITR and associated documents as to the Tyonek platform production drilling scheduled for 2021.[64]

The Court finds that a vacatur of the ITR, BiOp, and EA/FONSI that is limited to tugs towing the drill rigs is appropriately tailored relief that addresses the environmental harms potentially caused by NMFS's specific violations while avoiding the unnecessary and potentially severe consequences that would be caused by complete vacatur. Therefore, the Court will order a partial vacatur that applies to Hilcorp's use of tugs towing drilling rigs in connection with all exploratory

---

[63] Towing the drill rig from the plugged well to the Tyonek Platform would only add approximately .6 miles of tug transit while towing because the drill rig would presumably still need to return from the North Cook Inlet Unit to the Rig Tender's Yard in Nikiski in the absence of production drilling, a distance of approximately 40 miles. *See* Docket 78-1 at 8, ¶ 19 (Decl. of Amy Peloza) (explaining that the tugs would pick the rig up from the Rig Tenders Yard in Nikiski to transport it to the North Cook Inlet Unit well plugging and abandonment site).

[64] *See Pac. Rivers Council*, 942 F. Supp. 2d at 1022.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 16 of 18
Case 3:19-cv-00238-SLG   Document 85   Filed 05/27/21   Page 16 of 18

activities and in connection with tugs towing drilling rigs to all production activities apart from the 2021 production drilling at the Tyonek Platform.

## C. Remand Deadline

Lastly, Hilcorp requests that the Court impose time limitations on remand and require regular status updates. As Plaintiffs have noted, remand may well affect a variety of NMFS's analyses throughout each of the challenged documents. On remand, NMFS should have the time reasonably necessary for a thorough analysis addressing the errors in its ITR, BiOp, and EA/FONSI.[65] The Court therefore declines to impose such requirements.

## CONCLUSION

In light of the foregoing, IT IS ORDERED that the Incidental Take Regulations, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact are:

- VACATED as to Hilcorp's use of tugs towing a drill rig in connection with exploratory well drilling;[66]

---

[65] *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 605–06 (9th Cir. 2014) ("Deadlines become a substantive constraint on what an agency can reasonably do. In this case, the FWS not only had to write and compile the report—a substantial task in and of itself—but was under pressure to, among other things, produce a reliable population estimate of the delta smelt. Such scientific tasks may not be as well suited to deadlines as producing written copy; the final product will necessarily reflect the time allotted to the agency." (citation omitted)).

[66] Hilcorp states that it has no plans for this exploratory drilling until 2023. Docket 78 at 6–9.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 17 of 18
Case 3:19-cv-00238-SLG Document 85 Filed 05/27/21 Page 17 of 18

- REMANDED WITHOUT VACATUR as to production drilling in 2021 at the Tyonek Platform, provided that the drill rig is towed a distance of no more than one mile to the platform from the well being decommissioned;

- VACATED as to Hilcorp's use of tugs towing the drill rig in connection with all other production well drilling; and

- REMANDED WITHOUT VACATUR as to all other Hilcorp activities governed by the ITR.

IT IS FURTHER ORDERED that Hilcorp shall implement all of the mitigation measures outlined in its opening brief while engaging in well plugging and abandonment in the North Cook Inlet Unit authorized in the Year 3 Letter of Authorization and while engaging in production drilling at the Tyonek Platform.[67]

The Clerk of Court shall enter a final judgment accordingly.

DATED this 27th day of May, 2021 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

---

[67] Docket 78 at 14–15.

Case No. 3:19-cv-00238-SLG, *Cook Inletkeeper, et al. v. Raimondo, et al.*
Order on Remedy
Page 18 of 18
Case 3:19-cv-00238-SLG  Document 85  Filed 05/27/21  Page 18 of 18